

# BETSY COMBIER
315 East 65th Street, Apt. 4C
New York, N.Y. 10065
917-596-1762
Betsy.combier@gmail.com

May 2, 2018

<u>VIA FEDEX</u>

Hon. Chief Magistrate Judge Roanne Mann
United States Federal Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201



United States Federal Court
Eastern District of New York
Pro Se Desk
225 Cadman Plaza East
Brooklyn, N.Y. 11201

Lucio Celli
2743 Seymour Avenue
Bronx, N.Y. 10469

RE: Combier v. Portelos, et. al.
Docket No.: 1:17-CV-02239

Submission of Recent Information About Defendants' Misconduct and
Third Letter Motion to Seal or Redact Documents Submitted by Lucio Celli

Dear Chief Magistrate Judge Mann,

With all due respect I submit herein my request, made previously to a limited extent to the Hon. Judge Margo Brodie, to seal the papers on the docket of the case captioned above already submitted by Lucio Celli and any papers submitted by him in the future. Defendant Celli's claims are false, defamatory, perjurious and must not be permitted public exposure due to their permanent harm for me, the Plaintiff, and my husband.

None of Defendant's documents have anything relevant or material to present to this Court other than show his malice and intent to destroy Plaintiff's life and career, as well as that of her husband. He is continuing his defamation in support of Defendant Portelos by pursuing his destruction in this Court, on the Docket sheet.

I would like to refer once again to the Federal Rules of Civil Procedure Rule 5.2(e):

1

"(e) PROTECTIVE ORDERS. For good cause, the court may by order in a case:

(1) require redaction of additional information; or

(2) limit or prohibit a nonparty's remote electronic access to a document filed with the court."

The documents attached to this letter in EXHIBIT A show that Defendant Celli's claims, made in all of his papers, are false, and constitute violations of my Constitutional Rights to life, liberty, and property. He is wildly out of control, and there is no person of any authority who has been able to limit his destruction, or, for that matter, has tried to do so, and this empowers Defendant Celli to multiply his damages to me.

Defendant Celli gleefully litters this case's docket sheet with lies in pursuit of total destruction of my life and career, as well as the life and career of my husband. His modus operandi is to litter the Court and use the allegations as facts which will then be posted on Defendant Portelos' websites as proof of his claims that I am a criminal, a thief and just trash, as Celli says "Evil, fucking cunt". I have no access to any of their online sites, and therefore whatever they say is the "truth" as they know it. This is far from the truth.

Defendant Celli will not redact or remove anything from the docket as ordered to by Judge Brodie, as he has no interest in following any order from this Court. One of his documents, on the docket sheet #44, is under consideration by you for your Recommendation on dismissal of my case. I pray that you accept my third plea to seal Defendant Celli's papers, or delete mention of my body parts and the name and place of work of my husband. The Pro Se desk told me that a Pro Se Defendants cannot remove any document from the docket to redact it, and Defendant Celli benefits from leaving his lies for the public to see, as this is how he wins - and I lose - my case. He, and Defendants Portelos, Glass, and Harlow are laughing all the way to the bank, since the lies being told in Celli's documents are about to be made "facts" as they are spread all over the internet.

I never told Defendant Celli's former Attorney Jonathan Tand to place Celli's HIV+ status in his Federal lawsuit. The email I received from Attorney Tand is Attached (EX. A1-2). Also in EX. A:

I am not Peter Zucker, as Defendant Celli claims, and yes, Mr. Celli threatened Laurie Luft after she asked him why he was attacking me. I have never assumed a false identity for email anonymity. I never attacked or in any way belittled Mavis Shein at any time. I was never censured and prevented from participating as a paralegal or assistant at 3020-a hearings. I am not Peter Zucker, I never stole anything from anyone, I never claimed I was an Attorney, never gave anyone "legal advice" as an attorney or in any way practiced law without a license. This case is about four angry men who believe that

I need to be destroyed in order for them to succeed in their endeavors to represent all people, whether they be teachers, parents, or other. I am in their way as a person who has 14 years of experience listening to harmed souls, and trying to help these souls heal, as a person who cares. I never had any interest whatsoever in harming the business of Glass and Harlow, or interfering with the group UFT Solidarity, until they became a mob.

Cell's claim is that I stole my husband's account at his workplace in order to look up cases to use against Mr. Celli on PACER and Westlaw is absolutely defamatory and unprotected. Thus the claims of immunity pursuant to New York Common Law or Section 74 of the New York Civil Rights Law (see p. 8) made by Mr. Celli in Docket sheet #44 are invalid. I pay for my PACER account, don't use (or know if the College has) Westlaw, I have a subscription to various online legal services, and go often to the law libraries around the city where access is free to anyone who researches the law.

More worrisome is the way he uses his lies to further the defamation he so tenaciously holds on to, above all law and/or facts. He wants to be fired so he can sue for damages claiming discrimination for being HIV+ and gay. Celli wants to be fired and receive disability income.

I filed an Affidavit in this Court which states that I have never used nor "stole" my husband's account at his workplace, yet Celli does not stop his malicious destruction of my life. He did not "agree" with my statement, so he went to the Office of General Counsel at my husband's workplace, and told them his "facts" which are all completely false (See p. 2 of the email sent to Maura King, EXHIBIT A, attached). Maura King sent me all of his emails after I sent her a FOIL of his FOIL. Ms. King responded to Celli's FOIL request of my husband's internet account and his alleged "theft" by sending Celli the College Internet Policy, that is all she had because Celli made up everything else. She did not send any information or documents on my husband and my stealing from the College or New York State, because we never did anything that Mr. Celli claims. We are completely innocent of all charges. Defendant Celli called her a liar and went to New York State with his outrageous lies.

I never "stole" anything from him, and never claimed I was an attorney or gave legal advice. Yet he and Francesco Portelos went to the District Attorney and Portelos, Glass and Harlow urged Jim Geist to file a police complaint against me in New Jersey knowing that the claims made were false.

Defendant Celli's claim that I deleted or in any way altered the audiotapes, which I paid Ubiqus to transcribe and which I submitted to this Court, is an absolute lie. I don't have any way to alter an audiotape, and Ubiqus certified the transcripts. The name of Cathy Battle on both tapes may have been an error, she may be only on one tape, but I wrote the Court and all Defendants about that. There is only one voice that should be heard as relevant to my case presented here, and that is the voice of Lucio Celli. He taped his own hearings, and I have submitted here the certified transcripts of his tapes, unaltered.

I paid the fees. Why Lucio Celli would tape himself lying to the hearing officer and then send the audiotape to approximately 200 people by email is beyond comprehension, so I wont try, but this court now has this proof of lies made by Defendant Celli.

Defendant Celli sent many audiotapes out to more than 200 people on his self-created email list of every person who worked in politics, for newspaper, the UFT, or the Department starting in 2014, or maybe prior to that date. The two audiotapes that he claims I altered before submitting the transcripts he, Defendant Celli, sent out. I did not alter or create these audiotapes. I paid Ubiqus to transcribe the audiotapes as he sent out, and Ubiqus is a professional organization. They certified the transcript. Celli's claims are extremely outrageous. I cannot even imagine what his next fantasy will be.

The strategy of Defendants is to use the docket sheet to pursue the defamation and malicious prosecution of me and my work by littering the docket sheet with perjurious statements designed to be used later as "proof" of my misconduct.

An example is:

Defendants contacted my sister in Paris, France. Jill Danger, an alcoholic, beat our mother up from the time she was 8 years old, and tied her to chairs. Jill threw our mother to the floor in August 1997, and our mom was afraid of her, and wrote her out of her will in 1997 several months before she died, in her sleep, as a result of her fall at Jill's hands. Jill filed a lawsuit against me saying I stole money from the Trust fund at Banker's Trust. I wrote the Opposition papers and won complete dismissal in the Supreme Court and the Appellate division. But indeed I was not successful in getting back the momentos of my mom's apartment stolen by Jill and her attorney on July 28, 1998. This case is all described in detail on my blogs and websites:

**Without a Prayer For Relief: The NY State Supreme Court is Bought By Guide One Insurance Company and a Church, Madison Avenue Presbyterian**

http://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=7177

and

**RICO in the New York State Unified Court System: How the Courts Steal Your Property, Your Children, and Try To Destroy Your Life...And How You Can Stop Them**

http://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=7661

The real story does not matter, as the docket shows, with the wild accusations of Celli that no judge could possibly steal my mom's ashes. What matters is that Defendants submitted here an email from Jill Danger saying bizarre things, and this will be posted on Defendant Portelos' websites as the "truth" because he blocked me from ever answering or posting any answer on his webpages.

But that's not all. Francesco Portelos and Lucio Celli threaten anyone who may not believe them, or support me or any of my friends. In the attached documents in EX. B are text messages to K.I., a former tenant in one of Defendant Portelos' slumlord

buildings in Staten Island. I posted K.I.'s distress  in emails to Portelos on my blog, and Defendant called up K.I.'s wife and threatened her, then sent text messages to K.I. telling him that he better get his emails off of my blog because I am "unstable". K.I. called me and was very upset with Defendant Portelos for threatening his wife, and he sent me the text messages. See the attached. I suggested that K.I. go to the police, but he was too afraid.

And then there is my dear friend Laurie Luft, a former ATR like Defendants Portelos and Celli. She has been a close friend for 10 years. She opposed Defendants Portelos and Celli, then suddenly became the target of their wrath. Defendant Portelos sent an email to everyone on his email list giving them all of Laurie's confidential medical disability. When other people got upset with Defendants Portelos started a separate ATR group to get away from Laurie and her "mental madness". Defendants told all members that they had to choose Laurie or them, and it better not be Laurie.

Defendant Portelos believes that he can do anything to attack, harass, and undermine co-workers, principals, or people who don't work for the Department (like me), because he is immune to prosecution, as long as he is a "good" teacher. This is what my case is all about. Mr. Portelos gives this made up immunity to anyone who joins his efforts to attack and harm anyone else outside of their teaching duties. Yet in the decision by Arbitrator Busto (attached here as EX C) she states that Respondent Portelos is guilty of misconduct for "making the Department of Education look bad" and harassing others at the school, IS 49. These charges could easily lead to termination, and do terminate "good" teachers. Bryan Glass' former client Christine Rubino/Krystyne Dorto (she changed her name) was terminated for posting a comment on facebook and trying to get a friend to be held accountable, exactly what Defendant Portelos is doing. I have many other 3020-a decisions where "good" teachers were terminated for sending mass emails, threatening people, getting arrested, and many other non-Department lawless acts.

In 2012, Richard Candia filed a police complaint against Francesco Portelos after Portelos hacked into Candia's email, attacked his girlfriend, and stalked him. These events evidently began after Mr. Candia wrote a statement about Defendant Portelos (EX. B3). Immediately following his being found guilty of harassing people, unprofessional conduct and other, Defendant Portelos created his mobbing group UFT Solidarity, and started the website "Don't Tread on Me" and the A.N.O.I. List where anyone can post anything about any administrator. To say that this is defamatory stuff is, in my opinion, an understatement. The comments on his websites are racist, unprofessional and unproven, but the Department is looking the other way. Portelos is destabilizing the Department under the color of freedom of speech. He is challenging the warning of Busto every day, hoping to show his "power" and "influence" while getting everyone else in trouble.

EX. C is the paperwork with the substantiated charge against Francesco Portelos for exposing the private information of a student at DeWitt Clinton High School. While the

NYC Department of Education through the Office of Special Investigations found Portelos guilty of this FERPA violation, there was a delay in the finding, so the Department could not put the misconduct letter into Portelos' file. So, e was not charged with 3020-a. Portelos then sued the Department for claiming that he did something wrong, and gave himself immunity. Surprisingly, he used the letter denying him representation by the city in THIS case. Please see the letter from Corporation Counsel Neil Giovanatti to Defendant Portelos, filed in the papers Portelos filed in his lawsuit against the Department for claiming he was guilty of a FERPA violation.

Ex. D shows the win that I and Attorney Jonathan Behrins received for my client Rosalie Cardinale, where I used the material that Defendant Portelos hacked from my blog NYC Rubber Room Reporter in July 2016. On March 29, 2018 Judge Desmond Green in Richmond County Supreme Court declared the 3020-a hearing for teacher Rosalie Cardinale was a nullity because there was no vote in an Executive Session of the Panel For Educational Policy. Rosalie is the client of me and Attorney Jonathan Behrins. I contributed my information on the procedures used at 3020-a in New York City, the very same material that Bryan Glass and Jordan Harlow belittled me for since 2015, and that Francesco Portelos hacked into my blog and stole without my consent or any recognition, when he created his "UFT Solidarity 3020-a Guide" upon which this lawsuit is based. Jonathan and I have been working together for more than two years, and he issued a press release which is attached in EX. D. I also included my post about this case.

Shockingly, Defendants Glass and Harlow are now using my work in their cases presented to Federal and Supreme Courts. For example: Defendant Portelos ran for UFT President and lost, and one of the members of his slate, John Silvers, was just charged and terminated at 3020-a.

Did Defendant Portelos help his former slate member? No. But Defendant Glass and Harlow are defending Silvers in his Article 75 Appeal, and Glass has put in that Petition the case I and Attorney Jonathan Behrins just won for Rosalie, as if Bryan Glass believed in it all along.

On Friday April 27, 2018, I walked into 131 Livingston Street to do an Impartial hearing for a client, and I was stopped at the door. The security guard told me that I had to see Mr. Bernard Palmer on the 5th Floor. I went to see Mr. Palmer, a person I have known for many years since I started defending parents at impartial Hearings in 1999. He told me that there was a teacher in the rubber room on the 2nd floor who claimed that I was soliciting clients and he was going to bar me from the building. He told me that Francesco Portelos told the teacher that I should not be charging anything and cannot speak with teachers. I am a Parent Advocate, very well-known in the 131 Livingston building, for defending parents at Impartial Hearings, and if it weren't for a close friend of mine who works in that building who stopped Mr. Palmer, my advocacy would have stopped. Palmer evidently sent out an email to the UFT, Tweed, 65 Court Street, and "everywhere", he claimed, with the statement of the teacher acting in unison with

Francesco Portelos. He took the notice posted all over the building, down on May 1, 2018, after talking with me and hearing from my friend. It is obvious to many people working inside and outside of the Department that teacher discipline procedures are in disarray, are random and arbitrary. Defendants Portelos and Celli are getting away with their unprofessional, lawless conduct by each giving themselves immunity.

Where does all of this end?

CONCLUSION: I respectfully ask that my body parts and my husbands name, trashed and lied about in Lucio Celli's papers, be removed or redacted from the docket of this case by the Court, and any further submissions by Lucio Celli or Francesco Portelos with either my body parts or my husband's name be prohibited, and that this Court give me any other remedies that are just and fair.

Dated: May 2, 2018

*Elizabeth Combier*

Elizabeth Combier

# RE: Statements made by Lucio Celli to Federal Judge Brodie

Inbox x



**Betsy Combier <betsy.combier@gmail.com>**                    Apr 11, 2018,
                                                                1:57 PM

to Jonathan, me

Dear Mr. Tand,

Your former client Lucio Celli has submitted more than 20 motions to USDC Judge Brodie in the case I filed against him and Francesco Portelos in April 2017.

Several of Celli's papers contain the following statement:

**Please Take Notice:** On or around May 16, 2016, Jonathan Tand, Esq. told Lucio that is was Betsy's idea to get Lucio to place HIV status on his complaint so that she could post it on her website

Please email me no later than friday April 13, 2018, as to the truth or lie of this statement and any or all of your statements which I believe are false and defamatory.

If I do not hear from you on or before April 13, 2018, I will pursue all my legal options which include going to the Bar Association.

Thank you for your assistance and attention.



**Jonathan Tand <jtand@jtandlaw.com>**                         Apr 11, 2018,
                                                                2:21 PM

to me

Betsy,

That is blatantly false and you know it. The only things I knew about your relationship with Lucio was you two had some feud going which I told the both of you I wanted no part of.  The statement you sent me was ridiculous as the HIV part of his complaint was drafted and submitted by the Morelli firm before I even met Mr. Celli.  Furthermore, I have not spoken to Mr. Celli since I ended my representation of him.

You know full well I do not discuss any cases with you other than a few acknowledgements that I am representing certain people.  Please consider the source of these allegations before sending threat letters to me and wasting my time on this nonsense as I do not take these things lightly.

Sincerely,

#2

Jonathan A. Tand, Esq.
Tand & Associates
1025 Old Country Road, Suite 314
Westbury, New York 11590
www.tandandassociates.com
(516) 393 9151

## *Please be advised that our office is temporarily located in Suite 320*

ATTORNEY WORK PRODUCT - PRIVILEGED & CONFIDENTIAL
The information contained in this message from Tand & Associates and any attachments are confidential
and intended only for the named recipient(s).  If you have received this message in error, you are prohibited
from copying, distributing or using the information.  Please contact the sender immediately by return e-mail and
delete the original message and attachments.

Under U.S. Treasury regulations, we are required to inform you that any advice contained in this e-mail or
any attachment hereto is not intended to be used, and cannot be used, to avoid penalties imposed under the
Internal Revenue Code.

A3



*Office of Legal Affairs*

Lucio Celli

enzo0mad@me.com

February 14, 2018

Dear Mr. Celli

This letter is written in response to the records request you made to Hunter College (the "College") via email dated January 20, 2018 pursuant to the New York Freedom of Information Law ("FOIL"). Specifically you requested records of Mr. David Kapel's use of the subscription programs of Pacer, LexisNexus and Westlaw; personal information on Mr. Kaplan and Hunter Computer Usage Policy.

The College has conducted a comprehensive search and has located the attached document responsive to Request # 3.  Documents in response to Request #1, #2 and #10 would invade another's personal privacy and are therefor exempt from FOIL.  There are no records indicating logins to the systems and therefor there are no records to provide in response to Request # 4, Request #6, Request #8 and Request # 9.  The College does not have a subscription to Pacer and therefor there are no documents in response to Request #5, Request # 7 and Request #9.

If you disagree with this decision, you can appeal to the General Counsel and Vice Chancellor for Legal Affairs at the CUNY Central Office located at 205 East 42nd Street, New York, NY 10017.

Sincerely,

Maura A. King

Maura A. King

A4

## Foil Response

Maura King

**Sent:** Tuesday, February 13, 2018 10:34 AM
**To:** enzo0mad@aol.com
**Attachments:** ComputerUsePolicy.pdf (102 KB)

---

Good Morning

This is in response to your request for records.

FOIL applies to existing records and does not require agencies to create new records in response to requests for information.

Attached are the documents which are responsive to your request.

Regards,

Maura A. King
Office of Legal Affairs
Hunter College

A5

| | |
|---|---|
| **From:** | Fernanda celli |
| **To:** | Maura King |
| **Cc:** | Laura S Hertzog; Melissa Gonzalez; robert.freeman@dos.ny.gov |
| **Subject:** | Re: Appeal |
| **Date:** | Thursday, February 15, 2018 1:50:43 PM |

Does the person have a name and/or email

On Feb 15, 2018, at 1:48 PM, Maura King <mk3273@hunter.cuny.edu> wrote:

Good Afternoon-

As stated in the information provided to you yesterday, if you disagree with the decision, you can appeal to the General Counsel and Sr. Vice President Chancellor for Legal Affairs at the CUNY Central Office located at 205 East 42nd Street, New York, NY 10017.

---

**From:** Fernanda celli [enzo0mad@me.com]
**Sent:** Tuesday, February 13, 2018 11:50 AM
**To:** Laura S Hertzog; Maura King
**Cc:** Melissa Gonzalez; robert.freeman@dos.ny.gov
**Subject:** Appeal

Dear **Custodian of Records**:

I hereby appeal the denial of access regarding my request—it was more of a lack of acknowledgement, which was made on February 13, 2018. If Ms. Hertzog is not the person to appeal this matter, please provide me with the person's name because I have 30 days. Plus, I was not given a FOIL number by the agency

The only part of my request that was acknowledged was Hunter's internet policy. However, Hunter and CUNY maintains a list of what information is maintained by Hunter College and CUNY. According to Maura King, Hunter College is lying to the public about the information it maintains because it does not have any records of what Lucio asked on the list. Ms. King told me the lie over the phone and I am famous for audio recording conversation.

The list is here http://www2.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/communications-marketing/foil/subjectmatterslistFOIL.pdf. I do not understand if the list provides the information maintained by Hunter College and CUNY that Ms. King could say, without violating her code of ethics, Hunter College does not maintain documents stated it maintains...maybe it is only me, but I smell a liar.

I thought the list provides the public with an idea with what it available

to the public. I have to accept if the agency has a reason for denial but lying to the petitioner that documents do not exist when the list from Hunter and CUNY says it maintains.

I even provided what section it came from like (CIS-11):

Please be advised that the Committee on Open Government has emphasized that FOIL is meant to be a tool that enables the public to seek existing records. OASAS is not required to respond to questions, as FOIL is a vehicle for requesting existing records. *See* Committee on Open Government FOIL-AO-18795 (2012) ("FOIL pertains to existing records and states, in general, that an agency need not create a record in response to a request for information; it may choose to do so, but is not required to do so. Similarly, nothing in FOIL requires an agency to supply information in response to questions.").

I cc'ed Robert Freeman


Below the line is the original request:

_____

Under the **New York Freedom of Information Law, N.Y. Pub. Off. Law sec. 84 et seq.,** I am requesting an opportunity to inspect or obtain copies of public records:

**David Kapel (who is an electrician for Hunter College (30-plus years) from his Linkedin profile) and runs a Krypton Electric where he rents out** "Electrical Equipment and sells Supplies or provides the service of electrician for those who hire him. The store is in his apartment who he shares with Elizabeth Combier-Kapel at 315 E 65TH ST NEW YORK, NY 10065. David's wife runs a paralegal service at the same address and according to Ms. Combier, she uses her husband's Hunter College's password to access Westlaw and pacer to use in her business as a paralegal, advocate, and post many decisions on her various websites from

1. **David Kapel's Internal Information Records (CIS-11):**

2. Does David Kapel work a daytime or night shift

3. Internet Policy for Hunter College employees for acceptable usage, especially can spouses (who are not employees) use employees' passwords to log into databases paid by Hunter College

4. David Kapel's User Account Records (CIS-30), especially any logins to pacer, LexNexus, Westlaw, etc with dates, times, and IP addresses (from 2007 to present)

5. David Kapel's user account for pacer.gov with researches for "Lucio Celli" with dates, times, and IP addresses (from 2007 to present)

6. David Kapel's Computer report (CIS-33), especial any logins to pacer, LexNexus, Westlaw, etc with dates, times, and IP addresses (from 2007 to present)

A7

7. David Kapel's Computer report (CIS-33), especial logins to pacer with the search "Lucio Celli with dates, times, and IP addresses (from 2007 to present)

8. David Kapel's Network Usage Report (CIS-41), especially any logins to pacer, LexNexus, Westlaw, etc with dates, times, and IP addresses (from 2007 to present)

9. David Kapel's Network Usage Report (CIS-41), especially any logins to pacer with researches "Lucio Celli" and with dates, times, and IP addresses (from 2007 to present)

10. David Kapel's Personnel File

11. If there is a pattern of accessing pacer or Westlaw by David Kapel's account, I would like to be the one who files with NYS' Ethics board—I beg for this pleasure.

12. How to file a complaint for illegal use of the computer

Ms. Combier used pacer to place Lucio's HIV status to unjustly enrich her business with unauthorized accessed to databases paid for with public funds.

Ms. Combier uses pacer with Westlaw (and others) to enrich her business as she provides paralegal services and does research for her clients.

Private firms pay for their own pacer, Westlaw, etc accounts and, I believe, Betsy needs to pay for her own and needs to repay for unauthorized access to Hunter College because David Kapel is an electrician who installs lightbulbs and does not provide case laws to his clients or prepare legal documents, like Ms. Combier.

The New York Freedom of Information Law requires a response time of five business days. If access to the records I am requesting will take longer than this amount of time, please contact me with information about when I might expect copies or the ability to inspect the requested records.

If you deny any or all of this request, please cite each specific exemption you feel justifies the refusal to release the information and notify me of the appeal procedures available to me under the law.

Thank you for considering my request.

**Peter Zucker**
April 2 at 9:08pm · Yonkers

A8

What say you group? Is Lucio trying to extort Randi in these comments?

•ıll AT&T  LTE                    **8:58 PM**                    **✳** 25% ▭

<                                                                (i)

Lucio

press send ... it captures what the

# I hope Randi gets mad

# She retaliates

Today 5:50 PM

# tell your Grand Leech, i will stop if i can get out 75% pay on mental disability from the DoE .... this way it is a win/win I don't see the DoE and they dont see me... leaving the DoE is a win

# Or i keep it up until i get justice

 **Gmail**

Betsy Combier <betsy.combier@gmail.com>

---

### Re: Laurie luft
2 messages

**gilpp celli** <celliglipp@gmail.com>　　　　　　　　　　　　　　　　　　　　　　Sat, Feb 27, 2016 at 8:13 PM
To: Francesco Portelos <mrportelos@gmail.com>, rweingar@aft.org, Steve Morelli <smorelli@smorellilaw.com>
Cc: Betsy Combier <betsy.combier@gmail.com>, johnathan hinesley <jhinesley@optonline.net>, Claudia F Giordano <cfgiordano@gmail.com>, Lydia Ann
<lydia.howrilka@gmail.com>

Only you could have put Laurie up to what she's done or tell her about me calling you a cunt

I also have what Laurie has done to other people to harass them because of their association with Francesco

I didn't share the name or the screen shot but I want people see what I gathered

Laurie Kessler Luft
What I hear you saying is that since your abuser did not abuse me personally then he is not really an abuser.
Does that mean that my principal is not an abuser since she didnt abuse you??
and that even she can come on your show and talk about being abused by her boss?

Person.....

Have you lobbied in Albany,,,have you spent hundreds of thousands in court trying to expose this..have you lost your entire career for 30 years because you reported non
compliance with a law that is FUNDED just not enforced...I am TRYING to do the right thing....it may not be what you think is the right thing and that is ok...you do what
you have to do to expose this and I will what I have to do..I feel like you are harassing and bullying me know PLEASE refrain from contacting me any further..

Laurie Kessler Luft
you are in denial and yes i have lost my career and spend thousands.

Person harassed by Laurie...
PLEASE DO NOT CONTACT ME..

Laurie Kessler Luft
u asked to join my group
u contacted me
you are in denial and im telling u the truth
denial
denial
denial
denial
Sent from my iPhone

On Feb 27, 2016, at 7:54 PM, gilpp celli <celliglipp@gmail.com> wrote:

> Dear Evil Ms. Combier:
>
> Laurie carried out her threat against me! She presented that I hated women like she wrote to me....
>
> I even have serval different privates messages where she tells people my name— I promised not to name them. I love my mother, my aunts, my female
> cousins and female friends, and I will never use the word cunt to describe an honorable lady. HOWEVER, you are not an honorable lady because you're an
> evil cunt. Yet, my mother and aunts maybe uneducated, but they are not in anyway a bitch, cunt or evil, like yourself. You are an educated woman, but YOU,
> Betsy Combier, are an evil cunt.
>
> Unlike like you, I was honest when a few people asked me about Laurie's post—I will go to my grave with integrity, but I hope my recordings of you will ruin
> yours. Calling you a fucking evil cunt is not the same as hating women. I have you stating your knowledge of libelous statements and the emails
>
> I don't even hate you, but I do dislike liars like yourself. Grow up and now I truly have the evidence that shows that you're a bully and the mafia (as you wrote
> in your post) --dumb ass
>
> Please sue me because I want the judge to hear the legal advice that you gave me. In addition, please stop having people harass me..... That is all
> documented too
>
> It is funny that you did not tell anyone how you disturbed Mavis Shien as her mother passed away.  I am glad that I recorded you being a liar and a wretched
> human being
>
> I still have that one recording that will put you to shame...I haven't told anyone what it is about
> <image1.PNG><image2.PNG>
>
> Sent from my iPhone
>
> On Feb 27, 2016, at 3:51 PM, gilpp celli <celliglipp@gmail.com> wrote:
>
>> Again... Stop having people contact me on your behalf!
>>
>> You said that you'd sue me..., go ahead! I want you to sue, evil Combier! I want to press play for the judge, please sue me!!
>> Again, this is part of what you wrote about in your blog ... "Bulling and the mafia"
>>
>> Please, do not tell people that I call all women "cunts" but I did called you, Betsy Combier, an evil cunt-- tell your friends that I am thankful for
>> their harassment on your behalf. They are not the same statement but you're a liar, vicious, mean, evil, bitter old woman that creates stories to

A10

make herself look good
<image1.PNG>

Sent from my iPhone

On Feb 26, 2016, at 9:34 PM, gilpp celli <celliglipp@gmail.com> wrote:

> And I'll use what you've done though other people too ... They were dumb to tell me and it's documented
>
> Sent from my iPhone
>
> On Feb 26, 2016, at 9:33 PM, gilpp celli <celliglipp@gmail.com> wrote:
>
>> I want press play for a judge or the cops-- your choice really.
>>
>> I want the world to hear the real Betsy Combier
>>
>> Come on bitch
>>
>> Sent from my iPhone
>>
>> On Feb 26, 2016, at 8:01 PM, gilpp celli <celliglipp@gmail.com> wrote:
>>
>>> Dear Evil Combier:
>>>
>>> What is it going to take for you to sue me? I WANT a judge to hear you give me legal advice... Ok evil bitch
>>>
>>> I want the world to know that you like to lie!
>>> I want the world to know that you threatened anyone that supported Francesco
>>> I want the world to hear what type of evil fucking cunt you are to annoy Mavis Shein as her mother passed away
>>>
>>> Mostly, I want the judge to hear the legal advice. Hurry up evil bitch
>>>
>>> Sent from my iPhone
>>>
>>> On Jan 24, 2016, at 9:54 AM, Francesco Portelos <mrportelos@gmail.com> wrote:
>>>
>>>> Many are reporting the ill politics in Laurie's group. It's more about Laurie than it is about ATR issues. Good job Betsy. How's business?
>>>>
>>>> Francesco A. Portelos
>>>> Educator
>>>> www.EducatorFightsBack.org
>>>>
>>>> UFT Presidential Candidate 2016
>>>> www.UFT2016.com
>>>>
>>>> UFT Solidarity Caucus
>>>> www.UFTsolidarity.org
>>>>
>>>> Don't Tread on Educators
>>>> www.DTOE.org
>>>>
>>>> ATR Alliance
>>>> www.atralliance.org
>>>>
>>>> www.mrportelos.com
>>>>
>>>> "The foundation of every state is the education of its youth." -
>>>>
>>>> Greek Philosopher Diogenes
>>>>
>>>> On Jan 23, 2016 2:22 PM, "gilpp celli" <celliglipp@gmail.com> wrote:
>>>>> Fran,
>>>>>
>>>>> I was thrown out of ATR support group because of Betsy. Someone showed me the messages. Betsy didn't say how she owes me money, lied to my lawyer, libelous statements in her blog, etc
>>>>>
>>>>> Another harm
>>>>>
>>>>> Sent from my iPhone
>>>>>
>>>>> On Jan 23, 2016, at 11:50 AM, gilpp celli <celliglipp@gmail.com> wrote:
>>>>>
>>>>>> You don't want people posting the truth
>>>>>> <image1.PNG>
>>>>>> Sent from my iPhone
>>>>>>
>>>>>> On Jan 23, 2016, at 5:17 AM, gilpp celli <celliglipp@gmail.com> wrote:

A11

 **Gmail**               **Betsy Combier <betsy.combier@gmail.com>**

---

## audio tapes from Betsy Combier

3 messages

---

**Betsy Combier** <betsy.combier@gmail.com>        Tue, Mar 6, 2018 at 4:48 PM
Reply-To: betsy.combier@gmail.com
To: wclark@ubiqus.com, Betsy Combier <betsy.combier@gmail.com>

Please see the attached

--
Betsy Combier
betsy.combier@gmail.com
ADVOCATZ
parentadvocates.org
NYC Rubber Room Reporter
National Public Voice
NYC Public Voice
New York Court Corruption

   Virus-free. www.avast.com

---

🎵 **Opening.MP3**
9885K

---

**Betsy Combier** <betsy.combier@gmail.com>        Tue, Mar 6, 2018 at 4:50 PM
Reply-To: betsy.combier@gmail.com
To: Betsy Combier <betsy.combier@gmail.com>, wclark@ubiqus.com

Please see attached

--
Betsy Combier
betsy.combier@gmail.com
ADVOCATZ
parentadvocates.org
NYC Rubber Room Reporter
National Public Voice
NYC Public Voice
New York Court Corruption

   Virus-free. www.avast.com

---

📄 **Nov_2_grievance.mp4**
3615K

---

**Wayde Clark** <wclark@ubiqus.com>        Tue, Mar 6, 2018 at 5:10 PM
To: betsy.combier@gmail.com

Cc: mmurray@ubiqus.com

A~12

Good day Betsy,

I have received 2 emails from you, one with a 10 MB file titled "Opening.MP3" and a 4MB file titled "Nov_2_grievance".

The speaker ID's we have are

Male Voice– Lucio Celli

Female Voice 1 – Kathy Battle

And you are looking for a turnaround dead line of EOD Friday. There may be a third file we will transcribe but that will be decided after the conference call at 5PM.

I also have Monique Murray, who is actually your account manager and who moving forward will be able to assist you in this transcription process. Monique has been brought up to speed on what is happening and she has the files that are needed to be transcribed.

**Take care,**

**Wayde Clark**

**Account Manager, Transcription Division**

D: 212.346.6640 | E: wclark@ubiqus.com

61 Broadway | Suite 1400 | New York, NY 10006

# [ubiᴏus]

www.ubiqus.com

ISO 9001:2008 certified

Stay connected!



 Gmail

Betsy Combier <betsy.combier@gmail.com>

---

## Transcription, Audiorecording, Translation Services/Your Estimate
1 message

---

**mmurray@ubiqus.com** <mmurray@ubiqus.com>
To: betsy.combier@gmail.com

Tue, Mar 6, 2018 at 5:49 PM

Dear Betsy,

Thank you for considering Ubiqus for your transcription needs. I am sending herewith out an estimate for the certified transcription of your 2 audio recordings of conversations with Lucio Celli.

I also have attached a credit card authorization form. If you want to use the Amex on file expiring 07/20, then you do not have to fill out the authorizationg form again.

Let me know how you would like to proceed.

Have a great day!

Yours sincerely,

Monique Murray
Account Manager
Transcription Division
[ubiqus]
Direct: 212-346-6644
Fax: 888-412-3655
mmurray@ubiqus.com
www.ubiqus.com

CONFIDENTIALITY NOTICE - The information contained in this message and any accompanying documents may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

---

**2 attachments**


**estimate.pdf**
98K

**Credit Card Authorization Form - Documents.pdf**
50K

Ex B.1

# New York City Police Department
## Omniform System - Complaints

| Report Cmd: 120 | Jurisdiction: N.Y. POLICE DEPT | Record Status: Final, No Arrests | | Complaint #: 2012-120-03733 |
|---|---|---|---|---|

**Occurrence Location:** INSIDE OF 101 WARREN STREET

Name Of Premise:

    Premises Type: PUBLIC SCHOOL

Location Within Premise:

    Visible By Patrol?: NO

Precinct: 120
Sector: C
Beat:
Post:

**Occurrence From:** 2012-03-27 12:55 TUESDAY

Occurrence thru:

    Reported: 2012-03-28   14:20

Complaint Received: WALK-IN

Aided #
Accident #
O.C.C.B. #

**Classification:** HARASSMENT

Attempted/Completed: COMPLETED

Most Serious Offense Is: VIOLATION

    PD Code: 638  HARASSMENT,SUBD 3

    PL Section: 24026

    Keycode: 678  HARRASSMENT 2

**Case Status:** CLOSED

Unit Referred To:

Clearance Code: PATROL

Log/Case #: 0

File #: 51

Prints Requested? NO

| Is This Related To Stop And Frisk Report NO | SQF Number: 0000-000-00000 | Was The Victim's Personal Information Taken Or Possessed? NO | Was The Victim's Personal Information Used To Commit A Crime? NO |
|---|---|---|---|
| Gang Related? NO | OCCB FOD Log #: | Name Of Gang: | Child Abuse Suspected? NO |
| DIR Required? NO | | Child In Common? NO | Intimate Relationship? NO |

| If Burglary: | Alarm: | If Arson: | Taxi Robbery: |
|---|---|---|---|
| Forced Entry? | Bypassed? | Structure: | Partition Present: |
| Structure: | Comp Responded?: | Occupied?: | Amber Stress Light Activated: |
| Entry Method: | Company Name/Phone: | Damage by: | Method of Conveyance: |
| Entry Location: | Crime Prevention Survey Requested?: | | Location of Pickup: |
| | Complaint/Reporter Present?: | | |

| Supervisor On Scene - Rank / Name / Command : | Canvas Conducted: NO | Translator(if used): |
|---|---|---|

**NARRATIVE:**
AT T/P/O, C/V(SCHOOL TEACHER AT LISTED SCHOOL) STATES ABOVE LISTED PERP, ALSO A SCHOOL TEACHER, HAS BEEN FOLLOWING HIM ABOUT, THROUGHOUT THE SCHOOL, CAUSING ANNOYANCE AND ALARM. PERP ALSO HACKED INTO C/V'S EMAIL WITHOUT PERMISSION OR AUTHORITY TO DO SO. C/V IS IN FEAR FOR HIS SAFETY.

**N.Y.C. DEPARTMENT OF EDUCATION SCHOOLS:**

On School Property?: YES

During School Hours?: Travelling?: NO

Complaint # 2012-120-03733

School Sponsored Event?: NO

School Safety Division Operations Control #: 99999

Victim Type: TEACHER

Type Of School: I.S

School Number: 49

School Name: IS 49

Exact Location On School Property: ON SCHOOL GROUNDS

**No NYC TRANSIT Data for Complaint # 2012-120-03733**

| Total Victims: 1 | Total Witnesses: 0 | Total Reporters: 0 | Total Wanted: 1 |
|---|---|---|---|

| VICTIM: # 1 of 1 | Name: CANDIA,RICHARD | Complaint#: 2012-120-03733 |
|---|---|---|

Nick/AKA/Maiden:

    UMOS: NO

    Sex/Type: MALE

    Race: WHITE

    Age: 46

    Date Of Birth:

    Disabled? NO

Gang/Crew Affiliation: NO

    Name:

    Identifiers:

Ex. B2

Complaint# 2012-120-03733                                                                    Page 2 of 3

| | |
|---|---|
| Is this person not Proficient in English?: | Will View Photo: YES |
| If Yes, indicate Language: | Will Prosecute: YES |
| N.Y.C.H.A Resident? NO | Notified Of Crime Victim Comp. Law: NO |
| Is Victim fearful for their safety / life? | |
| Escalating violence / abuse by suspect? | |
| Were prior DIR's prepared for C/V? | |

| LOCATION | ADDRESS | CITY | STATE/COUNTRY | ZIP | APT/ROOM |
|---|---|---|---|---|---|
| HOME | ▮▮▮▮▮ | ▮▮▮▮ | ▮ | ▮▮▮ | |

| Phone #: |
|---|

| Action against Victim: | Actions Of Victim Prior To Incident: AT SCHOOL |
|---|---|
| Victim Of Similar Incident: NO | If Yes, When And Where |

## WANTED: # 1 of 1

**Name:** PORTELOS, FRANCESCO                      **Complaint#:** 2012-120-03733

| | | |
|---|---|---|
| Nick/AKA/Maiden: | Height: 5FT11IN | Order Of Protection: NO |
| Sex: MALE | Weight: 165 | Issuing Court: |
| Race: WHITE | Eye Color: BROWN | Docket #: |
| Age: 33 | Hair Color: BROWN | Expiration Date: |
| Date Of Birth: UNKNOWN | Hair Length: BALD | Order of Protection Violated? |
| U.S. Citizen: | Hair Style: UNKNOWN | Does Suspect abuse Drugs / Alcohol? |
| Place Of Birth: | Skin Tone: UNKN | |
| Is this person not Proficient in English?: NO | Complexion: UNKNOWN | Suspect threatened /attempted suicide? |
| If Yes, indicate Language: | | Is the suspect Parole / Probation? |
| Accent: NO | S.S. #: 0 | Relation to Victim: CO-WORKER |
| | | Living together: NO |
| | | Can be identified: YES |

| Gang/Crew Affiliation: NO |
|---|
| Name: |
| Identifiers: |

| LOCATION | ADDRESS | CITY | STATE/COUNTRY | ZIP | APT/ROOM | HOW LONG? | RES. PCT |
|---|---|---|---|---|---|---|---|
| HOME-PERMANENT | 101 WARREN STREET | STATEN ISLAND | NEW YORK | 10304 | | | |

| Phone #: |
|---|

| N.Y.C.H.A. Resident: NO | N.Y.C. Housing Employee: | On Duty: |
|---|---|---|
| Development: | N.Y.C. Transit Employee: | |

| Physical Force: NONE |
|---|

| Weapons: |
|---|

| Gun: | | |
|---|---|---|
| Weapon Used/Possessed: NONE | Make: | Recovered: |
| Non-Firearm Weapon: | Caliber: | Serial Number Defaced: |
| Other Weapon Description: | Color: | Serial Number: |
| | Type: | |
| | Other/Gun Specify: | |
| | Discharged: NO | |

| Used Transit System: |
|---|
| Station Entered: |
| Time Entered: |
| Metro Card Type: |
| Metro Card Used/Posess: |
| Card #: |

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | UNK |
| CLOTHING | ACCESSORIES -UNK -UNKNOWN COLOR |
| CLOTHING | FOOTWEAR -UNK -UNKNOWN COLOR |

Insert Fax This Way   Do not send cover sheets
Do not write on back   Do not send multiple sheets at one time

3376506

**New York City Department of Education**
**WRITTEN STATEMENT FORM**
FAX completed forms to  (718) 935-5860
ATS: CENTRAL\MSchemitsch

| NAME | GENDER |
|---|---|
| Rich Candia | M |

| STATUS | DATE OF BIRTH | |
|---|---|---|
| Science Teacher | 6/26/65 | |

**STATEMENT**

Over recent weeks, I have witnessed Francesco Portelos harrassing and taunting Susanne Abramowitz. On Thursday, January 26th, I was asked to mediate this ongoing dispute. As we were in Room 131 at approximately 7:30am, Francesco Portelos became enraged and started waving and flailing his arms in Susanne's Face. He began yelling and called Susanne "a fuck". As a result of his tirade, I saw papers fly onto the floor. Francesco stormed out of the room and then entered Room 129. He began yelling at the group of teachers during their inquiry meeting and demanded to know whether Susanne polled them on the issue of dissolving academies. He clearly disrupted this meeting by yelling + screaming. He continues to display erratic, unpredictable and unprofessional behavior.

**PREPARATION STATEMENT**

Statement by: Richard Candia   Signature: Richard Candia

Date: 1/27/12   Telephone Number:

Form Revision Date 7/26/200

FILED: RICHMOND COUNTY CLERK 05/13/2014
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 05/13/2014



**nysut**
*A Union of Professionals*

**Office of General Counsel**
Richard E. Casagrande
*General Counsel*

**Albany**

**James D. Bilik**
*Assistant General Counsel*

**Robert T. Reilly**
*Associate General Counsel*

**Michael S. Travinski**
*Associate General Counsel*

**New York**

**Claude I. Hersh**
*Assistant General Counsel*

**Lena M. Ackerman**
*Associate General Counsel*

ATTORNEY-CLIENT COMMUNICATION/
PRIVILEGED AND CONFIDENTIAL

May 2, 2014

*Via First Class Mail and Email*

Mr. Franceso Portelos
52 Wiman Place
Staten Island, NY 10305

Re:    **Portelos, Franceso advs. New York City Board of Education**
       **Our File No.: 256996-T240**

Dear Mr. Portelos:

Enclosed is a copy of Hearing Officer Felico Busto's decision, dated April 30, 2014 and received by this office on May 2, 2014. By this decision, the Hearing Officer has found you guilty of certain specifications charged. As a penalty, Arbitrator Busto has imposed a ten thousand dollar ($10,000.00) fine, which will be deducted in equal installments from your pay over the course of eighteen months.

You have **ten (10)** days from receipt of the decision by this office from the State Education Department (May 2, 2014) in which to appeal the Opinion and Award. After reviewing Ms. Busto's decision, this office has determined that there are no grounds in which to appeal and will not be appealing his decision. You, of course, have every right to appeal the decision on your own, if this is your desire. Below I have highlighted the circumstances by which a Hearing Officer's decision can be vacated.

Pursuant to CPLR 7511(b), an award can be vacated if the court finds that the rights of the party were prejudiced by: (1) corruption, fraud or misconduct in procuring the award; (2) partiality of an arbitrator appointed as a neutral; (3) an arbitrator exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made; or (4) failure to follow the procedure of this article. Put more succinctly by the Court of Appeals, vacatur may be warranted if an arbitration award violates "strong public policy, is irrational, or clearly exceeds a specifically enumerated limitation on the arbitrator's powers." *Mtr. of N.Y. State Correctional Officers and PBA, Inc. v. State of New York*, 94 N.Y. 2d 321 (1999); *Board of Educ., v. Arlington Teachers Assn.*, 78 N.Y. 2d 33 (1991).

NYCLegal:165609

52 Broadway, 9th Floor ■ New York, N.Y. 10004 ■ (212) 533-6300
New York State United Teachers
Affiliated with • AFT • NEA • AFL-CIO

Mr. Franceso Portelos
May 2, 2014
Page 2

      Once a party has participated in a hearing, courts are prohibited from passing upon the merits of the arbitrated dispute, the arbitrator's assessment of the evidence or the fashioning of the remedy, or from substituting their judgment for that of the arbitrator. *Town of Haverstraw v. Rockland County Patrolmen's Benevolent Ass'n.*, 65 N.Y.2d 677 (1985); *Albany County Sheriff's Local v. County of Albany,* 63 N.Y.2d 654 (1984); *Silverman v. Benmore Coats*, 61 N.Y.2d 299 (1984); *Rochester C.S.D. v. Rochester Teachers Ass'n.*, 41 N.Y.2d 578 (1977).

      An award challenged on the statutory ground that the arbitrator "exceeded his power" will only be set aside if it is "totally irrational." *Local Division 1179, Amalgamated Transit Union, AFL-CIO v. Green Bus Lines, Inc.*, 50 N.Y.2d 1007, 1009 (1980); *Mtr of National Cash Register Co. v. Wilson,* 8 N.Y.2d 377, 383 (1960). Even in circumstances where an arbitrator makes errors of law or fact, the courts will not interfere and assume the role of overseers. In fact, the arbitrator ordinarily is not bound by provisions of substantive law or rules of evidence. *Silverman v. Benmore Coats, supra*; *Sprinzen v. Nomberg,* 46 N.Y.2d 623. Vacatur cannot lie where there exists a rational basis for the arbitrator's award, even if the arbitrator's conclusion is contrary to one that a court may have reached. *Dutchess Building Renovations, Inc. v. Immerblum,* 198 A.D.2d at 414; *East Ramapo Teachers Ass'n. v. East Ramapo C.S.D.,* 191 A.D.2d at 697 (citing *Maross Construction v. Central N.Y. Regional Transp. Auth.,* 66 N.Y.2d 341, 346 [1986]).

      As such, should you wish to appeal the award you must bring a proceeding within **ten (10)** days of receipt of the decision directly from the Commissioner of Education.

      If you have any questions or concerns, please feel free to contact me.

                        Very truly yours,

                        RICHARD E. CASAGRANDE

By:

                        CHRISTOPHER M. CALLAGY
                        Of Counsel

CMC/kt
Enc.

C:     mrportelos@gmail.com

NYCLegal:165609

**NEW YORK STATE EDUCATION DEPARTMENT**
**UNIVERSITY OF THE STATE OF NEW YORK**

In the Matter of

**NEW YORK CITY DEPARTMENT OF EDUCATION,**

     "Complainant,"                    SED File No. 22,380

     - v. -

**FRANCESCO PORTELOS,**                 **OPINION**
                                       **AND**
     "Respondent,"                **AWARD**

Pursuant to Education Law § 3020-a.

Before **Felice Busto**, Hearing Officer

**Appearances:**

For the Department:
Courtenaye Jackson-Chase, Esq. General Counsel to the Chancellor
   Jordana Shenkman, Esq.
   Frances Hopson, Esq.

For the Respondent:
Richard E. Casagrande, Esq., General Counsel, NYSUT
   Christopher Callagy, Esq., Of Counsel

## PROCEDURAL HISTORY

Pursuant to Section 3020-a of the New York State Education Law, Charges were preferred by the Department of Education of the City School District of the City of New York ("Department" or "DOE") against tenured teacher Francesco Portelos ("Respondent") alleging that Respondent engaged in violations of the City Charter, Board Rules, Chancellor's Regulations, criminal conduct, violations of Department policies, neglect of duty, conduct unbecoming his position and conduct prejudicial to the good order of the service. Dept. Ex. 1.[1] The Department seeks, as a penalty, Respondent's dismissal from service. Respondent requested a hearing on the charges and I was appointed as Hearing Officer.

A pre-hearing conference on the Charges and Specifications was held on September 5, 2013. The Hearing Officer granted Respondent's request for a public hearing pursuant to the 3020-a statute. Hearings were held on September 12, 23, 30, October 29, November 4, 7, 13, and 15, 21, December 3, 4, 13, 18, 20, 2013 and January 10, 15, 21, 23, 28 and 30, and February 3, 2014 at the offices of the Department of Education at 49-51 Chambers Street in New York City.[2] The record was closed after rebuttal and closing arguments on February 12, 2014. All proceedings were transcribed and a certified transcript was prepared.

On March 14, 2014, the Department requested that the record be reopened because of a letter the Special Commissioner's Office on Investigations ("SCI") had issued to the Hearing Officer. This letter stated that SCI had discovered an error in its report and in the testimony of one of the investigators regarding documents on

---

[1] References to transcripts will be abbreviated as "T." and References to Department and Respondent Exhibits will be abbreviated as "Dept." and "Resp.," respectively.
[2] The Hearing Officer denied Respondent's Motion to Dismiss the Specifications on November 4, 2014.

Respondent's Department computer that were referenced in Specification 3. After Respondent contacted SCI, they reviewed the material and determined that these documents had been retrieved from the Internet and not from Respondent's DOE computer. During a conference call on that date, the Department withdrew Specification 3 and the March 11, 2014 letter from SCI was admitted. Joint Ex. 1; T. 3636-3645.

During the hearing, testimony was provided by Linda Hill (Principal), Erminia Claudio (former Superintendent, District 31), Ovie Igbayo (Teacher), Joanne Aguirre (Assistant Principal), Anne Marie Martino (Assistant Principal), Robert Laino (SCI Investigator), Sharon Mahabir (Network Achievement Coach), Jennifer Wolfson (Teacher), Dr. Richard Candia (Teacher), Lisa Buonviaggio (Teacher), Susanne Abramowitz (Teacher), Barry Lattig (Senior SCI Investigator), Lisa Vines-Monohan (Teacher), Denise Diacomanolis (Assistant Principal), Jacqueline Steiner (Parent), Awilda Campbell (Teacher), Michael Schiavo (Paraprofessional), Lisa Cavalleri (PTA President), Cindy Salzillo (Paraprofessional), Peter Lisi (Businessman), Sean Rotkowitz (UFT District Representative, District 31), Ruthie Jusino (former Parent Coordinator), Denise Wright (Parent), Clare Sullivan (ATR Teacher) and Respondent. Both parties were represented by counsel and had a full and fair opportunity to present evidence and argument, to engage in the examination and cross-examination of witnesses, and otherwise to support their respective positions. The evidence, positions of the parties and legal authorities provided have been fully considered in the preparation and issuance of the Opinion and Award.

## CHARGES AND SPECIFICATIONS:

The Respondent has been charged as follows:

# SPECIFICATIONS

**FRANCESCO PORTELOS** (hereinafter referred to as "Respondent"), under File # 762606, is a tenured teacher formerly assigned to I.S. 49

Berta A. Dreyfus on Staten Island within District 31.

During the 2011-2012, and 2012-2013 school years, Respondent engaged in misconduct, insubordination, conflicts of interest, criminal conduct, conduct unbecoming his profession, and neglect of duty as follows:

### In Particular:

## SPECIFICATION 1:

During the 2011-2012 school year, Respondent engaged in a non-Department of Education ("Department") activity and/or engaged in a private, personal, and/or business activity, including, but not limited to, a real estate practice, on school grounds and/or during the hours that Respondent was scheduled to work for the Department, including, but not limited to, lunch periods.

## SPECIFICATION 2:

During the 2011-2012 school year, Respondent, while committing one, some, or all the activity in Specification 1, used Department resources, equipment, and/or supplies, including, but not limited, to a Department computer.

## SPECIFICATION 3: [WITHDRAWN]

During the 2011-2012 school year, Respondent, while committing one, some or all the activities in Specifications 1 and/or 2, used Department resources, equipment, and/or supplies, including, but not limited to, a Department computer to store non-Department information, including, but not limited to, in sum and substance:

    A. A Trulia price-history report for a property on Staten Island.

    B. A Trulia home-facts report for a property that named Respondent as the listing agent.

    C. A Zillow.com home-details report for a property that named Respondent as the listing agent.

D. A Realtor.com agent profile for Respondent.

E. A Listbook.com profile for Respondent.

**SPECIFICATION 4:**

During the 2011-2012 school year, Respondent engaged in a non-Department activity and/or engaged in a private, personal, and/or business activity, including, but not limited to, working on a website known as www.Faceshop.me, on school grounds and/or during the hours that Respondent was scheduled to work for the Department, including, but not limited to, lunch periods.

**SPECIFICATION 5:**

During the 2011-2012 school year, Respondent, while committing one, some, or all the activity in Specification 4, used Department resources, equipment, and/or supplies, including, but not limited to, a Department computer.

**SPECIFICATION 6:**

During the 2011-2012 school year, Respondent disclosed confidential Department information, including, but not limited to, witness statements, on a non-Department website, including, but not limited to, protectportelos.org.

**SPECIFICATION 7:**

During the 2011-2012 school year, Respondent used his position as a public servant to advance a direct or indirect financial and/or other private interest of his by:

A. Obtaining confidential Department information, including, but not limited to, witness statements not otherwise available to the public.

B. Disclosing confidential Department information on a non-Department website, including, but not limited to, protectportelos.org.

**SPECIFICATION 8:**

During the 2011-2012 school year, Respondent inappropriately accessed and/or retrieved Department information, including, but not limited to, a Department email account and/or email messages of another Department employee.

**SPECIFICATION 9:**

During the 2011-2012 school year, Respondent inappropriately accessed a Department email account and/or email messages of another Department employee.

5

**SPECIFICATION 10:**

During the 2011-2012 school year, Respondent inappropriately reset the password for a Department email account and/or the email account of another Department employee.

**SPECIFICATION 11:**

During the 2011-2012 school year, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself when he inappropriately accessed and/or retrieved Department information, including, but not limited to, a Department email account and/or email messages of another Department employee.

**SPECIFICATION 12:**

During the 2011-2012 school year, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself when he inappropriately accessed a Department email account and/or email messages of another Department employee.

**SPECIFICATION 13:**

During the 2011-2012 school year, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself when he inappropriately reset the password for a Department email account and/or the email account of another Department employee.

**SPECIFICATION 14:**

During the 2011-2012 school year, Respondent inappropriately manipulated and/or caused Department computer(s) at I.S 49 to direct the user to a non-Department website, including, but not limited to, protectportelos.org.

**SPECIFICATION 15:**

During the 2011-2012 school year, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself by inappropriately manipulating and/or causing Department computer(s) at I.S 49 to direct the user to a non-Department website, including, but not limited to, protectportelos.org.

**SPECIFICATION 16:**

On or about February 9, 2012, Respondent remained inside I.S. 49 until approximately 5:57 P.M., in violation of Principal Linda Hill's directive requiring that all staff personnel vacate school premises by 5:30 P.M.

**SPECFICATION 17:**

On or about February 9, 2012, Respondent failed to leave I.S 49 through the main lobby exit after official school hours as directed by Principal Linda Hill.

**SPECIFICATION 18:**

On or about January 26, 2012, during a meeting with Susanne Abramowitz and UFT Chapter Representative Dr. Richard Candia, Respondent engaged in unprofessional and/or inappropriate conduct, in that Respondent:

   A. Referred to Ms. Abramowitz, in sum and substance as, a fuck.

   B. Raised his voice.

   C. Waived and/or flailed his arms in Ms. Abramowitz's face.

   D. Pointed his finger at Ms. Abramowitz.

   E. Caused papers to fall to the ground.

   F. Stormed out of the office.

**SPECIFICATION 19:**

On or about January 26, 2012, Respondent entered an ongoing meeting without permission or authority and engaged in unprofessional and/or inappropriate conduct, in that Respondent:

   A. Disrupted the meeting.

   B. Attempted to take control of the meeting.

   C. Addressed the attendees and demanded to know if Ms. Abramowitz had polled them about school academies.

**SPECIFICATION 20:**

On or about January 28, 2012, Respondent, without consulting, notifying, and/or seeking authorization from Principal Hill or the I.S. 49 administration, sent a mass email

to numerous staff members at I.S 49 using the school's Dreyfus email account system, in violation of Principal Linda Hill's previous directive indicating that mass emails were not to be sent to staff members without her approval.

## SPECIFICATION 21:

On or about December 3, 2012, Respondent called the teacher's lounge at I.S 49 and informed a staff member, in sum and substance, that he had a camera in the lounge and was taping the staff.

## SPECIFICATION 22:

During the 2011-2012 school year, Respondent, while committing one, some, or all the activity in Specification 21, caused staff members at I.S 49 to feel nervous and/or uncomfortable.

## SPECIFICATION 23:

On or about January 25, 2012, Respondent, without consulting, notifying, and/or seeking authorization from Principal Hill or the I.S. 49 administration:

    A. Accessed the school website, www.Dreyfus49.com, through an alternative access point that he created when he developed the site.

    B. Reinstated his administrative privileges on the www.Dreyfus49.com website after they had been revoked.

## SPECIFICATION 24:

On or about January 28, 2012, Respondent, without consulting, notifying, and/or seeking authorization from Principal Hill or the I.S. 49 administration:

    A. Accessed the school website, www.Dreyfus49.com, through an alternative access point that he created when he developed the site.

    B. Reinstated his administrative privileges on the www.Dreyfus49.com website after they had been revoked.

## SPECIFICATION 25:

On or about January 28, 2012, Respondent, without consulting, notifying, and/or seeking authorization from Principal Hill or the I.S 49 administration, accessed the school website, www.Dreyfus49.com, as a site administrator and manipulated the settings to revoke the administrative rights and/or privileges of all individuals previously granted such administrative access.

**SPECIFICATION 26:**

On or about January 28, 2012, Respondent, without consulting, notifying, or seeking approval from Principal Hill or the I.S 49 administration, manipulated the school website, www.Dreyfus49.com, by creating an alternative access point into the system that enabled him to maintain administrative access to the site in the event that the alternative access point, as mentioned in Specifications 23 and 24, was disabled.

**SPECIFICATION 27:**

By committing one, some, or all of the actions described in Specifications 23 and/or 24 and/or 25 and/or 26, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself.

**SPECIFICATION 28:**

On or about February 2012, Respondent refused to transfer control and/or ownership of the school website, www.Dreyfus49.com, to Principal Hill, I.S. 49, and/or the Department after agreeing to do so at a meeting with Principal Hill and Superintendent Erminia Claudio.

**SPECIFICATION 29:**

On or about November 2012, Respondent, without consulting, notifying, and/or seeking approval from Principal Hill or the I.S 49 administration, altered the website www.welearnandgrowtogether.com, which Respondent had created for the school with Principal Hill's approval, to automatically transfer visitors to his alternative website, https://sites.google.com/site/occupywarrenstreet/, which contained derogatory information about I.S. 49, Principal Hill, and/or the Department.

**SPECIFICATION 30:**

On or about November 2012, Respondent, without consulting, notifying, and/or seeking approval from Principal Hill and/or the Department, utilized the I.S. 49 recorded telephone message, which invited callers to visit the website, www.welearnandgrowtogether.com, to advertise, promote, and/or direct traffic to his alternative website, https://sites.google.com/site/occupywarrenstreet/.

**SPECIFICATION 31:**

During the 2012-2013 school year, Respondent, without consulting, notifying, and/or seeking approval from Principal Hill and/or the Department, altered the school website, www.Dreyfus49.com, to automatically redirect visitors to his website, protectportelos.org, which chronicled his issues with various groups including Principal Hill, I.S. 49, and the Department.

**SPECIFICATION 32:**

By committing one, some, or all of the actions described in Specifications 29 and/or 30 and/or 31, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself.

**SPECIFICATION 33:**

During the 2011-2012 school year, Respondent recorded a video in a school facility, namely, I.S. 49, of a student during school hours, without permission or authority.

**SPECIFICATION 34:**

On or about December 12, 2012, Respondent notified I.S. 49 Superintendent Erminia Claudio that he showed the video referenced in Specification 33 to parents, without permission or authority.

**SPECIFICATION 35:**

On or about December 3, 2012, at a Community Education Council Meeting, Respondent made disparaging comments about Assistant Principal Diacomanolis and/or discussed an ongoing confidential investigation regarding allegations that A.P. Diacomanolis had acted inappropriately with a student, despite the fact that he had already reported this conduct to Principal Hill and said allegation was under investigation by The Office of the Special Commissioner of Investigation ("SCI").

**SPECIFICATION 36:**

On or about and in the month of September 2012, Respondent:

    A. Sent an email message to a parent without permission or authority stating, in sum and substance, that the teacher who sent their son to summer school was not certified to teach and that this message identified the teacher and indicated that her teaching certification had expired.

    B. Failed to notify and/or confirm with I.S. 49 administration that the teacher referenced above lacked certification prior to contacting the parent.

**SPECIFICATION 37:**

On or about September 2012, Respondent sent the same parent, referenced in Specification 38, a second email message without permission or authority stating in sum and substance, that the teacher who sent the parent's son to summer school was back in school.

10

**SPECIFICATION 38:**

By committing one, some, or all of the actions described in the above Specifications, Respondent's actions:

    A. Had a disruptive and/or negative impact on students, staff, and/or administration at I.S. 49 and the Department.

    B. Caused negative publicity, ridicule, and notoriety to I.S. 49 and the Department.

## THE FOREGOING CONSTITUTES:

- Just cause for disciplinary action under Section 3020-a of the Education Law;
- Conduct unbecoming Respondent's position or conduct prejudicial to the good order, efficiency or discipline to the service;
- Substantial cause rendering Respondent unfit to perform properly his obligation to the service;
- Violations of the City Charter including, but not limited to, sections 2604(b)(2), and/or 2604(b)(3), and/or 2604(b)(3);
- Violations of Board Rules including, but not limited to, sections 1-13(a) and/or 1-13(b);
- Violations of the Chancellor's Regulations including, but not limited to, C-110, A-640, A-820;
- Violations of the Rules, Regulations and Policies of the Department of Education including, but not limited to, the Internet Acceptable Use and Safety Policy, the Social Media Guidelines;
- Misconduct;
- Criminal Conduct;
- Neglect of duty; and
- Just cause for termination.

Dept. Ex. 1.

## BACKGROUND

    I make the following findings of fact based upon the entire evidentiary record, including credibility determinations.  Despite the voluminous record in this proceeding which consists of over 3600 transcript pages and 94 exhibits, many of the relevant facts are not in dispute.

11

I.S. 49 is a middle school (grades six through eight) located in Staten Island. The school serves a challenging population of students who are impoverished and is located in an area of high crime. T. 36, 400-401. The school has been rated "persistently dangerous" for several years. T. 2167-2168. There are approximately 850 students, 60 teachers and a total of 90 staff at the school. In addition to the Principal, there are four Assistant Principals.

Respondent has been employed and assigned to I.S. 49 since 2007. Respondent and his wife, who is also a teacher, live in the vicinity of I.S. 49. Respondent left a higher paying position as an environmental engineer because he decided to enter the "noble profession of education." Respondent has a Bachelor's degree in engineering and later received a Master's degree in general science education. Initially, he was a substitute at I.S. 49 and Principal Linda Hill hired him in 2007 as a science teacher. In 2008, the Principal asked Respondent to take over the STEM (Science, Technology, Engineering, Math) lab when the position became available. There were four technology labs at the school. T. 2026-2066.

Between 2007 and 2011, Respondent was highly regarded by the Principal and other administrators. Both Principal Hill and Respondent described their working relationship as very positive. T. 37-39, 2068. In the fall of 2011, Respondent received a letter of recommendation from Principal Hill and two other Assistant Principals for the Leadership Academy program he was enrolled in to become an administrator. Principal Hill noted that:

> Francesco works tirelessly assisting and motivating his students to complete assigned work and reach his or her highest potential. Mr. Portelos is dedicated and hard working, giving the school access to the best technology the school can offer to our students and staff as well.

12

> Two years ago, Mr. Portelos helped us create a dynamic computer lab to teach STEM with … grant funding, often staying late hours on weekdays and on weekends to ensure a quality lab.

Resp. Ex. 2.

Assistant Principal Martino also provided Respondent with a letter of recommendation which described him as an "outstanding professional in every way. He is dependable, conscientious, organized and prepared." Resp. Ex. 2. She also noted that he is "highly respected, not only by the faculty and students at I.S. 49, but also by our parents and community members." Assistant Principal Ruzzi also provided a letter of recommendation which observed that Mr. Portelos is the "lead teacher in the school's technology department and played an integral part in placing Dreyfus on the map as having exemplary technology programs." Resp. Ex. 2.

In addition to teaching, Respondent volunteered for technological and other supportive activities for the school such as coaching the robotics team and developing the school's website (Dreyfus49.org) with another technology teacher, Mr. Valia. He, along with Mr. Valia, developed Power Point presentations about the technology program at I.S. 49 which impressed parents and recruited new students. T. 39, 2081-2082. Respondent also spent considerable time assisting other faculty and students with technology or computer-related issues. He considered himself to be unofficially second in command (after Mr. Valia) when it came to technology issues. T. 2087-2090.

At the end of the 2010-2011 school year, Mr. Valia left I.S. 49 to take a position elsewhere. Principal Hill selected another teacher, Mr. Rossicone, to assume his class and some of the technology-related responsibilities of Mr. Valia. Respondent learned of this from another source during the summer. There were a series of emails between

13

Principal Hill and Respondent in which he expressed disappointment that he was not selected for the "lead" technology position.

Principal Hill testified that her relationship with Respondent deteriorated in the fall of 2011 and that he became "disgruntled" after she selected Mr. Rossicone to replace Mr. Valia.  T. 46.  Ms. Hill testified that Respondent's behavior changed and that he no longer volunteered for extra assignments.  Respondent testified that her selection of Mr. Rossicone was a "hard pill to swallow" but that he let it go.  He testified that he cut back on some of the extra work (such as setting up new email accounts for students) because of having just become a father.  T. 2091-2096.  In the thread of their email exchanges, the Principal encouraged Respondent to become more involved in the school.  He responded that he had been interested in joining the School Leadership Team (SLT) but was waiting to be approved by the Chair, Ms. Susanne Abramowitz.

In September of 2011, Respondent became a member of the SLT.  T. 2236.  The school's UFT Chapter Leader, Dr. Richard Candia, also asked Respondent to join the Union Consultation Committee and encouraged Respondent to run for the position of Union Delegate.  Respondent was elected to the Union Delegate position in November 2011.  Respondent testified that he got involved in these entities to improve the school and became privy to more information about the school.  T. 2114.  Both of these positions set the stage for disagreements and concerns Respondent came to have with Dr. Candia, Ms. Abramowitz and the administration regarding school policy and union affairs.  Most of the Specifications regarding the 2011-2012 school year relate to conduct that involved Respondent, the Principal, Dr. Candia and Ms. Abramowitz between January and March 2012 and are pivotal in evaluating both credibility and the

14

arguments raised by Respondent regarding retaliation. These events are discussed sequentially below.

The SLT is composed of the Principal, Chapter Leader, teacher and parent representatives to align the school's Comprehensive Education Plan ("CEP") and budget with the school's goals. T. 538-539, 2131-2132. The SLT meets once a month. There was much testimony regarding the December 13, 2011 SLT meeting. Ms. Vines-Monohan, a teacher representative on the SLT, testified about the meeting before the Principal joined it:

> So we started the meeting and I don't think working on the CEP ("Comprehensive Education Plan") was Portelos' idea, or his own—I think we all had this impression, this is what we were here to do, and we need to do it, and we need to do it fast, cause we are really far behind.

T. 1527-1528.

Respondent and other SLT members including Vines-Monohan ( T. 1530-1532), Ms. Abramowitz, (T. 1207) Ms. Cavallieri (parent member, T. 2324-2327); Ms. Jusino (parent observer, T. 2324-2327), testified that Respondent asked "are we ever going to review the CEP and budget?" T. 2415-2416. (Respondent). When Principal Hill came into the meeting, Respondent testified that Ms. Abramowitz nervously asked the Principal if they were going to review the CEP/budget. Principal Hill replied that "the CEP was due December 1st and I already submitted it." Dept. Ex. 34A; T. 2239-2241. This caused some consternation among the SLT committee members, including Respondent. T. 2415-2416; 2439. That evening Respondent emailed an SLT support person, Mr. Joseph Calantjis, for direction. Mr. Calantjis advised Respondent that Chancellor's regulations (B801 and A655) were being violated by the Principal because the SLT has the duty to review the budget. T. 2435-2436; Dept. Ex. 34A. Respondent

15

forwarded Mr. Calantjis' email to Ms. Abramowitz and Dr. Candia and asked them "what do we do?" Dept. Ex. 34A; T. 2436, 2454-2455. Neither Dr. Candia nor Ms. Abramowitz responded.

Ms. Abramowitz testified that she took issue with Respondent's efforts to reach out to Mr. Calantjis because she was the Chair of the SLT. T. 1124-1126, 1201, 1260-1261. Respondent sent her an email on December 15, 2011 which reiterated his concerns that the SLT was not in compliance with Chancellor's regulations:

> "I'm sorry if you felt I overstepped in sending that email. I'm positive that it was brought up in the meeting as "let's ask and see" because as we left [two SLT members] asked me to keep her posted on any issue. I know this puts you in a difficult position, but we did nothing wrong. We were kept in the dark and have not seen this CEP. I just don't know how this has been going on for so long. I will not send another email or discuss it, but feel very uncomfortable continuing being a member if we are going to continue breaking state laws and chancellors regs. If you want, I can speak to Linda. I have no problem telling her how the team feels. We should have the CEP emailed to us. Who knows, maybe we all agree."

Dept. Ex. 34A.

Ms. Abramowitz informed Principal Hill of Respondent's concerns. T. 1222. Superintendant Claudio, Principal Hill, Dr. Candia and Ms. Abramowitz confirmed that the CEP template should be reviewed by the SLT prior to its submission which had not occurred. T. 205-208, 495-498, 1206-1207, 1340; see also T. 2522-2525. Respondent testified that after he raised the budget concerns in December, "everything changed" and that SLT meetings became more tense. T. 2417, 2424-2425, 2455-2456, 2570. Principal Hill testified that she was "not pleased" by Respondent's question about the budget but that she was not upset. T. 209-210.

On January 10, 2012, at the next SLT meeting, the participants reviewed the CEP that the Principal had already submitted. Respondent had prepared an excel

16

spreadsheet.  Respondent asked a question about the goals for the ELA program given the number of students.  When he did so, the Principal responded that he was a STEM teacher and not an ELA teacher.  T. 2419-2420.  According to Ms. Cavellieri, a parent member who was present, Ms. Hill scolded him.  Ms. Cavellieri testified that she was very upset with the way the Principal (and the other Assistant Principals) dismissed Respondent for asking a question.[3]  T. 1800, 1878-1881.  Another parent member who was present described Ms. Hill as "mocking him."   T. 2374-2375, 2324-2327.  Respondent replied that he was on the SLT to improve the school.  Respondent also testified that another issue concerning the school's academy structure came up when Ms. Abramowitz said the teachers had decided to keep the current structure.[4]  T. 1126-1128.  Ms. Abramowitz testified that Respondent brought up the issue again, even though she and the Principal had told him this was done by the State and there was "nothing we could do." T. 1127-1128, 1149-1152.

Between January 22 or 24, 2012, Respondent testified that he requested a meeting with Ms. Hill and Ms. Abramowitz:

> …listen, I don't know why our arrows are not aligned.  I was like please correct me if I'm wrong, but I'm just trying to do what is better for the school.  Ms. Hill was like stop, I told you [the academies], it's a dead issue. … Abramowitz is like, do you want to be chairman of SLT?

T. 2439-2440, 2448.

---

[3]  After testifying on December 13, 2013, Ms. Cavallieri wrote an email that evening that she had "lied" when she said she would not have concerns about her role in the school after testifying at Respondent's hearing.  T. 1881-1882.  Dept. Ex. 43.  She asked for an opportunity to clarify her testimony which the Hearing Officer granted.   Dept. Ex. 44.  When she returned to testify she explained that she misinterpreted the question and that she did have concerns.  T. 2253-2257.  In any event, her testimony regarding the January 10, 2012 SLT meeting was otherwise credible and it was also corroborated by another witness.  T. 2324-2327.

[4]   Under the current academy organization, Assistant Principals have oversight of groups of subjects across grades such as Journalism and Science and Technology.  The SLT was considering whether the school could return to its former structure where Assistant Principals were each responsible for a grade. T. 1126, 1555-1556.

The tension between the Principal, Ms. Abramowitz and Respondent increased in late January 2012 when a series of events occurred. Respondent became concerned that someone was giving his private Facebook posts to the Principal. In one post, Respondent recounted how he had participated, along with another teacher, in using a "findaphone" app to track down a stolen cell phone of another teacher. Principal Hill was disapproving of this and in a meeting on January 26, 2012 told him he was a "hindrance to the community." T. 2423-2425. Respondent also testified that during this meeting Assistant Principal Aguirre told him he was "unprofessional." T. 2425. Dr. Candia and Ms. Abramowitz were also present at this meeting.

On January 26, 2012, Respondent told the Principal that he had been contacted by a reporter from the New York Post about the stolen cell phone incident. Respondent was also continuing to have a debate with Ms. Abramowitz about the academy issue and suspected that she was providing his Facebook posts to the Principal. Respondent asked UFT Chapter Leader Dr. Richard Candia to mediate in a meeting with her. At a 7:30 a.m. meeting on January 26, 2012, tempers flared between Ms. Abramowitz and Respondent. Ms. Abramowitz and Dr. Candia informed the Principal about Respondent's behavior toward Ms. Abramowitz. Dr. Candia asked Ms. Abramowitz to provide a written statement to the Principal and the statement was provided on January 27, 2012. (Specifications 18, 19). According to a log of Portelos' incidents that the Principal created later in March, 2012, Dr. Candia also advised her on this date that Respondent was tape recording conversations with her with a concealed cell phone. Dept. Ex. 17. The Principal testified that she believed Dr. Candia's assertion because Respondent was often "fiddling with his pocket." T. 237-238.

A union meeting was scheduled to take place before school began the next day, on January 27, 2012. Dr. Candia had asked Respondent not to bring up anything about the disagreements with Ms. Abramowitz. When there was some time remaining after the agenda for the meeting had been completed, Respondent raised his hand and asked to speak. Dr. Candia told him the meeting was over. Respondent stated "et tu brute" and sat down. T. 1284-1286. Some members indicated they wanted to hear from Respondent. T. 2510. As he began to address union members, Dr. Candia and Ms. Abramowitz left the meeting. Respondent testified that he expressed concern that his Facebook posts that had been given to Principal Hill and this was causing divisiveness among the staff. T. 2529-2535; 1163-1164, 1286. Ms. Abramowitz testified that she was providing them to the Principal, and several messages were contained in a binder she began to keep on Respondent in December 2011. T. 1203-1206; Dept. Ex. 34A. Dr. Candia testified that he felt betrayed after Respondent spoke up at the union meeting. T. 1331-1332; 2530-2533.

That evening (January 27), Dr. Candia sent Respondent an email (and blind copied the Principal) informing him that he was removing him from the Union Consultation Committee. He also asked Respondent to resign from his elected position as Union Delegate. T. 1287, 2535; Dept. Ex. 35. Later that evening, Respondent advised Dr. Candia in an email that he would not resign his position as a Union Delegate. Respondent forwarded Dr. Candia's email, along with his response, to UFT members. T. 1165, 2537. (Specification 20). Dr. Candia testified that he felt betrayed again when Respondent sent his "private" email to the entire staff. T. 1323, 1332.

19

Over the weekend (January 28 and 29) there was a flurry of activity that occurred in connection with the school's "Dreyfus49" website.   Respondent and another technology teacher, Mr. Valia, had created the site, with the Principal's permission in the fall of 2009.   It was a Google email system and Respondent paid the $17.00 initial charge to register the domain and the annual renewal fees associated with it. Respondent was an administrator of the website and over time other technology teachers and the Principal were added as administrators. T. 2192-2198.

On the evening of January 27, 2012, Dr. Candia phoned the Principal to tell her he was very angry that Respondent sent the staff his email requesting Respondent to resign his Union Delegate position.   Principal Hill went into the Dreyfus email system and revoked Respondent's administrator privileges and his email account. T. 62-63. She testified that she did so to "stop this battle between the Union Delegate and the chapter chair." T. 378.  When Respondent tried to log onto his email account to enter students' progress reports which were due he could not do so.   Resp. Ex. 16. Respondent was able to log on by using a backup email that had been created by former technology teacher Mr. Valia.   He saw that there had been a number of communications between the Principal and Dr. Candia.   Thereafter, Respondent reinstated his administrator privileges and at the same time took away the administrator privileges of the Principal and other individuals who had administrator rights to the site. (Specifications 24, 25, 26 and 27).

On Sunday, January 29, 2012 at 12:48 a.m., Dr. Candia sent an email to Principal Hill identifying individual teachers as supporters (and their degree of support for Portelos (i.e., very very much, very much, etc.).   Respondent did not learn about this

20

email until late March 2012 (Specifications 8, 9, 10, 11 and 12).  In his email to the

Principal, Dr. Candia stated that the staff feels that they have "no voice" and that "3/4 of

the staff is supportive of him and that they want him to be Chapter Leader."  Dept. Ex.

35.[5]

Although internal union affairs might ordinarily not be germane in a 3020-a

proceeding, they are in this case because Dr. Candia then made a number of

allegations against Respondent (including Specifications 1, 2, 4, 5, 6, 7, 8, 9, 10, 18, 19,

20) which "got the ball rolling."  T. 1358-1359.  District 31 UFT Representative Sean

Rotkowitz, who was very circumspect and credible in his testimony, acknowledged that

"the complaint that was lodged by Dr. Candia was the start of where we are now."  T.

2143.  Dr. Candia testified that after he asked Portelos to resign, things "spiraled out of

control."[6]  T. 1324.  Both Dr. Candia and Respondent testified that they did not speak

again after the January 27, 2012 union meeting.

On Sunday January 29, 2012 an article appeared in the New York Post "Thief an

(apped) pupil" which quoted portions of Respondent's Facebook post.  Respondent

testified that he was contacted by the Post but hung up on the reporter.  T. 2426, 2686;

Dept. Ex.34A.  The Principal testified that she assumed that Respondent had initiated

the article because his Facebook post was quoted in it.  T. 164-165, 239-241.  Principal

---

[5]  Dr. Candia testified as follows:
   Q.    Why did you do that?
   A.    Because I wanted Ms. Hill to know who wasn't on my side.
   ...
   Q.    Why did you want her to be aware?
   A.    Because I felt that he was against her.  I felt like he was against me.  I felt like
         this was the beginning of a division.
   T. 1336-1337.
[6]  Throughout 2012, Dr. Candia filed more allegations against Respondent with SCI and continued to
provide the Principal with emails/blog posts from Respondent to union members when he considered
them detrimental to the school.  T. 1363, 1390-1395; Dept. Exs. 17, 31 & 35; Resp. Ex. 10.

Hill also testified that her opinion of Respondent changed afterward because he "used that article to promote whatever he did and at the same time, bring up negative things about my school that were negative." T. 245. She testified that he "drew attention to himself, to me, needlessly over an incident that happened in the school." T. 242.

That same afternoon, January 29, 2012, the Principal sent an email to I.S. 49 staff emphasizing the need for the staff to be cohesive. She referenced being told of "challenges" at the recent union meeting. Her email noted the damage done to the school's reputation by the New York Post article and commented that it was a setback "to satisfy one person who seems to have a need for recognition." Dept. Ex. 28. Respondent emailed the Principal and told her she should evaluate her sources and that "the person with their 'own interest' you mentioned in the staff email has been feeding you false information." Respondent advised that "he [Dr. Candia] and Susanne [Abramowitz] have put me out there as a decoy and you fell for it unfortunately." Dept. Ex. 17.[7]

On Sunday evening, Respondent also emailed the Superintendent of District 31, Dr. Ermina Claudio, and informed her that "in the last few weeks my teaching and my efforts at the school have come under attack by the administration. It all aligns with the time period when I started asking tough questions at the SLT and Union meetings that the administration didn't want to address." Dept. Ex. 19. The Superintendent phoned Respondent that evening and spoke with him. She suggested that they have a meeting with Principal Hill and UFT District 31 Representative Rotkowitz to clear the air.

---

[7]   Respondent attached text messages from Dr. Candia that were critical of the Principal and noted that Ms. Abramowitz had publicly questioned the Principal's leadership at a district-wide UFT meeting. T. 2227-2229; Dept. Ex. 17. Respondent's testimony about the UFT meeting was corroborated by two other witnesses in attendance. T. 1047, 1782-1783.

On Monday, January 30, 2012, Dr. Candia reported another allegation concerning Respondent to the Principal. Dr. Candia told her that he had observed Respondent using DOE computers during work hours to conduct real estate transactions. Respondent has a broker's license and Principal Hill testified that she was aware that he was a licensed real estate agent. Principal Hill reported Dr. Candia's allegation to SCI on January 30, 2012. Dept. Ex. 32. (Specifications 1, 2, 4 and 5). She also reported an allegation to SCI regarding Respondent's removal of her administrator rights on the Dreyfus website. Dept. Ex. 31.

In early February a series of other events occurred between Respondent and Principal Hill which further worsened their already deteriorating relationship. Three Letters to File were issued to Respondent. The first letter cited his unprofessional conduct toward Ms. Abramowitz during their January 26, 2012 meeting. Dept. Ex. 11. (Specifications 18 and 19). A second Letter to File was issued on February 7, 2012 because Respondent had forwarded Dr. Candia's email asking him to resign and his decision not to do so to the entire staff. The Principal stated that this email was contrary to an earlier directive she had given to not send mass emails to the staff. Dept. Ex. 10. (Specification 20). Principal Hill also informed Respondent that, per her discussion with Superintendent Claudio, he should "avoid having meetings of any kind with staff at this time" and should concentrate on his pedagogy. Resp. Ex. 17.

A meeting was held on February 14, 2012 between the Principal, Superintendent Claudio, Respondent and Mr. Rotkowitz. Superintendent Claudio testified that she attempted to mediate the dispute between Principal Hill and Respondent and that the meeting concluded on a positive note with Respondent agreeing to turn over the rights

to the Dreyfus49 website.  Respondent testified that he offered to transfer the ownership of the website to the Principal; however, after the meeting, he did not believe there was going to be a clean slate because the disciplinary letters were going to remain in his file. On February 16, 2012, Respondent advised the Principal that his intellectual property lawyer advised him to hold off on the transfer of ownership until he had the opportunity to review the matter.

On February 17, 2012 Respondent received his third letter to file for insubordination because he had stayed in school after 5:30 p.m.  Dept. Ex. 13. Principal Hill testified that she had issued a directive to staff that anyone staying in the building after 5:30 p.m. had to obtain advance permission as a safety protocol for after hours. (Specifications 16 and 17).

On February 28, 2012, SCI Investigators confiscated Respondent's DOE laptop from his classroom and two DOE-issued iPads that were at his home because of the allegations, reported by Dr. Candia, that Respondent was conducting real estate business on school computers.  This was the first time that Respondent became aware that he was under investigation.  T. 2220, 2573-2574.

Employing the principle that the best offense is a good defense, Respondent created a website entitled "protectportelos".org.  Respondent testified that he had been keeping an electronic file on Google Docs of his observations, letters to file, letters of recommendation and other documents.  He started to write a narrative of recent events to try and "make sense of it."  T. 2212-2213.  The protectportelos website was activated on March 7, 2012.  Prior to activating the website, Respondent sent an email from his personal email account to I.S. 49 teachers explaining that he had created a website to

create awareness and transparency.   In the email he stated that "these are not just attacks on me.   These are attacks on our careers, our school and our community." Dept. Ex. 34A.

Respondent posted his letters of recommendation, three letters to file, observations, witness statements and other documents on the website.   According to notes of Principal Hill, on March 9, 2012, Assistant Principal Ruiz expressed concern that Respondent had established a website that posted documents containing the administrators' names and signatures.   Dept. Ex. 17.

On March 13, 2012, Principal Hill issued a directive to Respondent to terminate the Dreyfus49.com website by March 19, 2012.   Respondent terminated the website but did not turn over its contents to the Principal. (Specification 28).

On March 16, 2012, Assistant Principal Aguirre conducted an informal observation of Respondent's class for two periods.   On March 16, 2012, Principal Hill received an email from the Department's legal staff saying that Respondent had contacted the New York Post with respect to the Principal reporting allegations against him to SCI and also that she had violated Chancellor's Regulations regarding the SLT.

On March 16, 2012, Assistant Principal Diacomanolis, who learned of the impending New York Post article from the Principal, expressed her concerns to Superintendent Claudio asking her "how can this man be stopped?"   Resp. Ex. 13.   On March 18, 2012 an article appeared in the New York Post entitled "Tech Teacher in Staten Island Chronicles Tiff with Principal Online."   The article referenced retaliation by the Principal in response to Respondent's inquiries about the CEP/budget and the fact that he was under investigation.   Department sources were quoted as calling

25

Respondent a "loose cannon." Dept. Ex. 20. Principal Hill testified that by mid-March things had "fallen apart" with Respondent. T. 226.

In late March 2012, after Respondent had deactivated the Dreyfus website, he searched Dr. Candia's emails for Portelos and discovered the January 29, 2012 email from Dr. Candia to the Principal. As the Union Delegate, he decided he should let other teachers know about it and he shared Dr. Candia's email with some of the teachers who were identified as "Portelos supporters." T. 2607-2608.

On March 23, 2012, Respondent filed a complaint with OEO alleging sexual harassment and retaliation by Assistant Principal Aguirre. (Dept. Exs. 27 & 56). This complaint related to an October 2011 event at the Burrito Bar and other conduct thereafter that Respondent believed was retaliatory. T. 2660-2669.[8]

On March 24, 2011, the Principal and Ms. Abramowitz unsuccessfully tried to have Respondent removed from the SLT. Dept. Ex. 17; T. 182, 2334-2335. On March 26, 2012, Respondent reported allegations against the Principal to SCI regarding "double dipping" in connection with her time cards.[9] Dr. Candia also filed a complaint with SCI on March 26, 2012 alleging that Respondent had posted DOE documents on the internet without permission or authority to do so. Dept. Ex. 31. (Specifications 6 and 7).

On April 4, 2012, the Principal filed a complaint with OEO regarding an email Respondent had sent to SLT parents after the vote in which he used the phrase "kosher" and quoted a passage from Martin Luther King. In her email she stated that

---

[8] The confidential OEO Report did not substantiate that Assistant Principal Aguirre violated Chancellor's Regulation A-830. Dept. Ex. 56.
[9] Respondent testified that he had previously reported these allegations on January 26, 2012 using a fake email address so that his complaint would remain anonymous. T. 2423-2424.

Respondent had been harassing "us" (herself and Ms. Abramowitz) for at least two months. Resp. Ex. 3. OEO advised Ms. Hill the next day that they saw no issue of discrimination in Respondent's email. Resp. Ex. 3.

On April 5, 2012 Respondent received his first Unsatisfactory Observation from Assistant Principal Aguirre after her March 16, 2012 observation and post-observation conference.[10] Dept. Ex. 24. At some point in April 2012, there was a "solidarity" day at I.S. 49 in which staff members wore blue to show support for Mr. Portelos and/or the union. T. 98, 217, 572-573, 1022. Principal Hill also testified that Respondent gave flags to staff with the historical Gasden flag with its motto "Don't Tread on Me" to place in their windows T. 96.[11]

On April 26, 2012, Respondent was reassigned from I.S. 49 pending investigation after a complaint about an email. The latter part of this email, written by Respondent, contained a citation to the City Code regarding false statements by city employees and "suggested anyone who has made false statements find a way to rectify or retract them very, very quickly and I may show mercy" to individuals who retract their false statements. Dept. Ex. 16. The Principal testified that this reference to "show mercy" was considered to be a threat against the two teachers who had written witness statements. T. 120-121. The letter of reassignment prohibited Respondent from being in the school building.

On June 15, 2012, Respondent was elected as I.S. 49 Chapter Leader. He assumed the responsibilities of Chapter Leader on July 1, 2012 and continued to serve

---

[10] Respondent testified that this was a "gotcha" observation as it was done during the first period on the Monday following his return from several days of jury duty. Ms. Aguirre was accompanied by the professional development coach Sharon Mahibir. Both witnesses testified as to deficiencies in the lessons they observed. Dept. Exs. 24 & 34.

[11] This is the logo on protectportelos.org with the motto "Don't Tread on Educators." Dept. Ex. 73.

27

in that position at the time of these hearings from various reassignment locations despite several recall attempts. T. 2174. After an arbitration award upheld Respondent's right to be recognized as the school's Chapter Leader, the Department took the position that he could not be recognized because he was the subject of an investigation and had been removed from I.S. 49. T. 194-198. The UFT litigated this issue and in 2013 the New York Supreme Court confirmed the arbitration decision ordering the Department to recognize Respondent as I.S. 49 Chapter Leader. T. 2136-2137, 2165.

Respondent filed a federal lawsuit in June 2012 alleging violations of the First Amendment by the Department which is pending. He also filed a lawsuit against Dr. Candia and Ms. Abramowitz for defamation of character. Dept. Ex. 48; T. 3375. In addition, he filed an allegation with SCI that he was retaliated against in violation of the New York Whistleblower Law (NYAC 12-113). Dept. Ex. 51.[12] Respondent also filed grievances and other charges with New York PERB regarding interference with union affairs. Dept. Ex. 55.

In what became a virtual war between Respondent and the administration of I.S. 49, allegations were filed by Principal Hill, Dr. Candia and Respondent with SCI, and other investigatory agencies. SCI Investigator Robert Laino testified that in 2011-2012 SCI received more than 35 complaints relating to issues at I.S. 49 and approximately 25 allegations against Respondent that were incorporated into their initial investigation. Dept. Exs. 29, 30 & 31; T. 841. SCI Investigator Laino interviewed Respondent on June 28, 2012. He described Respondent's attitude as "cooperative." T. 886-887. Investigator Laino completed his report in December 2012. Dept. Ex. 29; T. 1762.

---

[12] SCI denied Respondent's Whistleblower claim on January 17, 2013. Dept. Ex. 51.

28

On April 26, 2013, the final SCI report substantiating some of the allegations against Respondent was sent to the Chancellor of Education. Dept. Ex. 32. The report stated that "most" of the allegations against Respondent had been substantiated; however, the report was less than clear about which allegations were substantiated. Five allegations initiated by Respondent that were also referenced in the report were not substantiated. Dept. Ex. 32. One of Respondent's unsubstantiated allegations pertained to a video of Assistant Principal Diacomanolis that alleged possible frisking/corporal punishment of a student. (Specifications 33, 34 and 35). Principal Hill testified that one investigation against her remains open. T. 280; Dept. Ex. 53.

On May 17, 2013, the Department filed these Specifications against Respondent for misconduct during the 2011-2012 and 2012-2013 school years. On June 27, 2013, Superintendent Claudio sent Respondent a letter detailing the findings contained in the SCI report. Dept. Ex. 21.

After his removal from I.S. 49, Respondent was reassigned to various locations but had no teaching responsibilities.[13]  Respondent continued his blog posts on protectportelos.org to chronicle his disciplinary process, lawsuits, rights of educators, alleged financial misconduct and other topics. Dept. Exs. 50, 53, 61, 62, 64, 65, 68 & 70. The blog was the focus of extensive testimony and Superintendent Claudio, Principal Hill, Assistant Principals Diacomanolis, Aguirre and Martino testified that Respondent's conduct and postings have caused disruption and/or notoriety to I.S. 49

---

[13]  Respondent filed a grievance relating to his reassignment location which was denied in a July 2013 arbitration award. Dept. Ex. 69.

and the Department.  T. 95-98, 108-110, 143-144, 164, 455-457, 522, 526-527, 549-552, 648-649, 779-780, 1592-1595; Dept. Exs. 15, 20 & 28.[14]  (Specification 38).

Testimony revealed that administrators sought out Respondent's blog because they "wanted to know what he was saying about [them]."  T. 109-110, 279-280, 411-412, 475-476.  Both Principal Hill and Superintendent Claudio testified that they had not directed Respondent to remove any post, even though they deemed many of them to be distasteful, inappropriate and damaging to the school--this was apparently the result of legal advice.  T. 466-467; Dept. Exs. 19, 20 & 28.  Principal Hill testified that, in her view, Respondent should not have publicized problems within the school and that these issues should have stayed within the school.  T. 239-240.  Respondent confirmed that no administrator has ever spoken to him about his blogging or asked him to remove a particular post up through the time of this hearing.  T. 2682, 3345-3347.

The Department established Social Media Guidelines in the spring of 2013. Dept. Ex. 3.  These guidelines apply to Department employees who maintain professional or personal blogs.  Under the guidelines pertaining to personal media sites, DOE employees "should exercise caution and common sense."  The guidelines note that personal social media sites have the potential to result in disruption at school and/or the workplace and can be in violation of DOE policies, Chancellor's Regulations and the law.  The guidelines provide that they are not to be used as a basis for discipline; however, "all existing DOE policies, regulations and laws that cover

---

[14] Principal Hill and Superintendent Claudio were particularly disturbed by an image Respondent used in a post containing his First Amendment complaint that depicted him as a warrior with a sword and the caption "The Department of Education's 300 Lawyers vs. Portelos."  Dept. Ex. 73; T. 427, 452, 526-527. The Superintendent testified that this warranted, at least, a Letter of Reprimand.  Respondent testified that he photoshopped an image from the movie "300" as a metaphor for being outnumbered by the lawyers employed by the Department.  T. 2681-2685, 3329-3339.

employee conduct may be applicable in the social media environment." Dept. Ex. 4 at p. 6. Finally, the guidelines state that certain postings may be protected activity under labors laws, collective bargaining agreements and the First Amendment. (Id. at pp. 6 & 12).

The Department's witnesses also provided testimony that Respondent's actions had polarized the school and created divisions amongst the staff.  T. 96-98, 108-110, 1109-1110, 1181-1182, 1325-1331.  The Principal testified that teachers were no longer collaborating.  T. 296.  Principal Hill admitted that Respondent was not responsible for all of the problems at I.S. 49.  T. 377.  She further testified:

> "(t)he whole thing effect was very demoralizing and Mr. Portelos did have some support in the school. So that divided the school completely, supporters against non-supporters or people that didn't believe in what he was doing."

> T. 110.

On the other hand, Respondent's witnesses, which included current and former I.S. 49 teachers, paraprofessionals and parents, attributed the divisiveness in the school to the administration's retaliation against Respondent for speaking out and his removal from I.S. 49.  T. 1786, 1792-1794, 1833, 1924-1926, 1934; see also 1523-1524.  Ms. Jusino, the parent coordinator who had been employed at I.S. 49 for 12 years, testified that she resigned her position in 2013 due to the administration's antagonism toward pro-Portelos staff.  Other current and former teachers, paraprofessionals and parents testified that there were repercussions by administrators for those perceived as "pro-Portelos."  T. 1519-1526, 1928-1929, 1934, 1975, 2301-2313.  Mr. Schiavo, a paraprofessional, testified that the school was "split down the middle."  T. 1816.  Part of this contention between the staff and the administration stemmed from the fact that the

31

school would not recognize Respondent as Chapter Leader. T. 229-330. One teacher testified there was poor morale because they had no representation in the building. T. 1776.

Respondent's disciplinary process also became fodder for the media. Principal Hill testified that she was aware of five or six news articles which she attributed to Respondent's efforts. T. 164-165. Respondent's defamation lawsuit against Dr. Candia and Ms. Abramowtiz as well as his video streaming from the "rubber room" were reported by the media. Dept. Exs. 20 & 35. In addition, SCI's release of its report to the media on April 25, 2013 resulted in several news articles. Dept. Ex. 34A. Indeed, Respondent learned of the SCI report after he was contacted by a reporter for comment. Dept. Ex. 20. Needless to say, Respondent's case has generated considerable attention because of his prolific use of social media to publicize his disciplinary process and other issues.

## POSITIONS OF THE PARTIES[15]

### THE DEPARTMENT

The Department emphasizes that since Respondent has conceded so many of the Specifications, the crucial issue in this case is the penalty for his misconduct. The Department reviewed the evidence supporting its position on the respective Specifications. The Department takes issue with one of Respondent's main defenses that he could engage in conduct as long as it was not illegal. Respondent is required to

---

[15] The parties provided over 200 transcript pages of closing arguments which have been fully considered. The arguments are briefly summarized here while specific arguments (and supporting references to the evidence), on individual Specifications will be discussed in connection with those Specifications. In addition, both parties submitted case authorities in support of their respective positions to the Hearing Officer electronically.

follow the regulations and policies of the Department that also may proscribe conduct even if that conduct is legal.

The Department contends that Respondent's claim of retaliation must also fail. Two-thirds of the allegations were initiated by people other than Principal Hill which should defeat Respondent's Whistleblower defense.   With respect to the charges initiated by Principal Hill, the Department submits that the evidence established that his discord with her began long before she became aware in April 2012 that he had filed a complaint against her for financial misconduct.   Respondent became disgruntled after he did not get the "lead" technology position he believed he deserved.  By the time 2012 rolled around, Respondent was focused on bringing down the administration and not on teaching his students.     SCI also conducted an investigation of Respondent's Whistleblower claim and determined that it had no merit.   Even though Respondent talked at length about how he was targeted for discipline, despite the parade of Respondent's witnesses, there was no evidence to support this argument.   None of these witnesses could articulate any act of retaliation that the Principal committed against them or show that they had been identified as Portelos' supporters in the first place.

The Department submits that Respondent was duplicitous in his testimony and that many of his actions were driven by paranoia and his desire to have power.  His postings on his blog are riddled with sarcasm and violent images.  His testimony was often nonresponsive and lacked credibility.   The Department contends that the soft-spoken laid back image he tried to present during his testimony is not consistent with the vicious attacks he instigated while sitting behind his computer.

33

The Department maintains that Respondent has shown that he will go after any individual who he believes has wronged him. When Respondent identified someone as his enemy, he stopped at nothing to humiliate or denigrate them. As examples, the Department cites his charges against Assistant Principal Aguirre and Assistant Principal Diacomanolis, Principal Hill and Ms. Wolfson. Further, when he posted the video of Assistant Principal Diacomanolis on his blog it was malicious and a blatant attempt to humiliate her. There is ample testimony by the administrators with regard to the disruption that was caused by Respondent's taunting and disparaging of individuals and the Department in his blog. The atmosphere that Respondent created of fear and mistrust is not conducive to learning and does not provide a good example to children.

The Department also submits that Respondent's argument that his blog may not be considered for purposes of establishing notoriety because individuals have to seek it out by visiting it, is ludicrous. Respondent, in his letters and emails to various officials within the Department, attached information from his blog and/or posted the link to the blog.

Further, the Department maintains that none of Respondent's disruptive behavior resulted from his union position or his right to free speech. Respondent was not acting in his capacity as a union official in connection with any of the 38 Specifications with the exception of the mass email in Specification 20. As Respondent testified, he is obligated to obey now and grieve later. Being a union representative does not confer immunity against discipline or insubordination. Moreover, rude, insolent and disrespectful behavior is not protected even when expressing legitimate union or labor related concerns. Although Respondent attempts to cloak himself in a mantle of union

business, the evidence established that his intent was to create a "legion of warriors at I.S. 49 to revolt against the Principal."

The Department submits that postings on Respondent's blog that are outside of the charged period (after June 2013) are relevant for the issue of penalty. The Department emphasizes that some of Respondent's postings violate the Department's Internet Acceptable Use Policy ("IAUP") as well as the recently promulgated Social Media Guidelines. Even though the guidelines state that they are not disciplinary, they provide that other laws or policies may prohibit certain conduct.

Respondent's numerous allegations initiated with SCI and other agencies were also disruptive to the administration and efficiency of I.S. 49. Respondent felt entitled to act as judge, jury and executioner in making accusations, collecting evidence on his own and then drawing his own conclusions with complete disregard of the official investigators who are charged with making these determinations. Respondent testified that he believes the Department of Education is corrupt and the DOE attorneys who advised the Principal were incompetent. When Respondent did not get the answer he wanted to hear, he claimed there is some sort of conspiracy against him. Yet, Respondent still wants to collect a paycheck from the Department. The Department submits that Mr. Portelos will not be able to work in harmony with DOE employees if he is reinstated.

Further, with respect to the penalty, the Department contends that Respondent is beyond remediation. When you are an enemy of Portelos it is "no holds barred" because he continues to malign people even when conduct is unsubstantiated by agencies, grievances are denied or cases are dismissed by a court of law. Respondent

35

likened his position to that of a Greek warrior, used graphic violent images, and compared himself to a war hero showing a grandiose view of himself.

The Department also argues that Respondent demonstrated a lack of remorse for his misconduct. He was able to focus on his loss of weight and stress but never once acknowledged how damaging his behavior may have been to others. His inability to recognize that some of his behavior may have contributed to the downward spiral that occurred in I.S. 49 in 2012 shows he is incapable of remediation. Even at another school, the Department submits he would be incapable of getting along with his colleagues, following directives from his superiors or succeeding on any level in a cooperative, productive learning environment.

Respondent has also demonstrated that he does not believe that the rules apply to him. Respondent chastised Dr. Candia for violating union confidentiality but he had no problem showing Principal Hill information about a union meeting himself when he had the opportunity to tell her that staff members had said critical things about her.

For purposes of the penalty, the Department contends that Respondent had a motive to be spiteful after he was rejected for the "lead tech" position in 2011. The Principal responded patiently to his many emails, yet this is when Respondent had his meltdown. The Department maintains that Respondent is not capable of focusing on the children or serving as a positive role model. Despite his empty rhetoric that "this is about the kids," Respondent lost sight of the students when he became more and more obsessed with waging a war against the administration.

Although the Department concedes that Respondent brought innovative ideas to the school, there was no evidence that he was a good teacher in the classroom.

36

Despite receiving satisfactory ratings, during his four and a half years at I.S. 49, the Department states that it is telling that when he had an informal observation with little time to prepare he was rated Unsatisfactory. Even if Respondent felt that he was unfairly treated during the 2011-2012 school year, he did not handle the situation professionally and spiraled out of control. The Department argues that termination is warranted under these circumstances.

## RESPONDENT

Respondent argues that the evidence, including that presented by the Department's own witnesses, established that he was targeted for discipline after he spoke about the CEP and other issues as a member of the SLT. The Department's witnesses acknowledged that Respondent raised issues that were appropriate in connection with his responsibilities. Teacher tenure was developed to protect independent-minded educators from the whims of administrators.

Respondent contends that the evidence established that the Principal, Chapter Leader Candia and Ms. Abramowitz conspired to inflict consequences on Respondent for speaking out on issues of public concern. It showed that things changed dramatically for Respondent in January 2012 after he had raised these concerns. He points out that a short time after these events, Principal Hill acknowledged that Respondent had been harassing her and Ms. Abramowitz for at least two months.

Respondent submits that the Department has created a fairy tale that Respondent was a disgruntled employee at the beginning of the 2011-2012 school year when Principal Hill passed over Respondent to replace technology teacher Valia. The Principal's own actions showed that this was not the case. On October 21, 2011, she

37

wrote a glowing recommendation for Respondent and described his activities to improve I.S. 49. Rather than distancing himself from the school community at the beginning of the year, he became more involved by being elected to the SLT, jointing the UFT Consultation Committee and becoming Union Delegate at Dr. Candia's request.

Respondent also contends that principles of just cause were not followed because he did not receive a full and fair investigation. Instead, the administration's actions are retaliation masquerading as discipline. Respondent emphasizes Superintendent Claudio's testimony that she was not that concerned with his conduct before he was reassigned from I.S. 49. Yet, Superintendent Claudio signed the charges and, to the extent they relate to behavior before April 26, 2012, Respondent contends they are founded in bad faith and should be dismissed. Investigator Laino candidly acknowledged that "what he didn't testify about, was not substantiated." Yet, Respondent argues that many allegations show an absence of investigation.

The Department also failed to comply with the notice requirement for just cause. There were no Social Media Guidelines until a year after Respondent had started his blog. Before discipline can be imposed, the Department was required to tell an employee what was expected of him. Despite the volume of testimony regarding protectportelos.org, Respondent was never told by any superior not to write something or to remove a posting. Respondent questions that if Respondent's blog was destroying I.S. 49 and crippling its educational mission, why was it permitted? Superintendent Claudio and others stated they were advised by attorneys not to issue such an instruction but they cannot have it both ways.

Respondent further contends that by raising concerns about corruption and other matters of public concern, Respondent's postings as a public employee enjoy First Amendment protection. Some of the concerns that he raised about Assistant Principal Diacomanolis were brought to him by other teachers and parents, and he believed he was under an obligation as a mandated reporter to raise those allegations. Respondent had a good faith basis for making allegations against two of the Assistant Principals. The fact that the charges were not substantiated does not mean they were filed in bad faith. Moreover, Respondent submits that it is impossible to reconcile the Department's position that Respondent's complaints posed such a burden to the administration when they initiated so many more investigations against him. Further, the Department's supposed rule that you are not allowed to talk about an ongoing investigation was shown to be a rule that they violated frequently by discussing ongoing investigations themselves.

In addition, at the time of all of these Specifications, Respondent was either the UFT Union Delegate or its Chapter Leader. He does not lose his protected activity status when he speaks out for himself. There is no charge that Respondent was ever insubordinate to Principal Hill at school or in any meeting. As a union leader, Respondent may speak out publically about wrongdoing – it is protected activity and it should not be converted into discipline. As a union representative, Respondent may zealously advocate on behalf of himself and his members and case law protects the activity, even for a representative who may act overzealously.

Further, although the Department contends that Respondent does not abide by findings of lawful tribunals, he points out that it had no problem after losing the

arbitration regarding his right to be Chapter Leader to advance another theory not to abide by the decision.

The Department's argument that Respondent and his supporters are improperly dividing the school is a euphemism for "union busting." Principal Hill testified that there was no Chapter Leader for the school and accused him of engaging in menacing behavior when he tried to meet with his chapter members outside of the school. Although the Principal professed that she would not interfere with a union election, she did not rebuke Dr. Candia for sending an email having to do with the internal business of the union. Even though she found staff complaints against Portelos to be divisive too, she never took action in this circumstance. The Principal even found wearing the union color of blue to show solidarity to be divisive.

In addition, Respondent argues that the Principal took no responsibility for the breakdown in communication between herself and Respondent. The Superintendent, instead of answering many emails from Respondent, testified that she was instructed by Legal not to respond to them. Respondent also emphasized that even though the Principal opposed polarization of the staff, she had no problem hanging Respondent out to dry in an email where she wrongly assumed he had contacted the media. Respondent's witnesses also corroborated that Principal Hill did not take kindly to criticism and that they themselves experienced retaliation. Some staff members were afraid of retaliation even if they so much as mentioned Portelos' name.

Respondent maintains that notoriety is misconduct only if it significantly and reasonably impairs the capability of the teacher to discharge the responsibilities of his position. Respondent maintains that notoriety brought about by him is not misconduct

40

when the Department contributes to such notoriety by promulgating allegations against him and he creates a website to defend himself against the allegations. Further, Respondent references case law holding that it is not notorious when individuals have to seek out your blog. There was fascination and curiosity by Principal Hill, the Superintendent and other administrators seeking out Respondent's blog to see what he was saying about them. The Department is bound by its charges and cannot discipline Respondent for blogging that is not the subject of the charges themselves.

Alternatively, if any of the Specifications are sustained, Respondent emphasizes that his contributions as a parent, community member, teacher and union advocate for I.S. 49 are significant and should be recognized. Respondent further argues that his online chronicle of the Department's efforts to terminate him from I.S. 49 has no bearing on his ability to be an extremely capable teacher and a good employee.

## DISCUSSION

The Department has the burden to prove that the discipline of Respondent was for just cause. Before turning to the individual Specifications, I will address general arguments raised by the parties that pertain to the Specifications. Respondent has admitted to many of the Specifications. However, with respect to Specifications during the 2011-2012 year, he argues that they do not constitute misconduct because he was retaliated against or "targeted" for discipline because he raised matters of public concern about the budget and CEP in December 2011 and January 2012. As a result, Respondent argues that charges prior to April 26, 2012 should be dismissed. In response, the Department argues that Respondent was not retaliated against but

41

became disgruntled and began to act out in the fall of 2011 after he was passed over for the "lead" tech position by the Principal.[16]

The Department's position that Respondent withdrew from school endeavors and began to embark on "bringing down" the administration in the fall of 2011 is belied by the record. Despite being disappointed, Respondent got more involved, at the Principal's urging, in school policy through the SLT in order to improve the school. T. 2075-2078. He also accepted Dr. Candia's invitation to join the Union Consultation Committee and become Union Delegate. In late October 2011 Principal Hill wrote him a glowing letter of recommendation for the Leadership Academy.

It was not until a series of events in December 2011 and January 2012 that things at I.S. 49 changed dramatically for Respondent. I find that Respondent's raising issues of public concern with respect to the SLT's compliance with Chancellor's Regulations was <u>one</u> in a series of conflicts, described at pages 15-26, that arose between Respondent, the Principal, Dr. Candia and Ms. Abramowitz. It is also evident that Dr. Candia and Ms. Abramowitz came to view Respondent as threatening their positions as Chapter Leader and SLT Chair respectively and aligned themselves with the Principal who had begun to lose trust in Respondent. T. 367. All of the SLT participants agreed that Respondent did nothing wrong by raising these concerns.

The evidence also established that Principal Hill relied on secondhand information from others, made her own unverified assumptions about Respondent, and

---

[16]    The Principal's log shows little activity with respect to issues with Respondent in the fall of 2011. Dept. Ex. 17. The emails between Principal Hill and Respondent in June and July 2011, in which Respondent expressed his disappointment at the handling of Mr. Valia's departure, reflect a frank and open exchange of opinions between Respondent and Principal Hill. Principal Hill demonstrated patience in responding to his concerns and Respondent stated that he found her to be "an approachable supervisor". Dept. Ex. 38.

blamed him for negative press articles and intramural disputes that were developing between teachers and/or within the union. Further, she was "displeased" by Respondent's persistence with respect to the SLT and the CEP and budget when he asked questions and solicited outside advice regarding Chancellor's regulations. This conclusion is supported by her testimony as well as the other attendees at SLT meetings. In late January 2012, Principal Hill told Respondent he had become a "hindrance" to the community and wrote to staff that he was "divisive." Thus, by late January 2012, the evidence supports the conclusion that the Principal was predisposed to find fault with Respondent and, in some cases, overreacted.

At the same time, as Respondent perceived that he was under "attack" by the Principal, Respondent engaged in pushback against her that undermined her authority and constituted misconduct. As discussed more fully in the individual Specifications, some of the discipline during the 2011-2012 school year was for innocuous or petty reasons (as opposed to a pretext or bad faith). However, other conduct by Respondent provided the Principal with legitimate grounds to impose discipline. (See Specifications 6, 8, 9, 25 and 28). Accordingly, the 28 Specifications regarding conduct prior to April 26, 2012 will not be dismissed on grounds of bad faith and/or retaliation but will be addressed on their individual merits.[17]

Further, Respondent's argument that the Department did not conduct a full and fair investigation as required by just cause is not supported by the evidence. Numerous allegations against Respondent were exhaustively investigated by SCI and no charges

---

[17] In mid-April Principal Hill learned that Respondent had made allegations against her with respect to financial misconduct and "double dipping." Twenty-four of the twenty-eight Specifications for misconduct during the 2011-2012 year preceded that date. There is no credible evidence that she knew he had reported these allegations anonymously on January 26, 2012 and that she was retaliating against him for doing so.

43

were issued until the SCI investigation was completed. On another procedural point raised by Respondent, Superintendent Claudio testified that she satisfied the requirement imposed by the 3020-a statute to hold an Executive Session prior to issuing the charges. T. 548.

There were also arguments raised by both parties with respect to the issue of the extent to which Respondent's position as a union representative immunizes or otherwise protects him from discipline. As the Department argues, Respondent cannot use his position as a union representative as a shield against misconduct. Only two of the charges (Specifications 18 and 20) relate to conduct that involved Respondent's position as a union representative. Moreover, Respondent's conduct in the performance of his union duties and/or his substance and style of communicating as Union Delegate and/or Chapter Leader is a matter of internal union affairs. T. 3557.

There was also extensive testimony and documentary evidence regarding the elephant in the room--Respondent's blog chronicling his disciplinary process, airing allegations of misconduct against administrators, and other topics. I address Respondent's blog where it pertains to individual Specifications and in the discussion of the appropriate penalty for Respondent's misconduct. However, I am charged with making findings on the Specifications before me and have no authority to impose discipline against Respondent for uncharged conduct or rein in speech that may enjoy protection under the First Amendment.

Finally, with respect to credibility, Respondent was open and candid while testifying and he made admissions against interest which enhanced his credibility. However, at times, he was self-congratulatory and nonresponsive. There was also a

44

disconnect between Respondent, the soft-spoken and polite witness, and the man behind the computer who shows that he can be acerbic and sarcastic. See Dept. Exs. 66, 72 & 73.

Principal Hill made no effort to conceal the fact that Respondent had been a thorn in her side and that she had become increasingly frustrated with him. She was clearly exasperated by "her ordeal at school with Mr. Portelos" and at times she strained to paint him as a danger, or worse, even though she admitted that he has not made any threats against her.[18] T. 148-149, 172, 271-273. Although she took no responsibility for the breakdown in their communication, she maintained that he was the main reason for the divisiveness in the school. T. 274.

In the few instances in which Specifications require credibility determinations, they will be addressed in connection with those charges. I now turn to the individual Specifications.

### SPECIFICATION 1:

*During the 2011-2012 school year, Respondent engaged in a non-Department of Education ("Department") activity and/or engaged in a private, personal, and/or business activity, including, but not limited to, a real estate practice, on school grounds and/or during the hours that Respondent was scheduled to work for the Department, including, but not limited to, lunch periods.*

### SPECIFICATION 2:

*During the 2011-2012 school year, Respondent, while committing one, some, or all the activity in Specification 1, used Department resources, equipment, and/or supplies, including, but not limited to a Department computer.*

These Specifications are related and will be discussed together. Principal Hill testified that Dr. Candia told her on January 30, 2012 that Respondent was conducting

---

[18] For example, Respondent's lurking around the school was to meet with union members outside of the building because his reassignment barred him from entering the building. T. 147, 267.

his real estate business during school hours. T. 87. She was required to report the allegation to SCI and did so. Dr. Candia also called the SCI hotline anonymously that same date. Dept. Ex. 30. Dr. Candia's allegation was made on the heels of Respondent's speaking at the January 27, 2012 union meeting, declining to resign from his Union Delegate position and so informing UFT members. Dr. Candia admitted that he was very "angry" with Respondent at the time for speaking at the meeting against his wishes and sending his email to union members. T. 1285-1290, 1331-1332, 1358-1359, 1367-1368. The timing of his allegation against Respondent, as well as his admitted animosity toward him, raises some skepticism about this allegation.

Dr. Candia told SCI investigators that he saw Respondent viewing listings on his computer during class time. Dept. Ex. 30. At the hearing, Dr. Candia's testimony was vague and less than definitive. He testified that he saw Respondent viewing real estate listings on his DOE computer "a few times" when he went into his class to talk about an issue or to just to say hello. When pressed, he could not recall whether this was during class time or lunch periods. T. 1304.

The Principal and other administrators were aware that Respondent had a real estate license. T. 293-294. Respondent testified that she gave him time off when he had to take his real estate brokers' license exam. T. 2071. Principal Hill testified that she did not issue any instruction to Respondent that he could not use the internet to check real estate sites during his lunch hour. T. 286. She testified that there is no prohibition on an employee to refrain from using a DOE computer during free periods or non-working hours (such as lunch or after school) for personal business. T. 287.

Respondent also testified that Assistant Principal Aguirre asked him to help her find a tenant for her apartment. In 2009 and 2010, Ms. Aguirre testified that she had asked him to do a real estate presentation for the school's career day. T. 678-679, 2072-2074. It was also established that Respondent listed a house for a retired teacher in June 2011 and later received a commission for the sale. Dept. Ex. 31.

When Respondent was interviewed by SCI, he admitted that he used the school's computer during lunch or after school to check on real estate matters. Dept Exs. 29 & 32. Respondent testified that he primarily used his smartphone to conduct his real estate business. He also testified that he used the DOE computer to check his personal email account during lunch or after school to see if he might have an appointment confirmed after hours. T. 2590-2593. As discussed previously, a Desktop computer, a laptop and two portable school-issued devices were seized from Respondent on February 28, 2012. After seizing the DOE-issued devices that Respondent had been provided, no real estate documents were found on any of them. Joint Ex. 1.

Respondent questioned why Dr. Candia would come into his class while he was teaching (and see him viewing real estate documents on his computer). T. 2598. SCI Investigator Laino conceded that the only support that Respondent used the computer for real estate activity during class hours was Dr. Candia's statement which I find to be less than reliable.

The evidence established that Respondent went above and beyond in volunteering his time to participate in school and union committees, handle Dreyfus49.com issues, robotics, and assisted other teachers with technology related-

47

tasks.  The inference that he was operating a business or "scamming" the Department

by engaging in his real estate business on their time is not supported by Dr. Candia's

testimony or any other evidence.  To the extent that Respondent used the Department

computer to view listings or check his personal email account during lunch or after

school, it was incidental and *de minimus*.  I do not find that Respondent's activity

violated Chancellor's Regulation 110, conflict of interest provisions in the City Charter or

otherwise constituted misconduct.  Dept. Exs. 2, 5, 6 & 7.  Specifications 1-2 are

dismissed.

### SPECIFICATION 4:

*During the 2011-2012 school year, Respondent engaged in a non-Department activity and/or engaged in a private, personal, and/or business activity, including, but not limited to, working on a website known as www.Faceshop.me, on school grounds and/or during the hours that Respondent was scheduled to work for the Department, including, but not limited to, lunch periods.*

### SPECIFICATION 5:

*During the 2011-2012 school year, Respondent, while committing one, some, or all the activity in Specification 4, used Department resources, equipment, and/or supplies, including, but not limited to, a Department computer.*

These allegations are related and will be discussed together.  This allegation was

also initiated by Dr. Candia at the time of the allegation regarding Respondent's real

estate business.  Dr. Candia testified that Respondent talked to him about his Faceshop

website often and "one time he even showed me a little demonstration clip."  T. 1306.

His testimony was inconsistent and shifting with respect to this allegation:

Q.    … And how many times did you see that face shot (sic) dot me on
      his computer?

A.    Maybe once.

Q.    Once?

48

A.     Maybe.

THE HEARING OFFICER:  I'm sorry, maybe once?

A.     Once or twice, not more than that.

T. 1306.

Showing a colleague a website on the internet maybe "once or twice" during school hours, including lunch hours, does not establish that Respondent engaged in any misconduct.  Respondent also testified that he used the Faceshopme.com site in one of his technology lessons for instructional purposes to teach "superimposing."  T. 3116-3120.  Further, Principal Hill testified that "photoshop" (cutting and pasting) was a part of Respondent's technology curriculum.  T. 351-352.  To the extent that Respondent used Faceshopme.com for instructional purposes in teaching technology to students it was for a valid educational purpose.  The Department has not established that any of the *de minimis* activity observed by Dr. Candia is misconduct for which he can be disciplined.  Specifications 4 and 5 are dismissed.

### SPECIFICATION 6:

*During the 2011-2012 school year, Respondent disclosed confidential Department information, including, but not limited to, witness statements, on a non-Department website, including, but not limited to, protectportelos.org.*

On March 16, 2012, Dr. Candia reported to SCI that Respondent posted his witness statement regarding the January 26, 2012 meeting with Ms. Abramowitz on protectportelos.org.  Dept. Ex. 30.  Respondent admitted that he posted the witness statements of Dr. Candia and Ms. Abramowitz regarding the January 26, 2012 meeting on protectportelos.org with his commentary.  T. 2598.  Dept. Exs. 12 & 35.  The witness statements are on Department forms and are used to report incidents that take place

49

within a school.  Principal Hill testified that when teachers provide statements, their expectation is that they are confidential and that they will be used to investigate an allegation.  T. 218.  Principal Hill relied on the witness statements to investigate the allegations that are the subject of Specification 18.  Respondent had been given the witness statements on February 7, 2012 when he received his Letter to File for engaging in unprofessional conduct.  T. 2599.

Respondent argues that no one told him that the statements were "confidential" because they were provided to him by Principal Hill and were part of his personnel file.  T. 2598-2560, 2599.  This is the first of several incidents where Respondent argues he was not put on notice that certain conduct was prohibited.  Although notice to an employee of rules is an element of just cause, the doctrine of constructive notice applies.  An employer is not expected to create a rule for every situation that may arise in the workplace and it is well-settled that there are instances where an employee "knew or should have known" not to engage in an action.  This is one of them.  These witness statements are confidential documents and Respondent should have known not to post them.  He was still teaching at I.S. 49 at the time and so were Dr. Candia and Ms. Abramowitz.  As a matter of common sense, posting the witness statements of two teachers was inflammatory and unprofessional.  If witness statements are published, it may discourage witnesses from coming forward to report incidents in the school.

Further, the fact that Respondent spoke to a FOIL records officer, after the fact, and that they may be "FOILable" does not alter my conclusion.  T. 2599-2600.  Moreover, Respondent could have defended himself against these allegations without

posting the verbatim statements which contained signatures and phone numbers. (When Respondent was asked to remove phone numbers, he did so.) T. 2600-2601.

Respondent also posted his letters of recommendation, "thank yous" and his letters of discipline. Although posting his letters of discipline may have shown poor judgment, these documents related to his own employment and the Department has not established that they are confidential. The Department also takes issue with Respondent's posting of the Principal's time cards, emails and other information that he obtained through FOIL requests. The Department has also not established that these documents are confidential Department information as delineated in this Specification.

The Department has established that Respondent committed misconduct by posting confidential witness statements on his website protectportelos.org. This was unprofessional conduct and conduct unbecoming his position. Specification 6 is sustained.

### SPECIFICATION 7:

*During the 2011-2012 school year, Respondent used his position as a public servant to advance a direct or indirect financial and/or other private interest of his by:*

 A. *Obtaining confidential Department information, including, but not limited to, witness statements not otherwise available to the public.*

 B. *Disclosing confidential Department information on a non-Department website, including, but not limited to, protectportelos.org.*

The evidence established that witness statements, disciplinary letters and letters of recommendation were provided to Respondent by the Principal and other administrators. Other documents, such as the Principal's time cards, were obtained through Respondent's Freedom of Information Act (FOIL) requests. There is no

evidence that Respondent engaged in any misconduct with respect to obtaining these documents.

Specification 7B alleges that the disclosure of confidential information violated the Conflicts of Interest Board Rules ("Board Rules"), the City Charter 2604(b)(2) and/or (b)(3) and Chancellor's Regulation C-110 which prohibit conflicts of interest. Dept. Exs. 2, 5, 6 & 7. These conflict of interest provisions and policies prohibit disclosing confidential Department information not otherwise available to the public and are not applicable to Respondent's disclosure of the witness statements that are referenced in Specification 6. Specification 7 is therefore dismissed.

### SPECIFICATION 8:

*During the 2011-2012 school year, Respondent inappropriately accessed and/or retrieved Department information, including, but not limited to, a Department email account and/or email messages of another Department employee.*

On March 28, 2012, Dr. Candia reported an allegation to SCI that Respondent had "hacked" into Dreyfus49 and copied his personal emails to the Principal concerning school matters. Dept. Ex. 30. Respondent admitted that in March 2012 he went into the Dreyfus49.com website to view Dr. Candia's emails after he had terminated the website. T. 2603. He testified that he knew something strange was going on and he wished he could be a "fly on the wall":

> Q.  In the two weeks it had been closed, had you been given any directive to turn over all the rights or all documents or anything associated with that site?
>
> A.  Nothing, nothing. And I typed in Portelos in the search. I was like I want to see every time he mentioned my name. I'm going to find out what was going on or other than trying to find out, at least get some answers and maybe I could get some sleep. I don't know. I really don't remember the state of mind. I just remember it was one of great confusion and stress. And I saw that A, on February 27,

> when he'd asked me to resign, he had blind carbon copied the administrators and Sean Rotkowitz. I didn't care so much about Sean Rotkowitz.
>
> Q.   Was that January 27?
>
> A.   Yes. And I was really taken aback. I was like, oh, my god. I was like why is he getting them involved. Then I saw that email where ousted everyone and I was really taken aback 'cause it was not just me and him, now he brought 15 other people, innocent people, into this and I was what do we do now?

T. 2603, 2606-2607.

Prior to searching Dr. Candia's email, Respondent contacted Google and again confirmed that he was the sole owner of the website – "all its data, emails and everything." T. 2605. He described it as "David vs. Goliath" because he had no union representative to back him up. T. 2613-2615.

Although Respondent argues that he was the owner of the website, this does not excuse his conduct. The fact that his conduct was "not illegal" per his discussions with Google does not mean that the Department cannot discipline him for it. This is the first of several situations to be addressed in later Specifications where Respondent takes the misguided position that if something is not illegal it shields him from discipline.

Respondent testified that he believed that the Department's Internet Acceptable Use Policy (IAUP) applied only to Department of Education websites and not to the school's website. T. 2604; Resp. Ex. 19, Dept. Ex.4 (IAUP revised July 2012). In correspondence with DOE's Technical Department, the DOE official stated that the IAUP applied when Department resources were used, such as Department computers. Resp. Ex. 18. When Respondent searched these emails, he was at home. However,

during the three years that the school's Dreyfus website was operational, students and staff were using Department resources for emails, instruction and other purposes.

Respondent also argues that the IAUP puts users on notice that they are not entitled to privacy. Even though the IAUP states that administrators may have access to employee emails, once the Dreyfus system was terminated pursuant to the Principal's directive, Respondent was no longer an administrator of the website. Moreover, even as an administrator, he was not supposed to read other people's emails and there is no indication that he felt he was entitled to do so. The IAUP also prohibits "unauthorized users" and "modifying passwords belonging to other users, or attempting to login through another person's account." Resp. Ex. 19. Although Respondent testified that he routinely reset passwords for students, resetting the password of Dr. Candia to search his email was not done at Dr. Candia's request but on Respondent's own initiative.[19]

Finally, on March 19, 2012, just prior to terminating the Dreyfus website, Respondent emailed teachers to inform them that he would safeguard their privacy. Dept. Ex. 14. Teachers who had used the Dreyfus system for years had no reason to believe that their emails would become public. To view the emails of a fellow employee effectively undermines the confidence of users of a school website.

Even though Respondent was the legal owner of the contents of the site, it showed poor judgment to search Dr. Candia's email account. The fact that his search yielded information that was relevant for his defense does not excuse the conduct--the

---

[19] Respondent also argued that he did not reset the password on a "Department" email account because he was the legal owner of Dreyfus. T. 2613-2614. For the reasons stated here and in connection with Specification 28, I find this to be a distinction that ignores the purpose and function of the Dreyfus49 website.

end does not justify the means.  Moreover, Respondent demonstrated that he knew his conduct was inappropriate because he developed a ruse to explain to other teachers how he had obtained the Candia email.[20]  T. 2607-2608.  Accessing and retrieving the email of another teacher was inappropriate, unprofessional and conduct unbecoming his position.  Specification 8 is sustained.

### SPECIFICATION 9:

*During the 2011-2012 school year, Respondent inappropriately accessed a Department email account and/or email messages of another Department employee.*

Respondent admitted this allegation.   T. 2612.   He testified that, with the exception of the Candia email referenced in Specification 8, he built a "moat" around the Dreyfus site after it was terminated and did not touch it.  T. 2607.  However, in May or June of 2012, after he had initiated a First Amendment lawsuit against the Department, he and his attorney had discussions about emails of Principal Hill and whether they were accessible under FOIL.  He admitted that he accessed Principal Hill's Dreyfus email account and searched for Portelos.  T. 2612.  Respondent noted that the emails were available through discovery in his federal lawsuit.  However, the fact that he might have been able to obtain them through other means does not absolve him of misconduct in mining them off the Dreyfus website.

Other evidence established that Respondent accessed some of the Principal's emails in March 2012 prior to his filing of the lawsuit.  On March 29, 2012, the Principal contacted SCI with the allegation that "Portelos read, printed out and distributed Hill's private emails."  Dept. Ex. 30.  She also stated that despite her directive to shut down

---

[20] As a Union Delegate, Respondent decided it was important to let the named teachers know what their Chapter Leader had done.  T. 2607-2610.

the website Respondent "only changed the accessibility to the site so that only Portelos could manipulate the site's contents." Dept. Ex. 30; See also Dept Ex. 14.

The Principal testified that Respondent's posting of her emails adversely impacted her and the school. T. 143-144. For the reasons also discussed in connection with Specification 8 (and Specification 28, infra), Respondent's conduct was inappropriate, unprofessional and conduct unbecoming his position. Specification 9 is sustained.

### *SPECIFICATION 10:*

*During the 2011-2012 school year, Respondent inappropriately reset the password for a Department email account and/or the email account of another Department employee.*

As previously discussed in connection with Specification 8, Respondent accessed Dr. Candia's Dreyfus email account by resetting the password. I find that the conduct alleged in Specification 10 is merged or subsumed within that Specification. I therefore find no additional misconduct alleged in this Specification. Specification 10 is dismissed.

### *SPECIFICATION 11:*

*During the 2011-2012 school year, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself when he inappropriately accessed and/or retrieved Department information, including, but not limited to, a Department email account and/or email messages of another Department employee.*

### *SPECIFICATION 12:*

*During the 2011-2012 school year, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself when he inappropriately accessed a Department email account and/or email messages of another Department employee.*

Specifications 11 and 12 are related and will be discussed together.   Both Specifications rely on the conduct sustained in Specifications 8 and 9.  I do not find that Respondent's conduct is a violation of the City Charter, Board Rules or Chancellor's Regulation 110 regarding conflicts of interest.  Dept. Exs. 2, 5, 6 & 7.  Specifications 11 and 12 are dismissed.

### SPECIFICATION 13:

*During the 2011-2012 school year, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself when he inappropriately reset the password for a Department email account and/or the email account of another Department employee.*

Specification 10 has been dismissed.   Because it is the predicate for this Specification, Specification 13 is also dismissed.

### SPECIFICATION 14:

*During the 2011-2012 school year, Respondent inappropriately manipulated and/or caused Department computer(s) at I.S. 49 to direct the user to a non-Department website, including, but not limited to, Protectportelos.org.*

These charges relate to an incident that occurred shortly after Respondent was removed from I.S. 49 and a substitute teacher, Mr. Igbayo, was assigned to cover his class.  On May 4, 2012, Mr. Igbayo became concerned when he saw a pop-up on one of the student's computer screens that said "Mr. Portelos' class is fun."  He also reported that the computers did not have a direct Internet Explorer connection and were forced to go through "MrPortelos" desktop icon to log onto the internet.  He also testified that Mr. Portelos' STEM site appeared to be different.  T. 556-558.  Mr. Igbayo testified as follows:

> Q.     And the link you had to go through, did that link to any other
>          websites?

A.      It was a general – I believe it was something similar to like a homepage that he constructed, or teacher's page, or something to follow-up with students about their homework, going over the lesson and, you know, things of that sort. … And then later, the site had been updated. The color was changed and then periodically there was another site that actually linked up and that I saw while trying to go to the internet.

Q.      And what was that other site you were talking about?

A.      The first site was the homework site.  The second site was a site that was constructed in regards to Mr. Portelos having grievances with the Principal and various parts of the educational system.

T.      555-557.

Mr. Igbayo testified that the second site to which he referred in his testimony was

protectportelos.org.  T. 557.  Mr. Igbayo summoned Assistant Principal Martino who

was in a meeting with Network Achievement Coach Sharon Mahabir and Principal Hill.

The Principal asked them to go to the computer lab.  Assistant Principal Martino testified

as follows:

A.      … We were just checking all the computers and, you know, trying to figure out how this popped up.  So as we were looking to see how students, you know, would log in to go onto the internet, instead of internet explorer, there was a web page set up by Mr. Portelos.  So I'm assuming that's how they always got onto the internet.  So I guess they can go on to the assignments, whatever else, to the different things they could click on.  So when we went to click on, I remember it was a box to the right, it was – we were directed to the Protectportelos.com or whatever it was, so it directed us to that site.

T. 795, 958-960.

Assistant Principal Martino testified that the group decided that every computer in

the room had to be re-imaged.  A DOE technician was dispatched to perform this task

and the classroom was not used for a few weeks until this was accomplished.  T. 785-

58

786.  Principal Hill asked Mr. Igbayo to prepare a written statement which he did the following day.  Dept. Ex. 22.  This incident became one of great concern within the administration who feared that Respondent was able to access and manipulate Department computers from an offsite location.

On approximately May 15, 2012, Principal Hill reported this incident to SCI. Dept. Ex. 30.  Her notes confirmed that the computers were re-imaged with the exception of one computer in case an investigation needed evidence.  Dept. Ex. 17. Principal Hill told SCI Investigators that after Respondent was reassigned in April 2012, she had the locks to the computer room changed to deny Respondent access to the computers and the server.  Dept. Ex. 32.

Respondent testified that well before his removal from I.S. 49, he had created a website for his students "MrPortelos.com."  This website contained all his lessons and other instructional materials for his students:

> A.  So the reason that Mr. Portelos icon showed up on the computer was cause it sent it to explorer.  They might remember when they're home to watch, because they could watch those videos at home, MrPortelos.com, and if I put any other site for it to come up like MSN, they'll start looking, oh, look at the news, Justin Bieber is dating who or whatever.  So, Mr. Portelos is the icon – MrPortelos.com is the website to go to.  Even after I was removed, I guess that's how they left it.
>
> Q.  Did you ever direct any Department computer to somehow take people to protectportelos.org?
>
> A.  No.

T. 2617-2618.

Respondent further testified that he had no ability to access his classroom or other DOE computers after he was removed from I.S. 49.  T. 2618, 2708-2713.  This

testimony was also corroborated by the Department's technician who re-imaged the computers and told SCI Investigators that "Portelos could not access the I.S. 49 computer system from a remote location." Dept. Ex. 32. The image taken of Mr. Portelos' computer by SCI Investigators shows an icon with the text MrPortelos... Dept. Ex. 31. Another image shows Mr. Portelos' STEM site menu (with depiction of the videos referenced in his testimony above) and learning objectives.

The evidence established that Respondent had created the MrPortelos.com website for the use of his students. Although he testified that at a later time he forwarded visitors to MrPortelos.com to protectportelos.org, this action was accomplished without any manipulation or access to Department computers. (See Specification 31). Alternatively, the Department argues that directing users to his website (without manipulating or causing the Department computers) would establish this Specification. T. 3510. However, the Specification alleges that he manipulated or caused the computers to direct users to protectportelos which Respondent did not do. The specific conduct alleged in the charge cannot simply be ignored because the evidence did not conform to the Specification. The Department has not established that in the 2011-2012 school year, Respondent inappropriately manipulated and/or caused Department computers at I.S. 49 to direct the user to protectportelos.org. Specification 14 is dismissed.

### SPECIFICATION 15:

*During the 2011-2012 school year, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself by inappropriately manipulating and/or causing Department computer(s) at I.S. 49 to direct the user to a non-Department website, including, but not limited to, protectportelos.org.*

Specification 14 has been dismissed.   Because it is the predicate for the allegations in this Specification, Specification 15 is dismissed.

### SPECIFICATION 16:

*On or about February 9, 2012, Respondent remained inside I.S. 49 until approximately 5:57 P.M., in violation of Principal Linda Hill's directive requiring that all staff personnel vacate school premises by 5:30 P.M.*

Principal Hill testified that she had issued a directive to staff to advise her, in advance by email, if they would be remaining in the building after 5:30 p.m. Respondent testified that he was aware of the directive.   However, on February 9, 2012, he testified that he lost track of the time and was in the building until approximately 5:47 p.m.   Before leaving he knocked on the Principal's door but she refused to open it and speak with him and said "out now, get out, no."  T. 2561-2564.

Principal Hill testified that she did not open the door because she was startled and felt threatened.   She also confirmed that when Respondent asked to speak to her she told him "no" and asked him to leave.   When asked if she would have refused to speak with a teacher other than Mr. Portelos she was evasive.   T. 76-78, 289-292.

On February 17, 2012, Principal Hill issued Respondent a Letter to File for insubordination regarding his failure to follow this directive.  Dept. Ex. 13.  This one time oversight, under the circumstances described above where she refused to speak to him, was not insubordinate or conduct for which he can be disciplined.   Specification 16 is therefore dismissed.

### SPECIFICATION 17:

*On or about February 9, 2012, Respondent failed to leave I.S 49 through the main lobby exit after official school hours as directed by Principal Linda Hill.*

This charge is related to Specification 16.  The Principal's directive to teachers regarding staying after hours also included instructions to exit through the main doors of the lobby.  Principal Hill testified that after Respondent left the building she reviewed the hallway video to see which door he exited through.  T. 78.  The video showed that Respondent did not leave through the main doors as he should have in her after hours instructions to staff.

Respondent testified that he did not recall which door he exited through but that he was very flustered after the Principal refused to speak with him.  After she told him to leave, he testified that he would have headed for the nearest exit.  T. 2618.  He also testified that he had observed other teachers leaving through other doors after hours who were not disciplined.

I do not find that Respondent's exit, on one occasion through the wrong door, constitutes misconduct for which he can be disciplined.  This Specification falls within the realm of picayune and innocuous conduct and it is therefore dismissed.

### SPECIFICATION 18:

*On or about January 26, 2012, during a meeting with Susanne Abramowitz and UFT Chapter Representative Dr. Richard Candia, Respondent engaged in unprofessional and/or inappropriate conduct, in that Respondent:*

A. *Referred to Ms. Abramowitz, in sum and substance as, a fuck.*

B. *Raised his voice.*

C. *Waived and/or flailed his arms in Ms. Abramowitz's face.*

D. *Pointed his finger at Ms. Abramowitz.*

E. *Caused papers to fall to the ground.*

F. *Stormed out of the office.*

62

These charges relate to conduct at the meeting on January 26, 2012 between UFT Chapter Leader, Dr. Candia, Ms. Abramowitz and Respondent who were also members of the Union Consultation Committee. The Committee meets periodically with the Principal to raise issues of concern to its members. Respondent had asked Dr. Candia to mediate the disagreements he was having with Ms. Abramowitz. T. 1347, 2427-2438; Dept. Ex. 34A. Dr. Candia also testified that he did not want to have dissension on his consultation committee. T. 1348.

Respondent testified that the meeting began cordially but became very heated as he and Ms. Abramowitz began to argue. Respondent admitted that at one point he was yelling but stated they were both doing so. T. 2819. Respondent admitted waving his arms as he uses his hands when talking. (This tendency of Respondent was also observed by the Hearing Officer as he testified during multiple days of the hearing). He also admitted pointing at Ms. Abramowitz with his finger. T. 2819-2820. Ms. Abramowitz testified that he waved his arms in front of her face but Respondent testified he was seated across the table from her.

Respondent testified that Ms. Abramowitz called him "f-ing nasty" and told him that he was "full of shit" and at some point stated that he was a "fucking idiot". T. 2624. Respondent denied calling her a "fuck" but volunteered that after she told him he was full of shit, he replied in kind. T. 2620, 2820.

Ms. Abramowitz admitted that she called Respondent "a fucking idiot."[21] She also admitted that they were both yelling. Ms. Abramowitz demonstrated how Responded flailed his arms at her. She testified that she did not know how the papers

---

[21] In a deposition in another matter, Ms. Abramowitz listened to a tape recording of her voice during this incident. T. 1180.

fell on the floor.  T. 1188-1190.  Respondent testified that as he left the meeting, he misjudged the table and dropped the papers he was holding.  T. 2451.

Respondent admitted that he walked out or "stormed" out of the meeting to go into an adjoining classroom to speak with the participants of another meeting that is the subject of Specification 19.  Ms. Abramowitz testified that she was shaken up after the meeting; however, she also admitted that Respondent was "quite upset" as well.  T. 1155-1156, 1232.

Immediately following the incident, Ms. Abramowitz testified that Dr. Candia told her that she "needed to go into the office."  Dr. Candia proceeded to give his account of what had happened to Principal Hill and told Ms. Abramowitz that she should write a statement.  T. 1192.  She testified that she decided to provide a witness statement about the incident the following day after discussing what had transpired with her husband.  Dept. Ex. 12.  However, Ms. Abramowitz omitted any reference to her profanity in her statement and focused only on what Respondent said to her.

Dr. Candia also provided a witness statement regarding the meeting.  Dept. Ex. 12.  Dr. Candia testified that Respondent called Ms. Abramowitz a "fuck."  T. 1280.  He further testified that "[t]empers flared between both parties.  Mr. Portelos got very loud.  Ms. Abramowitz started to argue back with him."  T. 1280.  However, he had no recollection of Ms. Abramowitz using profanity toward Respondent.  T. 1342. Dr. Candia testified he did not remember because "they were both yelling at the same time."  T. 1343.

The Department contends that the statements made by Ms. Abramowitz and Dr. Candia with respect to Specifications 18 and 19 were consistent.  Further, the

Department notes that Respondent did not inform Principal Hill at his disciplinary conference that Ms. Abramowitz was the first one to use profanity toward him. Moreover, the Department submits that Respondent did not present his tape recording of the incident to Principal Hill or at this proceeding.

On the other hand, Respondent contends that Dr. Candia and Ms. Abramowitz made false statements about his conduct and omitted any reference to Ms. Abramowitz' provocation and/or profanity. Respondent also submits that this meeting involved three members of the Union Consultation Committee and the form or content of their disagreements concerned union affairs and should not be subject to discipline.

It was apparent that Ms. Abramowitz was genuinely upset by Respondent's conduct during this meeting. Respondent admitted that he became angry, upset and that he yelled. Ms. Abramowitz admitted that she yelled that she unleashed the "fucking idiot" comment to Respondent. Yet, it is very troubling that she left this important detail out of her written statement to the Principal concerning the incident and only described Respondent's conduct. Likewise, Dr. Candia also failed to mention Ms. Abramowitz' use of profanity in his statement.

The written statements of Dr. Candia and Ms. Abramowitz were self-serving and inaccurate as they told only one side of the story leaving the Principal with the wrong impression that Respondent was entirely at fault. Principal Hill relied on their statements in issuing a Letter to File to Respondent. She had not heard any suggestion that Ms. Abramowitz had used profanity toward Respondent until the hearing. T. 300. Respondent testified he did not bring it up at his disciplinary conference because it was a meeting between union members and to do so would be "childish." T. 2632-2634.

65

The discrepancies between the written statements and the testimony by Dr. Candia and Ms. Abramowitz regarding this incident cannot be reconciled. Their testimony that they did not remember Ms. Abramowitz' profanity toward Respondent when they wrote statements the next day was implausible. T. 1211-1212, 1334. This is especially so when their memories at that time should have been more accurate than nearly two years later at the hearing.

It is also relevant that these statements were written right after the January 27, 2012 union meeting in which Dr. Candia felt betrayed by Respondent and was angry with him. Dr. Candia admitted that he overreached in his witness statement when he accused Respondent of "erratic, unpredictable, and unprofessional behavior *over a period of weeks.*" He failed to identify anything other "bickering" that was going on between the two that was unprofessional. T. 1340-1341, 1350-1351.

Respondent's testimony denying that he called Ms. Abramowitz a "fuck" is credited. Respondent also made admissions against interest (volunteering that he responded to Ms. Abramowitz that she was "full of shit" when there was no such allegation). T. 2624-2625. Further, Respondent admitted that he yelled during part of the meeting, pointed his finger, waved his arms and hands, caused papers to fall to the ground and stormed out of the meeting. Nonetheless, raised voices, waving arms and hands, pointing a finger and dropping papers on the floor is not misconduct under these circumstances. Nor do I find that he can be disciplined for "storming" out of a meeting that he initiated. All three participants were members of the Union Consultation Committee who were having a heated argument. This is a far cry from a situation

where an argument between colleagues resulted in physical violence.[22]  Specification 18 is dismissed.

### SPECIFICATION 19:

*On or about January 26, 2012, Respondent entered an ongoing meeting without permission or authority and engaged in unprofessional and/or inappropriate conduct, in that Respondent:*

    *A.    Disrupted the meeting.*

    *B.    Attempted to take control of the meeting.*

    *C.    Addressed the attendees and demanded to know if Ms. Abramowitz had polled them about school academies.*

Dr. Candia's written statement about the argument in Specification 18 also referenced the allegations in this Specification. Dept. Ex. 12. Specifically, he stated that Respondent entered the room next door and "began yelling at the group of teachers" and "demanded to know whether Susanne polled them on the issue of dissolving academies." Dept. Ex. 11. Both Ms. Abramowitz and Dr. Candia testified that Respondent ran into the meeting next door and that Respondent was yelling. T. 1281.

Respondent testified that when he entered the meeting, he excused himself and explained that there was something he was trying to straighten out. He told them that Ms. Abramowitz had just denied polling teachers about the academies issue. He described his demeanor as "flustered but polite." T. 2822.

Respondent estimated that he was in the other classroom for approximately 40 seconds when Ms. Abramowitz and Dr. Candia entered the classroom. Respondent admitted that he interrupted or disrupted this meeting but testified that Ms. Abramowitz

---

[22]   The Department cited several 3020-a decisions where arguments between teachers escalated into physical altercations.

partook in whatever disruption took place.  T. 2625-2628, 3357-3358.  This occurred minutes before the homeroom bell rang at 8:00 a.m.

Ms. Abramowitz acknowledged that she entered the classroom and engaged in discussion with the participants.  She also testified that she had been asked by Assistant Principal Diacomanolis to find out if Respondent had been polling teachers about the academy issue.  T. 1194.  Ms. Abramowitz received no discipline for disrupting this meeting.

Ms. Wolfson, who was a participant in this meeting, testified that Respondent came into the meeting and that they (Respondent and Ms. Abramowitz) were both angry.  According to Ms. Wolfson, Respondent asked, in a loud voice, whether "she," Ms. Abramowitz, had polled them about school academies.  Ms. Wolfson testified that the meeting was almost over because classes were about to begin.  T. 1003.

Respondent admitted, on cross-examination, that he interrupted and/or disrupted the meeting and could have waited until another time when these teachers were available to speak with them.  T. 2823.  Even though Respondent should have exercised more self-control, I do not find that his conduct in asking about the polling or disrupting the meeting amounts to conduct for which he can be disciplined.  This was a small meeting of teachers which was about to end as it was nearing homeroom time.  There was also no evidence that he attempted to take control of the meeting.  It is doubtful this would have become a matter of discipline but for the issues that have been discussed in Specification 18.  Neither Ms. Wolfson, nor any other participants in the meeting, reported that Respondent acted unprofessionally.  Specification 19 is dismissed.

68

### SPECIFICATION 20:

*On or about January 28, 2012, Respondent, without consulting, notifying, and/or seeking authorization from Principal Hill or the I.S. 49 administration, sent a mass email to numerous staff members at I.S 49 using the school's Dreyfus email account system, in violation of Principal Linda Hill's previous directive indicating that mass emails were not to be sent to staff members without her approval.*

It was not disputed that in the fall of 2011 the Principal had issued a directive to Respondent that prohibited sending mass emails to staff using the Dreyfus email account system without prior approval. The directive was issued after Respondent had sent an email to the staff on November 4, 2011 reminding staff who had technological issues not to call about them during class time but to report them on the Dreyfus website. Dept. Ex. 54.

As discussed previously, when Respondent replied to Dr. Candia's request for him to resign as Union Delegate on January 27, 2012, he copied UFT.members@Dreyfus.49.com. Dept. Ex. 34A. On January 28, 2012, Respondent learned that his administrator rights and email account on the Dreyfus website had been suspended. On Sunday, January 29, 2012, Respondent sent Principal Hill an email stating that he believed that the contract prohibited her from preventing union members from communicating. Resp. Ex. 5. That afternoon Principal Hill replied that Respondent had deliberately disobeyed her directive not to send mass emails and that she had suspended his Dreyfus email account. Resp. Ex. 5. A Letter to File was issued to Respondent on February 7, 2012 stating that Respondent engaged in unprofessional conduct by sending a mass email on the Dreyfus email system without prior approval. Dept. Ex. 10.

Respondent testified that he copied an existing group list of UFT members and that his email was not sent to the entire staff (i.e., custodians, safety personnel, administrators). He stated further that he did not believe that her directive applied to an email to the UFT group. T. 2539-2541.

Principal Hill testified that Respondent's email went to a non-UFT member--a teacher who had retired and who she assumed was no longer a UFT member. Principal Hill also testified that she assumed that Respondent had created the UFT group list and said he did so "without her authority." T. 262. In any event, Ms. Hill acknowledged that the substance of Respondent's email response to Dr. Candia pertained to union business. T. 263-264.

The Department has not established that Respondent violated the Principal's directive against sending a mass email. The email cc: line shows that it was sent to a group list of UFT members and not to the entire staff. Dept. Ex. 34A. The fact that the UFT list had not been updated and contained the name of a retired teacher does not render it an email to the entire staff. Dr. Candia had created and used the group UFT list in the past to communicate with union members and there were no repercussions. T. 1425-1426, 2557-2558.

Moreover, this email dealt exclusively with internal union affairs—the request of the Chapter Leader for the Union Delegate to resign (an elected position) as well as notification to Respondent that he was being removed from the Union's Consultation Committee (an appointed position). To discipline a union representative for sending an internal union communication to members would have a chilling effect on union affairs. Specification 20 is dismissed.

***SPECIFICATION 21:***

*On or about December 3, 2012, Respondent called the teacher's lounge at I.S. 49 and informed a staff member, in sum and substance, that he had a camera in the lounge and was taping the staff.*

This incident occurred after Respondent's removal from I.S. 49. Ms. Buonviaggio testified that she was in the teacher's lounge and that Mr. Portelos phoned to ask about whether an item had been posted on the bulletin board. When she picked up the phone he identified himself as "Frankie." She testified that he told her that he could see the staff because had a video camera in the lounge. T. 1075. She testified that she was "bugging out because he was out of the building, and like I was hearing all these crazy things that he was doing and whatever or not doing..." According to Ms. Buonviaggio, another teacher, Ms. Vines-Monohan was also nervous and informed Principal Hill about the conversation. Thereafter, Ms. Buonviaggio wrote a statement concerning the incident. T. 1077-1078.

Ms. Vines-Monohan testified that Ms. Buonviaggio told her that Respondent had asked who was in the lounge. When Ms. Buonviaggio replied "I can't tell you that," she told Ms. Vines-Monohan that Respondent said that he knew who was down there because he had a video camera in the teacher's lounge. T. 1486. Ms. Vines-Monohan testified that she asked the school secretary if someone could call the phone from outside of the school because she was under the impression that calls came in on an inside line.

Another teacher, Ms. Campbell, was also present in the teacher's lounge when Respondent called. Ms. Campbell testified that Respondent could be sarcastic and would say something in a serious tone that was meant in jest. T. 1788-1789. At the

71

time she thought his comment "was a good joke." T. 1788. Neither Ms. Vines-Monohan nor Ms. Campbell had any adverse reaction to Respondent's attempt at humor. They also confirmed that Ms. Buonviaggio appeared to be upset after speaking with Respondent. Obviously, only she could hear his tone of voice and the actual substance of his statement.

Respondent testified that when he called the teacher's lounge and Ms. Buonviaggio recognized his voice asking "is this Frankie?," he responded yes, and said something about being able to see people there because of the cameras as a "stupid joke." After his comment, she told him that she had to go and hung up. Respondent testified he thought nothing more about it until he received the charges in this matter. T. 2630-2631.

An investigation conducted by the administration confirmed that there was no camera in the teacher's lounge. T. 307. That Ms. Buonviaggio took Respondent literally, I do not doubt. It bears noting that this incident occurred over six months after Respondent had been reassigned from I.S. 49. At this point, it was apparent that there were concerns, on the part of the administration and others, that Respondent was manipulating school computers and accessing the school's telephone recording. (See Specifications 14, 30 & 31). It was also clear throughout the course of the hearing that Respondent's technological prowess, while considerable, had become grossly exaggerated. This Specification involves picayune, innocuous conduct that cannot be subject to discipline. Specification 21 is dismissed.

**SPECIFICATION 22:**

*During the 2011-2012 school year, Respondent, while committing one, some, or all the activity in Specification 21, caused staff members at I.S. 49 to feel nervous and/or uncomfortable.*

Under the circumstances discussed in Specification 21, there is no basis on which to find that making another staff member feel nervous or uncomfortable can result in discipline. Specification 22 is dismissed.

**SPECIFICATION 23:**

*On or about January 25, 2012,[23] Respondent, without consulting, notifying, and/or seeking authorization from Principal Hill or the I.S. 49 administration:*

A. *Accessed the school website, www.Dreyfus49.com, through an alternative access point that he created when he developed the site.*

B. *Reinstated his administrative privileges on the www.Dreyfus49.com website after they had been revoked.*

Respondent was an authorized administrator of the Dreyfus49 site. Respondent testified that on or about this date he was unable to change a student's password on the Dreyfus system. He saw that his administrator privileges had been revoked. When Respondent contacted Google, he learned that Mr. Rossicone, the other technology teacher, had rescinded his privileges. T. 2578-2580, 2909-2912. Respondent testified that this confused him and he contacted former I.S. 49 technology teacher Mr. Valia.

At the time the system was set up a backdoor account called "BMAC" had been created. After speaking with Mr. Valia, Respondent used the BMAC account to restore his administrator privileges. T. 2222-2223, 2788, 2904. This was also confirmed by SCI's interview of Respondent and documentation from the Dreyfus activity log. T. 849-

---

[23] The activity log shows that these actions occurred on January 26, 2012. Dept. Ex. 31; T. 3524.

850; Dept. Ex. 31. The reason why he was unable to gain administrative access on this date was not apparent on the record.

In later testimony, Respondent testified that Mr. Valia used BMAC to help him reinstate his administrator privileges. T. 2904.[24] Respondent's testimony was contradictory on this point but the evidence established that Respondent was able to restore his administrator privileges on January 26, 2012. T. 2899-2906.

At this time, Respondent was an authorized administrator of the Dreyfus49 website. He had been not been informed by any administrator that his privileges had been revoked. There is also no evidence that Principal Hill (or any other administrator) ever spoke to him about the revocation of his administrator privileges or his actions to reinstate them. There is no basis to conclude that Respondent did anything inappropriate to restore his privileges as an administrator of the site in order to reset the student's password. Accordingly, Specification 23 is dismissed.

### *SPECIFICATION 24:*

*On or about January 28, 2012, Respondent, without consulting, notifying, and/or seeking authorization from Principal Hill or the I.S. 49 administration:*

> *A. Accessed the school website, www.Dreyfus49.com, through an alternative access point that he created when he developed the site.*

> *B. Reinstated his administrative privileges on the www.Dreyfus49.com website after they had been revoked.*

On January 28, 2012, Respondent found that he was unable to access his Dreyfus email account and that his administrator privileges had been revoked again.

---

[24] Respondent referenced the IP addresses that appear on Exhibit 31. In addition, when Principal Hill was interviewed by SCI, she informed them that Mr. Valia told her he had assisted Respondent in restoring his administrator privileges. Dept. Ex. 30.

Respondent admitted that he accessed the Dreyfus system and reinstated his gmail account and administrator privileges by using the BMAC account.  T. 2633-2634, 2787.

Respondent testified that this occurred right before he was due to go to his school administration class on Saturday morning and that he took the action to protect against any possible security breach of the system.  T. 2990-2991.  It was also the day after the union meeting and exchange of emails with Dr. Candia about resigning his Union Delegate position.  Principal Hill testified that she suspended Respondent's email account and administrator privileges after Dr. Candia complained to her that Respondent had sent his email asking Respondent to resign as Union Delegate to union members.  However, she did not inform Respondent that she was taking this action.  Given recent events, it was not unreasonable for Respondent to restore his gmail account and/or administrator privileges.  He testified that progress reports were due and that he needed to access the Dreyfus site in order to submit them.  Resp. Ex. 16.  Respondent's conduct cannot be subject to discipline when he was never advised why his Dreyfus email account and administrator privileges had been suspended by the Principal.  Specification 24 is dismissed.

### SPECIFICATION 25:

*On or about January 28, 2012, Respondent, without consulting, notifying, and/or seeking authorization from Principal Hill or the I.S 49 administration, accessed the school website, www.Dreyfus49.com, as a site administrator and manipulated the settings to revoke the administrative rights and/or privileges of all individuals previously granted such administrative access.*

Shortly after Respondent accessed the system to restore his Dreyfus email account and his administrator rights as described in Specification 24, he then suspended the rights of all other administrators including the Principal.  T. 2548-2549,

2634. (The other administrators were technology teachers). Respondent testified that he feared that there had been a breach of security on the Dreyfus site. T. 2684. Respondent testified that he "took it upon [himself] to make believe – to make sure I was, so to speak, the only one with the key until we could figure things out." He testified that all individuals maintained their access to Dreyfus but that by rescinding their administrator privileges he ensured that the system was secure. T. 2547-2548. Respondent also testified he revoked the administrator rights of others to ensure that no one could do "this" (deny him access and administrator privileges) again. The Principal's administrator privileges were restored by the next day, Sunday January 29, 2012, by someone other than Respondent. T. 2996; Dept. Ex. 31. Principal Hill testified that she was shocked that Respondent had revoked her administrator privileges. T. 62.

Respondent's testimony about his fears that there had been a security breach testimony disassembled as he testified further about the chain of events. T. 2986-2913. Although he initially stated that he built a firewall around the system because of a possible security issue, he later testified he thought that revocation of his administrator rights could have been a form of discipline imposed by Dr. Candia because he saw there was email activity between Dr. Candia and Principal Hill over the weekend. T. 2543-2547, 2914-2922. He further testified he did not want to disturb the Principal at 6:30 a.m. on a Saturday. Nonetheless, he could have easily contacted the Principal later in the morning to let her know of his concerns before he unilaterally rescinded her and the other teachers' administrator privileges.

76

Respondent also admitted in his cross-examination that control of the Dreyfus website had become a "power struggle". T. 2907. His vacillating testimony does not adequately explain or justify his unilateral action to rescind the rights of all other administrators, including the Principal. This action by Respondent to rescind other personnel's administrator privileges was outside his authority as an employee—even one who had been granted administrator rights. This action was the start of when Respondent began to leverage his ownership rights of the Dreyfus website against the Principal. Respondent's conduct to revoke administrator privileges of the Principal and others without consulting or notifying Principal Hill was inappropriate and conduct for which he can be disciplined. Specification 25 is sustained.

### SPECIFICATION 26:

*On or about January 28, 2012, Respondent, without consulting, notifying, or seeking approval from Principal Hill or the I.S. 49 administration, manipulated the school website, www.Dreyfus49.com, by creating an alternative access point into the system that enabled him to maintain administrative access to the site in the event that the alternative access point, as mentioned in Specifications 23 and 24, was disabled.*

Respondent's testimony with respect to this Specification was also vacillating. Respondent denied creating the alternative access point. T. 2636. However, Respondent told SCI that he asked Mr. Valia to create "RN1213@Dreyfus.com" as an alternate access point in case the BMAC account was shut down. Dept. Ex. 29; T. 849-850. According to the Dreyfus activity log, this action was taken on Sunday, January 29, 2012 shortly after midnight. Dept. Ex. 31. This occurred before Principal Hill advised Respondent in an email at 12:45 p.m. that afternoon that she had revoked his administrator privileges as well as his access to his Dreyfus email because he had sent the "mass email" to staff. Resp. Ex. 5.

77

The activity log established that "guidance" revoked the administrator privileges for RN1213@Dreyfus.com later on Sunday, January 29, 2012. Dept. Ex. 31. Under the circumstances where Respondent had not been told by any supervisor that his administrator privileges had been revoked, I find that the creation of an alternative access point, in and of itself, does not rise to the level of conduct for which he can be disciplined. Specification 26 is dismissed.

### SPECIFICATION 27:

*By committing one, some, or all of the actions described in Specifications 23 and/or 24 and/or 25 and/or 26, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself.*

Specifications 23, 24 and 26 have been dismissed. Respondent's conduct sustained in Specification 25 is not a violation of the Board Rules, the City Charter or Chancellor's Regulation 110 pertaining to conflicts of interest.

### SPECIFICATION 28:

*On or about February 2012, Respondent refused to transfer control and/or ownership of the school website, www.Dreyfus49.com, to Principal Hill, I.S. 49, and/or the Department after agreeing to do so at a meeting with Principal Hill and Superintendent Erminia Claudio.*

Respondent and Principal Hill testified that ownership of the Dreyfus site was not an issue until the events regarding the website previously discussed in Specifications 24 and 25 occurred. T. 55-57, 255-257, 2586-2587, 2686-2687. Over that weekend, both Respondent and Principal Hill were in contact with Google and were reminded that Respondent was the legal owner of the domain Dreyfus49.com website since he had

paid the initial fee for the domain in 2009 and for the renewals thereafter.[25]  T. 2585-2587.

Respondent agreed to transfer ownership of Dreyfus49.com to the Principal during a meeting with Principal Hill and Superintendent Claudio.  T. 81-85, 406, 2131, 3014-3019.  On February 16, 2012, Respondent informed the Principal that his intellectual property attorney had advised him to hold off on the transfer until he could review the legalities of the matter.  In his email, he advised the Principal that this was a "short term" delay until he could receive the advice of his attorney.  He also informed her that he was not attempting to hold the site hostage. Dept. Ex. 14.

After February 16, 2012, Respondent was continuing to research legal ownership and privacy issues by speaking to the Department's technology personnel and to representatives of Google.  Dept. Ex. 14.  On March 8, 2012, Respondent sent an email to Principal Hill and Superintendent Claudio advising them of concerns.  The issues that he raised in this email regarded adherence to COPPA, FERPA and the DOE's Internet Acceptable Use Policy ("IAUP") which he had recently downloaded.  He suggested that the website have a "service down" page temporarily until these issues could be sorted out.  Neither the Principal nor the Superintendent replied to Respondent's email.  Resp. Ex. 4.

On March 12, 2013, Principal Hill issued a letter to Respondent which stated:

On February 14, 2012, we met with UFT District Representative and Superintendent Ermenia Claudio to discuss issues at the school, including the Dreyfus49.com website.  At that meeting, you agreed to transfer the

---

[25]   In its closing, the Department argued that Respondent had established the website under false pretenses.  T. 3533-3535.  There is no evidentiary support for this argument, nor is this charged conduct. T. 515-516.  Respondent testified that the fees associated with the site were minimal and that he did not seek reimbursement.  There was also testimony that Mr. Valia had originally owned "welearnandgrowtogether" because he too had established a website on behalf of the school.

ownership of Dreyfus49.com to me, as the Principal of the school. On February 16, 2012, you sent me an email that stated you needed more time in order to relinquish the site. To date, approximately one month later, you have not transferred Dreyfus49.com to me. I am now directing you to terminate the entire Dreyfus49.com website by the close of the school day (2:30 p.m.) on March 13, 2012.

Dept. Ex. 14.

Respondent testified that he did not receive the March 12, 2012 letter. T. 3359.

The Principal issued an identical letter on March 13, 2012 directing him to terminate the

Dreyfus49.com website by 2:30 p.m. on March 19, 2012. Resp. Ex. 20. Respondent

terminated the Dreyfus49.com website on March 19, 2012 while he was on jury duty. T.

3363.

Respondent, in his testimony, confirmed that the Dreyfus49 website was

developed for the benefit of the school and not for himself personally:

Q.     ... You, yourself, didn't even realize or had forgotten that you owned this domain name until you talked to Google and was reminded of that on January 29, 2012, right?

A.     Around January 29. I didn't consider myself an owner of a website. It was just a great thing that we were all using. Ownership was never an issue. Real, official ownership, or any ownership really.

Q.     Okay. So until you had that conversation with Google on January 29, 2012, before that you just considered Dreyfus49 as the school's website, right?

A.     It was called the school's site. It was the site the school used for communication and ...

Q.     And for educational purposes?

A.     Educational purposes, right.

T. 2786-2787.

He also testified that the Dreyfus website was not intended to serve him in a personal capacity. T. 2775-2776.

The Department argues that Respondent knew, on February 14, 2012 or earlier, that the Principal wanted him to transfer the ownership of the Dreyfus website to her. Respondent admitted that Principal Hill wanted control of the Dreyfus49 website. T. 3166. He also knew, as he stated in an email to the staff on March 19, 2012 that "*even though I may face more disciplinary or legal action*, I have ensured that I am the only administrator of the site I legally own and created." Dept. Ex. 14. (emphasis supplied). Thus, the Department argues that Respondent was on notice that he could face discipline by refusing to transfer control of the website.

Respondent defends his conduct by arguing that he did not receive a directive to transfer the site to the Principal—only to terminate the site which he did:

> Q.  So you never relinquished the rights to the site, to Principal Hill, did you?
>
> A.  No, she didn't ask me to.
>
> T.  3162.

This argument amounts to "I know my boss wanted it but I wasn't going to give it to her." Respondent was on notice from the February 14, 2012 meeting forward that the Principal wanted him to turn over the website to her and he agreed to do so at that meeting. His testimony that he was not aware that the Principal wanted him to transfer control of the website strains credulity and is contradicted by other evidence. T. 3159-3162, 3396-3397; Dept. Ex. 14, Resp. Ex. 20. Although it was not unreasonable for Respondent to ask for additional time to gather more information from the Department's Technology Department and his attorney, the fact remains that a month later he had not

81

transferred the site. There was no reason for Respondent to retain ownership of the site—other than intransigence and/or as a bargaining chip. Even though he professed that he was not trying to hold the site hostage in his February 16, 2012 email, he ended up doing just that.

Respondent's legal ownership of the website did not relieve him of his responsibility, as a Department employee, to transfer ownership of the school's website over to the Principal. The Department cites the analogous case of Dept of Ed v. J.L., (Tillem 2010). In this case, the teacher refused to relinquish the rights to the website because she was angry at the Principal. The arbitrator held that the website belonged to the school even though its domain was registered to the teacher's husband.[26] Even though Principal Hill's letter did not explicitly direct Respondent to transfer control, the preceding sentence reiterated that he had refused to transfer the website to the Principal for a month. Under these circumstances, I find that Respondent should have relinquished his ownership of the Dreyfus49 site because it was created for the school and functioned as the school's website. Respondent's failure to transfer ownership and control of the Dreyfus site was unprofessional, conduct unbecoming his position and neglect of duty. By refusing to do so, the school was required to create a new website. This caused administrative burden, embarrassment for the Principal and hardship to the staff. T. 255, 3162-3166. Specification 28 is sustained.

### SPECIFICATION 29:

*On or about November 2012, Respondent, without consulting, notifying, and/or seeking approval from Principal Hill or the I.S 49 administration, altered the website www.welearnandgrowtogether.com, which Respondent had created for the school with Principal Hill's approval, to automatically transfer visitors to his alternative website,*

---

[26] In the J.L. case, the school had reimbursed the teacher for the domain registration fees; I do not find that distinction to make the rationale inapplicable to the facts presented here.

*https://sites.google.com/site/occupywarrenstreet/,* which contained derogatory *information about I.S. 49, Principal Hill, and/or the Department.*

Respondent testified that the I.S. 49 website "welearnandgrowtogether.com" had been created by Mr. Valia prior to Respondent's arrival at I.S. 49. Respondent testified that over the years, the site was devoid of content and forwarded visitors to the Department of Education website. T. 2637-2639.

Respondent testified that in June 2012, he bought the domain welearnandgrowtogether.com which was available at that time. He admitted that in October 2012, he redirected visitors from welearnandgrowtogether.com to another website he had created, occupywarrenstreet.com (OWS). I.S. 49 is located on Warren Street. T. 2639. On OWS, Respondent posted information available from the Department of Education that showed that the school's rating had deteriorated over the past few years. At the top of his article which preceded the statistics, there is a photo of the school sinking into water. To the bottom right of the photo is a life-preserver. There is also a fake news article about I.S. 49 closing. Dept. Ex. 15. Superintendent Claudio, Principal Hill and other administrators were very disturbed about this particular post, citing the "ominous" photo of the school in particular. T. 129-132, 455-456.

Respondent testified that he was trying to mobilize the community, to bring attention to the school's failing scores and being rated persistently dangerous two years in a row. T. 2639-2641. The first page of the posting advertises a meeting for members of the community. The site also contains a slide show of Principal Hill's time cards and states that there "appears to be financial misconduct." Dept. Ex. 15. Respondent notes that "[e]ven with the horrible data above, the DOE continues to give the principal satisfactory ratings." Dept. Ex. 15.

According to SCI's investigation, the DOE Chief Information Security Officer advised that "DOE had no legal recourse regarding the content contained on Portelos' website." In the report, the officer stated that "redirecting a visitor to a website that he registered and owned to another website which he registered and owned was within his right and DOE had no authority over those sites." Dept. Ex. 32. Thus, Respondent defends his conduct because he was forwarding traffic from one site he owned to another.

Respondent also attributed the fact that the administration had let the welearnandgrowtogether domain expire to "ignorance and negligence." Dept. Ex. 66. Respondent could hardly contain his glee when he testified that he learned the domain name was available. T. 2639. Was this because he planned to launch it as an educational tool? The answer is no. He used it as another vehicle to forward visitors to OWS, which contained some derogatory information about Principal Hill. Certainly, former users of the school's "welearnandgrowtogether" website or parents trying to find information about I.S. 49 would not be expecting to land on "occupywarrenstreet." At this point Respondent owned Dreyfus49 and was also forwarding it to protectportelos. To link another school website to the OWS website was making mischief and embarrassment for the administration. Even though the Department had no legal recourse to "stop" Respondent, it does not mean it waived the right to discipline him. Once again, because something may not be illegal, the Department may discipline Respondent for engaging in conduct that he should have known would thwart or undermine the school's mission. This was conduct unbecoming his position and

prejudicial to the good order, efficiency or discipline of the service. Specification 29 is sustained.

### *SPECIFICATION 30:*

*On or about November 2012, Respondent, without consulting, notifying, and/or seeking approval from Principal Hill and/or the Department, utilized the I.S. 49 recorded telephone message, which invited callers to visit the website, www.welearnandgrowtogether.com, to advertise, promote, and/or direct traffic to his alternative website, https://sites.google.com/site/occupywarrenstreet/.*

The SCI report references the fact that an investigator listened to the school's recorded message and that it referenced the website welearnandgrowtogether.com. When the investigator went to this website he was directed to Respondent's website, occupywarrenstreet.com. Dept. Ex. 32. Respondent testified that he had no means of accessing or utilizing I.S. 49's recorded telephone message to change its content. T. 2642. The Department, in closing argument, stated that it does not contend that Respondent accessed the school's telephone message. The Department argues that Respondent, as a Department employee, would have known that the recorded message referenced welearnandgrowtogether.com and, consequently, was directing visitors to OWS. However, this Specification, on its face, charges Respondent with *utilizing* the I.S. 49 recorded message. Even if the charge could be construed in the manner the Department suggests, there is no evidence to establish that Respondent knew the content of the school's recorded telephone message. Specification 30 is dismissed.

### *SPECIFICATION 31:*

*During the 2012-2013 school year, Respondent, without consulting, notifying, and/or seeking approval from Principal Hill and/or the Department, altered the school website, www.Dreyfus49.com, to automatically redirect visitors to his website, protectportelos.org, which chronicled his issues with various groups including Principal Hill, I.S. 49, and the Department.*

On the day before school started in September 2012, Ms. Vines-Monohan was assigned to an online meeting program in the computer lab formerly occupied by Mr. Portelos.  Ms. Vines-Monohan testified that an icon appeared on the computers that said "MrPortelos".  She observed this icon on almost every computer.  When she clicked on the icon, it directed her to another website which contained a petition to "reinstate Mr. Portelos."  She testified as follows:

Q.   I think you testified that something to the effect of, that you knew you had to get rid of this.  My question to you is why?

A.   Because I was the teacher in the classroom.  The kids did love Mr. Portelos.  If I'm trying to teach them and I'm going to do a reading in the program, where the, this class is a class that the kids did really love, my class is reading, not as exciting.  And there is a petition to reinstate him, it's really going to make my life a little bit difficult.  So I wanted it off.  And I also noticed on the petition, there was, you know, and Hill's name was there.  I didn't read the whole thing thoroughly, but it was definitely going to interfere.

Q.   Interfere with what?

A.   With the class.

T.  1471-1475.

Ms. Vines-Monohan consulted another teacher who showed her how to remove the icon which she did, and then she turned off all of the computers.  When she returned in the afternoon, the icon reappeared.  At this point, Ms. Vines-Monohan was paged on the school's loud speaker to report to Assistant Principal Martino who had apparently learned of the issue.  Assistant Principal Martino and Ms. Mahabir, who had viewed these computers in May 2012 (See Specification 14), came to the classroom.  There was some discussion amongst the group about how the computers were re-imaged the prior year and that this (MrPortelos icon for his STEM website) was not on it.

86

T. 1478. After speaking with Mr. Rossicone, Ms. Mahabir was informed that the Windows server was not wiped out and reimaged back in May 2012 when the technician reimaged and restored the lab computers. Dept. Exs. 29 & 32; T. 3175. Ms. Vines-Monohan taught her class with iPads for two to three weeks while the computers were inaccessible. Ms. Vines-Monohan testified that switching from the desktop computers to the iPad complicated her instruction for that period. T. 1478-1481.

On September 6, 2012, Principal Hill reported this computer incident to SCI. The Chief of the Department's Technology Department informed SCI investigators that Respondent had no ability to access or manipulate DOE computers when he was not in the building. Dept. Ex. 32. Respondent testified to the impossibility of this as well. T. 2643.

The Department also relies upon another incident which occurred in November of 2012 to support this Specification. Ms. Vines-Monohan observed a student who was online viewing a photo of Respondent and his baby and questioned how the student had accessed the site. The student explained that he inadvertently entered the old school website, Dreyfus49.com by mistake. Ms. Vines-Monohan testified that when she entered Dreyfus49.com it directed her to the protectportelos website which contained photos of Mr. Portelos' kids. T. 1483-1484.

Ms. Vines-Monohan testified, and Respondent confirmed, that for some period of time, Dreyfus49.com was a blocked website. T. 1533-1534, 2712. At some point, it became unblocked. Ms. Vines-Monohan texted Mr. Portelos that day to ask him "why is this happening?" and he responded that he did not control the internet. T. 1485.

87

Respondent testified that he auto-renewed the Dreyfus49.com domain name after the site had been terminated because of the ongoing issues with the administration. T. 2712. He admitted that in November 2012 he forwarded visitors from Dreyfus49.com to protectportelos.org. T. 2643-2644, 2713. This explains how the student who accidentally typed in the old website address was able to view the photographs of Mr. Portelos' children on protectportelos.org. This was accomplished, not by manipulating school computers, but by forwarding visitors from one website that he owned to another of his websites.

The Department argues that Respondent's "hijacking" of the school's former website is contrary to the directive he was given to terminate the website. Further, it submits that by directing visitors of Dreyfus49 to his own website, Respondent engaged in vindictive tactics to fuel ill will against the school. Once again, Respondent argues that as the legal owner of Dreyfus49.com, there is no basis for the Department's position that he was required to consult, notify or seek approval from Principal Hill and/or the Department.

Respondent testified that he did not believe that students, or anyone for that matter, would be typing in Dreyfus49 six months after the site had been terminated. T. 2713. Moreover, Respondent offered no legitimate reasons to renew the domain name of a website he had been directed to terminate and then use it to forward visitors to protectportelos. Respondent conceded that students viewing of protectportelos during class would be a distraction from their instruction. T. 3184. By redirecting visitors from Dreyfus 49, students who mistakenly entered in the old website address from habit landed on protectportelos. This served no purpose for accomplishing instruction. Ms.

88

Vines-Monohan testified that once the site became unblocked, word got out among the students and that they were viewing protectportelos.org on more than one occasion. Further, a student's parent (or a prospective student's parent) could easily type in Dreyfus49 to get information about the school and they too would be directed to protectportelos which, in part, chronicled Respondent's complaints and allegations against the Principal and other administrators.

Although the Department had no legal recourse to stop Respondent's action, this does not mean it was appropriate for him to do this as an employee. Once again, Respondent confuses his legal right as a carte blanche and a shield against discipline. Respondent offered no legitimate reason for forwarding Dreyfus49 visitors to protectportelos. Respondent's decision to link the two sites showed extremely poor judgment. As in the case of "welearnandgrowtogether", this was another avenue to show up the administration. It cannot be said that his action in doing so was consistent with the letter or spirit of the earlier directive to "terminate" the Dreyfus49 website. T. 3153. When Respondent prepared his commentary on the charges he stated that "[t]he school computers were set to default to www.dreyfus49.com when you open internet explorer. At one point, since I owned the domain name, I had it forward to another site the summer after I was removed. It is not my fault they did not change the default." (emphasis supplied). (Dept Ex. 20—April 25, 2013 post). This comment misses the point. Respondent was expected to terminate the Dreyfus49.com website and not resurrect it to promote his own agenda.

I find that Respondent's action to forward visitors from Dreyfus49.com in September 2012 and thereafter to protectportelos.org was conduct unbecoming his

89

position and conduct prejudicial to the good order, efficiency or discipline of the service.

Specification 31 is sustained.

### SPECIFICATION 32:

*By committing one, some, or all of the actions described in Specifications 29 and/or 30 and/or 31, Respondent used or attempted to use his position as a public servant to obtain a financial gain, contract, license, privilege, and/or other private and/or personal advantage, direct or indirect, for himself.*

Specification 30 has been dismissed.  The Department has not established that the misconduct sustained in Specifications 29 and 31 constitutes a conflict of interest as defined in the Board Rules, the City Charter and/or Chancellor's Regulation 110.

### SPECIFICATION 33:

*During the 2011-2012 school year, Respondent recorded a video in a school facility, namely, I.S. 49, of a student during school hours, without permission or authority.*

Respondent admitted that he recorded a video of Assistant Principal Diacomanolis in the hallway with a student with his cell phone in late April 2012 without permission or authority.  T. 2644-2646; Dept. Ex. 36.  Respondent testified that he heard a commotion in the hallway and took the video because he witnessed Assistant Principal appearing to frisk a student.  Respondent defended his conduct by arguing that he was under a duty to report the infraction as a mandated reporter.  T. 2644-2646. Respondent testified that he was unaware of any prohibition on taking photographs or videos and stated that staff took pictures and videos of students routinely.  T. 2646. Principal Hill testified that Department policy prohibits taking a photograph or video of a student in school absent permission from the Principal.  T. 122; See also Dept. Ex. 9.

On June 12, 2012, Respondent sent an email with a link to the video to SCI with the subject line "corporal punishment."  Dept. Exs. 18 & 60.  At the time he reported the

90

allegation, he made clear to investigators that he was not alleging that the touching of the student was sexual in nature but that it was inappropriate. Dept. Ex. 29; T. 1463. In the email Respondent requested confidentiality. Respondent advised Principal Hill of the corporal punishment allegation in an email dated June 17, 2012. Principal Hill reported the allegation to SCI the following day. Dept. Exs. 17 & 60. Respondent sent another email which contained allegations from individuals who did not want to be identified regarding other conduct by Assistant Principal Diacomanolis.[27]

The video and this incident was a large focus of the Department's case because it argues that Respondent made the allegations in bad faith as revenge against Assistant Principal Diacomanolis. Respondent maintains he had a good faith basis to record the video and report the conduct to SCI for further investigation.

Assistant Principal Diacomanolis testified that she had no independent recollection of the incident. When the student was interviewed she told investigators that Assistant Principal Diacomanolis was trying to help her fix her zipper which had gotten caught in her sweater. T. 1570-1574. SCI Investigator Lattig testified regarding the investigation. The video, which is blurry and of poor quality, was admitted into evidence. Dept. Ex. 36. The allegation of corporal punishment was not substantiated by SCI. T. 1450; Dept. Ex. 32. Principal Hill and Assistant Principal Diacomanolis also testified that the parents of the student were upset over the fact that the child was videotaped and that the video was distributed. T. 122-123, 279, 1574-1575, 1618-1620.

---

[27] Dept. Exs. 18 & 32. A former paraprofessional from I.S. 49 testified about complaints she had made in the past that she shared with Respondent regarding the attire of Assistant Principal Diacomanolis. She had taken a photo of Assistant Principal Diacomanolis outside on her own initiative and sent it to Respondent. Respondent forwarded this photograph to SCI. T. 1930-1933. Assistant Principal Diacomanolis testified that Respondent had brought numerous allegations against her but conceded that she knew that others were providing information to him in his role as Union Delegate and Chapter Leader. T. 1574, 1624-1626.

Assistant Principal Diacomanolis was distraught over the allegation because she had had no charges brought against her in her 16 years as an educator.  T. 1576-1577, 1581-1582.

SCI Investigator Laino, Superintendent Claudio and Principal Hill agreed that Respondent had an obligation to report mistreatment of a student.  T. 277-278, 413-415, 1457.  Principal Hill testified that Respondent could have reported the incident without taking the video.  T. 92.  Superintendent Claudio emphasized that Respondent had delayed in reporting the incident.  T. 506, 520.

The circumstances surrounding this video call Respondent's motives for taking it into question.  Even if the allegation of corporal punishment was made in good faith, Respondent delayed reporting the incident for two months.  Instead, he waited until he had been removed from I.S. 49 and began to receive complaints from others regarding the conduct of Assistant Principal Diacomanolis.  Further, he could have reported the incident to SCI for investigation without video recording it.  The school has cameras in the hallways and it is not Respondent's responsibility to be filming incidents that occur in the school without permission.  I find that Respondent's conduct violated the Department's policy that prohibits photographing or videotaping a student without permission and that he can be disciplined for doing so.  Specification 33 is sustained.

### SPECIFICATION 34:

*On or about December 12, 2012, Respondent notified I.S. 49 Superintendent Erminia Claudio that he showed the video referenced in Specification 33 to parents, without permission or authority.*

Superintendent Claudio testified that Respondent sent an email to her on December 12, 2012 stating that he had shown the video of Assistant Principal

Diacomanolis and the student, referenced in Specification 33 to parents. Dept. Ex. 18. It is not disputed that he showed the parents the video without permission or authority of the administration. Respondent admits that he did so. T. 2646-2648. Prior to showing the video to anyone, Respondent testified that he blurred the student's face and distorted her voice so she could not be identified in order to comply with the COPPA. T. 2647.

Respondent testified that the Superintendent "didn't tell me not to do it or not to distribute it" when he contacted her. T. 2647-2648. Respondent's email, sent six months after he had reported the allegation to SCI, questions why no action has been taken. Dept. Ex. 18. Yet, by the time Respondent contacted Superintendent Claudio, he had already distributed the video to parents and it was a fait accompli. Thus, any objection that Superintendent Claudio might have raised about sending out the video would have come too late.

Respondent's testimony and actions established that he was upset by Assistant Principal Diacomanolis' interaction in the hallway with the student. Respondent apparently wanted to solicit other opinions regarding the content of the video, asking "am I crazy?" Respondent also testified that he showed the video to the PTA President and Vice President. They found it disturbing and expressed surprise that no action had been taken. T. 2648; see also Dept. Ex. 52.

Superintendent Claudio testified about the impact of Respondent's action:

Well, because fifth grade is the incoming class. So I.S. 49 has had such a difficult time trying to recruit children because the neighborhood's challenging and the reputation. And fifth graders, what we do – I don't know when this took place, or where the forum was when this happened, but we try to recruit fifth grade parents to go to our school. We try to make them feel safe about our schools and that this is, you know, a great place

> to be. We are going to work with your child. So it is disturbing because now we have fifth – we have an elementary school parent – I don't know if he is from the feeder school or somewhere else, but that parent now thinking, "oh my goodness, terrible things are happening at I.S. 49."

T. 440-441; see also 414-415. Superintendent Claudio also testified that posting the video on his website was dangerous because anyone, including children, would have access to it. T. 419.

Respondent's argument, once again, that there is no prohibition on showing a video to a parent begs the question. By forwarding the video to the appropriate authorities, he had followed the Department's protocol for reporting incidents to SCI. Although the issue of corporal punishment of students is of public concern, his duty was fulfilled when he reported the incident. Even though Respondent made the student "blurry" in the video, he does not appear to have given any consideration to how distribution of the video would impact the student, Assistant Principal Diacomanolis or the school. T. 415. Instead of leaving it to SCI to investigate a highly sensitive issue, he took matters into his own hands. Respondent posted the video on his website and then others posted it on YouTube. Dept. Ex. 52. T. 419. SCI determined in its report on I.S. 49, that "there was nothing improper regarding the Assistant Principal's interaction with the student." Dept. Ex. 32. The charge of corporal punishment was not substantiated.

Respondent's distribution and posting of this video support the Department's position that, at times, Respondent acts as, judge jury and executioner. T. 3569-3570; Dept. Ex. 52. Respondent's distribution of the video to parents without permission or authority was unprofessional and conduct for which he can be disciplined. Specification 34 is sustained.

94

**_SPECIFICATION 35:_**

_On or about December 3, 2012, at a Community Education Council Meeting, Respondent made disparaging comments about Assistant Principal Diacomanolis and/or discussed an ongoing confidential investigation regarding allegations that A.P. Diacomanolis had acted inappropriately with a student, despite the fact that he had already reported this conduct to Principal Hill and said allegation was under investigation by The Office of the Special Commissioner of Investigation ("SCI")._

At a December 3, 2012 Community Education Council ("CEC") Meeting, Respondent got on the speaker's list. The CEC is a body composed of parent representatives. Respondent spoke for approximately five minutes summarizing how things had changed for him as an educator at I.S. 49 and his current reassignment to a "rubber room". He also described being elected to the Chapter Leader position and having made allegations against Principal Hill for financial misconduct. He then stated the following in reference to the video that is the subject of Specifications 33 and 34:

> There's videos of an Assistant Principal doing inappropriate things to a student that parents are like, how is she still in there and how are you in the rubber room? Those are questions I can't answer.

> Dept. Ex. 47.

Approximately one minute later, Respondent mentioned Assistant Principal Diacomanolis but did not identify her as the Assistant Principal on a video "doing inappropriate things." After another speaker brought up issues at I.S. 49, Superintendent Claudio advised the CEC that these matters were under investigation and that she was not at liberty to discuss them. Dept. Ex. 47. T. 409-410, 437-438, 458.

Respondent testified that this was his first CEC meeting and that he attended because "no one was doing anything" about the allegations he had made to SCI. T. 2648, 2660; Dept. Ex. 18. He defends his speech at the CEC regarding the video on

95

the grounds that it was a matter of public concern.  He also testified that when he was interviewed by Investigator Laino, he inquired whether he could share the information regarding the allegations against him.  According to Respondent, Mr. Laino threw up his hands and said "I'm not your lawyer."  Respondent maintained that he was never told that he was prohibited from speaking about allegations.  T. 2648-2651.  There is no evidence that Respondent was attempting to impede or interfere with an investigation with respect to his allegations concerning the video.

The Department argues that Respondent knew he was not to discuss matters under investigation because at a later CEC meeting on January 7, 2013 he stated "I promised I wouldn't talk about my investigations."  Dept. Ex.  47.  This CEC meeting occurred a month after the meeting at issue in this Specification and cannot establish Respondent's state of mind at that time.

Respondent further argues that he is protected from discipline because he was speaking as a citizen on a matter of public concern.  The Department maintains that his speech was disruptive to the Department's operations and outweighs any right to First Amendment protection under the balancing test in Pickering v. the Board of Education of Township High School, 391 U.S. 589 (1968).

In Pickering and its progeny, the U.S. Supreme Court articulated a two-part balancing standard to determine whether speech by a public employee is accorded constitutional protection.  The first question is whether the employee spoke as a citizen about a matter of public concern rather than as a function of his employment duties.  Whether speech addresses a matter of public concern depends upon the "content, form, and context of a given statement."  Connick v. Meyers, 461 U.S. 138, 147-148 (1983).

96

If an employee speaks as a citizen with respect to a matter of public concern, the inquiry turns to whether the government's interest as the employer outweighs any First Amendment protection afforded to the speech. See Pickering, supra, 391 U.S. 598 (1968); Garcetti v. Ceballos, 547 U.S. 410 (2006). In other words, "[t]o be protected, the speech must be on a matter of public concern and the employee's interest of expressing [himself] on this matter must not be outweighed by any injury the speech could cause to the 'interest of the state, as an employer, in promoting the efficiency of the public services it performs, through its employees'." Connick v. Meyers, 461 U.S. 138 (1983).

There is no bright line in applying this two-prong standard and each case turns on its facts. The context for this statement is an open forum during a public meeting. Respondent delivered his remarks in a calm and soft-spoken manner and the statement for which he is being disciplined was not the centerpiece of his overall remarks. When he was called on, he told the audience that he was wearing several hats—parent, educator, business, owner and Chapter Leader. His comments were addressed to an interested public and the subject of the speech for which he is being disciplined extended beyond his own employment situation. He contrasted his own situation of being removed from the school with the treatment of a superior who faced allegations that he had made to SCI regarding corporal punishment and/or inappropriate touching of children. The issue of corporal punishment or inappropriate touching of children in schools is a matter of legitimate public interest. I find that Respondent was speaking as a public citizen on a matter of public concern.

The question now becomes whether the potential disruption to the Department's operations from Respondent's speech outweighs his rights under the First Amendment.

In many cases, speech may be more disruptive when made in the workplace rather than in a public forum. For example, in Waters v. Churchill, 511 U.S. 661 (1994), an employee's negative speech to an employee in cross-training was held to be disruptive as it would discourage the employee from working for the employer. Similarly, in Dept. of Education v. J.J., (Watanabe 2013) the repeatedly defiant, confrontational and unprofessional remarks by the teacher made to the Principal in meetings at school were determined to be disruptive to the good order and discipline of the service. On the other hand, off duty speech can be potentially or actually disruptive to an employer. See Locurto et al v. New York City Police Department, et al, 447 F.3d 159 (2006).

Respondent's speech was made in a public forum which is important but not determinative. Superintendent Claudio did not testify regarding any potential or actual disruption due to the remarks by Respondent regarding the video. She also acknowledged that, as a parent, Respondent was free to raise issues of public concern. T. 518-519, 528. The CEC members did not question Respondent about the video or make any comments with respect to it.

Further, when Respondent wrote to the Superintendent a week after the meeting to inform her that he and other parents planned to attend the January 7, 2013 CEC meeting specifically to discuss the video, he was not advised not to discuss the video and/or face discipline if he did. Dept. Ex. 18. If his remarks regarding the video were potentially disruptive, it is expected that the Superintendent would have advised Respondent and put him on notice.[28]

The Supreme Court's employee-speech jurisprudence also makes clear that the First Amendment interests at stake extend beyond the speaker. There is a public

---

[28] Respondent did not discuss the video at the January 7, 2013 CEC meeting. Dept. Ex. 47.

interest in having views of public employees received by the community.  See Garcetti, supra.  The CEC and other public bodies depend on the information and opinions of teachers to carry out their responsibilities.  To impose discipline under these circumstances risks dissuading public employees from contributing to the public discourse.  For these reasons, the Department has not established that the potential disruption from Respondent's speech regarding the video outweighs Respondent's expressive rights under the First Amendment.  Specification 35 is dismissed.

### SPECIFICATION 36:

*On or about and in the month of September 2012, Respondent:*

> *A. Sent an email message to a parent without permission or authority stating, in sum and substance, that the teacher who sent their son to summer school was not certified to teach and that this message identified the teacher and indicated that her teaching certification had expired.*

> *B. Failed to notify and/or confirm with I.S. 49 administration that the teacher referenced above lacked certification prior to contacting the parent.*

Ms. Steiner, the parent of the student in question, testified regarding this incident. She is a neighbor of Respondent and was also a fellow member of the SLT. Respondent sent Ms. Steiner an email which informed her that her son's teacher was uncertified, that she did not have her license, and implied that this was the reason he had to go to summer school.  T. 1661.  The email contained a link to the New York State website which contains teacher certification information.  Ms. Steiner contacted Assistant Principal Diacomanolis about what she had been told and was very concerned.  T. 1662-1663.  Ms. Wolfson also testified that she learned of Respondent's email from Assistant Principal Diacomanolis but did not see it herself.  T.1004-1009, 1033.

The Principal testified that although Ms. Wolfson's teacher's certification had lapsed, she had been an ELA teacher for years and was qualified to teach as a substitute. T. 303-305. There was also testimony that the website that contains the Department's information about teacher certifications was not up to date. T. 1004, 1008.

Respondent admitted sending this email. T. 2672-2677. Respondent's argument is that he was never told he had to contact the administration to verify the information about Ms. Wolfson's license. At this time, he testified that he was not getting any responses from the administration about union-related or any other issues. However, he continued to write emails to various officials and he could have attempted to contact the administration before inserting himself into this matter. Moreover, when he raised this issue in September 2012, the student had already completed summer school.

Respondent was not an administrator and it was not within his authority as a teacher to police the licensing of other teachers. Ms. Steiner was very clear in her testimony that Respondent raised the "red flag" with her concerning Ms. Wolfson's lack of certification. Despite Respondent's testimony to the contrary, it is no coincidence that the teacher in question was the fiancé (now wife) of Dr. Candia. Respondent, as a professional educator, knew or should have known better than to engage in this conduct. This is another example of making trouble for the administration without regard to its effect on the parent or on the school. Respondent can be disciplined for engaging in unprofessional conduct and conduct unbecoming his position. Specification 36 is sustained.

100

### SPECIFICATION 37:

*On or about September 2012, Respondent sent the same parent, referenced in Specification 36, a second email message without permission or authority stating in sum and substance, that the teacher who sent the parent's son to summer school was back in school.*

Respondent admitted sending this second email. T. 2677. This action on the part of Respondent was also unnecessary. At this point, Ms. Steiner's son was finished with summer school and no longer had her as a teacher. T. 1672. However, there was no evidence that Ms. Steiner contacted the school or was upset by the information. I do not find that Respondent's email to the parent that the teacher was back in school rises to the level of conduct for which he can be disciplined or demonstrates that he committed misconduct beyond the charges in Specification 36. Specification 37 is therefore dismissed.

### SPECIFICATION 38A:

*By committing one, some, or all of the actions described in the above Specifications, Respondent's actions:*

*Had a disruptive and/or negative impact on students, staff, and/or administration at I.S. 49 and the Department.*

There can be no question that the number of SCI investigations at I.S. 49 caused disruption to the staff and administration. However, the bulk of these investigations were initiated by the administration and Dr. Candia. Even though Respondent initiated a number of investigations with SCI (and other entities), the fact that they were not substantiated does not establish that they were filed in bad faith nor is there a charge alleging that he did so.

It was established that the staff at I.S. 49 is polarized and divided. Some divisions existed before Respondent's incidents began. They were apparent as early as

January 2012 when Dr. Candia sent the Principal a list of Portelos' supporters. Dept. Ex. 35. At the time of these hearings, there was testimony from the administration and Respondent's witnesses that these divisions have intensified and that the staff remains divided into pro and anti Portelos' camps.

However, Specification 38A is limited to determining whether one, some, or all of the actions described (and sustained) in these Specifications had a disruptive and/or negative impact on students, staff, and/or administration at I.S. 49 and the Department. For reasons previously discussed, I find that Respondent's misconduct in Specifications 6, 8, 9, 25, 28, 29, 31, 33, 34 and 36 had a disruptive impact on the students, staff and/or the administration at I.S. 49 and the Department. Specification 38A is sustained.

### SPECIFICATION 38B:

*By committing one, some, or all of the actions described in the above Specifications, Respondent's actions:*

*Caused negative publicity, ridicule, and notoriety to I.S. 49 and the Department.*

As discussed previously, the disciplinary process against Respondent and its various tentacles have been the subject of publicity, ridicule and notoriety to I.S. 49 and the Department. Respondent argues that notoriety cannot be established where the employer contributes but this argument cannot prevail in the face of Respondent's wide-ranging use of social media, sending blog posts to Department officials and publicizing his blog in the media and at CEC meetings.

However, this Specification is not a referendum on Respondent's blog. Rather, it is limited to determining whether by committing one, some or all of the actions described (and sustained) in the above Specifications, Respondent caused publicity, ridicule and notoriety to I.S. 49 and the Department. For the reasons previously

102

discussed in Specifications 6, 8, 9, 28, 29, 31, 33 and 34, I find that Respondent caused negative publicity, ridicule, and notoriety to I.S. 49 and the Department. <u>See also</u> Dept Exs. 12, 15, 18, 20, 28, 29, 34A, 35, 38, 47, 52 and 62.

## <u>PENALTY</u>

Having determined that the Department has just cause for discipline, I now turn to the issue of the appropriate penalty. Although the Department vigorously argues that Respondent's misconduct warrants termination, a lesser penalty is warranted under the totality of circumstances.

Many of the Specifications have been dismissed. Further, prior to February 2012, Respondent had an unblemished and stellar record. It is also mitigating for purposes of the penalty that Respondent's raising issues of public concern with the SLT played a part in bringing him into the disciplinary arena. This was an extracurricular and volunteer activity that he engaged in to improve the school. It is also an extenuating circumstance that he had no Chapter Leader to defend him because Dr. Candia had initiated many of the allegations and aligned himself with the administration.

The Department advances several arguments to support the proposition that Respondent is "irremediable." These include his initiation of investigations against administrators, use of FOIL and other litigation. In this regard, the Department relies upon uncharged conduct and activity that may be protected by the First Amendment, FOIL, the collective bargaining agreement and other laws. Even though Respondent's defense has been aggressive, Department witnesses conceded that he has the right to

103

defend himself against the charges and represent his members as Chapter Leader. [29] T. 551-552.

The Department also notes the amount of disruption that Respondent created at I.S. 49. As discussed throughout this Opinion, the causes of the disruption are diverse and, as Principal Hill recognized, are not all attributable to the misconduct by Respondent.

Further, Respondent cannot be deemed irremediable because he publicized his discipline, the 3020-a process in a contentious and public way. For the bulk of the charged years there were no social media guidelines. The new guidelines, promulgated in the spring of 2013, do not ban personal blogs and further state that they alone will not be used for disciplinary purposes absent a showing of a violation of regulation, law or policy. Despite the provocative nature of his postings and airing of his disciplinary process, there has been no showing that the notoriety regarding his charges or reassignment "seriously compromised his ability to retain the respect of students and to be perceived as a responsible adult to whom they should pay attention." See Matter of Goldin v. Board of Ed. 45 A.D.2d 870 (1974).

The Department also contends that Respondent was disingenuous when he testified that if returned to I.S. 49 he would work professionally and cooperatively with Principal Hill. Yet as Respondent points out, there is not a single allegation that he was ever rude, disrespectful or defiant to the Principal or any other administrator. [30] On

---

[29] This includes internal communications to union members that the Department cited as further evidence of Respondent's disruptiveness to I.S. 49. Dept. Ex. 71. See PBA v. City of Newburgh, 32 PERB 4576 (1999), (there is a wide range of latitude afforded to union representatives in communicating with management and members, including overzealous speech).

[30] For this reason, the 3020-a decisions cited by the Department (which include several of my own), are not analogous to the facts here. In those cases, the teachers were terminated for rude, defiant and, in some cases, flagrantly insubordinate conduct to their superiors. Respondent's case is also not akin to the

January 31, 2013, two weeks before these hearings concluded, Respondent had a meeting with Principal Hill with the Union Consultation Committee which he testified was cordial and professional.  T. 3377.

The Department also maintains that Respondent's lack of remorse makes him irremediable.  It appears that Respondent became so consumed in his defense that he was unable to reflect on how he may have contributed to his dilemma or how some of his conduct affected I.S. 49.  This is especially so, as Superintendent Claudio testified, during the 2012-2013 school year when he was removed from I.S. 49, relieved of all teaching responsibilities and had so much time to "stew" about what had happened.  T. 549.  Nonetheless, Respondent's admissions, conduct, demeanor and demonstrated commitment to education persuade me that, if given the chance, he can resume his career as a highly effective educator.

Finally, the record is replete with evidence of Respondent's exceptional teaching and abilities from the administration, colleagues, parents and students.  Only a few months before things spiraled out of control, three administrators noted his significant contributions to the school and highly recommended him to become an administrator.  Resp. Ex. 2.  There was also testimony that Respondent worked collegially with other teachers at I.S. 49 and volunteered his time to assist them with technological issues.  T. 1779, 1921-1922.  Many colleagues and parents testified regarding his dedication to children and his ability to get "even the most troubled child's attention and get them interested in a lesson."[31]  T. 1809; see also 565, 1669, 1682-1683, 1778-1779, 1868-

---

Chapter Leader in Department of Education v. J.J. (Watanabe 2013) who was insolent, rude and grossly disrespectful to his Principal, and repeatedly violated rules.

[31] This testimony was reinforced by former students and parents who started a petition to reinstate Respondent:

1870, 1918-1921; Dept Ex. 19. Given the challenging population of students at I.S. 49 this is no small feat. The unique attributes of this teacher, which the Department has minimized, has many years ahead of him to provide a quality education to students and make a difference in their lives. At the same time, Respondent, in his quest to defend himself, lost sight of the fact that the Department is his employer, and not his enemy. Notwithstanding the events of the last two years, Respondent must refocus his energies on their shared mission of educating children.

After two years of reassignment, it is important that Respondent be returned to the classroom. I have determined that the appropriate penalty for Respondent's misconduct is a substantial fine of $10,000. This fine is based on the nature and the number of infractions as well as Respondent's inability to acknowledge any wrongdoing.

---

-- "[Respondent] is a great teacher who was only looking out for the school and his students whom he cares about deeply";
-- "Mr. Portelos was one of the few brilliant educators the school systems have left";
-- "[B]ecause Mr. Portelos ... has set a wonderful standard for us all, we all were motivated by this man to become something more in this world than we could have ever imagined possible";
Dept. Ex. 19.

## AWARD

1.  Specifications 6, 8, 9, 25, 28, 29, 31, 33, 34, 36 and 38 are sustained.

2.  Specifications 1, 2, 4, 5, 7, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 30, 32, 35 and 37 are dismissed.

3.  Specification 3 has been withdrawn.

4.  For the violations sustained in Paragraph 1, Respondent shall pay a fine of $10,000 which shall be deducted from Respondent's paychecks in equal amounts over a period of 18 months.

Dated:  April 30, 2014
      Ocean Grove, New Jersey     Felice Busto

State of New Jersey       }
County of Monmouth    } ss:

On this 30th day of April, 2014 before me personally came and appeared Felice Busto to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that she executed same.

Gretchen L. Boone
Notary Public of New Jersey
Commission Expires 4/30/14

107

EX C 1



**Francesco Portelos** @MrPortelos · 14h
Comments - Outraged students file class-action suit against tenure laws @nycschools @UFT @nycparentsunion ow.ly/yQary

⬇ View summary



**mvOtter** @MVOtter · 13h
@MrPortelos .@NYCParentsUnion I have outraged stdnts everyday/I need tenure 2 be able 2 call #BS! BS #CCSS/BS TESTS/BS #tenure lawsuits!

Expand



**Francesco Portelos** @MrPortelos · 13h
.@NYCParentsUnion Nope...@MVOtter u need your protection removed so if you see a disservice to little Franklin P or Eric D u look away

Expand



**Parents Union - CT** @CTparentsunion · 13h
@MrPortelos r u inciting harm2students in #davids lawsuit - r u encouraging tcher 2 ignore a child in need @NYCParentsUnion @rweingarten

Expand



**NYC Parents Union** @NYCParentsUnion · 12h
@CTparentsunion @MrPortelos @rweingarten We are taking this threat very seriously.

12:16 AM - 7 Jul 2014 · Details

🚫 Hide conversation    ↩ Reply  ↕ Retweet  ★ Favorite  ••• More    '' HootSuite

Ex. C2

# Parents against teacher tenure say they're being harassed by educator

By BEN CHAPMAN

| NEW YORK DAILY NEWS |

JUL 07, 2014 | 11:39 PM
**NY DAILY NEWS**

http://beta.nydailynews.com/new-york/education/tenure-foes-harassed-teacher-article-1.1858189



Sam Pirozzolo

Two city parents who signed onto a suit to end teacher tenure in New York State say they're being harassed by an educator who backs the protection.

Mona Davids and Sam Pirozzolo of the New York City Parents Union say they were targeted by teacher Francesco Portelos in a Sunday tweet.

"U need your protection removed so if you see a disservice to little Franklin P or Eric D u look away," tweeted Portelos, referring to to Davids' son Eric, 6, and Pirozzolo's son Franklin, 11. "Teachers need to be protected so they can speak up for any disservice to students," said Portelos.

EX C 3



**Department of
Education**
Carmen Fariña, Chancellor

Howard Friedman
General Counsel

Charity M. Guerra
Executive Deputy Counsel

Jaclyn B. Vargo
Director

Christopher J. Dalton
Deputy Director

Christina Nowak
Deputy Director

# OFFICE OF SPECIAL INVESTIGATIONS
## INVESTIGATIVE REPORT

October 19, 2016

Re:   Francesco Portelos, tenured teacher, File #0762606
      10X440 – De Witt Clinton High School

      OSI Case #16-07353X

---

## ORIGIN OF COMPLAINT

On June 30, 2016, the Office of Special Investigations ("OSI") received a referral from the Special Commissioner of Investigation ("SCI") concerning the conduct of an unidentified subject. Santiago Taveras, Principal, reported that a number of X440 student transcripts, student attendance records, and student grade change records were posted on the Internet, on the website of a group calling itself UFT Solidarity.[1] The documents were partially redacted, but on one attendance record, Student A's name was not redacted and plainly visible. During the investigation, it was discovered that the domain name "uftsolidarity.org" was registered by Absence Reserve teacher Francesco Portelos.[2]

## RESULTS OF INVESTIGATION

### DOE STAFF WITNESSES INTERVIEWED:

#### Santiago Taveras, Principal:

Principal Taveras reported that, while reviewing the UFT Solidarity website, he discovered confidential documents concerning students from his school were posted there. Principal Taveras explained that he is under investigation by SCI, and that as part of the investigation, they requested a variety of documents including student transcript update forms and transcripts. In preparation for his interview with SCI, his union representative from the Council of School Supervisors & Administrators ("CSA") requested that he remove a subset of documents from the larger packet and prepare a written explanation for each of the documents. He gave this subset of documents–mainly transcript updates and transcripts–to his secretary to scan and upload, so that he could email

---

[1] UFT Solidarity is not affiliated with the United Federation of Teachers ("UFT") union.
[2] According to Whois.net, an internet domain name search engine, "uftsolidarity.org" is registered to Mr. Portelos. A printout of the registration information on "uftsolidarity.org" is maintained in the case file.

EX C 4

FILED: NEW YORK COUNTY CLERK 07/22/2017 05/04:18 PM   Page 136 of 186  INDEX NO. 156810/2017
NYSEF DOC. NO. 2                    1490                    RECEIVED NYSCEF: 07/22/2017

OSI Case #16-07353X

the documents to CSA.[3] Many of these documents were included in the online post by UFT Solidarity.[4] Principal Taveras speculated that someone made a copy of the documents at a time when they were unattended.[5]

### Mary Rodriguez, school secretary:

Ms. Rodriguez reported that she scanned the documents for Principal Taveras using a copy machine in her office. She explained that the copier does not save documents to a networked drive; a flash drive needs to be inserted into the copier in order to save scanned documents. Ms. Rodriguez did not know how the documents were obtained by the person(s) posting them to UFT Solidarity, though she could not recall if they were left unattended at any point prior to scanning. She stated that the documents have been kept in a locked closet in her office since they were scanned, with only herself and Principal Santiago having the key.

### Joseph Baranello, Chief Privacy Officer at the Office of the General Counsel (DOE):

Mr. Baranello reviewed the documents posted by UFT Solidarity on the Internet. He opined that the document which was not redacted and showed Student A's name in its entirety was a clear violation of Chancellor's Regulation A-820 and the Family Educational Rights and Privacy Act ("FERPA").[7] With regard to the remainder of the documents, Mr. Baranello stated that the DOE would not release a student transcript to a third party redacted in this manner, and that it would be possible to identify the students in the records, despite their names being redacted, by one with enough knowledge of the students' programs.

### SUBJECT:

### 48-Hour Notice:

On September 27, 2016, this investigator notified Francesco Portelos that he was the subject of this investigation. After serving Mr. Portelos with a 48-Hour Notice, he was explicitly instructed not to discuss the details of this investigation with anyone at the location of the alleged incident other than his union representative.

### Francesco Portelos, teacher:

On October 11, 2016, Mr. Portelos appeared at OSI and was interviewed in the presence of Donna Coppola, a representative for the United Federation of Teachers.[8] At that time, Mr. Portelos confirmed that the UFT Solidarity domain name (uftsolidarity.org) is registered to him and he admitted that he was involved in posting the documents in question to its website. He stated that there were "many people involved," but he would not identify any of them, or divulge how they had obtained the documents. Mr. Portelos reviewed the documents and stated that extreme care was taken to redact student identifying information; he stated that Student A's unredacted name must have been an oversight. Mr. Portelos said that it was not his intention to divulge student information.

[3] Copies of the original unredacted documents that Principal Taveras emailed to CSA are maintained in the case file.
[4] Copies of the student records posted online are maintained in the case file.
[5] On September 2, 2016, the undersigned investigator interviewed Yolanda Danforth, Security Applications Manager for DIIT, by telephone. Ms. Danforth reviewed the redacted ATS documents posted online and stated that it was not possible to determine which ATS user accessed the documents.
[7] Family Educational Rights and Privacy Act (FERPA) is a Federal law that protects the privacy of student education records. The law applies to all schools that receive funds under an applicable program of the U.S. Department of Education.
[8] On October 17, 2016, Mr. Portelos emailed the undersigned investigator and reiterated many of the points he made during his interview. A copy of his email is maintained in the case file.

Chancellor's Office of Special Investigations
65 Court Street · Room 922 · Brooklyn, NY 11201
Telephone: 718-935-3800
-2-

Ex C5

OSI Case #16-07353X

Mr. Portelos accessed the UFT Solidarity website during his interview and removed the post containing the documents, stating that he would have done so earlier had he known that Student A's name was not redacted.

## CONCLUSION

Chancellor's Regulation A-820 addresses the confidentiality of and access to student records, and incorporates pertinent provisions of the federal Family Educational Rights and Privacy Act.[9] Under the regulation, no part of a student's education record may be divulged with personally identifiable information, including a student's name, address, or personal identifying number, to any person, organization, or agency in any manner, unless: the parent or student has provided informed written consent; a valid court order or lawfully issued subpoena requests such information; a request from an authorized educational authority requests the information for an audit or other evaluation of educational programs; there is a health and safety emergency which requires the disclosure; or any other reason permitted by law exists. As none of the exceptions to the rule apply in this case, the publication by Mr. Portelos and UFT Solidarity of Student A's education record with personally identifiable information was a violation of Chancellor's Regulation A-820 and FERPA. Additionally, the remaining, partially redacted records, published online, contained sufficient information that a person in the X440 community might be able to identify the students with reasonable certainty. Mr. Portelos admitted involvement in the posting of the records, and during his interview, accessed the offending post as an administrator of the website and removed it. While Mr. Portelos may not have intended to disclose student records in violation of the law, that was the effect of his actions. The allegation that Francesco Portelos violated Chancellor's Regulation A-820 and FERPA by posting student education records on the Internet is substantiated.

## RECOMMENDATION

It is the recommendation of this office that a copy of this report be referred to the Administrative Trials Unit ("ATU") so that a Technical Assistance Conference ("TAC") may be convened, and appropriate disciplinary action may be determined for Francesco Portelos.

SUBMITTED BY:

Eric Black
Supervising Investigator

APPROVED BY:

Jaclyn B. Vargo
Director

---

[9] A copy of the regulation is maintained in the case file.

EX C 6



**Department of
Education**
*Carmen Fariña, Chancellor*

New York City Department of Education
Teacher Recruitment and Quality
Attn: Field Services Support
65 Court Street
Brooklyn, NY 11201

### Summons to Disciplinary Conference

March 21, 2017

Francesco Portelos
Employee File No. 0762606

Dear Mr. Portelos:

I have scheduled an appointment for you to meet with me at your current assignment on
Thursday, March 23, 2017, at 10:30 AM: P.S. 046, 41 Reid Avenue, Staten Island, NY 10305.

The purpose of the meeting is to discuss the report of the Office of the Special Investigations
(OSI Case #16-07353X), which concludes that, you violated Chancellor's Regulation A-820 and
FERPA by posting student education records on the internet.

Because this conference may lead to disciplinary action, you may bring a union representative.

Sincerely,

Mark J. Ryan
Principal/Field Supervisor

1

Ex C 7



**Department of Education**
Carmen Fariña, Chancellor

April 19, 2017

New York City Department of Education
Teacher Recruitment and Quality
Attn: Field Services Support
65 Court Street
Brooklyn, NY 11201

Francesco Portelos
Teacher
Employee File # ████

Dear Mr. Portelos:

On March 23, 2017, we met at P.S. 46, located at, 41 Reid Avenue, Staten Island, NY, to discuss the allegations and conclusions contained in the attached investigative report issued by the Office of the Special Investigations (OSI) regarding OSI Case #16-07353X. Also present at this meeting were U.F.T. Chapter Leader Eileen Schmidt and Field Supervisor, Joann Peters.

After an investigation, OSI substantiated that you violated Chancellor's Regulation A-820 and FERPA (the Family Educational Rights and Privacy Act) when you posted a number of DeWitt Clinton High School (10X440) student transcripts, student attendance records and student grade change records on the Internet, on a website which is part of a group called "UFT Solidarity." OSI further substantiated that when you posted the above student records, Student A's name was not redacted and the remaining partially redacted records, published online, contained other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the DeWitt Clinton High School community who does not have personal knowledge of the relevant circumstances, to be able to identify the students with reasonable certainty. It was determined that this website is not affiliated with the UFT and is registered under your name.

At our meeting, I provided you with a copy of the attached OSI report and gave you an opportunity to review the report. I then gave you an opportunity to respond to the allegations and conclusions contained in the OSI report. Prior to responding, you met privately with your union representative to review the attached OSI report.

1

FILED: NEW YORK COUNTY CLERK 09/27/2017 06:01 PM
INDEX NO. 156610/2017
NYSCEF DOC. NO. 20
RECEIVED NYSCEF: 09/27/2017

**Upon your return, you presented me with the following written response:**

March 23, 2017

Mr. Mark Ryan,

    I have read the OSI report (Case 16-07353X) dated October 19, 2016, I strongly disagree with the findings of the report. I assert that I have not violated any Chancellor's Regulation, nor any Federal Law as the report findings claim.

    In addition, I believe that as an owner of a public educational press blog, that falls under the Freedom of the Press, I should not be disciplined as a New York City Department of Education employee, when the alleged conduct was in no way in connection to my official duties as an employee.

                    Sincerely,

                    Francesco Portelos

After reading your response, I asked you if you wanted to add anything. You indicated that you did not wish to add anything to your response. At your request, I clarified my role as a licensed supervisor.

Based on our meeting on March 23, 2017, a review of the attached OSI investigative report and your responses at our meeting, I conclude that you violated Chancellor's Regulation A-820 and FERPA when you posted a number of DeWitt Clinton High School (10X440) student transcripts, student attendance records and student grade change records on the Internet, on a website which is part of a group called "UFT Solidarity." I further conclude that when you posted the above student records, Student A's name was not redacted and the remaining partially redacted records, published online, contained sufficient information for someone in the DeWitt Clinton High School community who does not have personal knowledge of the relevant circumstances, to be able to identify the students with reasonable certainty.

More specifically, Chancellor's Regulation A-820 addresses the confidentiality of and the access to student records and incorporates pertinent provisions of FERPA. Under the regulation, no part of a student's educational record may be divulged with personally identifiable information, including not only a student's name, address or personal identifying number but also [o]ther information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty." When you published Student A's education record on your website with personal identifiable information, including the name, you violated Chancellor's Regulation A-820 and FERPA. You also violated FERPA when you published the records of other students, which were not sufficiently redacted given the definition of personally identifiable information found in FERPA and Chancellor's Regulation A-820. From the records that were posted on the website, a DeWitt student is able to identify another DeWitt student with reasonable certainty based on the particular courses the other student took (which you did not redact), and thereby learn the particular grades the student received in those courses (which you also did not redact)—and which specifically constitute relevant circumstances for which they would not have previously had personal knowledge.

When you were interviewed by OSI on October 11, 2016, you admitted that you posted the above documents to the UFT Solidarity website and stated that Student A's un-redacted name must have been an oversight. Notwithstanding the above, your actions still violated Chancellor's Regulation A-820 and FERPA. You demonstrated professional misconduct by failing to maintain the confidentiality of student records, as required by federal law and Chancellor's Regulations. The Family Educational Rights and Privacy Act (FERPA) was enacted to protect the privacy of both students and families we are entrusted to serve.

3

[FILED: NEW YORK COUNTY CLERK 09/27/2017 06:01 PM] INDEX NO. 156610/2017
NYSCEF DOC. NO. 20                                    RECEIVED NYSCEF: 09/27/2017

Please be advised that the above misconduct may lead to further disciplinary action including charges that may lead to the termination of your employment.

Sincerely,

Mark J. Ryan
Principal/Field Supervisor

I have received this letter.

_____                    4/26/17
Name                                        Date

4

Case 1:17-cv-02258-AKH-RLE Document 117 Filed 05/23/18 Page 143 of 186 INDEX NO. 610/2017
1497
EXC 11

 Gmail

**Francesco Portelos <mrportelos@gmail.com>**

---

## October 11, 2016 Investigation Interview - DeWitt Clinton Students

17 messages

---

**Francesco Portelos <mrportelos@gmail.com>**                                          Mon, Oct 17, 2016 at 11:37 PM
To: Black Eric <EBlack5@schools.nyc.gov>, Archie Michelle <MArchie@schools.nyc.gov>
Cc: Donna Coppola <dcoppola@uft.org>, Vargo Jaclyn <JVargo2@schools.nyc.gov>, "Rodi Katherine G."
<krodi@schools.nyc.gov>, Friedman Howard <HFriedman@schools.nyc.gov>, Guerra Charity
<CGuerra7@schools.nyc.gov>, Nathan Judy <JNathan@schools.nyc.gov>, Becker Lawrence <lbecker@schools.nyc.gov>,
Staple Carron <cstaple@schools.nyc.gov>

Investigator Black and Archie,

As per our meeting on October 11, 2016, I reiterate what was stated by me and my union rep:

I registered the site www.uftsolidarity.org. I run it with a growing group of other people.

I was aware of the post on the site in question, where Principal Santiago Taveras alleged private student information was posted.

I stated that I will not divulge the names of the others involved, but that I did take part in aspects of the post
http://www.uftsolidarity.org/former-deputy-chancellor-shows-how-easy-it-is-to-fix-gradesschool/

I also have access and rights to edit the site. This was exhibited when I was first informed that, out of the dozens of redactions, one student name was missed and I quickly rectified it using my phone in the OSI office. This was not done due to a request. You stated a name was visible and I rectified the matter instantly.

It was emphasized to you that extreme care was taken to redact student names (Principal Santiago Taveras allegedly changed many records) and there was no intent to disclose information, violate any regulation, law or policy.

It should also be noteworthy that DOE attorneys reviewing this case understand that this post is an educational blog and no one takes part, nor contributes, in their official capacity as DOE employees. In fact, people responsible for actually publishing this post were not DOE employees.
The site also falls under Freedom of the Press and the 9th U.S. Circuit Court of Appeals in San Francisco ruled that bloggers are entitled to the same free speech protections as a traditional journalist.

Several things trouble us about this investigation:

1. There was knowledge that a student's name was visible on an attendance record online on June 16, 2016 and SCI, OSI, DOE directors, Principal Santiago and attorneys failed to remedy the situation until 4 months later. The ethics finger needs to be pointed at Court Street, Maiden Lane and Chambers Street.

2. The student name that slipped should not overshadow the fact that the post exposed great *matters of public concern*. The information in this allegation was also posted on mainstream media.

3. Investigators and Chancellor Fariña's "Task Force," headed by Phil Weinberg, has been criticized for taking so long to complete the first investigation at issue here. This is further embarrassment to embattled Mayor de Blasio, who made the statement that the investigation would be swift here: http://newyork.cbslocal.com/2015/11/30/bronx-high-school-grade-fixing/

Lastly, I need to know who was involved in ordering Security Agent Cruz to escort me to the 9th floor, wait an hour and escort me out of 65 Court Street on October 11th, 2016. I was not permitted to even review my personnel file during my lunch break, after the interview. For this reason I copied Katherine Rodi and Lawrence Becker as they may also have the answer to this disparaging treatment I received.

With kind regards,

Francesco A. Portelos
Educator
www.EducatorFightsBack.org

FILED: NEW YORK COUNTY CLERK 07/22/2017 07:46 PM INDEX NO. 153064/2017
NYSCEF DOC. NO. 10                                                                    RECEIVED NYSCEF: 07/22/2017



THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

**ZACHARY W. CARTER**
*Corporation Counsel*

**NEIL GIOVANATTI**
*Assistant Corporation Counsel*
ngiovana@law.nyc.gov
(212) 356-0886

June 2, 2017

**BY EMAIL AND REGULAR MAIL**
Francesco A. Portelos
52 Wiman Place,
Staten Island, NY 10305
mrportelos@gmail.com

Re:  Elizabeth "Betsy" Combier v. Francesco Portelos, et al.
17 CV 2239 (FB) (RLM)

Dear Mr. Portelos:

Pursuant to Section 50-k of the General Municipal Law, our Office has reviewed the facts and circumstances relating to the above-referenced action in which you are named as an individual defendant. After careful consideration, we have concluded that we are unable to represent you in this matter.

Section 50-k(2) of the General Municipal Law states, among other things, that the City shall provide for the defense of an employee in an action "arising out of any alleged act or omission which the Corporation Counsel finds occurred while the employee was acting within the scope of his employment and in the discharge of his duties and was not in violation of any rule or regulation of his agency at the time the alleged act or omission occurred." We have concluded that we cannot make the requisite findings under Section 50-k(2), and, consequently, we are unable to represent you.

Ex C 13

Court records indicate that you were served with a copy of the Amended Complaint on or about May 12, 2017. As such, we suggest that you **immediately** contact private counsel or union counsel to discuss the possibility of legal representation in this matter. Upon notification from either union or private counsel, we will provide your attorney with all written communications between the City and the Court to date.

Sincerely yours,

Neil Giovanatti
Assistant Corporation Counsel

cc:   Thomas Crane, Esq., New York City Law Department (by Inter-Office Mail)
      Judy Nathan, Esq., New York City Department of Education (by Email)

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------
FRANCESCO PORTELOS,

                    Petitioner,

         -against-

NEW YORK CITY DEPARTMENT OF EDUCATION;
CARMEN FARIÑA, CHANCELLOR of
NEW YORK CITY DEPARTMENT OF EDUCATION;
and JACLYN VARGO, DIRECTOR OF THE OFFICE OF
SPECIAL INVESTIGATIONS,

                    Respondents,

For an Order and Judgment Pursuant to Article 78 of the
Civil Practice Law and Rules.
--------------------------------------------------------------------

**VERIFIED PETITION**

Index No.

        Petitioner FRANCESCO PORTELOS, as and for his Verified Petition, respectfully alleges as follows:

        1.     This is a special proceeding commenced to challenge Respondent New York City Department of Education ("NYCDOE") Office of Special Investigation's (OSI) finding that Petitioner violated the United States Family Educational Rights and Privacy Act (FERPA), as well as FERPA related NYCDOE Chancellor's Regulation A-820. Respondent's decision to substantiate alleged misconduct related to actions by Petitioner as a citizen, and not as an employee, lacks rationale and is arbitrary and capricious. A copy of OSI's Case 16-07353X report, dated September 28, 2016, is annexed hereto as Exhibit A.

        2.     Petitioner requests a trial of any triable issues of fact pursuant to CPLR Section 7804(h), as well as oral argument on this petition.

## THE PARTIES

3. Petitioner FRANCESCO PORTELOS is a resident of the State of New York, and a parent of two public school children in Staten Island, New York.

4. Respondent CITY OF NEW YORK is a municipality of the State of New York, charged with educating the children of the citizens of New York City.

5. Respondent NEW YORK CITY DEPARTMENT OF EDUCATION (NYCDOE) is a duly authorized and existing agency or corporation of the municipality of the City of New York, charged with educating and maintaining the welfare of the children of the citizens of New York City.

6. Respondent CARMEN FARIÑA is the Chancellor of Respondent NYCDOE, and, as such, is said Respondent's chief executive officer.

7. Respondent JACLYN VARGO is the Director of the Respondent NYCDOE's Office of Special Investigation.

## VENUE

8. Venue is placed in New York County, New York pursuant to CPLR Section 506(b) since it is where the headquarters of the NYCDOE is located.

## STATEMENT OF FACTS

9. Respondents substantiated an allegation that Petitioner Francesco Portelos violated the Family Educational Rights and Privacy Act when he was involved in publishing copies of fraudulent DeWitt High School student grade and attendance forms filled out by DeWitt Clinton High School Principal Santiago Taveras on an education activism blog.

2

10.     DeWitt Clinton High School, located in the Bronx County of New York City is a public school of NYCDOE.

11.     Petitioner is a public citizen, who resides in the County of Richmond of the City of New York, and is NYCDOE public school parent.

12.     Petitioner helps run several education activist websites. One of the websites is called uftsolidarity.org. UFT Solidarity is a political caucus within the United Federation of Teachers (UFT) union in City of New York.

13.     Petitioner's activities, as an educational activist, are not part in parcel of Petitioner's official teaching duties while also employed as a NYCDOE teacher in the borough of Staten Island, New York which is located roughly twenty miles from DeWitt Clinton High School.

14.     In mid-November 2015, UFT Solidarity held a meeting to discuss issues in education, such as workplace bullying and alleged corruption in NYCDOE schools. At this meeting, members from DeWitt Clinton High School were present and shared copies of school records that showed dozens of illegal student grade and attendance changes by then DeWitt Clinton High School Principal Santiago Taveras[1].

15.     Petitioner, and other UFT Solidarity members, comprised of both NYCDOE and non-NYCDOE members, informed the DeWitt Clinton staff that the allegations need to be reported to the proper authorities, but also that they will help shed light on these very serious allegations.

---

[1] NYCDOE rules require that both subject teachers and the principal sign off on all grade changes. The documents presented were all missing the teachers' required signatures.

3

16.     Members of UFT Solidarity reviewed the documents (roughly 30 pages) to make sure they were redacted and personal identifiable information of minors, such as names, age, gender, student ID numbers and addresses were not visible. The documents were then sent to several members of the mainstream media. None of these actions taken by Petitioner, and other members of UFT Solidarity, were conducted as part of their official capacity as NYCDOE employees.

17.     On or about November 29, 2015, as a result of UFT Solidarity sharing the Principal Santiago Taveras DeWitt Clinton illegal grade and attendance change documentation to mainstream media reporters, several articles and television news segments were published. Several titles of the news stories included:

**-Staffers accuse Bronx principal of fixing grades so students pass**
**(New York Post)**

**-Bronx High School Principal Accused Of Changing Failing Grades**
**(CBS Local)**

**-Bronx Principal Accused of Changing Grades, Installing Own**
**Office Shower (Slate Magazine)**

18.     Upon information and belief, the allegations garnered more media attention because Principal Santiago Taveras was a Former Deputy Chancellor of the NYCDOE and one of his past duties was closing failing schools. He was also hired as a principal to "turnaround" an allegedly failing DeWitt Clinton High School.

19.     Despite New York City Mayor Bill de Blasio stating, during a November 30, 2015 press conference, that this grade and attendance change "investigation will proceed promptly," the investigation conducted by the NYC Special Commissioner of Investigation (SCI) was still open nearly 8 months later.

4

20.     Due to the fact that that there appeared to be no movement on this serious investigation, on June 16, 2016 UFT Solidarity members posted an article on their site uftsolidarity.org titled **"Former Deputy Chancellor Shows How Easy It Is To 'Fix' Grades/School"** In addition to the allegations against Principal Santiago Taveras, the article also contained the redacted evidence that showed illegal grade and attendance record fixing. A copy of this article has been annexed hereto as Exhibit B.

21.     Petitioner's participation in the posting of the article, regarding allegations at DeWitt High School in the Bronx, was not in any way related to the Petitioner's official capacity as NYCDOE employee, especially as a teacher teaching at schools more than twenty miles away from DeWitt Clinton in Staten Island.

22.     On or about June 17, 2016 DeWitt Clinton High School Principal Santiago Taveras made a complaint with the NYC Special Commissioner of Investigation (SCI) alleging that confidential student information was published on the blog referenced in the article annexed hereto as Exhibit B. As the documents in question are embedded in a link in the online article, they are annexed separately as Exhibit C.

23.     On or about June 30, 2016 SCI's office referred the complaint by Principal Santiago Taveras to the Respondent NYCDOE Office of Special Investigations (OSI). Both SCI and OSI have only jurisdiction to investigate alleged misconduct conducted by NYCDOE employees and or contractors.

24.     Respondent OSI alleges that in July 2016, a review of the content of the article (Exhibit B and C) showed documents that may be in violation of federal law due to

Case 1:17-cv-02239-MKB-RLM   Document 117   Filed 05/03/18   Page 151 of 186 PageID #: 1369

their content. Respondent also alleged that they used the website "www.who.is" to find who the site uftsolidarity.org is registered to. Petitioner's contact information appeared[2].

25.   Despite having contact information for a website that allegedly contains private student information in violation of FERPA, Respondents OSI and NYCDOE made no attempt to remove any of the alleged publicly disclosed confidential student information posted nor contact Petitioner.

26.   On or about October 1, 2016, nearly three months after the investigation was initiated, Petitioner received a letter from OSI stating that he was the subject of an investigation and had to contact OSI Investigator Eric Black for an interview. The letter and subsequent communication with Investigator Black did not indicate what the investigation was about.

27.   Petitioner appeared at OSI's office on October 11, 2016, with union representation, believing the allegation had to do with his duties as a NYCDOE employee, as OSI only investigates NYCDOE employees and related contractors. It was only at that meeting that he was informed of an alleged violation of the Family Educational Rights and Privacy Act and produced the article and documents attached as Exhibit B and C.

28.   Petitioner was informed, by Investigator Eric Black, that despite UFT Solidarity's efforts to have all personal identifiable information hidden, a former student's name was not redacted. In addition, Investigator Black indicated that NYCDOE attorney and Records officer Joseph Baranello believed that the remaining documentation was also in violation, despite the redaction of personal identifiable information.

---

[2] UFT Solidarity collects donations and part of those donations pay for all aspects of the website. Petitioner is not the owner of the website and merely registered it.

6

29.     Without being asked to, Petitioner took out his smartphone at the interview and used his shared administrative access to ufstolidarity.org to remove the entire article from the website. He was not convinced that the information, that was redacted, was in any violation, but removed it due to the new knowledge that one name was missed. Petitioner reiterated his argument that the content was not a violation, and these allegations had nothing to do with his employment, in a post interview email to Respondents annexed hereto as Exhibit D.

30.     Investigator Eric Black admitted, during the course of the interview, that his office reviewed the blog in question, saw Student A's name in July 2016, and printed the entire set of redacted student records. Investigator Black further admitted that his office again reviewed the site, sometime in September 2016, and printed the documents out again.

31.     Neither Investigator Black, nor his supervisors OSI Director Jaclyn Vargo, Esq. and OSI Deputy Director Christina Nowak, Esq., made any attempt to remove any known publicly disclosed confidential student information posted on ufstolidarity.org, despite reviewing the site multiple times during the course of several months.

32.     At a later point in the day, Petitioner redacted the one student's name that was missed, and republished the article in its entirety. Article annexed as Exhibit B and

33.     Petitioner did not hear anything regarding this OSI investigation from October 11, 2016 until March 21, 2017 when he was handed a letter, by a school secretary, while teaching at an elementary school in Staten Island, NY. The letter was from a NYCDOE supervisor the Petitioner never met and it indicated he was being summoned to a disciplinary conference regarding an OSI report that substantiated he committed misconduct as a NYCDOE employee. The letter has been annexed hereto as Exhibit E.

7

34.     On March 23, 2017, NYCDOE Field Supervisor Mark Ryan met with Petitioner and provided him with a five month old OSI report dated October 19, 2016. The report has been annexed hereto as Exhibit A. Mr. Ryan requested that Petitioner read the OSI report and respond to it. After reading it, Petitioner wrote up his response, denying all wrongdoing and allegations, and submitted it to Mr. Ryan. In that response, he also mentioned that as an owner of an educational press blog, he should not be disciplined as a NYCDOE employee.

35.     On March 29, 2017, Petitioner sent a more detailed response to OSI Deputy Director Christina Nowak, Esq., who signed off on the OSI report with Investigator Eric Black. In the letter, Petitioner requests that Ms. Nowak reconsider the facts and outcomes regarding, among other things, the fact that Petitioner was not acting as a NYCDOE employee and has Freedom of Press protection, as blogs are considered press. The letter to Deputy Director Nowak has been Annexed hereto as Exhibit F.

36.     On April 4, 2017 OSI Director Jaclyn Vargo responded to Plaintiff's request for reconsideration of the case outcome and denied the request. A copy of the denial is attached hereto as Exhibit G.

37.     The investigation against DeWitt Clinton High School Principal Santiago Taveras ultimately concluded and substantiated the allegations that he engaged in misconduct by manipulating student records. He was removed as principal and Respondent Chancellor Farina made him "Manager of Student Support" in the Bronx. The SCI

8

# ARGUMENT

## Respondents' Lack of Jurisdiction

38.     Respondents OSI overstepped their jurisdiction by initiating an investigation against a public citizen, since OSI can only investigate conduct by NYCDOE employees as part of their duties. The Special Commissioner of Investigation (SCI) opted to not take the initial complaint of alleged FERPA violation by Petitioner. When Respondents were referred the case from SCI in June 2016, they had the option of administratively closing the case, as they have done in the past with other cases. Respondents could have also unsubstantiated the case citing "non-intent" as they have done in other cases where OSI has found that an incident might have occurred, but misconduct was not the intention. Notifying UFT Solidarity of the unredacted name would have been sufficed in remedying the situation.

39.     Blogs fall under Freedom of the Press. In the case of Obsidian Finance Group LLC and Kevin Padrick vs. Crystal Cox, 12-35238. The Court found that tax fraud allegations were a matter of public concern, which means Obsidian had to show evidence of negligent behavior by Cox when she wrote about them online. Here, the Petitioner, along with other members of UFT Solidarity, wrote allegations about Principal Santiago Taveras in a blog and were not negligent, as was noted by Investigator Black in the OSI report noting Petitioner's "extreme care was taken to redact student identifiable information."

40.     All three documents, FERPA, Chancellor's Regulations A-820 and footnote 7 in the final OSI report (Exhibit A), state in sum and substance that FERPA only applies to "all schools that receive funds under an applicable program of the U.S. Department of Education." The Petitioner is not a school, nor does Petitioner receive funding from the US

9

Case 1:17-cv-02239-MKB-RLM Document 117 Filed 05/03/18 Page 155 of 186 PageID #: 1369

Department of Education and therefore cannot be in violation of FERPA as an individual. A diligent search for successful cases of FERPA violations against an individual was conducted and none were found.

41.     Respondent OSI also lacks jurisdiction to claim violation of a Federal law. According to FERPA, only a complaint made by a parent, or eligible student 18 and older can make a complaint that results in a FERPA determination. According to the OSI report, it is evident that the man named "Student A," whose name was accidentally not redacted on an attendance sheet was not interviewed. Had this man been questioned, Investigator Black would have come to find that "Student A" was actually discharged from DeWitt Clinton High School long before the posting of this article, and that he was over 18.

42.     In another legal matter, unrelated to the investigation in question, Petitioner and Respondent Chancellor Carmen Farina have been named as co-Defendants in a suit, along with other parties, Elizabeth "Betsy" Combier v. Francesco Portelos. et al. 17 CV 2239. The suit relies heavily upon Petitioner Francesco Portelos' actions on social media activities and blog postings, similar to the actions in this case. Petitioner was sued both in his personal and official capacity as a NYCDOE employee. Petitioner made a request for representation as an employee and was denied by NYC Corporation. In their letter denying representation, annexed hereto as Exhibit I, NYC Corporation Council states in performing Petitioner's social media related allegations, he was not **"acting within the scope of his employment and in the discharge of his duties."** Additionally, in a Pre-Motion letter to the Eastern District Court, NYC Corporation Counsel wrote "The Amended Complaint goes on to describe various alleged ploys by Defendants Portelos and Celli against Plaintiff by writing negative things about Plaintiff **on the internet...**" "None of the actions described

10

in the Amended Complaint by Defendants Portelos and Celli **possibly fall within their scope of employment as teachers.**" Here, the Respondents arbitrarily use Petitioner's social media education activity as both a "sword and shield" in connecting it with his official capacity as an employee only when it suits them. Even if Respondents were accurate in that the alleged actions were a violation of FERPA, they cannot target a public citizen, acting outside of his official employement duties, just because he "happens to also be" an employee of the NYCDOE.

### Respondent's Finding of Misconduct is Inaccurate and Lacks Rationale

43.     According to the OSI report, NYCDOE Chief Confidentiality Officer of the General Counsel Joseph Baranello was shown the student records posted online (Exhibit C) and opined. In his opinion, he inaccurately asserts, without sound basis, that students' transcripts, with all Personal Identifiable Information (PII) redacted, could still be identified by "one with enough knowledge of the students' programs." That may be true for the students' teachers, class programmers, or anyone with access to a student's record. However, that is not the standard used by FERPA law and Chancellor's Regulation A-820. FERPA's standard is that if the information was not fully redacted such that the information, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, *who does not have personal knowledge of the relevant circumstances*, to identify the student with reasonable certainty and thereby have access to personal identifiable information from the student's education record, then there may *possibly* be a violation of FERPA.

11

44.     It should be noted that Petitioner Francesco Portelos's education activism has created a prior history with Respondents. Petitioner alleged that former Staten Island Intermediate School 49 Principal Linda Hill engaged in financial misconduct. OSI ultimately substantiated Petitioner's allegations, and she was forced to retire, but only after delaying the investigation for three years and hiding the findings from the public. Petitioner has also made numerous Freedom of Information Law (FOIL) requests with Respondent's Records Officer Joseph Baranello, Esq., who opined about the student records in this matter, and has appealed numerous searches made by his office. A concerned anonymous OSI employee dropped off a written narrative of OSI issues in Petitioner's home mailbox on 2014. The narrative also stated that they have been told by former OSI director Candace McLaren that when they "...send emails about Francesco Portelos and Betsy Combier we should call them by their initials 'FP' and 'BC' so that when they FOIL the emails they won't get them." This shows prior animus towards Petitioner by Respondents. Petitioner has also brought two Federal suits against Respondent in the Eastern District (12 CV 3141 and 17 CV 872). It is Petitioner's belief that this prior history played a role in Respondents trying to find something to substantiate against him, even if it were to be a stretch.

45.     Finally, even if the Court were to find that Petitioner was somehow acting in his official capacity, and Respondents were accurate that there was a violation of FERPA, the finding should then be dismissed as it is time barred according to the UFT-NYCDOE Collective Bargaining Agreement. Article 21c(3) states that: "Incidents investigated by the Chancellor or by a governmental investigatory agency must be reduced to writing by the appropriate supervisor **within 6 months** and 12 months respectively from the date the incident either occurred or should have been discovered by the appropriate

12

school officials. Employees must receive a complete copy of any such writing and an opportunity to answer in writing and to have such response attached. The writing may not be incorporated into the employee's personnel file or record, unless this procedure is followed, and any such writing will be removed when an employee's claim that it is inaccurate or unfair is sustained.

In this case, the Office of Special Investigations far surpassed the 6 month deadline to conduct the investigation, reduce it to writing and provide the copy to the Petitioner. Through their own admission, Respondents were made aware of the allegations in June 2016, allegedly wrote the report on October 19, 2016 and did not furnish it to Petitioner until March 23, 2017.

## AS AND FOR A FIRST CAUSE OF ACTION

1.      OSI's outcome substantiating FERPA and Chancellor's Regulation A-820 violations was arbitrary and capricious, in violation of lawful procedure, outside their jurisdiction and in bad faith.

2.      Petitioner has no other adequate remedy at law and the procedural vehicle of Article 78 is the only remedy available to her to seek the relief she requests in this special proceeding.

3.      No prior application has been made herein.

**WHEREFORE**, it is respectfully requested that this Court order Respondents to annul OSI's determination that Petitioner violated FERPA and Chancellor's Regulation A-820.

13

Case 1:17-cv-02302-WFK-RLM Document 117 Filed 05/22/18 Page 159 of 186 PageID #: 1513

Dated:      New York, New York
               July 21, 2017

                           Sincerely,

                           FRANCESCO PORTELOS
                           PRO SE
                           52 WIMAN PLACE
                           STATEN ISLAND, NY 10305

             By:       _____
                           FRANCESCO PORTELOS

14

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------- x

FRANCESCO PORTELOS,

                                     Petitioner,

                   – against –

NEW YORK CITY DEPARMTENT OF EDUCATION;
CARMEN FARIÑA, CHANCELLOR of NEW YORK
CITY DEPARTMENT OF EDUCATION; and JACLYN
VARGO, DIRECTOR OF THE OFFICE OF SPECIAL
INVESTIGATIONS,

                                   Respondents,

For an Order and Judgment Pursuant to Article 78 of the
Civil Practice Law and Rules.

-------------------------------------------------------------------------- x

**VERIFIED ANSWER**

Index No. 156610/2017

           Respondents, New York City Department of Education, ("DOE"), Carmen Fariña,

in her official capacity as Chancellor of the DOE, and Jaclyn Vargo, in her official capacity as

Director of the Office of Special Investigations, by their attorney, Zachary W. Carter,

Corporation Counsel for the City of New York ("City"), as and for their verified Answer to the

petition ("Petition"), respectfully allege as follows:

           1.      Deny the allegations set forth in paragraph "1" of the Petition, except

admit that Petitioner purports to proceed as stated therein, and respectfully refer the Court to

Petitioner's Exhibit A cited therein for the contents thereof.

           2.      Deny the allegations set forth in paragraph "2" of the Petition, except

admit that Petitioner purports to proceed as stated therein.

           3.      Deny knowledge or information sufficient to form a belief as to the truth

of the allegations set forth in paragraph "3" of the Petition.

4.      Deny the allegations set forth in paragraph "4" of the Petition, and affirmatively state that Petitioner did not identify "City of New York" as a Respondent in this proceeding.

5.      Deny the allegations set forth in paragraph "5" of the Petition, except admit that DOE is organized and existing under the laws of the State of New York, and respectfully refer the Court to the Education Law and Chapter 20 of the New York City Charter, for a statement of the powers of the DOE.

6.      Deny the allegations set forth in paragraph "6" of the Petition, except admit that Respondent Carmine Farina, sued here in her official capacity, is Chancellor of the DOE, and respectfully refer the Court to the New York Education Law § 2590-h for a full and accurate statement of the powers of the Chancellor of the DOE.

7.      Deny the allegations set forth in paragraph "7" of the Petition, except admit that Jaclyn Vargo is the Director of the Office of Special Investigations at DOE.

8.      Deny the allegations set forth in paragraph "8" of the Petition, except admit that DOE maintains offices in New York County, and that Petitioner purports to proceed as stated therein.

9.      Deny the allegations set forth in paragraph "9" of the Petition, except admit that the Office of Special Investigations substantiated an allegation that Petitioner violated the Family Education Rights and Privacy Act ("FERPA") by publishing confidential student information on his blog.

10.     Admit the allegations set forth in paragraph "10" of the Petition.

11.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "11" of the Petition.

2

12.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "12" of the Petition.

13.   Paragraph "13" of the Petition sets forth a legal conclusion only, to which no responsive pleading is required.

14.   Deny knowledge or information sufficient to form a belief as to the allegations set forth in paragraph "14" of the Petition, except admit that DOE maintains policies regarding grade changes and state that Petitioner's characterization of allegedly illegal changes is a legal conclusion to which no responsive pleading is required.

15.   Deny knowledge or information sufficient to form a belief as to the allegations set forth in paragraph "15" of the Petition.

16.   Deny the allegations set forth in paragraph "16" of the Petition, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether members reviewed the documents for redactions, or whether they were sent to the media, and state that petitioner's characterization of the official capacity of NYCDOE employees is a legal conclusion to which no responsive pleading is required.

17.   Deny the allegations set forth in paragraph "17" of the Petition, and respectfully refer the Court to the news stories cited therein for the contents thereof.

18.   Deny knowledge or information sufficient to form a belief as to the allegations set forth in paragraph "18" of the Petition.

19.   Deny the allegations set forth in paragraph "19" of the Petition, except admit that an investigation was conducted into the incident and the Mayor made comments about the investigation.

3

Case 1:17-cv-02239-MKB-RLM   Document 117   Filed 05/03/18   Page 163 of 186 PageID #: 1317

20.     Deny the allegations set forth in paragraph "20" of the Petition, and respectfully refer the Court to the Petitioner's Exhibit B cited therein for the contents thereof.

21.     Paragraph "21" of the Petition sets forth a legal conclusion only, to which no responsive pleading is required.

22.     Deny the allegations set forth in paragraph "22" of the Petition, and respectfully refer the Court to the Petitioner's Exhibit C for the contents thereof.

23.     Deny the allegations set forth in paragraph "23" of the Petition, except admit that the Office of Special Investigations ("OSI") investigated a complaint against Petitioner and state that Petitioner's conclusion as to the jurisdiction of the Special Commissioner of Investigation and OSI is a legal conclusion, to which no responsive pleading is required.

24.     Deny the allegations set forth in paragraph "24" of the Petition, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding how UFT Solidarity collects revenue, and admit that OSI found that the documents Petitioner posted violated federal law regarding protection of student information, and that OSI determined Petitioner registered the domain name of the website the documents were posted on.

25.     Deny the allegations set forth in paragraph "25" of the Petition.

26.     Deny the allegations set forth in paragraph "26" of the Petition, except admit that Petitioner was contacted for an interview regarding an OSI matter in which he was the subject of investigation.

27.     Deny the allegations set forth in paragraph "27" of the Petition, except admit that Petitioner, accompanied by his union representation, met with OSI as part of an OSI investigation.

4

28.     Deny the allegations set forth in paragraph "28" of the Petition, except admit that OSI met with Petitioner and discussed the documentation that disclosed confidential student information.

29.     Deny the allegations set forth in paragraph "29" of the Petition, except admit that Petitioner accessed the website during the interview and removed the article, and respectfully refer the Court to Petitioner's Exhibit D cited therein for the contents thereof.

30.     Deny knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "30" of the Petition, except admit OSI reviewed the student records throughout their investigation.

31.     Deny the allegations set forth in paragraph "31" of the Petition.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "32" of the Petition, except admit that Petitioner published the article, and respectfully refer the Court to Petitioner's Exhibit B cited therein for the contents thereof.

33.     Deny the allegations set forth in paragraph "33" of the Petition, and respectfully refer the Court Petitioner's Exhibit E cited therein for the contents thereof.

34.     Deny the allegations set forth in paragraph "34" of the Petition, except admit that Petitioner was given a copy of the OSI report, Petitioner submitted a response to the report, and respectfully refer the Court to Petitioner's Exhibit A for the contents thereof.

35.     Deny the allegations set forth in paragraph "35" of the Petition, and respectfully refer the Court to Petitioner's Exhibit F cited therein for the contents thereof.

36.     Deny the allegations set forth in paragraph "36" of the Petition, and respectfully refer the Court to Petitioner's Exhibit G cited therein for the contents thereof.

5

37.     Deny the allegations set forth in paragraph "37" of the Petition, except admit that Santiago Taveras was investigated and is still employed by DOE.

38.     Deny the allegations set forth in paragraph "38" of the Petition.

39.     Paragraph "39" of the Petition sets forth a legal conclusion to which no responsive pleading is required.

40.     Deny the allegations set forth in paragraph "40" of the Petition, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding Petitioner's search for caselaw.

41.     Paragraph "41" of the Petition sets forth a legal conclusion to which no responsive pleading is required, except Respondents deny knowledge or information sufficient to form a belief as to the truth of Petitioner's allegations regarding "Student A.".

42.     Deny the allegations set forth in paragraph "42" of the Petition, except admit that Petitioner is a named defendant in the unrelated federal case cited, Docket No. 17-CV-2239, Eastern District of New York, and that the Office of the Corporation Counsel of the City of New York declined to represent Petitioner in that case, and respectfully refer the Court to Petitioner's Exhibit I, and to the docket sheet and its contents in the federal case cited, for the contents thereof.

43.     Deny the allegations set forth in paragraph "43" of the Petition, and respectfully refer the Court to Petitioner's Exhibit C cited therein for the contents thereof.

44.     Deny the allegations set forth in paragraph "44" of the Petition, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding purported anonymous mail drops to Petitioner's home mailbox and Petitioner's

6

Case 1:17-cv-02239-MKB-RLM Document 117 Filed 05/03/18 Page 166 of 186 PageID #: 1628
INDEX NO. 156610/2017

RECEIVED NYSCEF: 09/27/2017

professed belief, and admit that Petitioner has made previous allegations to OSI and DOE, and that Petitioner has sued Respondents previously.

45.    Deny the allegations set forth in paragraph "45" of the Petition, and respectfully refer the Court to the provision of the collective bargaining agreement cited therein for the contents thereof.

1.    Deny the allegations set forth in the second paragraph "1"[1] of the Petition.

2.    Deny the allegations set forth in the second paragraph "2" of the Petition.

3.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second paragraph "3" of the Petition.

## FOR A STATEMENT OF PERTINENT AND MATERIAL FACTS, RESPONDENTS RESPECTFULLY ALLEGE

**A. The OSI Investigation into Petitioner's Disclosure of Confidential Student Information.**

49.    Petitioner is a teacher employed by DOE, currently assigned to the Absent Teacher Reserve. See Service History of Petitioner, annexed hereto as Exhibit "1."[2]

50.    Near the end of the 2015-2016 school year, Petitioner became the subject of an investigation by the Office of Special Investigations ("OSI") after OSI received a referral to investigate from the Special Commissioner of Investigation. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2."

---

[1] Petitioner's numbering restarted after Paragraph 45.
[2] For the convenience of the Court, Respondents numbered the paragraphs in our Answer as if the paragraphs in the Petition had been numbered sequentially. Further, all numbered exhibits, unless otherwise indicated, refer to those annexed to the Verified Answer, because Petitioner used letters to refer to his exhibits.

7

Case 1:17-cv-02239-MKB-PLM Document 117 Filed 05/03/18 Page 167 of 186 PageID #: 1521

51.     OSI investigates allegations of improper and unlawful behavior, including corporal punishment and verbal abuse against students, to help ensure a safe and secure learning environment for New York City's students, staff members, and parents. See OSI Website, publicly available at

http://schools.nyc.gov/Offices/GeneralCounsel/Investigative/OSI/default.htm.

52.     A principal, Santiago Taveras, reported that student transcripts, attendance records, and student grade change records were posted on the Internet. The records were posted on uftsolidarity.org, the website of a group calling itself UFT Solidarity. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 1.

53.     During the investigation, OSI discovered that the domain name "uftsolidarity.org" was registered by Petitioner. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 1.

54.     OSI conducted interviews of DOE staff as part of the investigation into confidential student information posted on uftsolidarity.org. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 1.

55.     OSI interviewed Principal Santiago Taveras, who stated that he was reviewing the website when he discovered confidential documents concerning students from his school. Principal Taveras also stated that he had recently prepared these documents to send to his union representative and had asked his secretary to scan them. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2. Principal Taveras stated that many of the documents he had prepared for his union representative were included in the online post by UFT Solidarity. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2.

8

Case 1:17-cv-02239-MKB-RLM   Document 117   Filed 05/03/18   Page 168 of 186 PageID #: 1621

56.     OSI also interviewed Mary Rodriguez, the school secretary. Ms. Rodriguez stated that she scanned the documents for Principal Taveras using a copy machine and saving them on a flash drive, as the copier does not save scanned documents to the network. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2.

57.     Ms. Rodriguez could not explain how the documents were obtained by whomever posted them to the UFT Solidarity's website, but she also could not recall if the documents were left unattended prior to scanning. She also stated that the documents were in a locked closet in her office after she scanned them. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2.

58.     Joseph Baranello, Chief Privacy Officer at the Office of the General Counsel of DOE, was also interviewed as part of the investigation. He reviewed the documents posted by UFT Solidarity and noted that one document, which was not redacted and showed Student A's name in its entirety, was published in violation of Chancellor's Regulation A-820 and the Family Educational Rights and Privacy Act ("FERPA"). See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2.

59.     FERPA is a federal law that applies to all schools that receive federal funds under an applicable program of the U.S. Department of Education. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2.

60.     Mr. Baranello also noted that DOE would not release student transcripts in the form they were published by UFT Solidarity because it would be possible, for someone with enough knowledge of the DOE and student programs, to use the information on the transcripts to identify the students in the records, despite some redactions. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2.

9

61.     On or about September 27, 2016, OSI notified Petitioner that he was the subject of an OSI investigation. Petitioner was interviewed as part of the investigation on or about October 11, 2016. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2. Petitioner was accompanied by Donna Coppola, a representative of the United Federation of Teachers ("UFT"), Petitioner's union. Id.

62.     At the interview, Petitioner confirmed that the UFT Solidarity domain name is registered to him and admitted to being involved in posting the documents in question to the website. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2. Petitioner stated that multiple people were involved, but refused to identify those people or explain how the documents were obtained. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2.

63.     Petitioner stated during the interview that he and the others he claimed had posted the material took care to redact student identifying information, and that the failure to redact Student A's name must have been an oversight. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 2-3.

64.     During the interview, Petitioner accessed the UFT Solidarity website and removed the post containing the documents. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 3.

65.     After Supervising Investigator Eric Black conducted interviews and reviewed the records, he concluded that Petitioner and UFT Solidarity's publication of Student A's education record with personally identifiable information was a violation of Chancellor's Regulation A-820 and FERPA. See OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 3; see Chancellor's Regulation A-820, annexed hereto as Exhibit "6."

10

FILED: NEW YORK COUNTY CLERK 09/27/2017 06:01 PM
NYSCEF DOC. NO. 15

Case 1:17-cv-06225-AJB-RMJ Document 11-2 Filed 05/23/18 Page 170 of 186 PageID #: 661 10/2017
1524

INDEX NO. 660610/2017
RECEIVED NYSCEF: 09/27/2017

66.     The investigation further concluded that the remaining partially redacted documents, also published by Petitioner and UFT Solidarity, contained "sufficient information that a person in the [school where the records originated] might be able to identify the students with reasonable certainty." <u>See</u> OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 3.

67.     The investigator noted that Petitioner admitted his involvement in posting the records, and during the interview, was able to remove the post after accessing the website. <u>See</u> OSI Report dated October 19, 2016, annexed hereto as Exhibit "2," at 3.

**B. Petitioner's Disciplinary Conference and Disciplinary Letter Not to File.**

68.     By notice dated March 21, 2017, Petitioner was summoned to a disciplinary conference by his supervisor, Mark Ryan. <u>See</u> Summons to Disciplinary Conference, annexed hereto as Exhibit "3."

69.     After this conference occurred, Petitioner sent a response to the OSI report to OSI Deputy Director Christina Nowak. <u>See</u> Petitioner's Exhibit "F."

70.     On or about April 4, 2017, OSI Director Jaclyn Vargo denied Petitioner's request to reconsider the final OSI determination. Director Vargo also noted that she reviewed the report and found that it was consistent with FERPA. <u>See</u> April 4, 2017 Letter, annexed hereto as Exhibit "4."

71.     On or about April 19, 2017, Field Supervisor Mark Ryan wrote Petitioner a disciplinary letter memorializing the conference they had in March 2017, and noted that the investigation found Petitioner posted documents containing Student A's unredacted name to the UFT Solidarity website. <u>See</u> April 19, 2017 Letter, annexed hereto as Exhibit "5."

11

72.     The letter further noted that Petitioner's actions violated Chancellor's Regulation A-820 and FERPA and that Petitioner demonstrated professional misconduct by failing to maintain the confidentiality of student records. See April 19, 2017 Letter, annexed hereto as Exhibit "5."

73.     Petitioner was also advised by the letter that the misconduct may lead to further disciplinary action, including disciplinary charges that could lead to termination of his employment. See April 19, 2017 Letter, annexed hereto as Exhibit "5," at 3.

74.     Notably, the April 19, 2017 letter is a disciplinary letter that is not placed in Petitioner's personnel file. See April 19, 2017 Letter, annexed hereto as Exhibit "5."

75.     The applicable collective bargaining agreement requires that for a disciplinary letter to be placed in a personnel file, it must be completed within certain timeframes. If the timeframe to issue a letter to file has passed, supervisors may still issue letters that are not placed in a personnel file. Letters that are not a part of the employee's personnel file may, among other things, serve to provide notice to an employee regarding a DOE policy or regulation, or memorialize performance issues (including misconduct).

76.     As of September 27, 2017, no disciplinary proceedings have been initiated against Petitioner based on the substantiated OSI investigation regarding disclosure of student educational records.

77.     Petitioner commenced the instant Article 78 proceeding on August 3, 2017.

12

## FOR A FIRST DEFENSE

78.    The Petition fails to state a cause of action upon which relief may be granted.

## FOR A SECOND DEFENSE

79.    At all times relevant to the Petition, Respondents acted reasonably, lawfully, and in good faith, without malice, in accordance with the Constitution and laws of the United States and the State of New York, the Charter and laws of the City of New York, the by-laws and regulations of DOE, and all applicable laws, by-laws, rules and regulations, and were neither arbitrary nor capricious.

Case 1:17-cv-02238-MKB-RLM Document 117 Filed 05/03/18 Page 173 of 186 PageID #: INDEX NO. 160410/2017

1327

**WHEREFORE**, respondents respectfully request that the Petition be dismissed in its entirety, that the relief requested be denied in all respects, that judgment be entered for respondents, and that respondents be granted costs, fees, and disbursements together with such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          September 27, 2017

                              **ZACHARY W. CARTER**
                              Corporation Counsel of the
                              City of New York
                              Attorney for Respondents
                              100 Church Street
                              New York, New York 10007-2601
                              (212) 356-2387

By:    _____
          LILIYA PERELMAN
          Assistant Corporation Counsel

14

Case 1:17-cv-08223-JMF-RWL Document 117 Filed 05/03/18 Page 174 of 186

1528

## VERIFICATION

STATE OF NEW YORK    )
                          : SS. :
COUNTY OF NEW YORK   )

      JOSEPH A. BARANELLO, an attorney duly admitted to practice before the Courts of the State of New York, affirms, under penalty of perjury, that he is the Chief Privacy Officer and Agency Counsel of the respondent New York City Department of Education, that he has read the annexed Verified Answer and knows the contents thereof; that the same is true to his own knowledge, except as to those statements stated to be based upon information and belief, which to those, he believes to be true; and that the source of this information and the basis for his belief are the books and records of the New York City Department of Education, and from statements made to him by employees of the New York City Department of Education.

                                               JOSEPH A. BARANELLO

Dated: New York, New York
       September 27, 2017

Oct 27 (4 days ago)

**Karamoko Inniss <karamokoinniss@yahoo.com>**

to me

--- On Wed, 10/26/16, Karamoko Inniss <karamokoinniss@yahoo.com> wrote:

> From: Karamoko Inniss <karamokoinniss@yahoo.com>
> Subject: What is wrong with you
> To: "Francesco Portelos" <mrportelos@gmail.com>
> Date: Wednesday, October 26, 2016, 12:37 PM
> You text me telling me that you're
> confused, that I owe you rent for the month of November, and
> that you did nothing wrong.
>
> So us repeatedly being sick to the point that we've lost
> wages, due to the state of your property,
> Nasty orange water falling on us from the bathroom ceiling.
>
> Mushrooms growing from the bathroom walls and ceilings and
> you want to open the ceiling, exposing us to more spores and
> getting us more sick, and letting in more insects, instead
> of waiting until we leave. All so that you can rent the
> apartment immediately, no matter what effect it has on our
> health. You blame me for not reporting a leak, that I
> couldn't have known was happening.
>
> Mosquitos, beetles, drain flies, spiders, crickets and
> centipedes, on the walls our clothes, our food and  our
> bodies. Bugs whose existence you repeatedly lied about,
> whose presence I repeatedly told you that my fiancé was
> highly afraid of. Bugs that you refused to exterminate,
> because they live inside of the entire foundation of your
> property,
>
> The fact that there is little to no insulation which makes
> the apartment unbearably cold in the winter. The fact that
> there was a hole under the bathroom sink from which cold air
> from outside blew into the bathroom on a daily basis because
> for about 3 to 4 months you refused to do anything about it.
>
> Even though you assured me that the hole would be covered
> before I moved in.
>
> The fact that you promised to clean the apartment before I
> moved in, but instead I walked into a completely dust filled
> apartment.
>
> The fact that you lied about the washer and dryer being free
> more than once.
> The fact that you refuse to get a new washer and dryer even
> though Edna, the repair man and I all told you that the
> machines do not work properly and need to be replaced.
> I'm the one stuck paying the electricity bill for for this

> old beat up machine that I barely even use, that Edna
> doesn't have to pay for, but uses daily around the clock.
>
> You unnecessarily decided to bring in people in a full month
> in a half in advance, before our lease ends, while telling
> me that people want to move in before our lease ends, which
> suggest that you want us out. You suggest several times that
> we can leave early if we want, all so that we can forfeit
> our deposit and then you tell me that I'm at fault for the
> time period in which people can view the apartment, and I'm
> at fault for you not being able to find a tenant, because I
> don't want you and some strangers around our pets and our
> belongings while were not home.
>
> We keep getting locked out of the building in the cold and
> in the rain because no matter how many times I tell you that
> the door is malfunctioning, you always reply that its the
> batteries, when it is in fact the door itself and not the
> batteries at all. You wouldn't even give us a key.
>
> You suggest that I can move out sooner, while retaining my
> deposit, then change your mind and try to make it seem as if
> you paying your bills is somehow my responsibility. What you
> owe a bank has nothing to do with me. You try to make is
> seem as if a new tenants deposit, is my deposit, which it
> isn't, and has nothing to do with me.
>
> You sent a stove repair man, who shat on the bathroom floor
> and left it there.
> You sent an exterminator, who smelled so bad that we had to
> open the doors and windows for hours to clear the apartment
> of his body odor.
>
> The fact that we are well beyond stressed out all due to
> these conditions that you caused, provided us or didn't even
> care to take care of or prevent.
>
> The fact that you you refuse to acknowledge that any of
> these things are or your responsibility to take care of or
> to have prevented before hand, the fact that we are up
> coughing or can't sleep at night due to these conditions.
>
> Almost every single time that I told you that I had an issue
> with your property, you immediately replied that the
> conditions that we moved into were somehow my fault, or you
> replied that I had to spend my own money to fix these
> conditions
>
> I do not owe you and I am the one who is confused. Its
> surprising that you could treat people like this without a
> care in the world. You really don't care about how sick
> we've been, you don't care what happens to your tenants so
> long as you get rent.
>
> These conditions are more than legitimate reasons for our
> agreement to be broken and for you to return our deposit.
> Instead you refuse to acknowledge any wrong doing, You
> refuse to do the right thing. Even though these things are
> all on you, even though Melissa and I have never done

> anything wrong to you or to your property, even though we
> paid rent in full every month, you simply don't want to
> return our deposit. You patronize me as if I'm a child, as
> if I don't know how things are supposed to work, by saying
> that you know this is my first apartment, as if I have no
> rights or as if I'm unaware as to how a tenant should expect
> to be treated.
>
> You need to get off of your privilege high horse.
>
>
>

Oct
27 (4
days
ago)

**Karamoko Inniss <karamokoinniss@yahoo.com>**

to me

--- On Wed, 10/26/16, Francesco Portelos <mrportelos@gmail.com> wrote:

> From: Francesco Portelos <mrportelos@gmail.com>
> Subject: Re: What is wrong with you
> To: "Karamoko Inniss" <karamokoinniss@yahoo.com>
> Date: Wednesday, October 26, 2016, 3:55 PM
> What is it
> that you want?
>
> On Wed, Oct
> 26, 2016, 2:25 PM Francesco Portelos <mrportelos@gmail.com>
> wrote:
> Let's be
> adults, honest and call it is as it is...
> You want money
> for a deposit on a new place and want to break you agreement
> to get that deposit. However, instead of saying so ahead of
> time to try and work with you, you come up with this. I
> chips have advertised it as November 1st.
> Through your own
> admission, in your email, you state that I called repairmen
> and an exterminators. In fact I addressed your concerns as
> soon as you informed me. From stuck doors to battery
> replacement.
> Please indicate
> if you will allow me to enter and fix there bathroom
> ceiling.
> Francesco
>
> On Wed, Oct 26,
> 2016, 12:37 PM Karamoko Inniss <karamokoinniss@yahoo.com>
> --
>
>
> Francesco A. Portelos

Ex. G. 19

> 
> Educator
> 
> www.EducatorFightsBack.org
> UFT Solidarity
> Caucus
> 
> www.UFTsolidarity.org
> www.mrportelos.com
> "The
> foundation of every state is the education of its
> youth." -
>  Greek
> Philosopher Diogenes
> --
> 
> 
> Francesco A. Portelos
> 
> Educator
> 
> www.EducatorFightsBack.org
> UFT Solidarity Caucus
> 
> www.UFTsolidarity.org
> www.mrportelos.com
> "The foundation of every state is the
> education of its youth." -
>  Greek Philosopher Diogenes

ExC 20



**+1 347-564-7597**

(1/3) Mr. Inniss, I've sent you several emails and just called you to obtain some clarification. I will call again and suggest you pick up. Over a year after yo

(2/3) u broke your lease, and took all the bugs and alleged apartment issues with you, your false and derogatory comments against me have appeared on someone's

(3/3) website. She is not stable and alleged you and her spoke.

(1/2) You have chosen to enter an arena you know nothing about. You are an unlicensed employee teaching our students. Something I didn't know when I tried findi

(2/2) ng you after school work. I suggest you contact this person and have them remove your defamatory allegations.

EXC 21

+1 347-564-7597

2/2) ng you after school work.  I sugg

ou contact this person and have them

emove your defamatory allegations.

This is the site http://

nycrubberroomreporter.blogspot.com/

2018/01/francesco-portelos-and-atto

bryan.html?m=1

Ex C 22

This is the person's contact.

Betsy.combier@gmail.com

Do the right thing and have the false information taken down.

(1/2) Just so you know the woman you are getting involved with and I are caught in a legal matter in front of a federal judge. This is what you want on your pla

(2/2) te ? To get involved in this matter? Why?





Betsy Combier <betsy.combier@gmail.com>

---

## Fwd: Constitutional/Education Law decision of significance

2 messages

---

**JB** <jb@behrinslaw.com>                                                    Thu, Apr 5, 2018 at 3:03 PM
To: Betsy Combier <betsy.combier@gmail.com>


Jonathan B. Behrins
The Behrins Law Firm, PLLC


---------- Forwarded message ----------
From: **JB** <jb@behrinslaw.com>
Date: Tue, Apr 3, 2018 at 4:57 PM
Subject: Constitutional/Education Law decision of significance
To:


FOR IMMEDIATE RELEASE:


In a significant turnabout upholding the constitutional rights of teachers, a court ordered the reinstatement of Rosalie Cardinale to her former position, vacated the arbitration that terminated her position, awarded her full back pay to the date of her unconstitutional termination on the basis that the DoE's processes are unconstitutional and violate tenets of due process.


For years, 3020a proceedings in the NYC DoE were brought in contravention of New York State Education Law 3020a, but courts seemed to pay little care.


"This is a long overdue victory for teachers who have been subjected to the vicissitudes of the DoE," Jonathan Behrins said. "The court shined a light on a heretofore corrupt process that gave power to vengeful administrators, enabling them to much more easily end the careers of teachers. It should be noted that Betsy Combier first discovered this procedural defect in her tireless advocacy of teachers over the past 14 years. Approximately seven years ago, as a teacher advocate, she began bringing motions to dismiss based upon the identical grounds before scores of arbitrators, all of whom denied the motion.  Even on occasions where the gravamen of the motion was brought under the aegis of an Article 75 proceeding, the trial courts did not give sufficient credence to the issue."


Decision & Order, p. 9: "[The] Hearing Officer conducted the Education Law § 3020-a hearing based on unproven assumptions that the delegations of duties and responsibilities from the office of the Chancellor to subordinate administrators occurred in compliance with the relevant statutory authority... Notwithstanding the low standard needed to demonstrate the rationality of an Opinion and Award, the fact that the Hearing Officer failed to consider a basic jurisdictional predicate before conducting the hearing renders the entire decision irrational because his authority to conduct the hearing is suspect."


Decision & Order, p. 10: "The DOE's failure to make a finding of probable cause and adhere to the procedural protections guaranteed to Petitioner in Education Law § 3020-a violates Petitioner's due process rights and violates New York's strong public policy protecting the integrity of the tenure system."

Behrins continued: "Over the last two years, I have had the satisfaction of representing teachers at Education Law 3020a arbitration and in Article 75 proceedings in which Ms. Combier served as an extraordinarily capable paralegal. Along with Jason Katz of my firm, through further research and writing, we carefully molded and fine-tuned the issues to the point that the Cardinale legal team notched an important victory for teachers. Ms. Cardinale's career was terminated by administrators who preyed upon the fact that she was rebounding from beating cancer when they embarked on a campaign to find fault with her abilities after 17 years of exemplary teaching. She was beloved by her students and parents, but the DoE saw the opportunity to weed out somebody they saw as a burden to the school's payroll. Ms. Cardinale returned to her position after receiving various therapies and the gaslighting began. Administrators repeatedly told her that she wasn't strong enough to perform her tasks even though she was. By ignoring due process and trampling Ms. Cardinale's rights, the DoE moved ahead and had their hand selected arbitrator run her out of the system. Fortunately for her, the judge saw how baseless and craven the Department of Education actors were. The very motion that was brought before the arbitrator, and later, Mr. Justice Green, called for Ms. Cardinale's rights to be respected. Teachers throughout the NYC DoE who are facing similarly baseless charges-- and they are legion, should be comforted that there is now precedent to uphold their constitutional rights."

Jonathan B. Behrins
The Behrins Law Firm, PLLC
M- (212) 495-9515

 **Cardinale Decision 3 April 2018.pdf**
599K

---

**Betsy Combier** <betsy.combier@gmail.com>          Sat, Apr 7, 2018 at 12:26 AM
Reply-To: betsy.combier@gmail.com
To: Betsy Combier <betsy.combier@gmail.com>

[Quoted text hidden]
--
Betsy Combier
betsy.combier@gmail.com
ADVOCATZ
parentadvocates.org
NYC Rubber Room Reporter
National Public Voice
NYC Public Voice
New York Court Corruption

---

**Cardinale Decision 3 April 2018.pdf**
599K

**ParentAdvocates**.org

---

**CURRENT EVENTS**              <u>Print This Article >></u>

---

## ADVOCATZ President Betsy Combier Unravels The 3020-a Arbitration Procedure in New York City

---

*For fourteen years I have been researching the 3020-a Arbitration charging process used in New York City, and in particular the omission of a vote in Executive Session by the New York City Panel For Educational Policy which is mandated by Education Law 3020-a(2)(a). I ignored the verbal attacks by attorneys who chose to threaten me with doom if I continued to ask for the vote - and I went to both NYSUT and Department of Education Attorneys working on 3020-a cases. I have never received a rational response to "Betsy's Motion", until Judge Green stepped into the fray. On March 29, 2018, Judge Green in Richmond County Supreme Court granted the petition of Rosalie Cardinale wherein we argued that her right to a fair 3020-a hearing was denied by an unlawful determination of probable cause. Ergo, my argument that the 3020-a process in New York City has a lawless charging procedure. What does that mean? What you want it to.*

---

Betsy Combier
ADVOCATZ
betsy.combier@gmail.com
917-596-1762

Betsy Combier
Editor, <u>ADVOCATZ.com</u>
Editor, <u>ADVOCATZ</u> blog
Editor, <u>Parentadvocates.org</u>
Editor, <u>New York Court Corruption</u>
Editor, <u>NYC Rubber Room Reporter</u>
Editor, <u>NYC Public Voice</u>
Editor, <u>National Public Voice</u>
Editor, <u>Inside 3020-a Teacher Trials</u>

UPDATE April 7, 2018:

On April 5, 2018, a recently terminated teacher who used NYSUT for her 3020-a Arbitration, sent me the following email from /to her NYSUT Attorney:



Betsy Combier

"Date: April 5, 2018 at 12:23:45 PM EDT

"I spoke to a lawyer about the Staten Island decision and he had a warning shot for the UFT. I am not sure why i would have to hire a private lawyer to have my case revisited when the UFT has a duty to all terminated tenured teachers that can't be brushed away in light of this decision. The Uft opens itself up to personal liability if it fails to take action - such as intervening in the Staten Island case or bringing its own case against the DOE that is appropriate to protect the collective bargaining rights of tenured teachers who were improperly termination under the Staten Island decision. The UFT would be making a seriously unwise strategic decision if it were to do nothing simply because there are competing lower court decisions on the issue. The UFT's liability would be subject to appellate decision(s) that are unpredictable. My case was never presented to the PEP and I would appreciate knowing how the Union intends to help people in my position in light of this decision.
Please advise."

The NYSUT attorney responded:

"I have now read the entire decision and the content of the Post article and any advice you are receiving which is the basis of your e-mail is misleading.

The Judge in the Staten island case did not rule that all 3020a cases have to be voted upon by the PEP in order to be validly brought. In fact, the Judge accepted the reasoning of other courts that the Chancellor (Farina) can delegate the authority to find probable cause and bring charges to Superintendents who can then delegate that authority to principals. What the Judge found was that in this case the DOE/ NYC Corporation Counsel failed to provide him with proof of such written delegations of authority.

The case you cite to is just the result of poor lawyering on the part of the DOE's counsel in the matter. The Delegation letters in question exist and my office has copies of those letters. When Chancellor Farina was installed we demanded copies of such letters from the DOE in order to ensure that the law was being

respected/followed and that all cases were being properly brought. As a result, this office is satisfied that the law is being followed and that findings of probable cause underlying 3020a charges are being properly made.

I understand your frustration and anger. However, this decision is not a basis to challenge any 3020a result."

Hmmmm. First, I don't believe that Judge Green wrote that he 'accepted' that "Chancellor (Farina) can delegate the authority to find probable cause, and all the NYC DOE has to do is get the paper saying that the Chancellor delegates "...authority to [do anything]" and boom, probable cause is determined? That's just unfair and unjust.

I of course have the backstory on the "Delegation" statements submitted to countless arbitrators. They are worthless. Yep, that's what I have said, what I am saying, and what I will say, and I can prove it. In my work, I know that there is always a DOE Attorney and/or a NYSUT Attorney who will gladly say that I'm wrong, I don't know anything, I am not an Attorney, etc (I'm NOT an attorney, so that part is good), so I have spent 10 years coming up with facts and research to back up what I say and write.

How does the decision of Judge Green affect tenured teachers who have been given an unfair 3020-a decision in New York City?



Betsy Combier
We dont really know yet. What we do know is that we are ready to assist any DOE employee who has been charged with 3020-a in New York City (or New York State). We believe that every case is unique, and therefore we need to look at the circumstances in each case very carefully. Teacher trials are serious events.

I have tried to find any mention at all of probable cause determination in Education Law 2590, anywhere. I haven't found it. I have worked on 3020-a arbitration with about 8 different attorneys, and each of these attorneys except two, Attorneys Bryan Glass and Jordan Harlow, believed that this issue of the procedural error due to a missing vote on probable cause was valid, and placed my essay/motion into the mix. The side agreements between the UFT and the NYC DOE, the April 15 2010 letter and the previous letter dated June 27 2008 focus on what happens AFTER the charges are served on the tenured employee.

As the paralegal for Attorney Jonathan Behrins in the Article 75 Appeal of Rosalie Cardinale, we once again made the argument that the Department of Education in New York City never gave any 3020-a arbitrator the right to make a decision, or, in legal terms, the arbitrator did not have subject matter jurisdiction. We are saying that due to the Department's desire for speed above rights, no vote in Executive Session took place at the Panel for Educational Policy, and therefore no arbitrator has subject matter jurisdiction and cannot hear evidence or decide on penalty. Our win in Staten Island for Rosalie changes the landscape of tenure rights and 3020-a, big time.

Jonathan and I have been working together on 3020-a hearings for almost two years (I have worked on about 58 cases over the past 7 years as an independent consultant/paralegal for several attorneys). We believe that Ms. Cardinale's termination at 3020-a arbitration in New York City was not rational, and Arbitrator Michael Lendino lawlessly took on the case (at $1400/day) despite our submission of "Betsy's Motion" to Dismiss For Lack of Subject Matter Jurisdiction, now cited by Staten island by Judge Green:

DOE took illegal steps to fire tenured teacher: judge
Selim Algar, NY POST, April 3, 2018

City teachers facing termination have been thrown a legal life preserver.

In a precedent-setting decision, a Staten Island judge ruled last week that the Department of Education took illegal shortcuts in firing a tenured teacher.

Judge Desmond Green said that a termination hearing can take place only after a vote by the Panel for Educational Policy establishes probable cause.

Green said the DOE ignored that requirement in canning Rosalie Cardinale and ordered her reinstated.

Longtime advocate Betsy Combier, who worked on Cardinale's case, said the DOE has ignored the law for more than a decade — and thinks Green's ruling sets a precedent to challenge other firings.

"This is huge," she said. "This is a protection we are supposed to be giving tenured teachers. For all these years, they have not gotten it. It's not right."

Neglecting the probable- cause vote "violates Petitioner's due-process rights and violates New York's strong public policy protecting the integrity of the tenure system," Green wrote in his decision.

Cardinale's lawyer, Jonathan Behrins, said the DOE purposefully avoids the PEP vote because it exposes dubious terminations to more scrutiny.

A city Law Department spokesman defended Cardinale's firing.

"We believe DOE's determination was appropriate and lawful," said spokesman Nick Paolucci.

For 14 years as a teacher advocate in New York, my focus has been assisting educators with problems concerning their workplace, and/or, if they were tenured, <u>researching the backstory of 3020-a charges</u> served on them in the rubber room or reassignment.

In New York City, I knew that the <u>controlling Law for 3020-a arbitration is Education Law 3020-a</u>. It says so in the charging papers. But Ed Law 3020-a (2)(a) says that there must be an Executive Session and a vote by the school board (in NYC the "PEP") on probable cause for the charges before the charges are served. In NYC, this Executive Session never takes place and there is no date in the charging papers for this meeting and vote.

For many years teachers charged with 3020-a Specifications received the 3020-a charges ("Specifications") with <u>APPENDIX A</u> in the packet. I asked NYSUT and the DOE why this was sent out to all tenured charged educators if there was no compliance in NYC, and the answer was always, "that's the way it is".

I used to attend PEP meetings and spoke about the "Executive Session" being held <u>before the public meeting began</u>, which is a violation of <u>Open Meetings Law #105</u>. I collected the Agendas 2007-1013, whenever there was an Executive Session which violated Open meetings Law. I did not understand then nor do I understand now, why PEP members violated Open Meetings Law consistently, without any questions asked by the PEP members themselves. I also filed a Freedom of Information request for the contract of Joel Klein, and I was told by the NYC Department of Education that Mr. Klein did not have a contract!

See <u>The "Who Are You Kidding??" Award Goes To: Joel Klein, New York City Board of Education Pretender</u>

I also spoke about my dismay that the charging process for teacher tenure hearings was a violation of the tenure law, in my non-attorney opinion.

When speaking at <u>PEP meetings</u> (video produced by Norm Scott) - where I called Joel Klein "Mr." Klein, because I do not believe he ever had a valid contract, and no Chancellor who followed him had one either - I carefully tried my best to take less than 2 minutes, leaving 45-50 seconds for former NYC schools Chancellor Joel Klein to give me an answer. He rolled his eyes, sometimes looked at DOE General Counsel Mike Best with his "there she goes again" look and took 10 seconds to tell me " your time is up, Ms. Combier, next speaker please" and 10 seconds for me to say "...but you didnt answer my question..."

I did not attend PEP meetings since then because they are useless, except for the PEP meeting on Feb 28 2018, where the two schools I was helping, <u>MS 53 and PS/MS 42</u>, were allowed to continue, open and free.

I have been writing about the PEP and teacher tenure on my blogs and websites since 2007, and I have submitted these issues to the DOE Attorneys as well as the Attorneys I work with and NYSUT, for at least that long, if not longer (I started working with teachers in 2003). I now assist at 3020-a as a member of the legal team (Im not an attorney). An educator charged with 3020-a does not need an Attorney in arbitration, but if anyone goes Pro Se, I highly recommend an assistant to help with the process. I do that, but I most often work with attorneys.

In 2003 I started asking all of the Attorneys I knew why there was no compliance with this section of Ed Law 3020-a. The answer I received always was, "...because that's the way it is", or "Don't worry about it". But I did worry about it, and when I began working on 3020-a hearings as an assistant to teachers who wanted to be pro se (without an attorney) or who wanted me and a private attorney to be the legal team, we always presented a Motion To Dismiss on the issue that if there was no vote on probable cause, then the arbitrator had no authority to proceed to a decision, and any decision was invalid.

We were denied on our Motion in the Supreme Court until Judge Desmond Green saw it differently:

"The DOE's failure to make a finding of probable cause and adhere to the procedural protections guaranteed to Petitioner in Education Law § 3020-a violates Petitioner's due process rights and violates New York's strong public policy protecting the integrity of the tenure system."

It appears that this decision unravels the 3020-a panels and nullifies the decisions made by any arbitrator who refused to grant the Motion To Dismiss on the basis of a lawless determination of probable cause signed by a Principal or Superintendent. There is no rule, law, or memo that specifically gives either Principals or Superintendents the authority to sign that paper, NOTICE OF DETERMINATION OF PROBABLE CAUSE.

I am writing a book about my experiences in 3020-a hearings after I brought up this issue.

The Department Attorneys have submitted responses, or Opposition to the Motion To Dismiss that range from the boring to the funny and ridiculous. One theme always appears: the Chancellor has the right to charge anyone, and can delegate this authority to anyone.

Again, I am not an attorney, but <u>preferring</u>, or serving, charges on tenured educators is not the same as determining "probable cause". My final answer.

Betsy Combier
917-596-1762
betsy.combier@gmail.com