BETSY COMBIER
315 East 65th Street, Apt. 4C
New York, N.Y. 10065
917-596-1762
Betsy.combier@gmail.com

July 30, 2018

Hon. Margo K. Brodie
United States Federal Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

Hon. Roanne Mann
United States Federal Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

Pro Se Desk
United States Federal Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

Lucio Celli
2743 Seymour Avenue
Bronx, N.Y. 10469



RE: Combier v. Portelos, et. al.
Docket No.: 1:17-CV-02239 (MKB)(RLM)

## OBJECTIONS TO THE STATEMENTS OF DEFENDANTS THE NEW YORK CITY DEPARTMENT OF EDUCATION AND LUCIO CELLI

Dear Judges Brodie and Mann,

I am submitting to you both copies of my Objections to the Statements of Defendants the Department of Education and Lucio Celli.

The attachments are the evidence in support of the claims made in my Complaint.

An exact copy is sent by FEDEX to Lucio Celli.

Thank you,

Respectfully,

Elizabeth Betsy Combier

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————————————x

ELIZABETH "BETSY" COMBIER,

                Plaintiff

-against-

FRANCESCO PORTELOS, LUCIO CELLI,
BRYAN GLASS, ESQ., JORDAN HARLOW, ESQ.,
NEW YORK CITY DEPARTMENT OF
EDUCATION, CARMEN FARINA, CHANCELLOR
OF THE NEW YORK CITY DEPARTMENT OF
EDUCATION, all sued individually and officially,

                Defendants

————————————————————x

DOCKET NO. 17-cv-02239 (FB)(RLM)

OBJECTIONS TO THE STATEMENTS
MADE BY DEFENDANTS THE DEPARTMENT
OF EDUCATION AND CARMEN FARINA, AND
DEFENDANT LUCIO CELLI



**PLAINTIFF** ELIZABETH "BETSY" COMBIER, proceeding pro se

respectfully objects to the responses of Defendants The New York

City Department of Education, Carmen Farina, and Lucio Celli,

pursuant to federal Rules of Civil Procedure Rule 72(b)(2).

I have not, yet, as of July 29, 2018 received any hard copies of

the responses from Celli or the NYC Department of Education and

Carmen Farina.

The response of the Department and Carmen Farina to the REPORT

AND RECOMMENDATION of Judge Mann, by reference addressed in full

herein, is nonsensical. The article cited by me in my Complaint,

namely

# The 3020-a Arbitration Newswire: Digging Up The Garbage On the UFT/DOE Partnership
## of Harm For Charged DOE Employees"

has the teacher tenure discipline policy of the Department in Carmen Farina's own words. Former Chancellor Farina describes the policy of disciplinary procedures she wants all parties – including all the Arbitrators, as well as all the NYSUT and Department attorneys – to follow. The 27-minute talk given by Carmen Farina in February 2015 at Tweed, the Department headquarters, was obtained through a Freedom of Information Request (#11,129) which I made in March 2015 to the Department records Access Officer Joseph Baranello. I have attached the proof of my work to get the paperwork on this meeting.

On June 4, 2015 I received the transcript of Carmen Farina's speech to the audience, the attendance list, the emails from/to the DOE concerning attendance, and a calendar. On June 8, 2015 I went to Tweed, and was handed the video of the meeting which was posted on my blog in the above cited article in May 2016. I put the panel picture at the top, as a snapshot from the video. Two things are very clear in this post:

1. Carmen Farina is talking about teacher disciplinary hearings, in general, as a policy of the Department;

2. Carmen farina gives her personal views as to what the Arbitrators and lawyers should do when prosecuting teachers.

Two months later, defendant Francesco Portelos chose to hack into my blog, delete the entire section known as the "3020-a Arbitration newswire", and then he posted the video from my blog without saying where he got it, saying that he "obtained it". He added that no one should allow anyone without a law license to help them, and he recommended Bryan Glass and Maria Chickedanz as the attorneys who should work on the cases. Portelos' websites "UFT Solidarity", "Educator Fights Back", and "Don't Tread On Educators" are NOT personal websites. They are reflections of his so-called "leadership" for Department of Education employees. While he gives some useful information as far as grievances, he threatens anyone who says no to him, and never posts anything about the NYC DOE Social Media Guidelines, attached.

Defendants knew in 2016, from reading my blog, that the policy for teacher tenure disciplinary hearings was clearly stated on my blog, because I heard from several attorneys who do the hearings, as well as the arbitrators. I have been writing about the disarray in the procedures at 3020-a arbitration since 2007.

Also, in The Ethics of School Administration, Kenneth A. Strike, Emil J. Haller, and Jonas F. Soltis discuss hypothetical cases illustrating moral dilemmas school administrators might be called upon to resolve in such areas as intellectual liberty, equal educational opportunity, and educational evaluation. Mr. Strike and Mr. Haller are professors of education at Cornell University; Mr. Soltis is a professor of education at Teachers College, Columbia University. They wrote:

"In the following case, a principal, "Mr. Endicott," has discovered that one of his best teachers, "Miss Loring," works in the evenings as a dancer at a topless bar:

"*If the scope of a teacher's job goes beyond the role of instructor and includes being a good influence on students, that is a reason to hold that any behavior on the part of a teacher that has an adverse effect on the values of students is not a private matter.*"

It is nonsensical to believe that anyone participating in public education would see a teacher of technology hacking into computers and calling someone a criminal and thief without any proof as not frightening. Similarly, the actions of Lucio Celli even during the course of this lawsuit show a man who should not be in a classroom, he has no concept of reality.

Defendants Portelos and Celli were acting as public servants as they destroyed my career as an advocate, filed police complaints, called me an evil fucking cunt, and hacked into my protected computer.

Indeed, the public does not condone this behavior, as can be seen in the lawsuit filed by Mymoena Davids against the State of New York. Attached is the Complaint. The Appellate Division Second Department has ruled that the case must move forward, and Answers to the Complaint were just filed by the Defendants on July 18, 2018.

Upon information and belief, the fact that Francesco Portelos threatened the health, safety and welfare of the children of Plaintiffs Sam Pirozzolo and Mymoena Davids in 2014 was a factor in the filing and pursuit of the case cited above, and attached. (See attached Complaint as well as pp. 133-134 of Document #117).

Thus, I object and oppose the statement made by Defendant the NYC Department of Education and Carmen Farina sent to Judge Brodie ddated July 26, 2018.

As far as the statement made by Lucio Celli, I have no idea what he was saying, but I oppose and object to everything that he says. The statement he filed in the Court on July 23, 2018 is gibberish and he should be now sanctioned. I object to his putting my name in the caption, as if I joined with him in making the outrageous claims in the papers. Upon information and belief, the police or detectives or some law enforcement personnel were sent to Defendant Celli's home after his screaming threats to Carmen Farina at the Panel For Educational

Policy meeting November 28, 2017. I have the video of his outburst.

Thus, I oppose and object to all of Lucio Celli's claims made in his latest statement, and I pray for the relief of having this Court now sanction him and give me an opportunity to put him before a jury to decide what relief I should receive for his – and the other Defendants' – harassment and violations of my safety and well-being protected by the US Government.

Respectfully,

Elizabeth Betsy Combier

Dated: July 30, 2018


**Department of
Education**

# NYC Department of Education Social Media Guidelines

## A. Introduction/Purpose

1. Social media technology can serve as a powerful tool to enhance education, communication, and learning. This technology can provide both educational and professional benefits, including preparing New York City Department of Education ("DOE") students to succeed in their educational and career endeavors.

2. The Chancellor is committed to ensuring that all DOE stakeholders who utilize social media technology for professional purposes, including staff and students, do so in a safe and responsible manner. The DOE strives to create professional social media environments that mirror the academically supportive environments of our schools.

3. These Social Media Guidelines ("Guidelines") provide guidance regarding recommended practices for professional social media communication between DOE employees, as well as social media communication between DOE employees and DOE students.

4. In recognition of the public and pervasive nature of social media communications, as well as the fact that in this digital era, the lines between professional and personal endeavors are sometimes blurred, these Guidelines also address recommended practices for use of personal social media by DOE staff.[1]

## B. Definition of Social Media

Social media is defined as any form of online publication or presence that allows interactive communication, including, but not limited to, social networks, blogs, internet websites, internet forums, and wikis. Examples of social media include, but are not limited to, Facebook, Twitter, YouTube, Google+, and Flickr.[2]

1. **Professional social media** is a work-related social media activity that is either school-based (e.g., a DOE principal establishing a Facebook page for his/her school or a DOE teacher establishing a blog for his/her class), or non-school-based (e.g., a DOE office establishing a Facebook page to facilitate the office's administration of a Chancellor's Regulation).

2. **Personal social media** use is a non work-related social media activity (e.g., a DOE central administrative employee establishing a Facebook page or a Twitter account for his/her own personal use).

---

[1] These Guidelines do not address student-to-student communication via social media. The DOE's Bill of Student Rights and Responsibilities sets forth expected standards of behavior with respect to student communication. The DOE's Discipline Code establishes the range of disciplinary options and guidance intervention that can be used when students engage in misconduct involving social media.

[2] These Guidelines do not address the professional use of third-party collaboration tools for purposes other than social media. Further guidance from the DOE addressing the use of third-party collaboration tools is forthcoming.

**C. Applicability**

These Guidelines apply to DOE employees. The DOE will take steps to ensure that other DOE stakeholders, including DOE vendors, DOE volunteers, and DOE independent contractors are informed of these Guidelines.

**D. Professional Social Media Use**

1. **Maintenance of Separate Professional and Personal E-mail Accounts**

    DOE employees who decide to engage in professional social media activities should maintain separate professional and personal email addresses. As such, DOE employees should not use their personal email address for professional social media activities. The professional social media presence should utilize a professional email address and should be completely separate from any personal social media presence maintained by the DOE employee. Regular and continuous use of a personal email address for professional purposes, including social media use, will result in DOE considering the email address, and the corresponding use of that address, as a professional account.

2. **Communication with DOE Students**

    DOE employees who work with students and communicate[3] with students through professional social media sites[4] should follow these guidelines:

    a. Professional social media sites that are school-based should be designed to address reasonable instructional, educational or extra-curricular program matters;[5]

    b. Professional social media sites that are non-school based should have a reasonable relationship to the mission and function of the DOE office creating the site;

    c. Each school year, DOE parents[6] will be notified about the professional social media activities their children will be invited to participate in. We will inform parents of the purpose and nature of each professional social media account their children will access and will instruct parents to contact the school with any questions or concerns;

    d. To the extent possible, based on the social media site being used, DOE supervisors or their designees should be given administrator rights or access to the professional social media accounts established by DOE employees;

    e. DOE employees will be required to obtain their supervisor's approval before setting up a professional social media presence;

    f. Supervisors and their designees are responsible for maintaining a list of all professional social media accounts within their particular school or office; and

---

[3] The term "communicates", as used in this Guidance, refers to activity, including, but not limited to, "friending," "following," "commenting," and "posting messages" using social media sites.

[4] The term "site" and "sites" refer to an online social media account or usage.

[5] On school-based professional social media sites that involve DOE students, DOE employees should use the sites for professional purposes. DOE employees are not to review any personal social media accounts created by their students.

[6] The term parent means the student's parent or guardian, or any person in a parental or custodial relationship to the student. This includes: birth or adoptive parent, step-parent, legally appointed guardian, and foster parent.

g. Professional DOE social media sites should include language identifying the sites as professional social media DOE sites. For example, the professional sites can identify the DOE school, department or particular grade that is utilizing the site.

3. **Guidance Regarding Professional Social Media Sites**

   a. DOE employees should treat professional social media space and communication like a classroom and/or a professional workplace. The same standards expected in DOE professional settings are expected on professional social media sites. If a particular type of behavior is inappropriate in the classroom or a professional workplace, then that behavior is also inappropriate on the professional social media site;

   b. DOE employees should exercise caution, sound judgment, and common sense when using professional social media sites;

   c. DOE employees should use privacy settings to control access to their professional social media sites to ensure that professional social media communications only reach the employees' intended audience. However, DOE employees should be aware that there are limitations to privacy settings. Private communication published on the internet can easily become public. Furthermore, social media sites can change their current default privacy settings and other functions. As a result, employees have an individualized responsibility to understand the rules of the social media site being utilized;

   d. Professional social media communication should be in compliance with existing Chancellor's Regulations, DOE policies and applicable laws, including, but not limited to, prohibitions on the disclosure of confidential information and prohibitions on the use of harassing, obscene, discriminatory, defamatory or threatening language;

   e. No personally identifiable student information may be posted by DOE employees on professional social media sites, including student photographs, without the consent of the students' parents; and

   f. DOE students who participate in professional social media sites may not be permitted to post photographs featuring other students.

4. **Monitoring of Professional Social Media Sites**

   a. Employees using professional social media have no expectation of privacy with regard to their use of such media. The DOE will regularly monitor professional social media sites to protect the school community;

   b. DOE supervisors, or their designees, such as webmasters, are responsible for monitoring their employees' professional social media sites. The monitoring responsibilities include reviewing the professional social media sites on a regular basis. If supervisors discover

questionable communications or behavior on professional social media sites, the supervisors are required to contact the appropriate authorities for assistance. If DOE employees decide to create a professional social media site and they are notified of questionable communications or behavior on their site, they are required to contact the appropriate authorities as well as their supervisor for assistance.[7]

c.  DOE supervisors reserve the right to remove, disable, and provide feedback regarding professional social media sites that do not adhere to the law or Chancellor's Regulations or do not reasonably align with these Guidelines;

d.  To assist in monitoring, as a recommended practice to the extent possible, the default setting for comments on professional social media sites should be turned off. If the default setting for comments is turned on, the comments on the site must be monitored on a daily basis;

e.  When establishing professional social media sites, supervisors and employees should consider the intended audience for the site and consider the level of privacy assigned to the site, specifically, whether the site should be a private network (for example, it is limited to a particular class or particular grade within a school) or a public network (for example, anyone within the school or a larger group within the DOE community can participate). It is a recommended practice for professional social media sites to be private networks, unless there is a specific educational need for the site to be a public network; and

f.  DOE supervisors should maintain a detailed log of all reported non-compliant communications as well as any violations that are otherwise brought to the supervisor's attention.

5.  **Press Inquiries**

Any press inquiries received via professional social media sites should be referred to the DOE Office of Communications and Media Relations (http://schools.nyc.gov/Offices/mediarelations/default.htm).

## E.  Personal Social Media Use

1.  **Communication with DOE Students**

In order to maintain a professional and appropriate relationship with students, DOE employees should not communicate[8] with students who are currently enrolled in DOE schools on personal social media sites. This provision is subject to the following exceptions: (a) communication with relatives and (b) if an emergency situation requires such communication, in which case the DOE employee should notify his/her supervisor of the contact as soon as possible.

---

[7] Existing DOE reporting requirements must be followed. Depending on the circumstances, the appropriate authorities may include, but are not limited to: the Network or Cluster Leader, Borough Safety Directors, the Office of the Special Commissioner of Investigations, the Office of Special Investigations, the Office of Equal Opportunity, the Office of the General Counsel, the Senior Field Counsel, the New York City Administration for Children's Services, and the New York City Police Department.

[8] Examples of such communications include, but are not limited to, "friending," "following," "commenting," and posting messages.

2. **Guidance Regarding Personal Social Media Sites**

DOE employees should exercise caution and common sense when using personal social media sites:

    a. As a recommended practice, DOE employees are encouraged to use appropriate privacy settings to control access to their personal social media sites. However, be aware that there are limitations to privacy settings. Private communication published on the internet can easily become public. Furthermore, social media sites can change their current default privacy settings and other functions. As a result, employees have an individualized responsibility to understand the rules of the social media site being utilized;

    b. DOE employees should not "tag" photos of other DOE employees, DOE volunteers, DOE contractors or DOE vendors without the prior permission of the individuals being tagged;

    c. Personal social media use, including off-hours use, has the potential to result in disruption at school and/or the workplace, and can be in violation of DOE policies, Chancellor's Regulations, and law;

    d. The posting or disclosure of personally identifiable student information or confidential information via personal social media sites, in violation of Chancellor's Regulations, is prohibited; and

    e. DOE employees should not use the DOE's logo in any postings and should not link to the DOE's website or post DOE material on any personal social media sites without the permission of the DOE Office of Communications and Media Relations.

**F.**   <u>**Applicability of DOE Policies and Other Laws**</u>

1. These Guidelines provide guidance intended to supplement, not supersede, existing DOE policies, Chancellor's Regulations and laws. Users of professional social media sites are responsible for complying with all applicable federal, state and local laws, including, but not limited to the Children's Online Privacy Protection Act (COPPA) (http://business.ftc.gov/privacy-and-security/children%E2%80%99s-privacy), Family Educational Rights and Privacy Act (FERPA) (http://www2.ed.gov/policy/gen/guid/fpco/index.html), and intellectual property laws.

2. These Guidelines are not designed to serve as a code of conduct for social media use. However, all existing DOE policies, regulations and laws that cover employee conduct may be applicable in the social media environment. These include, but are not limited to, Chancellor's Regulations, the Conflicts of Interest Law, and Section 3020-a of the Education Law.

3. DOE employees who are mandated reporters[9] are required to abide by the same reporting responsibilities in a social media context.

---

[9] Various Chancellor's Regulations impose reporting requirements on DOE employees for issues such as child abuse, child maltreatment, school-related incidents and crimes, corporal punishment, verbal abuse, unlawful discrimination or harassment by DOE employees, student-to-student sexual harassment, and student-to-student bias-based harassment, intimidation, and/or bullying. For example, see Chancellor's Regulations A-412, A-420, A-421, A-750, A-830, A-831, and A-832. Please note that all previous reporting requirements continue to be in force and will apply to behavior occurring within a social media context.

**G. Additional Inquiries**

This document is meant to provide general guidance and does not cover every potential social media situation. Should any questions arise, please consult the Frequently Asked Questions segment or contact your DOE Senior Field Counsel. As these Guidelines address rapidly changing technology, the DOE will regularly revisit these Guidelines and will update them as needed.

**H. Frequently Asked Questions (FAQs)**

**OVERVIEW**

1. Why is the DOE issuing guidance regarding social media?

   - Social media technology offers many educational benefits. The DOE is issuing this guidance to provide recommended practices for employees to take advantage of this technology in a manner that encourages professionalism, responsibility, safety and awareness.
   - In addition, these Guidelines provide recommended best practices for employees who use social media for personal communications.

**GETTING STARTED**

2. What if DOE employees are already using social media for either professional or personal purposes?

   - Professional social media use: DOE employees currently using social media for professional purposes should examine whether their use aligns with the Social Media Guidelines and these FAQs. Any use not consistent with these documents should be altered or amended within a reasonable period of time. We will answer any questions or address any concerns during training and feedback sessions. If employees have linked their social media site to a personal email address, they should transition the site to a professional email address.

   - Personal social media use: DOE employees who use social media for personal purposes should take steps to remove current DOE students, subject to the exceptions listed in the Guidelines, from those sites. Additionally, employees should review all of the Social Media Guidelines and FAQs to ensure familiarity with the recommended practices.

3. What are some common types of social media?

   - **Blogs** - Short for 'web-logs', these are sites that can function as ongoing journals with multiple entries. Typically, entries are categorized with 'tags' for easy searching. Most blogs allow for reader comments. Examples: *Blogger, Wordpress, TypePad.*

   - **Micro-Blogs** - These blogs allow for shorter content posts, typically with a limited set of typed characters allowed. Micro-blogs can be used for status updates and to quickly communicate information to 'friends' or 'followers.' Examples: *Twitter, Tumblr.*

   - **Networking** - These sites allow people to connect with each other around common interests, pursuits and other categories. Examples: *Facebook, LinkedIn, Google+, Ning.*

- **Photo/Video** - These sites allow people to share videos, images, slideshows and other media. Often these sites allow viewers to comment and share posted content. Examples: *YouTube, Vimeo, Flickr*.

4. What should DOE employees who want to develop professional social media for their classroom, school, or office do?

- Employees should review the Social Media Guidelines and FAQs periodically to ensure that they are familiar with their contents and are aware of any updates.

- Employees should research and familiarize themselves with the social media site they intend to utilize. For example, if the proposed professional social media use involves students, employees are required to review the social media site's regulations and determine whether children under a certain age are allowed to use the site. In addition, employees should, for example, understand the default privacy and viewing settings for the social media site. Where possible, we recommend that DOE employees establish group pages, rather than individual profiles, for educational purposes.

## MONITORING

5. Who monitors professional social media sites and how frequently are they monitored?

- Professional social media sites will be reviewed and monitored by supervisors or their designees, such as a webmaster, on a regular basis. The specific level of review required for each professional social media site will depend on the particular characteristics of the social media site. Sites that are interactive, for example, those that allow comments and posting, will need to be monitored more closely. Other factors that will impact the frequency include the level of privacy assigned to the site, specifically, whether the site is a private network (for example, limited to a particular class) or a public network (open to anyone within the school or a larger group within the DOE community). Employees who decide to establish professional social media sites can engage in a voluntary review of their specific site on a regular basis.

## STUDENT COMMUNICATION

6. Do these Guidelines apply to DOE students?

- These Guidelines do not address student-to-student communication via social media. The DOE's Bill of Student Rights and Responsibilities sets forth expected standards of behavior with respect to student communication. The DOE's Discipline Code establishes the range of disciplinary options and guidance interventions that can be used when students

engage in misconduct involving social media.

7. How should DOE employees respond to "friend" requests by current DOE students on their personal social media sites and accounts?

- If DOE employees receive a request from a current DOE student to connect or communicate through a personal social media site, they should refuse the request. The following language is one suggested response: "Please do not be offended if I do not accept or respond to your request. As a DOE employee, the agency's Social Media Guidelines do not permit interactions with current DOE students on personal social media sites. If you do want to connect, please contact me through the school (or class) page at _____ [insert link]."

## PERSONAL USE

8. May DOE employees using social media for personal use communicate with DOE colleagues?

- These Guidelines do not address communication between employees on personal social media sites. DOE employees who use personal social media are encouraged to use appropriate privacy settings to control access to their personal social media sites.

9. Why is it a recommended practice to have separate professional and personal social media sites and email addresses?

- The reason for this distinction is to ensure separation between personal and professional spheres of online communication for DOE employees. In this context, this separation is intended to clarify that professional social media and personal social media are different. Professional social media is work-related and may involve employee-to-student communication. Personal social media is not work-related, and subject to certain exceptions noted in the Guidelines, does not involve employee-to-student communication.

## FEEDBACK

10. May DOE parents, students and employees provide feedback on these Guidelines?

- Yes. The DOE welcomes feedback regarding these Guidelines and the FAQs. Because technology changes rapidly, the DOE plans to review and update its guidance as necessary. If you have any feedback or suggestions, please forward them to SocialMedia@schools.nyc.gov.

## PARENTS

11. Will DOE parents be notified regarding their children's social media use for school-related activities?

- Yes. DOE schools will notify parents if their child is invited to participate in professional social media activities and we will provide information describing the professional social media sites that will be available to their child. Parents who have questions or concerns about their children's use of social media for school purposes should contact the school for more information.

**REPORTING**

12. What should DOE supervisors and their designees, who are responsible for monitoring professional social media, do when they discover or receive a report of inappropriate activity?

   - A DOE supervisor who discovers or receives a report of inappropriate or questionable content posted on a professional social media site should contact the appropriate authorities for assistance, in accordance with existing DOE reporting requirements. Depending on the circumstances, the appropriate authorities may include, but are not limited to: the Network or Cluster Leader, Borough Safety Directors, the Office of the Special Commissioner of Investigations, the Office of Special Investigations, the Office of Equal Opportunity, the Office of the General Counsel, the Senior Field Counsel, the New York City Administration for Children's Services, and the New York City Police Department.

   - In addition, if other members of a school community find inappropriate material on a professional social media site, they are encouraged to report it to a DOE supervisor.

13. How can DOE employees and supervisors determine what constitutes confidential information or personally identifiable student information that should not be posted or disclosed?

   - If DOE employees and supervisors have any questions about what constitutes confidential information or personally identifiable student information, they should contact their Senior Field Counsel, the DOE's Office of Legal Services at (212) 374-6888 or asklegal@schools.nyc.gov.

**FOIL 11,129**

**RE: FOIL Request For Records From the Secret Meeting Held At Tweed on 3020-a, February 24, 2015: Joe Baranello Says He Will Respond "Soon"**
http://nycrubberroomreporter.blogspot.com/search?q=FOIL+11%2C129
May 31, 2015


**Joe Baranello Says Pay or You Dont Get To Play (F11,129)**
April 22, 2015

**Betsy Combier Asks FOIL Officer Joe BaranelloTo Clarify the Fees of $29.95/hr For F11,129**
April 15, 2015

**Joe Baranello and His New Facebook Comment on the City, as Well as His Refusal to Answer Betsy Combier's FOIL Request #11,129**


**Betsy Combier Files a Freedom of Information Request to Obtain the Information Given Out At The NYC DOE February 24, 2015 Secret Meeting on 3020-a Hearings**
March 31, 2015

 Gmail                                   Betsy Combier <betsy.combier@gmail.com>

---

**Freedom of Information Request**
1 message

---

**Betsy Combier** <betsy.combier@gmail.com>                          Wed, Mar 18, 2015 at 12:21 AM
To: Baranello Joseph <JBaranello3@schools.nyc.gov>, Betsy Combier <betsy.combier@gmail.com>

---

**Betsy Combier, Editor / Reporter**
NYC RUBBER ROOM REPORTER
**212-794-8902**
betsy.combier@gmail.com

March 17, 2015

Mr. Joseph A. Baranello
Central Records Access Officer
Office of the General Counsel
New York City Department of Education
52 Chambers Street
New York, NY 10007

JBaranello3@schools.nyc.gov
FOIL@schools.nyc.gov

Dear Mr. Baranello:

Under the provisions of the New York Freedom of Information Law, Article 6 of the Public Officers
Law, I hereby request to receive E-mail copies of:

1) any and all documents, letters, emails, agendas,videos, tapes, or any communications relating
to invitations to the plenary meeting at Tweed on February 24, 2015 at 4:00PM.

2) All invitees to the February 24, 2015 meeting.

3) All agendas, speakers and hosts of the February 24th 2015 4PM meeting at Tweed.

4) any and all written or recorded discussions, emails, notes, and correspondence with any
participant at the meeting to/from any other participant who attended this 4PM meeting or attended
another meeting either before or after the 4PM meeting.

5) any and all policy statements, directives, procedures or other information given out to any and all attending the meeting(s) at Tweed concerning this feb. 24th meeting.

If the records have been removed from their original locations, please cause a diligent search to be conducted of all appropriate file rooms and storage facilities.

If any record has been redacted, please identify which categories of information have been redacted, and cite the relevant statutory exemption(s).

If you have any questions relating to the specific record(s) or portion(s) being sought, please phone me at 212-794-8902 so that we may discuss them.

## RELEVANT ADVISORY OPINIONS

www.dos.state.ny.us/coog/ftext/f13952.htm

www.dos.state.ny.us/coog/ftext/f14287.htm

## RELEVANT LOCAL LAW

As you know, the Freedom of Information Law requires that an agency respond to a request within five business days of receipt of a request.  Therefore, I would appreciate a response as soon as possible and look forward to hearing from you shortly.  If for any reason any portion of my request is denied, please inform me of the reasons for the denial in writing and provide the name and address of the person or body to whom an appeal should be directed.

Sincerely,


**Betsy Combier**

--
Betsy Combier
betsy.combier@gmail.com
ADVOCATZ
parentadvocates.org
NYC Rubber Room Reporter



**Department of
Education**
Carmen Fariña, Chancellor

Courtenaye Jackson-Chase
*General Counsel*

Joseph A. Baranello
*Central Records Access
Officer & Agency Attorney*

Office of Legal Services
NYC Dept. of Education
52 Chambers Street
Room 308
New York, NY 10007

+1.212.374.6888 tel.
+1.212.374.5596 fax

March 25, 2015

**VIA EMAIL**
Betsy Combier
betsy.combier@gmail.com

**RE:   #F11,129**
Plenary Meeting information

Dear Ms. Combier:

On March 18, 2015, the Office of Legal Services of the NYC Department of Education (DOE) received your Freedom of Information Law (FOIL) request and assigned it FOIL reference number **F11,129.**   Please include this FOIL reference number on all subsequent correspondence. The following items will be addressed under this reference number:

1. "any and all documents, letters, emails, agendas, videos, tapes, or any communications relating to invitations to the plenary meeting at Tweed on February 24, 2015 at 4:00PM.
2. All invitees to the February 24, 2015 meeting.
3. All agendas, speakers and hosts of the February 24th 2015 4PM meeting at Tweed.
4. any and all written or recorded discussions, emails, notes, and correspondence with any participant at the meeting to/from any other participant who attended this 4PM meeting or attended another meeting either before or after the 4PM meeting.
5. any and all policy statements, directives, procedures or other information given out to any and all attending the meeting(s) at Tweed concerning this feb. 24th meeting."

Please be advised that for requests for digital records, such as those you are requesting pursuant to the above-cited request (specifically for internal emails), Public Officers Law §87(1)(c) permits the DOE to charge a fee for the <u>actual cost</u> of reproducing any other record.

Moreover, the Committee on Open Government has opined that §87(1)(c) of FOIL authorizes an agency to establish a fee based on the actual cost of reproducing records that are maintained electronically. For digital records that take two hours or more to prepare, (including to make redactions pursuant to Public Officers Law §87(2)), an agency may charge a fee based on the hourly salary of the lowest paid employee able to do so, plus the cost of the storage media. <u>See</u> an opinion of the Committee on Open Government dated May 15, 2013, FOIL-AO-19021, available at http://docs.dos.ny.gov/coog/ftext/f19021.html. I also note that review and redaction of the requested records may be very time consuming given that you are requesting internal communications, portions of which will likely be exempt pursuant to Public Offices Law §87(2)(g).

You have not provided a price that you are willing to pay for the preparation of these digital records. The hourly rate for the preparation of these records is $29.95 per hour. The first two hours of preparation are performed free of charge.



**Department of
Education**
~~~~~ ~~~~, ~~~~~~~~

Therefore, please advise this office by <u>April 22, 2015</u> if we should proceed and the maximum amount you are willing to pay for preparing copies of the requested records. If you do not respond by the above date, the portions of your requests for "emails" as described in items one and four will be deemed withdrawn and marked as "closed" in the FOIL Unit's database.

Once you provide an amount you are willing to pay, preparation of records as described above will begin. In that event, we anticipate providing you with a response by <u>April 22, 2015</u>. A search will also be conducted for the remainder of your request. Regarding the remainder of your request, we anticipate providing you with a response by <u>April 22, 2015</u>.

In addition, if responsive records are located and identified for release, you will be notified of the cost of reproduction. At that time, please make your check or money order payable to the New York City Department of Education and include the FOIL reference number on the instrument of payment. Please be advised that Public Officers Law § 87(1)(b)(iii) permits the DOE to charge a fee of 25¢ per photocopy not in excess of nine inches by fourteen inches, or the actual cost of reproducing any other record in accordance with Public Officers Law § 87(1)(c).

Any person denied access to a record may appeal the decision in writing within thirty days. Please state a specific ground for appeal and include copies of the initial request and the denial. Appeals should be sent to: Courtenaye Jackson-Chase, General Counsel, c/o Office of Legal Services, New York City Department of Education, 52 Chambers Street – Room 308, NY, NY 10007, FOIL@schools.nyc.gov.

Sincerely,

Joseph A. Baranello
FOIL@schools.nyc.gov

JAB/ma

 Gmail                                  **Betsy Combier <betsy.combier@gmail.com>**

# RE: F11,129 response
3 messages

**Betsy Combier <betsy.combier@gmail.com>**                     Tue, Apr 14, 2015 at 11:59 PM
To: Baranello Joseph <JBaranello3@schools.nyc.gov>, Betsy Combier <betsy.combier@gmail.com>,
rfreeman@dos.state.ny.us

Dear Mr. Baranello,

I am responding to your email dated March 25, 2015 in which you stated I must pay $29.95 for the preparation of digital
records above two hours that relate to my request in F11,129. See my post on my blog:
**Betsy Combier Files a Freedom of Information Request to Obtain the Information Given Out At The NYC DOE
February 24, 2015 Secret Meeting on 3020-a Hearings**
http://nycrubberroomreporter.blogspot.com/2015/03/betsy-combier-files-freedom-of.html

You ask what the maximum amount is that I am willing to pay to the person you hire to prepare these records and for the
storage media.

I need more information in order to give you my response:

1. I need to know the number of records responsive to my request and the amount you charge to me for full access
before I decide what I am willing to pay.
2. I also need to know exactly what records you will charge me for - emails? agenda? invitees? This meeting included
several groups, NYSUT/UFT, DOE, and Arbitrators , therefore this meeting was not only for Department of Education
employees. What redactions are relevant to Public Officer's Law 87? Please be specific. I also understand that you can
charge me 25 cents for each page - do you add the $29.95/hr to this, and where are you authorized within the Law to do
this, if you charge the $29.95/hr in addition to the $.25/page?
3. I need to know who the person is who will be paid by me at $29.95/hour. Please give me this person's full name, job
title, and daily duties. I also need to know whether or not there is any person willing to do those same duties at $8/, or
$9/hr, and whether you sought to find any such individual, and where you posted the job description.
4. In your demand that I pay for the cost of storage media, please describe exactly what you mean by this. What is the
"storage media" that I have to pay for? Please give any and all details.
5. Please describe to me what costs are involved in reproducing records that are maintained electronically.
6. Please tell me why I have to pay a person $29.95 to forward electronic documents via email to me, as you no doubt
have people on staff who are already being paid to assist you in granting FOIL requests.
7. Please describe what "internal communications" you refer to, as the February 24, 2015 meeting was not a meeting of
DOE employees, but also UFT, NYSUT, and arbitration panel members.

Please take note that I am willing to pay for the records of the meeting held by your colleague Courtenaye Jackson-
Chase at Tweed at 4PM of February 24, 2015 and that I intend on writing the Committee on Open Government to ask for
an opinion. I advise you not to close this request, I am simply asking questions to clarify your very vague response.

Please reply to this email in its entirety no later than 5PM on friday, April 17, 2015, so that I can receive all the
documents/emails/powerpoint/video/presentations on or before April 22, 2015.

Thank you for your prompt response.

Sincerely,

Betsy Combier
--
Betsy Combier
betsy.combier@gmail.com
ADVOCATZ
parentadvocates.org
NYC Rubber Room Reporter

--
Betsy Combier

betsy.combier@gmail.com
ADVOCATZ
parentadvocates.org
NYC Rubber Room Reporter

---

**Betsy Combier** <betsy.combier@gmail.com>                          Sun, Apr 19, 2015 at 3:19 PM
To: Baranello Joseph <JBaranello3@schools.nyc.gov>, Jackson-Chase Courtenaye <cjackson-chase@schools.nyc.gov>,
Betsy Combier <betsy.combier@gmail.com>

Dear Mr. Baranello,

I sent you an email on April 14, 2015, requesting clarification of your demand that I tell you how much I was willing to pay
your employee at $29.95/hr for documents, emails and records of the February 24, 2015 meeting on 3020-a arbitration
held at your offices at 52 Chambers Street. Please see my blog, and the original email request forwarded above.

### Betsy Combier Asks FOIL Officer Joe BaranelloTo Clarify the Fees of $29.95/hr For F11,129

http://nycrubberroomreporter.blogspot.com/2015/04/betsy-combier-asks-foil-officer-joe.html

The Freedom of Information number for the requested meeting records has been given the FOIL # 11,129. This meeting
was set up by Adam Ross, UFT lawyer,and by your colleague and Supervisor (also the Appeals Officer of FOIL requests)
Courtenaye Jackson-Chase.

If I had simply given you an amount I would be willing to pay, I could be precluded from any documents above that fee,
and denied my choice. For instance, if I told you I would pay for $10 hours, $299.50, then you could pick through the
documents available, and tell me that the 10 hours were spent on retrieving those documents, thank you and goodbye.
But I would be denied any other documents related to my request due to the fact that I said I would pay for 10 hours, and
you would effectively withhold any related documents that you wanted to withhold and tell me I didnt want to pay for them,
because I told you I would only pay for 10 hours of your employee's search, at $29.95/hour.

As this mandatory meeting on 3020-a included all the NYC Panel arbitrators, NYSUT attorneys and DOE attorneys
involved (no private attorneys) and as this is not a NYC DOE agency-only meeting and this meeting is open to public
access (the arbitrators and NYSUT attorneys are not DOE employees), I asked you to explain your fees of $29.95/hour to
access the documents and emails related to the creation of this meeting.

In any case, I asked you to reply to me no later than 5PM on April 17, 2015, so that I could get the documents on April 22,
2015. I received no response.

Now that you did not answer my request for clarification, I am left with the assumption that you are not going to give me
the documents, as I have not given you the amount I would be willing to pay.

Therefore, I am sending this email and posting this email on my blog as Notice to your Supervisor, Courtenaye Jackson-
Chase, that on April 22, 2015 I will formally appeal all of this, and add this to my lawsuit against you currently on for
depositions in the Supreme Court. I respectfully suggest that you are retaliating against me for making my request for
documents of this February 24th meeting, for placing your Facebook page on my blog, and for suing you for the almost 2-
year delay in obtaining the contract of former Chancellor Dennis Walcott.

Please give me the fee for documents, emails and records requested, with details of each and every document and email,
no later than 5PM on April 20, 2015.

Betsy Combier
[Quoted text hidden]

---

**Betsy Combier** <betsy.combier@gmail.com>                          Mon, Apr 20, 2015 at 8:31 AM
To: Betsy Combier <betsy.combier@gmail.com>

---------- Forwarded message ----------
From: **Betsy Combier** <betsy.combier@gmail.com>
[Quoted text hidden]
[Quoted text hidden]



**Department of
Education**
*Carmen Fariña, Chancellor*

Courtenaye Jackson-Chase
*General Counsel*

Joseph A. Baranello
*Central Records Access
Officer & Agency Attorney*

**Office of Legal Services**
NYC Dept. of Education
52 Chambers Street
Room 308
New York, NY 10007

+1.212.374.6888 tel.
+1.212.374.6596 fax

April 22, 2015

**VIA EMAIL**
Betsy Combier
betsy.combier@gmail.com

**RE:    #F11,129**
Plenary Meeting information

Dear Ms. Combier:

I am in receipt of your email, dated April 15, 2015, regarding the above-captioned Freedom of Information Law (FOIL) request. In that email, you ask a series of questions and seek clarification of the Committee on Open Government's (COOG) guidance, as well as the FOIL Unit's policy, regarding document review and reproduction costs. I offer the following:

First, please note that the document reproduction costs referenced in my letter of March 25, 2015 relate only to *digital* records. The COOG has stated that FOIL authorizes a public agency to charge a fee for reproducing and preparing records that are maintained electronically. The COOG has further opined that the redaction of a digital record constitutes "preparation" of that record and when preparing a record, an agency may charge a fee "based on the hourly salary of the lowest paid employee able to do so, plus the cost of the storage media"[1] if review and redaction takes more than two hours. See FOIL-AO-19021, May 15, 2013, available at http://docs.dos.ny.gov/coog/ftext/f19021.html. Conversely, if preparation (i.e. redaction of digital records) takes less than two hours, the only fee an agency may charge is that of the storage media.

It has been established by the General Counsel's Office that the lowest paid employee in the FOIL Unit who is able to redact digital records has an hourly salary of $29.95.

To clarify a point in your email, requests for digital records that have been "prepared" as discussed above, will not be assessed a 25¢ fee per page. A requestor may only be charged the $29.95 hourly rate plus the cost of the storage media for digital records; a requestor may not also be charged for the duplication of each page.

---

[1] "Storage media" is defined as a device on which requested records and data can be stored. Examples may include a hard disk, flash drive or CD-ROM.



**Department of Education**
Carmen Fariña, Chancellor

However, for requests for hard copy records, the COOG has stated that redactions made to records in paper form do not constitute the "preparation" of a record and as such, the $29.95 hourly fee does not apply. Rather, a requestor would only be charged a 25 ¢ fee per each page that is reproduced. Id.

In the instant matter, you have asked what specific records you will be required to pay for. In short, you will be charged for the duplication of any videos or tapes, to the extent such records exist, which are estimated at $5.00 per CD-ROM. You will also be assessed an hourly fee for any digital records that require redaction, if review of those digital records exceeds two hours (plus the cost of the storage media, if such records cannot be emailed to you), as discussed above. While you contend that many of the responsive documents, to the extent they exist, may not be considered inter or intra-agency material as defined by Public Officers Law §87(2)(g), please be advised that these records must still be reviewed as their contents may fall within other exemptions outlined in §87(2). For example, emails may contain sensitive information, such as a home address or other private contact information, which would be withheld under §87(2)(b). Lastly, you will be charged a 25¢ per page fee for any hard copy records, if portions of these paper copies require redactions.

At this time, it is not possible to determine what the potential costs of preparation and reproduction might be as it is unclear how many records responsive to your request exist. Due to the volume of requests that we receive, it is the policy of the FOIL Unit to require a requestor to first indicate a willingness to pay, as well as provide a maximum amount s/he is willing to pay, before the collection of records begins.[2] This ensures that undue time is not wasted gathering records for a requestor who is unwilling to remit payment for the preparation of requested documents.

In light of the above, should you wish to proceed with the duplication and preparation of records, please indicate your willingness to do so and the maximum amount you are willing to pay by May 20, 2015.

I hope this letter has answered your inquiries.

Any person denied access to a record may appeal the decision in writing within thirty days. Please state a specific ground for appeal and include copies of the initial request and the denial. Appeals should be sent to: Courtenaye Jackson-Chase, General Counsel, c/o Office of Legal Services, New York City Department of Education, 52 Chambers Street – Room 308, NY, NY 10007, FOIL@schools.nyc.gov.

Sincerely,

Joseph A. Baranello
FOIL@schools.nyc.gov

JAB/sa

---

[2] Please be advised that a fee is not assessed for the collection of records.



**Department of Education**
*Carmen Fariña, Chancellor*

**Courtenaye Jackson-Chase**
*General Counsel*

May 8, 2015

**VIA EMAIL**
Betsy Combier
betsy.combier@gmail.com

**RE:   #F11,129**
Plenary Meeting information

Dear Ms. Combier:

I am writing in response to your email, dated April 22, 2015, in which you appeal what you describe as the New York City Department of Education's (DOE) "constructive denial" of access to records which you requested pursuant to the Freedom of Information Law (FOIL).

By email dated March 18, 2015, you submitted a FOIL request seeking the following records:

1. *"Any and all documents, letters, emails, agendas, videos, tapes, or any communications relating to invitations to the plenary meeting at Tweed on February 24, 2015 at 4:00PM.*
2. *All invitees to the February 24, 2015 meeting.*
3. *All agendas, speakers and hosts of the February 24th 2015 4PM meeting at Tweed.*
4. *Any and all written or recorded discussions, emails, notes, and correspondence with any participant at the meeting to/from any other participant who attended this 4PM meeting or attended another meeting either before or after the 4PM meeting.*
5. *Any and all policy statements, directives, procedures or other information given out to any and all attending the meeting(s) at Tweed concerning this feb. 24th meeting."*

Consistent with Public Officers Law §89(3)(a) and Chancellor's Regulation D-110(VI)(A), by letter dated March 25, 2015, the Central Records Access Officer ("CRAO") acknowledged your request within five business days and informed you that a requestor, in accordance with the Committee on Open Government's (COOG) guidance, may be assessed a fee for the preparation of digital records as well as the duplication of hard copy records. In light of this guidance, the CRAO asked that you provide an amount you were willing to pay for the duplication and preparation of any responsive records by April 22, 2015, to the extent that any records would be located.

By email dated April 15, 2015, you asked the CRAO a series of questions seeking clarification of the Committee on Open Government's (COOG) guidance, as well as the FOIL

Unit's policy, regarding document review and reproduction costs. In response to your email, the CRAO provided a lengthy explanation, dated April 22, 2105, further clarifying and elaborating on the COOG's guidance and once again, requested that you provide an amount you were willing to pay for digital and hard copy records before duplication and preparation of records would be undertaken.

By email dated April 22, 2015, you submitted an appeal asserting that your request has been constructively denied and that the CRAO "delay[ed] the release of records" because you have been asked to first provide an amount you are willing to pay before a search for responsive records is initiated. I disagree with your contention.

While the CRAO's letter did not state a definitive amount you would be required to pay for the records you are seeking, such an omission does not constitute the constructive denial of your request. According to Chancellor's Regulation D-110(VIII)(A), a request may be deemed constructively denied only where a requestor "is neither granted nor denied access to records within the time limits set forth above [in section (VI)] or in the acknowledgment letter or any extension letter(s)..." In the instant matter, the CRAO expressly indicated that duplication and preparation of records would proceed if you provided an amount you were willing to pay for such records. At no time did the CRAO fail to respond to you in a timely fashion, nor did he fail to comply with the time limits for response as required by §89(3)(a). See, FOIL-AO-19224 (Dec. 5, 2014) available at: http://docs.dos.ny.gov/coog/ftext/2014/f19224.html. For these reasons, your request has not been constructively denied.

Notwithstanding the above, based on a preliminary search, it appears that review of the digital records responsive to your request will not exceed two hours. As such, you will not be assessed a fee for the preparation of digital records. However, at this time the exact volume of responsive hard copy records and/or recordings remains unclear. Once these records are located and reviewed, I direct the CRAO to provide a cost breakdown to you based on record type prior to the duplication and preparation of these records.

For the foregoing reasons, your appeal is denied.

Sincerely,

Judy E. Nathan
First Deputy Counsel

CC: Joseph A. Baranello
Robert J. Freeman,
Executive Director, Committee on Open Government

 Gmail                                    **Betsy Combier <betsy.combier@gmail.com>**

---

# FOIL Request # F11,129 (NYC DOE/Combier)
4 messages

---

**Baranello Joseph <JBaranello3@schools.nyc.gov>**                     Thu, Jun 4, 2015 at 4:58 PM
To: "Betsy Combier (betsy.combier@gmail.com)" <betsy.combier@gmail.com>
Cc: Alba Miosotis <MAlba6@schools.nyc.gov>

      Dear Ms. Combier,


      Attached are records and a determination letter concerning your request. For the CD-ROM with video, please let us know
      if you would like to come to 52 Chambers Street to pick it up, instead of having us mail it to you and if so, when you plan
      to do so.


      Sincerely,


      Joseph A. Baranello

      Central Records Access Officer and Agency Counsel

      New York City Department of Education

      52 Chambers St.

      New York, NY 10007


      _____

      **5 attachments**

      📄 **Calendar from Outlook.pdf**
           25K

      📄 **Emails-release version.pdf**
           2354K

      📄 **Invitees-redacted.pdf**
           52K

      📄 **Transcript of 2 24 15 Meeting at Tweed.pdf**
           36K

      📄 **F11,129-2015-06-04-resp (final).pdf**
           145K

---

**Betsy Combier <betsy.combier@gmail.com>**                     Thu, Jun 4, 2015 at 11:58 PM
To: Baranello Joseph <JBaranello3@schools.nyc.gov>, Betsy Combier <betsy.combier@gmail.com>

      Dear Mr. Baranello,

      I would like to pick up the CD-ROM with video on monday, June 8, at 1PM. I will be across the street at 49-51 Chambers,
      and will come to the main desk at 1PM. I will have a check for the payment. Should I ask for you?

Thank you,

Betsy Combier
[Quoted text hidden]
--
Betsy Combier
betsy.combier@gmail.com
ADVOCATZ
parentadvocates.org
NYC Rubber Room Reporter

---

**Baranello Joseph** <JBaranello3@schools.nyc.gov>                    Fri, Jun 5, 2015 at 8:09 AM
To: Betsy Combier <betsy.combier@gmail.com>
Cc: Alba Miosotis <MAlba6@schools.nyc.gov>

That should work. Ask for me or Mio Alba, copied here.

Sent from my BlackBerry 10 smartphone.
From: Betsy Combier
Sent: Thursday, June 4, 2015 11:58 PM
To: Baranello Joseph; Betsy Combier
Subject: Re: FOIL Request # F11,129 (NYC DOE/Combier)

Dear Mr. Baranello,

I would like to pick up the CD-ROM with video on monday, June 8, at 1PM. I will be across the street at 49-51 Chambers, and will come to the main desk at 1PM. I will have a check for the payment. Should I ask for you?

Thank you,

Betsy Combier

On Thu, Jun 4, 2015 at 4:58 PM, Baranello Joseph <JBaranello3@schools.nyc.gov<mailto:JBaranello3@schools.nyc.gov>> wrote:
Dear Ms. Combier,

Attached are records and a determination letter concerning your request. For the CD-ROM with video, please let us know if you would like to come to 52 Chambers Street to pick it up, instead of having us mail it to you and if so, when you plan to do so.

Sincerely,

Joseph A. Baranello
Central Records Access Officer and Agency Counsel
New York City Department of Education
52 Chambers St.
New York, NY 10007

--
Betsy Combier
betsy.combier@gmail.com<mailto:betsy.combier@gmail.com>
ADVOCATZ
parentadvocates.org<http://parentadvocates.org>
NYC Rubber Room Reporter

May 28, 2016
NYC Rubber Room Reporter
**The 3020-a Arbitration Newswire: Digging Up The Garbage On the UFT/DOE Partnership of Harm For Charged DOE Employees**
http://nycrubberroomreporter.blogspot.com/2016/05/the-3020-arbitration-newswire-digging_28.html



UFT General Counsel Adam Ross, UFT President Michael Mulgrew,
NYC Chancellor Carmen Farina, former NYC DOE General Counsel Courtenaye Jackson-Chase

On February 24, 2015, the New York City Department of Education held a mandatory meeting at TWEED at 4:00pm for all NYSUT , all DOE Attorneys, and all arbitrators working on the NYC rotating permanent panel for 3020-a hearings (both misconduct cases under ATU and incompetency cases under TPU).

I was told about this meeting by an Arbitrator several days before the February 24 date, and at my suggestion a private lawyer with whom I work on 3020-a hearings sent an email to the creator of this meeting, former General Counsel Courtenaye Jackson-Chase, asking for an invitation. Courtenaye answered with "sorry, you are not invited to this meeting, but we will be scheduling a future meeting for all private lawyers."



Courtenaye Jackson-Chase

She never did have this meeting for non-union teacher defenders, so I filed a FOIL request for the information, and was shocked to get a reply that I would have to pay someone $29.95/hour to download emails. I posted all this on my blog, and then the NYC Records Access office

relented, and sent me the video, the transcript from the video, and the emails on who was present/invited, all posted below.

In this material there are statements which many readers may find surprising, if not very distressing:

Why I write "distressing" is : the emphasis on speed and efficiency trample important procedural and substantive due process rights, such as:

1. ignoring Education Law 3020-a(2)(a) with the requirement of the determination of probable cause by a vote in an Executive Session of the school board take place before the charges are served on the charged party. In NYC this never occurs, in fact these steps are simply overlooked. The Office of Legal Services creates the charges, serves them, assigns an Arbitrator after the charged party asks for a hearing, and goes immediately into a pre-hearing. The principal signs off on the probable cause, and then the Respondent cannot argue that this is improper. The tell-tale sign of this "speed and efficiency" garbage is the empty box on the right, above the "Please be advised that at a meeting in executive session on the above date..."

Date Charges Filed: | January 28 2016 | Date of Executive Session: |

Please be advised that at a meeting in executive session on the above date the school district identified herein has found that there is probable cause for Education Law §3020-a charge(s) against you. The specific charges are attached to this form. Within ten (10) days of receipt of these charges, you must elect to request a hearing before an impartial hearing officer, or waive your right to such a hearing. Should you fail to so request or to waive your right to a hearing within the specified ten days, the district clerk or the secretary of the board of education will notify both you and the Commissioner of Education that a waiver has been deemed to have occurred and that the board of education will meet to determine the case and fix the penalty or punishment, if one is to be imposed.

This box, the date of Executive Session, is never filled in. NYSUT, the UFT, and the DOE don't want to take the time. Respondents should object, then use this in any Appeal. The rest of what Adam, Mike, Carmen and Courtney are saying in the video and the transcript is also meaningless garbage. They do not mean that they want fairness, just speed. This same argument was used by UFT Attorney Carol Gerstl in or about 2008 when she stopped anyone in NYC from having a three-member arbitration panel. This took too much time.

2. The arbitrators and DOE/NYSUT Attorneys are together for hearings through the school year, and make deals behind the charged party's back, as well as cut out any private attorney hired to replace the NYSUT attorney. This creates a closed club, and when a private attorney may have to adjourn dates due to other commitments, the arbitrators wont let this happen.

3. In NYC the arbitrator is assigned by the Director/Deputy Director of the Unit whose case it appears under (ATU or TPU). Outside of New York City the charged party may participate in choosing the arbitrator. Not in NYC. Speed counts.

4. Witnesses brought in by the NYC DOE are scheduled without problem, but when the charged party starts his/her case, there is a rush to finish, and all witnesses must be given "offers of proof" - i.e. the DOE and the Arbitrator don't want to "slow things down" by having witnesses for the charged party.

5. Closing arguments are done when testimony is finished, preferably the same day. The charged party does not have the transcripts because the Respondent's case always goes second. The charged party feels rushed, unable to bring in all the documents and evidence he/she believes prove the case against the DOE.

At all times, the Arbitrator, DOE and NYSUT (if NYSUT is not replaced by a private law team, as happens frequently) work together to make sure that nothing "irrelevant" is brought in to be discussed or examined. What is "irrelevant"? Yep, that's right, whatever the DOE wants it to be.

Here are the emails and documents sent to all Attendees (Arbitrators) on the Joint Education Law 3020-a Panel.

In the video above you can see that UFT General Counsel Adam Ross(UFT Lawyer -far left), UFT President Mike Mulgrew (second from left), NYC Department of Education Chancellor Carmen Farina (second from right) and former NYC DOE General Counsel Courtenaye Jackson-Chase, all believe that speed is the most important mandate for all participants in the 3020-a process (except of course the charged employee/Respondent). I am not the only one who has seen the UFT-NYSUT-DOE chumminess.

I have written quite often about my dislike about how NYSUT Attorneys do 3020-a hearings (and, by



Stuart Lichten, Daniel Bright, of Lighten & Bright

the way, I do not like the hypocrisy of Maria Elena's husband, Stuart Lichtendefending Claude Hersh Assoc. General Counsel, NYSUT, and Steve Freidman, NYSUT Attorney, in the case of Lisa Guttilla, Federal Court:

1:14-cv-00156-JPO

Mr. Lichten was hired to do the 3020-a of one of my favorite teachers, ever, from my daughter's school, NEST+M.I suggested that I testify for him as a parent, but Stuart told the teacher "No, never". My friend was fired by the Arbitrator.

Listen to David Brodsky, Director of Labor Relations, Theresa Europe, Director of the Administrative Trials Unit, and Florrie Chapin, the Director of the Teacher Performance Unit, explain the "Tenured Teacher Removal with Charges" Process .

I LIKE most of the NYSUT attorneys as people, I dont really know any of them "well". David Pakter took a picture with me and his NYSUT Attorney Chris Callagy in 2009:



Betsy and Chris Callagy, about 2009

I still see Chris at 100 Gold, minus the beard. He is funny, does a good job....but is still under the guidelines of NYSUT and the DOE, whereas private lawyers and non-lawyer advocates are not. He is, nonetheless, a favorite of many members who have had him assigned to their cases

In my opinion, an informed, well-experienced advisor/Representative who has won many 3020-a is the best bet for a strong defense in 3020-a, but that is my biased opinion, being in that group (We have many non-termination awards, and 6 full exonerations - no penalty).

I have seen and heard NYSUT attorneys in a shouting match with the charged person to get him/her to resign, settle, go away. This ain't right. The only chance that a Respondent has to say what happened and tell his/her side is if he/she goes through the 3020-a and testifies. Sometimes the NYSUT Attorney convinces the Respondent not to testify. This is automatic termination. Arbitrators must terminate, as there is nothing heard as far as evidence from the charged party, therefore everything that the Principal/AP/DOE witness testified to must be held as fact.

Remember I'm not an attorney. But to not testify on your own behalf is absurd. I was invited into the chambers of a NY State Supreme Court Judge on this issue, with a Respondent (and the DOE Attorney, NYC Law Department) who appealed his termination after he was fired by the Arbitrator at his 3020-a. The Judge said that this was a real problem, and that HE SHOULD HAVE TESTIFIED.

We do win cases - my point is, put everything on the table and in the record!

See the case of David Suker, I helped him with his appeal of his termination:
The New York City Rubber Room Anti-Teacher Charging Process Shows How Corrupt the Carmen Farina-Bill De Blasio Department of Education Really Is. by Betsy Combier

My point is that there are many twists and turns in the proceedings known as 3020-a, especially in New York City with the permanent panel of arbitrators, a very bad idea. More about that in

another post.

Here is the full transcript of the video above, sent to me as part of the FOIL request:

Welcome.[CARMEN FARINA]

>> You're like a cast of thousands. I didn't even know I had this Army. So this is really good. I would say thank you for coming.
I know many of you who have traveled distances to be here today, and I appreciate your coming.
I think you're, first of all, seeing something very unique. You're seeing two of us sitting next to each other.
We're actually smiling at each other.
All because we really have one mission, and one mission is to make sure that there is the best teacher in every single classroom in every school in our city.
Many of you are parents and grandparents.
What I want to tell you is that I take very seriously about any classroom that I would not put my grandchild in, I would not put anybody else's children in.
By the same token, there are many teachers who can have an angry parent or an angry this or an angry that bring up charges that may not be correct, but we cannot have people in limbo.
We cannot have people who should be working, not working, and people who shouldn't be working, working.
And I am asking you to really rethink the whole process of the work that you do.
First of all, we want to make sure you're looking at evidence that matters.
Having been a principal who would spend 40 percent of a given year writing people up.
I understand how much time it took me.
If I forgot to cross a T, I literally hired a retired principal to just read my paperwork because it was so cumbersome, and as onerous as some of the charges were, if my T wasn't crossed and my dot, we should not be looking at our work in that kind of detail.
We should be looking at what is the problem and how serious is it and what do we do as the next steps?
Do I want to make sure that you're looking at evidence that's relevant to the case.
, that that's your focus, your lens.
When I visit a school, I know there are at least three things I want to look for in every single school, and I am focused on that.
Principals try to divert me and say look at this, look at that, I want to go back to the three things that I want to look at.
So what are the things you need to do to decide your case and focus on those.
Also, I don't know why we need five witnesses when three will do.
The reality is, if something is substantiated and one person says it, another person says it, and then a third person says it, I don't understand why we need to have a cast of thousands.
And I'm really asking you -- and I don't think it's due process.

It's just a matter of how much longer can this drag out. I'm looking at how much sooner can we get this done?
Is there's a 30-day rule for most things, and I think to the degree that we can do it, I suggest we do it.

The other thing is that I think it's really important also to ensure that, if there's anything that's standing in the way, at least from my perspective as a chancellor, and you need me to fix it, I'm more than happy to fix it.

So for example, you need a witness, you need them to be there at 4:00, you need someone to come from the school, to a degree that I can say to a principal make sure this person is released when this person has to be there, I'll do that because my thing is to get this thing done as quickly as possible so that everyone's rights are protected, and most importantly, the child who sits in a classroom.

And if it means I have to send someone to convince the parent for a child to be a witness in the case, I'm happy to do that as well, but I also feel that sometimes we wait so long to hear a case, that my memory certainly isn't what it used to be, we can't expect a kid to be able to do that.

So the quicker we do things, the more concentrateded we are on getting the case settled, the better we'll have a public school system.

And both Michael and I are convinced the only way to have a public school system is we hold everyone to the highest level.

I do not want to see some teachers who are getting by on slightly ineffective.

I only want highly effective teachers in every one of our schools. To that, I am committed, and I am committed, along with Michael, to make sure the 30-20 process is fair, equitable, and reasonable.

I do not understand why some cases are dragging along as far as they are.

Again, I'll be very personal.

I remember having a teacher for six months on suspension, going back to the hearing, having the teacher allowed to pick, in those days, what kind of hearing she wanted, and then coming back to the classroom and actually doing very serious to a child because of the process.

We cannot have that. You're on, Michael.

## [MICHAEL MULGREW]

>> Thank you very much, Carmen, and thank you all for coming. It's lovely weather that we're having here.

I just found out that we now have the coldest February in the history of New York City.

So thank you all for coming out.

I met with some of you years ago, and I want to first thank you for the amazing service that you supply us.

These are not easy issues, and we have taken a system that used to be

-- take a lot longer, and we have really shortened it.

And what you're hearing from myself and the chancellor today is we're looking to even try to make it faster.

Fairness is the key to all of this.

The legal processes, I understand at times, can become somewhat of an impediment in terms of efficiency and speed, but what you're hearing us say here today is this is what we would like.

And if there is something going on that we should know about, if there is someone on either side, an attorney from either staff doing something that drags out a case, not doing things properly, not using the full hearing day, we need to know about that because we will be looking, because we do believe it is important that, if there is any sort of allegation, we want it to take as little time as possible because I do know from being a teacher, from a chapter leader, people

that would be completely exonerateded but were never correct because they were out of the classroom for so long and the astigmatism that was tied to that.

So we know it's in everyone's interest to have the most efficient, effective, speediest process as long as we can also ensure fairness, which is a difficult job that we're asking to you do.

But I know that we have shortened the timelines greatly from where we were at five and six years ago, and I can't thank you enough for that, but we're looking now to say, as Carmen said, if there's two witnesses saying the same thing, we don't want ten.

And the things that you know better than I do about what else in the process, but more importantly, if you feel there's something not going right, please let us know because we want to know if people aren't doing what we have directed them to do, which is to make it efficient, effective, fair, and speedy.

Because that is the way that we feel will better serve the students of this city.

So I can't thank you all enough for what you already have done.

I speak very proudly around this state about what we have done here in New York City, and you all know the scrutiny that it is under, and I love that I can produce actual facts to refute a lot of the rhetoric that's out there, and that has a lot to do with your work.

So I can't thank you enough for that, but at the same time, we believe that we can do it even better.

So at this point, questions?

## [COURTENAYE JACKSON-CHASE, ADAM ROSS, AUDIENCE]
>> Sure.

>> I get a lot of questions when I speak to principals and teachers and whatever. Not one question? Okay.
Yes?

>> Remember the last time we were here?

>> Why are we here?

>> Because we want to make sure that everybody understands that we want this process to be done quickly.

You are in charge of the process when it gets to your level.
And if there are people -- if there is something that could be done to make it faster, we'd like to hear it, and if there is a party on either side that you believe is wasting time, we need to know about it.

>> And I would say also very clearly that for too long, that the head of the education department and the unions were almost expected to be fighting each other and that this group would say, well, we can't do this because, and we can't do this because.
We wanted to be clear here today that we're giving the same message to everyone from both of us, and I think that's really important, and it's certainly something that people outside the organization say, well, you can't do it because of the union, or you can't do it because of the chancellor.
We're united on this one.

There is absolutely no disagreement between the two of us on only the best people need to be in these positions.

So we wanted to say it, and we wanted to say it out loud, and we'll probably be repeating it a lot.

>> And an agreement that was signed --
>> 2010.

>> That would be five, 2010.
It said that the chancellor and the union president can bring the panels in to discuss this with them, and we just wanted to make it clear exactly what our expectations are at this point.

>> How do the pro ses get in the transcripts?

>> We have an agreement, as part of the 2010 agreement, that the transcripts are not necessary before you issue a decision or before you do a closing.
So the pro ses should be getting the transcripts, but it should not be impeding the speed of the process.

>> That's not my question. How do we get them?
It's on teach.
Do the pro ses have access to Teach?

>> The pro se, I don't know the answer to that. I can find out the answer to that.

>> Come on up if you have the answer. [ No microphone ].

>> I would say for the more technical questions for the lawyers that do the work, you can feel free to stand up like Laura just did.


>> She spoke.
They have access to the Teach.

>> Well, I would assume, since there are no questions, that everyone gets the message.
Again, I just want to be clear that, if there's anything that is actually keeping you from doing the job, all you need to do is let us know because I am determined on this issue -- many others, but this one in particular -- that we will get to June with as many cases closed as possible so principals can be assured that teachers they do not want back in the building, or teachers that can be cleared so they can be back in the building, we can be on their rosters at the end of June.

>> So there's no need to have transcripts before a closing argument, is that correct?
That the arbitrators should all know that.

>> Yes, that's correct.

>> Okay.

Well, thank you.

>> Thank you for coming.

>> We can go through a couple of more technical things.
So what I was going to just say is that Michael and Carmen's point about making the process be as efficient as possible and still fair, there are a group of things that the DOE and NYSUT and Courtney and I have agreed to over the years to help make the process run as efficiently as possible without compromising the hearing.
One of them relates to the holding of pre-hearing conferences, which should not be done on hearing days.
We should be using hearing days for hearings.
We shouldn't be using them for settlement discussions either. Parties are free to discuss settlement whenever they want.
Courtney and I actively encourage people to settle, but hearing days should be used for hearings.
The pre-hearing conferences should be used to the maximum extent possible to premark exhibits, stipulate the facts, stipulate to admissibility of documents, where those things are not in dispute. And discovery should be provided prior to the pre-hearing conference to the extent that that's required by our agreements.
We have agreements about what things are supposed to be provided on what timeline, and we have asked that the -- all of the attorneys abide by those provisions.

>> I think the other thing that we want to talk about, I know that there are more cases that are handled by private counsel, and we're


going to be doing another orientation.
But I know that it's hard when you have lawyers who may not be used to kind of the groove of things, and they're balancing cases in courtrooms and also trying to manage within this system.
Please let us know how we can be helpful to help better integrate them into the system so they get caught up to speed because I know at times it can be a nightmare for everyone to juggle the scheduling that has to happen, and we want to help get you to the place where the rules for timelines can apply to everybody.
So we do know.
We are aware that that's been a problem.
We're working on it on our end, but I welcome -- even though that can be seen as a more technical issue, you obviously talked to the managers that you usually interface with and the lawyers, but you can also reach out to us so that we can help manage them a lot.

>> Absolutely.
But what I would say is, regardless of who the attorney is, whether it's pro se, whether it's an NYCIT attorney representing the respondent, another attorney representing the respondent -- all of the cases should be held to the same timelines, the same 60 days for doing the hearing, the same efficiency requirements, the same everything else.
To that end, one of the other things we have agreed is to the use of full hearing days to the maximum extent possible.

That may require either or both parties to have multiple witnesses ready to go in the day, and that is something that we expect both sides of the case to be ready to do.

That's something that's written in our agreement and that we believe is an important part of making sure that the full hearing day is used.

>> I will add, particularly for the DOE, since we have the burden and we also have the school-based witnesses, as Carmen said, we are committed to making sure that we can work to make things easier to get the witnesses here.

Again, everyone here knows that it's a hard juggle to manage what we do down here and what goes on in schools, but I welcome your feedback on that point, and we're committed to making that even more seamless. I know we've made some improvements over the last few years, but we're going to keep working on it.

>> One of the things that we hear a lot about, Courtney and I do, is about the length of particular testimony and who is allowed to testify to what.

My way of summing this up has been that grandma is not a relevant witness.

We are asking the hearing officers to actively control the hearings, to make firm -- rather than -- we know there's a tradition in labor arbitration to sort of take everything for whatever it's worth and sort it out later.

That is not what I think is the best way to be doing business.

We think the hearing officer should be ruling on relevancy, ruling on redundancy, ruling on cumulative, ruling on whatever it is, hearsay, whatever it is, to make sure that we're not spending an inordinate amount of time on the testimony of witnesses who don't have anything relevant to testify to or anything additionally relevant to testify to.

One of the other things we've looked at in terms of the process is the use of rebuttal witnesses. We have pretty clearly written out that rebuttal is supposed to be used only for purposes of refuting a fact that an opposing party attempted to establish on its case and not just for further bolstering the case that one side or the other put on on its direct case, and we would ask all of you to please think about whether or not, in the cases that come up for you, whether or not rebuttal is being used for what is truly a rebuttal purpose and not simply to bolster the direct case.

We talked about the private counsel cases.

The only other thing I would add about that is that even when attorneys change in the middle of a hearing, we totally understand that hearing officers, and obviously the UFT and the DOE, all want to make sure that everyone has their constitutional due process and right to counsel and all of the other stuff.

But it also is not true that those changes in counsel should do anything more than the most minimal derailing of the speed of the case.

The only other thing that I have on my list of things that I wanted to highlight for everyone was decisions and that we've asked the hearing officers to -- not only have we asked, but it's in the law that the decisions be issued within 30 days.

That means, look, I have read a lot of 3020 decisions, and many of them are comprehensive, and I know how much hard work and deliberation goes into all of those decisions, and certainly we want decision that's are thoughtful and review all of the evidence and stand up to review on appeal.

But we also need that to be balanced with the notion that we need the decisions to be issued as timely as possible because we want the people who should be back at work to be back at work, and we want the people who should be disciplined or terminated to be disciplined or terminated. And it's to no one's benefit for someone to be waiting, reassigned, doing administrative work for a period of time while we wait for a decision.

Some of that is necessary. I totally understand that.

But we'd like to minimize that as much as possible. Anything I left out on our list?
Is.

>> No.


Yes, sir?

>> If you don't want us to have a pre-hearing conference on a hearing day, what do you suggest we do with the rest of the day?

>> I think the pre-hearing conferences should not be held on hearing days.
They could be held either on other days of the month. They could be held before a regular hearing starts.
They could be held after a regular hearing starts. After it concludes.
They can be held on a lunch break.
They can be held on another day, like I said.
But they shouldn't be held in lieu of using a hearing day for a hearing.

>> In lieu of is your problem?

>> Yes. Okay.

>> There a hand in the back?

>> Yes.
I heard earlier about the position before they close.
What is your position about a pro se or a private counsel insisting I need to look at the transcript before I close or I need to look at the transcript before seeing a referee.
I guess the question is twofold.
Do I need the transcript before closing?
And what is your position on reading briefs?

>> We trust you to use your discretion. I'm sorry, I can't see you now.
We trust you to use your discretion to manage the process. I was a prosecutor for many years. We would have trials where someone's liberty was actually at risk. We were never permitted to actually get transcripts.
For those of you who are trial lawyers on the criminal side, you know what I'm talking about.
The judge would just say, you were just here. You heard all the evidence.
Let's go.
I understand that these hearings don't happen on consecutive dates, but they do happen closely enough in time where we're saying if you really -- some cases might be complex.
We understand that.

But for ones that are not, you can hold firm.
You'll have us to support you to say, I don't believe that that's necessary or warranted here in this case and your request is denied.


>> Right, exactly.
In a lot of these cases, you'll have -- I forgot what -- I'm blanking on the word.
You won't have final transcripts, but you'll have the -- what's the word I'm looking for?
Is the tentative transcripts.

>> What's a tentative transcript?

>> There are -- well, I will talk to -- Courtney and I can talk to the transcription services about whether or not there's a way to get the transcripts to you even if they're not certified and final, as fast as possible.
Let's put it that way.

>> What about briefs?
Do you have a position on reading briefs? Do you allow it?
Do you not?

>> Again, I would never think -- I would never want to manage the process.
That's why we have you.
I respect your discretion on what you think is necessary in order to have a full and fair hearing on a case.

>> Absolutely.
I think, if you were to say, given the case, no, I as a hearing officer don't need a brief, that that is not something that inherently either one of us think there's a problem with.
There may be occasions where you think it's appropriate to have a brief, but if you don't think it's appropriate to have written briefing, there's nothing that we would say says to you you have to.

>> We'll support you on that. [ No microphone ].

>> But the point is you want these cases to hold up in court, and you have lawyers insisting, again, a pro se, saying I want to file a brief.

>> Then you can say no.

>> You're telling me to just say no.

>> I understand, but you know on appeal, as long as the facts are there, it's clear that a person acting pro se really did follow and really did understand.
I'm not saying, if I were in your shoes, I wouldn't have some

trepidation too.
The first few cases where you say no, yeah, you're going to wait and see if they take an appeal and what happens.

But we're saying do what's right and what's best and what's prudent for each case.
If you do not need all the extra, do not do it. If it's not appropriate, don't do it.
Again, you'll have our support.

>> Nina, did you have a question?

>> No.
Just with the transcript, I just wanted to clear that up.
As far as the practice, it's determined case by case if it's relevant. If you have a minor witness or a minor witness who doesn't have important testimony, the parties could agree that the transcript is not necessary, it's limited testimony.
However, if there are some days of hearing where you'll have a transcript, I think certainly the need for a transcript, they should have that and should not waste time to wait for the hearings to move forward by not having a transcript for all of our cases.
I think it works out just that way.

>> Yes, sir?
[ No microphone ].

>> It is essentially unfair that the transcripts from the DOE are open, but the testimony of our witnesses aren't available by transcript.
Is there a way to make sure that maybe that's a fair process?

>> What you're saying is they're being prepared chronologically. So because the DOE goes first, that comes first.
Sure, we'll certainly look into that.

>> Yeah, I think that's right, Chris.
I mean, I'm just -- I just think what Lena said is a fairly good point.
No one size fits all solution in any of these cases.
But the hearing officers and the attorneys together should be making good faith judgments about what is necessary to do to get the case done efficiently and fairly and what is not necessary to get the cases done efficiently and fairly and what is just extra, I guess, is the best way of putting it.
The fact that it's a pro se counselor, pro se respondent or a nonNYCIT council, doesn't necessarily in my mind alter the analysis so much as what is the nature of the case and what is the nature of the arguments that are being made?

>> There's a question that came in via -- over here.


>> We won't forget you.

>> There's a question that came in from someone who's doing the live streaming, an arbitrator asked the question, when private counsel's involvement in a case leads to scheduling difficulties, it would sometimes be helpful to be able to take the next case out of order. We have been told that that is not permitted.
Can there be some flexibility here?

\>> We'll look into that.

\>> Yeah, but I would also say that, in general, our agreements are pretty specific that the scheduling of the attorneys is not ordinarily a reason, whether it be a private counsel case or otherwise, for a case not to proceed on the scheduled day.
[ No microphone ].

\>> I'm looking for the language of the agreement on what we have.
The actual language of the agreement on transcripts from 2010 is "a party to the hearing or a hearing officer may request an unedited copy of the relevant transcript.
If a certified transcript is not available when needed.
The unavailability of a certified transcript shall not excuse adherence to the timelines for completion of a hearing and issuance of a decision.
That's the language of what we've agreed to.

\>> If I ask for it, do I pay for it?

\>> I don't know the answer to that.

\>> Do you guys know?

\>> What's the new agreement that you just signed? Is there anychange?

\>> I don't think we have signed a new agreement.

\>> Does anybody know? Hold your point.
Does anybody know if there's a cost associated with what we're calling a tentative transcripts?

\>> There's a cost for it.

\>> Yes, that's okay.

\>> Unedited was the word I was looking for.

\>> There's a cost for expedited transcripts.
I'm not really clear if what Adam just referred to would qualify as an expedited.
And there is a new agreement that's in the process of being signed with the new transcription service, but we'll get some clarity on that and let all the arbitrators know if there will be a cost involved with getting the tentative, unedited transcript.

\>> Thank you.

\>> My understanding is we do not, under the new agreement, get copies of transcripts.
Okay rat?

\>> I don't know, but lots of people who I trust are nodding their heads in the audience.
So I'll say yes.

>> I believe that the transcripts are going to be uploaded to Teach.

>> Yes, that's what I said.

>> Yes, where you can get them.

>> Yeah, I know. Thank you.

>> Anybody else?
Well, now I guess you get to eat.

>> Now you can really eat.

>> And I think we lose the room at 5:00.
So you have about 15 minutes to mingle and take your time.

>> Can I just say one other thing, Courtney?
  On behalf of the UFT, NYSUT, the DOE, we're all very appreciative of attorneys on both sides and hearing officers.
As practitioners, we want to say it too. We know that you all have not an easy job.
The attorneys have the job of being zealous advocates, the hearing officers have the job of being neutral referees.
It is not easy, but you can all -- you all do on a daily basis a vital service and can really deserve a lot of appreciation for the work you do.


>> Thank you very much."

Here are the attendees:

[attendee list illegible]

Betsy Combier
betsy.combier@gmail.com

Editor, NYC Rubber Room Reporter

Editor, Parentadvocates.org


Editor, New York Court Corruption
Editor, National Public Voice
Editor, NYC Public Voice
Editor, Inside 3020-a Teacher Trials

Posted by Betsy Combier at 4:25 PM ✉️ 🖊️

Labels: 129, Carmen Farina, Courtenaye Jackson-Chase, FOIL, FOIL 11, Mike mulgrew, NYSUT attorneys, The 3020-a Newswire, UFT General Counsel Adam Ross

## 3 comments:

**steve said...**

> Can you spell out what part is distressing you the most?
>
> May 28, 2016 at 6:44 PM 🗑️

> **Anonymous said...**
>
> Hi,
>
> I found the whole thing distressing that these low-intelligence persons are getting together to evidence their inability to successfully terminate teachers. Carmen spending 40% of the year to fire teachers! What does that say about her ability to manage this school system. The mayor should ask her to resign.
>
> May 31, 2016 at 7:24 PM 🗑️

> **Jeffery said...**
>
> Very informative. You mention a video, but I fail to see it.
>
> June 10, 2017 at 7:43 PM 🗑️

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

Index No. _101105/14_

MYMOENA DAVIDS, by her parent and natural
guardian MIAMONA DAVIDS, ERIC DAVIDS, by his
parent and natural guardian MIAMONA DAVIDS,
ALEXIS PERALTA, by her parent and natural guardian
ANGELA PERALTA, STACY PERALTA, by her parent
and natural guardian ANGELA PERALTA, LENORA
PERALTA, by her parent and natural guardian
ANGELA PERALTA, ANDREW HENSON, by his
parent and natural guardian CHRISTINE HENSON,
ADRIAN COLSON, by his parent and natural guardian
JACQUELINE COLSON, DARIUS COLSON, by his
parent and natural guardian JACQUELINE COLSON,
SAMANTHA PIROZZOLO, by her parent and natural
guardian SAM PIROZZOLO, FRANKLIN PIROZZOLO,
by her parent and natural guardian SAM PIROZZOLO,
IZAIYAH EWERS, by his parent and natural guardian
KENDRA OKE, on behalf of themselves and others
similarly situated,

Plaintiffs,

**SUMMONS**

-against-

THE STATE OF NEW YORK, THE NEW YORK
STATE BOARD OF REGENTS, THE NEW YORK
STATE EDUCATION DEPARTMENT, THE CITY OF
NEW YORK, THE NEW YORK CITY DEPARTMENT
OF EDUCATION, JOHN AND JANE DOES 1-100,
XYZ ENTITIES 1-100,

Defendants.

TO:    Office of the Attorney General
       120 Broadway, 24th Floor
       New York, NY 10271

       The New York State Board of Regents
       State Education Building
       89 Washington Avenue, Room 110
       Albany, New York 12234

1

The New York State Education Department
State Education Building
89 Washington Avenue, Room 110
Albany, New York 12234

Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

The New York City Department of Education
65 Court Street
Brooklyn, New York, 11201

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorney within 20 days after service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is plaintiff's residence.

Dated: June 30, 2014
     Staten Island, New York

Yours, etc.

JONATHAN W. TRIBIANO, PLLC

JONATHAN W. TRIBIANO, ESQ.
1811 Victory Boulevard
Staten Island, NY 10314
Tel.: (718) 530-1446

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

Index No. _____

MYMOENA DAVIDS, by her parent and natural
guardian MIAMONA DAVIDS, ERIC DAVIDS, by his
parent and natural guardian MIAMONA DAVIDS,
ALEXIS PERALTA, by her parent and natural guardian
ANGELA PERALTA, STACY PERALTA, by her parent
and natural guardian ANGELA PERALTA, LENORA
PERALTA, by her parent and natural guardian
ANGELA PERALTA, ANDREW HENSON, by his
parent and natural guardian CHRISTINE HENSON,
ADRIAN COLSON, by his parent and natural guardian
JACQUELINE COLSON, DARIUS COLSON, by his
parent and natural guardian JACQUELINE COLSON,
SAMANTHA PIROZZOLO, by her parent and natural
guardian SAM PIROZZOLO, FRANKLIN PIROZZOLO,
by her parent and natural guardian SAM PIROZZOLO,
IZAIYAH EWERS, by his parent and natural guardian
KENDRA OKE, on behalf of themselves and others
similarly situated,

                                        Plaintiffs,

        -against-

THE STATE OF NEW YORK, THE NEW YORK
STATE BOARD OF REGENTS, THE NEW YORK
STATE EDUCATION DEPARTMENT, THE CITY OF
NEW YORK, THE NEW YORK CITY DEPARTMENT
OF EDUCATION, JOHN AND JANE DOES 1-100,
XYZ ENTITIES 1-100,

                                        Defendants.

**VERIFIED CLASS
ACTION COMPLAINT**

## PRELIMINARY STATEMENT

1.      NYC Parents Union (http://www.nycparentsunion.org/) is coordinating the

filing of this Class Action Lawsuit against the State of New York, the New York State

Board of Regents ("Board of Regents"), the New York State Education Department

1

("NYSED"), the City of New York and the New York City Department of Education ("NYCDOE") to compel these institutions to protect our children's rights and to fulfill their New York State Constitutional mandate to offer all children the opportunity of a sound basic education.

2.     At the heart of the discussion is teacher tenure. The New York State Education Law ("N.Y. Education Law") has been amended to remove many references to the word "tenure." However, the tenure concept and its appurtenant protections are found throughout the N.Y. Education Law, particularly in sections 1102(3), 2509, 2573, 2590(j), 3012, 3014 and 3020-a (the "Tenure Laws"). The word "tenure" is specifically mentioned in section 3020-a, which defines disciplinary procedures and penalties.

3.     To be clear from the outset, neither the NYC Parents Union nor any of the parents of the named plaintiffs are against tenure *per se*.     In fact, our State Legislature has declared that tenure has been found to advance the public interest in the education of our youth as a system designed to foster academic freedom in our schools and to protect *competent teachers* from the abuses they might be subjected to if they could be dismissed at the whim of their supervisors.

4.     The NYC Parents Union and the parents of the named plaintiffs think it's simple: reward and retain excellent teachers and hold those accountable who are failing our children. An education system that gives every child a sound basic education consists of teaching skills that enable students to undertake civil responsibilities meaningfully. It is the opportunity for a meaningful education, one which prepares children to function productively as civic participants capable of voting and serving on a jury. The right to such an education means that children are entitled to schools that provide a myriad of

2

essentials, the most important of which is sufficient personnel adequately trained to teach basic, up-to-date curricula such as reading, writing, mathematics, science, and social studies.

5.     While the NYC Parents Union and the parents of the named plaintiffs recognize the constitutionally-protected procedural due process rights that teachers with tenure enjoy, namely notice and an opportunity to be heard with respect to any disciplinary or removal procedure, especially with respect to the charges that a teacher is ineffective and cannot deliver the sound basic education guaranteed by the New York State Constitution, we believe the Tenure Laws, the adjudicative framework contained within N.Y. Education Law and the implementation of that framework by the Board of Regents, the NYSED and the NYCDOE is gross and glaringly inadequate and effectively deprives the delivery of said constitutionally-guaranteed sound basic education to an exceedingly worrisome number of children in our City and State.

6.     Additionally, the Tenure Laws and other procedures contained within the N.Y. Education Law and implemented by the Board of Regents, the NYSED and the NYCDOE related to teacher layoffs and re-hiring are similarly problematic and unconstitutional.   The existing framework give no consideration to the minimum Constitutional requirement of teacher competence when layoffs become necessary. The state requires a quality-blind approach to layoffs that considers only years of service— and completely ignores job performance and the ability to deliver a sound quality education.  The N.Y. Education Law and the related administrative procedures consider only tenure and/or career longevity as the sole determinant factor with respect to which teachers are laid off in hiring cuts and as to which teachers are hired back when jobs re-

3

open. We believe that this framework is grossly and glaringly inadequate as it fails to give due consideration of the ability of a teacher to deliver a constitutionally guaranteed sound quality education to the direct detriment of our children. This framework is not only severely misplaced, but unconstitutional.

7.      As such, this lawsuit will seek to declare the present N.Y. Education Law and its implementation via the Board of Regents, the NYSED and the NYCDOE is gross and glaringly inadequate in several ways:

a. Tenure and the Tenure Laws cannot serve as an absolute shield as to the dismissal of incompetent teachers who cannot meet the Constitutionally-required minimum standards of competence in order to deliver a sound basic education.

b. Tenured teachers have Constitutionally-protected procedural due process rights to a hearing and an opportunity to be heard prior to their dismissal. However the process for dismissing a single ineffective teacher far exceeds the level of protection required under the Constitution.

c. For-cause dismissal for incompetence involves a borderline infinite number of steps, requires years of documentation, costs hundreds of thousands of dollars and still, rarely ever works.

d. In New York City, the largest school system in the state, only 12 teachers—out of 75,000 in any given year—were formally replaced because of poor performance over an entire decade from 1997 to 2007. Teachers in New York City are more likely to die on the job than be replaced because of poor performance.

4

e. All told, it can take up to 18 months and cost taxpayers $250,000 to replace a single poorly-performing teacher. Principals must spend hours filling out paperwork and attending hearings.

f. Teachers who received multiple "unsatisfactory" ratings, missed entire weeks of work, or even physically abused students can remain in the classroom over the objections of their schools.

g. Low-income and minority students get less effective teachers. Disadvantaged students receive less effective teaching, on average, compared with other students. In other words, the students who need a sound basic education the most are least likely to get a competent teacher to deliver it. This is not just wrong but is a violation of the equal protection of the laws.

8. Politicians - Public and Elected Officials in New York have not listened, in large part because the power and money behind the teacher's union exerts an inordinate amount of influence on politicians and their campaign contributions - effectively leaving parents and administrators without a seat at the table. The latest example is New York City's new contract with its teachers' union, which will continue many of the same unconstitutional policies that have failed students and their families for decades.

9. In light of the watershed decision in the case of *Vergara v. California*, the NYC Parents Union and the parents of the named plaintiffs believe that the time is ripe to step up and advocates for the rights of all New Yorkers and all of the children in our public schools.

6

## JURISDICTION AND VENUE

10.    The New York State Supreme Court is the court of original jurisdiction in causes of action for declaratory judgment and injunctive relief for applications involving the interpretation and applicability of the New York State Constitution.

11.    The New York State Supreme Court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed.  CPLR Sec. 3001

12.    Venue lies in this court as Defendants' acts, decisions, and other material events have arisen within this judicial district. CPLR Sec. 506(b).

13.    Similarly, at least one of the parties resides within Richmond County where this court is situated. CPLR Sec. 503(a).

## CLASS ACTION ALLEGATIONS

14.    The action is brought as a class action pursuant to the provisions of Article Nine of the CPLR. The class consists of New York State children who have been, as a result of the gross and glaring inadequacy of the N.Y. Education Law and its implementation under the Board of Regents, the NYSED and the NYCDOE, denied a sound basic education as guaranteed by the New York State Constitution.

15.    The Education Article of the New York State Constitution requires the State to offer all children the opportunity of a sound basic education." *Campaign for Fiscal Equity, Inc. v. State of New York*, 8 N.Y.3d 14, 20 (N.Y. 2006); *Paynter v. State*, 100 N.Y.2d 434 (N.Y. 2003); *Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 316, 655 NE2d 661, 631 NYS2d 565 (N.Y. 1995).

6

16.    The exact number of Plaintiffs' class members is not known.    Plaintiffs estimate that the class includes hundreds of thousands of New York children and thus is so numerous that joinder of individual members is impractical. The number and identities of the class members can only be ascertained through appropriate discovery.

17.    Questions of law and fact common to the class predominate over any questions affecting only individual members of the class.

18.    The common questions of fact include but are not limited to:

a.  Defendants' gross and glaring failure to deliver a sound quality education;

b.  The extent to which Defendants' gross and glaring failure to deliver a sound quality education is a substantial factor in poor student performance.  Last year, only about 3 in 10 students across the state scored "proficient" or better on annual reading and math tests. In two of the state's largest school districts, fewer than 1 in 10 students passed these tests;

c.  The extent to which the Tenure Laws and other applicable N.Y. Educational Law and its implementation is costing New York taxpayers.  All told, it can take up to 18 months and cost taxpayers $250,000 to replace a single poorly-performing teacher;

19.    The common questions of law include but are not limited to:

a.  Whether the framework of the Tenure Laws and the applicable provisions of the N.Y. Education Law deprive New York students of their right to a sound basic education under the New York State Constitution on its face;

b.  Whether the framework of the Tenure Laws and the applicable provisions of the N.Y. Education Law deprive New York students of their right to a

7

sound basic education under the New York State Constitution in its implementation;

c. Whether the framework of the Tenure Laws and the applicable provisions of the N.Y. Education Law in its implementation unconstitutionally and disproportionately deprives minority and low income New York students of their right to a sound basic education under the New York State Constitution in violation of the equal protection of the laws under the New York State Constitution and under Fourteenth Amendment to the Federal Constitution.

20. The claims of the individually named Plaintiffs, all of whom are New York public school students, are typical of the claims of the Plaintiff class members. The Plaintiffs and all members of the Plaintiff class have been similarly affected by the Defendants' course of conduct and the members of the class have similarly situated claims and causes of action against the Defendants.

21. There is no conflict between the named Plaintiffs and other class members with respect to this action or the claims and requested relief herein. The claims or defenses of the representative parties are typical of the claims or defenses of the class.

22. Plaintiffs and their attorneys are able to and will fairly and adequately protect the interest of the class. Plaintiffs' attorneys can vigorously prosecute the rights of the proposed class members.

23. The prosecution of separate actions by individual Plaintiffs is not feasible or efficient and would be unduly burdensome. Individual prosecution will create the risk of inconsistent and varying adjudications and will establish incompatible standards of conduct for the Defendants.

8

24.     A class action is superior to the other available methods for the fair, just and efficient adjudication of the controversy.

25.     The class action device allows a single court to provide the benefits of a single adjudication, conserving judicial economy and the fair and equitable handling of all of Plaintiffs' claims in a single action and forum.

## PARTIES

26.     Plaintiff Mymoena Davids is a child who resides in the State of New York and is guaranteed a sound basic education.  Plaintiff Mymoena Davids is African-American and attends public school in New York City.  Miamona Davids, is a single, unemployed mother, is the parent and natural guardian of Plaintiff Mymoena Davids and intends to file a petition with the court to act as *guardian ad litem*.  Miamona Davids is the President of the NYC Parents Union, a volunteer organization.

27.     Plaintiff Eric Davids is a child who resides in the State of New York and is guaranteed a sound basic education.  Plaintiff Eric Davids is African-American and attends public school in New York City.  Miamona Davids, an unemployed single mother, is the parent and natural guardian of Plaintiff Eric Davids and intends to file a petition with the court to act as *guardian ad litem*.  Miamona Davids is the President of the NYC Parents Union, a volunteer organization.

28.     Plaintiff Alexis Peralta is a child who resides in the State of New York, County of Richmond, and is guaranteed a sound basic education.  Plaintiff Alexis Peralta attends public school in New York City.  Angela Peralta, a Hispanic single mother, is the parent and natural guardian of Plaintiff Alexis Peralta and intends to file a petition with the court to act as *guardian ad litem*.

9

29.     Plaintiff Stacy Peralta is a child who resides in the State of New York, County of Richmond, and is guaranteed a sound basic education. Plaintiff Stacy Peralta attends public school in New York City. Plaintiff Stacy Peralta has special needs. Angela Peralta, a Hispanic single mother, is the parent and natural guardian of Plaintiff Stacy Peralta and intends to file a petition with the court to act as *guardian ad litem*.

30.     Plaintiff Lenora Peralta is a child who resides in the State of New York, County of Richmond, and is guaranteed a sound basic education. Plaintiff Lenora Peralta attends public school in New York City. Plaintiff Lenora Peralta attends public school in New York City. Angela Peralta, a Hispanic single mother, is the parent and natural guardian of Plaintiff Lenora Peralta and intends to file a petition with the court to act as *guardian ad litem*.

31.     Plaintiff Andrew Henson is a child who resides in the State of New York and is guaranteed a sound basic education. Plaintiff Andrew Henson attended public school in New York City until he was the victim of a teacher assault. Christine Henson is the parent and natural guardian of Plaintiff Andrew Henson and intends to file a petition with the court to act as *guardian ad litem*.

32.     Plaintiff Adrian Colson is a child who resides in the State of New York and is guaranteed a sound basic education. Plaintiff Adrian Colson attends public school in New York City. Jacqueline Colson is the parent and natural guardian of Plaintiff Adrian Colson and intends to file a petition with the court to act as *guardian ad litem*.

33.     Plaintiff Darius Colson is a child who resides in the State of New York and is guaranteed a sound basic education. Plaintiff Darius Colson attends public school in

10

New York City. Jacqueline Colson is the parent and natural guardian of Plaintiff Darius Colson and intends to file a petition with the court to act as *guardian ad litem*.

34.    Plaintiff Samantha Pirozzolo is a child who resides in the State of New York, County of Richmond, and is guaranteed a sound basic education. Plaintiff Samantha Pirozzolo attends public school in New York City. Sam Pirozzolo is the parent and natural guardian of Plaintiff Samantha Pirozzolo and intends to file a petition with the court to act as *guardian ad litem*. Sam Pirozzolo is the Vice President of the NYC Parents Union.

35.    Plaintiff Franklin Pirozzolo is a child who resides in the State of New York, County of Richmond, and is guaranteed a sound basic education. Plaintiff Franklin Pirozzolo attends public school in New York City. Sam Pirozzolo is the parent and natural guardian of Plaintiff Franklin Pirozzolo and intends to file a petition with the court to act as *guardian ad litem*. Sam Pirozzolo is the Vice President of the NYC Parents Union.

36.    Plaintiff Izaiyah Ewers is a child who resides in the State of New York and is guaranteed a sound basic education. Plaintiff Izaiyah Ewers attends public school in New York City. Kendra Oke is the parent and natural guardian of Plaintiff Izaiyah Ewers and intends to file a petition with the court to act as *guardian ad litem*.

37.    Defendant the State of New York (the "State") is responsible for the operation, financing and administration of the New York State public school system.

38.    Defendant Regents of the University of the State of New York ("Board of Regents") is an executive department of the State of New York. Its offices are located at State Education Building, 89 Washington Avenue, Room 110, Albany, New York 12234. Pursuant to the power delegated to it by the New York Legislature, the Board of Regents determines    educational    policies,    and    promulgates    rules    to    effectuate

11

New York State education laws and policies. The Board of Regents presides over the New York Education Department and appoints a Commissioner of Education who is responsible for the direct management of the New York Education Department N.Y. Const. Art V, § 4; N.Y. Education Law § 207.

39.　Defendant the New York State Education Department (the "NYSED") is an executive agency of the State of New York. Its office is located at State Education Building, 89 Washington Avenue, Room 110, Albany, New York 12234. The Education Department implements the policies of the Board of Regents under the Commissioner's direction.

40.　Defendant the City of New York (the "City") is responsible for the operation, financing and administration of the New York City public school system.

41.　Defendant the New York City Department of Education ("NYCDOE") is an administrative agency of the City of New York. It has offices located at 65 Court Street, Brooklyn, New York, 11201.

12

## STATEMENT OF FACTS

42. The State, the Board of Regents, the NYSED, the City and the NYCDOE (together the "Defendants") have failed the children of New York City and State in its obligation to provide minimally acceptable educational services. The Plaintiffs hereto bring this action, inter alia, under the Education Article, N.Y. Const. art. XI, § 1 (the "Education Article").

43. The legal framework under the Tenure Laws and the N.Y. Educational Law, as discharged by the Defendants, fails to deliver adequate resources into the classroom. As such, the Defendants fail to satisfy the constitutional promise under the Education Article of delivering a sound basic education.

44. The Education Article enshrined in the Constitution a State-local partnership in which people with a community of interest and a tradition of acting together to govern themselves make the basic decisions on funding and operating their own schools.

45. The premise of the Education Article is thus in part that a system of local school districts exists and will continue to do so because the residents of such districts have the right to participate in the governance of their own schools.

46. The Education Article creates a right to adequate instruction—which entails a duty on the Defendants' part to bring the educational inputs locally available up to a minimum standard.

47. The Defendants have a duty to ensure that New York's public schools are able to teach the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury.

13

48. In assessing adequacy of education, the standard is the constitutional minimum or floor. A sound basic education consists of teaching skills that enable students to undertake civil responsibilities meaningfully. It is the opportunity for a meaningful school education, one which prepares children to function productively as civic participants.

49. The tenure system as embodied in the Tenure Laws and the N.Y. Educational Law render it impossible for the Defendants to deliver a sound basic education to all students, as there is no recourse to remove incompetent teachers who cannot deliver a sound basic education as required by the Education Article.

50. The N.Y. Educational Law, as administered by the Defendants render it impossible for the Defendants to deliver a sound basic education to all students, as there is effectively no recourse to remove incompetent teachers who cannot deliver a sound basic education as required by the Education Article.

51. The tenure system as embodied in the Tenure Laws and the N.Y. Educational Law render it impossible for the Defendants to deliver a sound basic education to all students, as there is no consideration as to whether a teacher can deliver a sound basic education as required by the Education Article in layoff and rehiring situations.

52. The N.Y. Educational Law, as administered by the Defendants render it impossible for the Defendants to deliver a sound basic education to all students, as there is no consideration as to whether a teacher can deliver a sound basic education as required by the Education Article in layoff and rehiring situations.

14

53. The tenure system as embodied in the Tenure Laws and the N.Y. Educational Law render it impossible for the Defendants to deliver a sound basic education to all students, as there is no recourse to remove incompetent teachers who cannot deliver a sound basic education as required by the Education Article. Said failure to deliver basic education is even further pronounced in minority and low income schools, school districts and communities, and is a violation of Equal Protection of the laws guaranteed by the New York State and the Federal Constitutions.

54. The N.Y. Educational Law, as administered by the Defendants render it impossible for the Defendants to deliver a sound basic education to all students, as there is no recourse to remove incompetent teachers who cannot deliver a sound basic education as required by the Education Article. Said failure to deliver basic education is even further pronounced in minority and low income schools, school districts and communities, and is a violation of Equal Protection of the laws guaranteed by the New York State and the Federal Constitutions.

55. Schools can accurately identify their most and least effective teachers. Using multiple measures of performance—including classroom observations and students' progress on standardized tests—schools can accurately identify teachers who help their students learn the most, and those who struggle to help students learn at all. See Ensuring Fair and Reliable Measures of Effective Teaching. MET Project, 2013 available at: http://www.metproject.org/downloads/MET_Ensuring_Fair_and_Reliable_Measures_Pr actitioner_Brief.pdf [last visited June 30, 2014].

15

56. Defendants have a duty to identify which teachers fail to meet the minimum standards under the Education Article as to the delivery of a sound basic education.

57. Defendants have the ability to identify which teachers fail to meet the minimum standards under the Education Article as to the delivery of a sound basic education.

58. Defendants have failed to identify which teachers fail to meet the minimum standards under the Education Article as to the delivery of a sound basic education or Defendants have failed to undertake corrective action when Defendants have identified which teachers fail to meet the minimum standards under the Education Article as to the delivery of a sound basic education.

59. Quality-blind layoffs fail to consider whether teachers fail to meet the minimum standards under the Education Article as to the delivery of a sound basic education. See Teacher Layoffs: An Empirical Illustration of Seniority v. Measures of Effectiveness, available at:

http://www.urban.org/publications/1001421.html [last visited June 30, 2014].

Donald Boyd et al., 2010, Assessing the Determinants and Implications of Teacher Layoffs. Dan Goldhaber et al., 2010, available at:

http://www.urban.org/publications/1001496.html [last visited June 30, 2014].

60. Disadvantaged students, particularly minority and low income students, receive less effective teaching compared with other students. See Access to Effective Teaching for Disadvantaged Students, Mathematica Policy Research / U.S. Department of Education, November 2013, available at:

http://www.mathematica-mpr.com/Education/tqd.asp [last visited June 30, 2014].

16

61.    Defendants' failure to meet the minimum standards under the Education Article as to the delivery of a sound basic education at disproportionately greater levels with respect to minority children is a violation of Equal Protection of the laws guaranteed by the New York State and the Federal Constitutions.

62.    All of the Plaintiffs herein have been harmed as a result of the Defendants'' actions and/or omissions.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATION OF THE EDUCATION ARTICLE OF THE NEW YORK STATE CONSTITUTION (All Defendants)

63.    Plaintiffs repeat, reallege and reiterate each and every allegation previously stated in the paragraphs above as if fully stated herein and further states as follows.

64.    The tenure system as embodied in the Tenure Laws and the N.Y. Educational Law render it impossible for the Defendants to deliver a sound basic education to all students, as there is no recourse to remove incompetent teachers who cannot deliver a sound basic education as required by the Education Article. As such, the offending portions of the N.Y. Educational Law and related underlying administrative regulations should be stricken as unconstitutional

17

## SECOND CAUSE OF ACTION

## VIOLATION OF THE EDUCATION ARTICLE OF THE NEW YORK STATE

## CONSTITUTION (All Defendants)

65.    Plaintiffs repeat, reallege and reiterate each and every allegation previously stated in the paragraphs above as if fully stated herein and further states as follows.

66.    The N.Y. Educational Law, as administered by the Defendants render it impossible for the Defendants to deliver a sound basic education to all students, as there is effectively no recourse to remove incompetent teachers who cannot deliver a sound basic education as required by the Education Article.  As such, the offending portions of the N.Y. Educational Law and related underlying administrative regulations should be stricken as unconstitutional.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE NEW YORK STATE

## CONSTITUTION (All Defendants)

67.    Plaintiffs repeat, reallege and reiterate each and every allegation previously stated in the paragraphs above as if fully stated herein and further states as follows.

68.    The N.Y. Educational Law, as administered by the Defendants render it impossible for the Defendants to deliver a sound basic education to all students, as there is no recourse to remove incompetent teachers who cannot deliver a sound basic education as required by the Education Article.  Said failure to deliver basic education is even further pronounced in minority and low income schools, school districts and

18

communities, and is a violation of Equal Protection of the laws guaranteed by the New York State Constitution

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FEDERAL CONSTITUTION (All Defendants)

69.    Plaintiffs repeat, reallege and reiterate each and every allegation previously stated in the paragraphs above as if fully stated herein and further states as follows.

70.    The N.Y. Educational Law, as administered by the Defendants render it impossible for the Defendants to deliver a sound basic education to all students, as there is no recourse to remove incompetent teachers who cannot deliver a sound basic education as required by the Education Article.  Said failure to deliver basic education is even further pronounced in minority and low income schools, school districts and communities, and is a violation of Equal Protection of the laws guaranteed by the Federal Constitution.

## JURY DEMAND

71.    Plaintiffs hereby demand a trial by jury.

19

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray for judgment against Defendants as follows:

1) Certify this case to proceed as a class action pursuant to CPLR Article 9;

2) Issue an Order declaring that the applicable provisions of the N.Y. Educational Law are unconstitutional on their face with respect to the Educational Article of the New York State Constitution;

3) Issue an Order declaring that Defendants, in their administration of the applicable provisions of the N.Y. Educational Law and related administrative regulations, have rendered the applicable provisions of the N.Y. Educational Law unconstitutional in effect with respect to the with respect to the Educational Article of the New York State Constitution;

4) Issue an Order declaring that Defendants, in their administration of the applicable provisions of the N.Y. Educational Law and related administrative regulations, have rendered the applicable provisions of the N.Y. Educational Law unconstitutional in effect with respect to the with respect to the Equal Protection Clause of the New York State Constitution;

5) Issue an Order declaring that Defendants, in their administration of the applicable provisions of the N.Y. Educational Law and related administrative regulations, have rendered the applicable provisions of the N.Y. Educational Law unconstitutional in effect with respect to the with respect to the Equal Protection Clause of the Federal Constitution;

6) Award Plaintiffs reasonable costs, litigation expenses, and attorneys' fees;

7) Grant Plaintiffs such additional relief as may be just, proper and equitable.

Dated: June 30, 2014
      Staten Island, New York

Yours, etc.

JONATHAN W. TRIBIANO, PLLC

JONATHAN W. TRIBIANO, ESQ.
1611 Victory Boulevard
Staten Island, NY 10314
Tel.: (718) 530-1445

20

FILED: RICHMOND COUNTY CLERK 05/22/2018 03:13 PM

NYSCEF DOC. NO. 1

INDEX NO. 101105/2014

RECEIVED NYSCEF: 05/22/2018

## VERIFICATION

**State of New York**

**County of Richmond ss.:**

_____, being duly sworn, deposes and says. I am the

parent and natural guardian of _____, Plaintiff in this

matter   I have read the foregoing pleadings to be submitted to the Court and know the

contents to be true to my own knowledge. except for those matters alleged to be on

information and belief. and as to those matters. I believe them to be true.

Name Printed: _____

Sworn to before me this _____ day

of _____, 20___.

_____

**NOTARY PUBLIC**

SHAILESH A. PATEL
Notary Public of New York
Bronx County #01PA6061382
My Commission Expires October 7, 20___

## VERIFICATION

**State of New York**

**County of Richmond ss.:**

ANGELA PERALTA, being duly sworn, deposes and says: I am the parent and natural guardian of ALEXIS PERALTA, STACY PERALTA and LENORA PERALTA, Plaintiffs in this matter. I have read the foregoing pleadings to be submitted to the Court and know the contents to be true to my own knowledge. except for those matters alleged to be on information and belief, and as to those matters, I believe them to be true.

ANGELA PERALTA

Sworn to before me this 30th day

of _____ July _____, 20 14.

NOTARY PUBLIC

### VERIFICATION

**State of New York**

**County of Richmond ss.:**

SAM PIROZZOLO, being duly sworn, deposes and says: I am the parent and natural guardian of SAMANTHA PIROZZOLO and FRANKLIN PIROZZOLO, Plaintiffs in this matter. I have read the foregoing pleadings to be submitted to the Court and know the contents to be true to my own knowledge, except for those matters alleged to be on information and belief, and as to those matters, I believe them to be true.

_____
SAM PIROZZOLO

Sworn to before me this ____ day

of _____, 20 __ .

_____
**NOTARY PUBLIC**

## VERIFICATION

**State of New York**

**County of Richmond ss.:**

_Kenda Oke_, being duly sworn, deposes and says I am the parent and natural guardian of _Iziyah E West_, Plaintiff in this matter. I have read the foregoing pleadings to be submitted to the Court and know the contents to be true to my own knowledge, except for those matters alleged to be on information and belief, and as to those matters, I believe them to be true.

Name Printed: _Kenda Oke_

Sworn to before me this _____ day of _____, 20__.

_____
**NOTARY PUBLIC**

SHAILESH A. PATEL
Notary Public of New York
Bronx County #01PA6061382
My Commission Expires October 7, 20__

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND                                    INDEX NO.:080182/2013

MYMOENA DAVIDS, by her parent and natural guardian MIAMONA DAVIDS, ERIC
DAVIDS, by his parent and natural guardian MIAMONA DAVIDS, ALEXIS PERALTA, by
her parent and natural guardian ANGELA PERALTA, STACY PERALTA, by her parent
and natural guardian ANGELA PERALTA, LENORA PERALTA, by her parent and natural
guardian ANGELA PERALTA, ANDREW HENSON, by his parent and natural guardian
CHRISTINE HENSON, ADRIAN COLSON, by his parent and natural guardian
JACQUELINE COLSON, DARIUS COLSON, by his parent and natural guardian
JACQUELINE COLSON, SAMANTHA PIROZZOLO, by her parent and natural guardian
SAM PIROZZOLO, FRANKLIN PIROZZOLO, by her parent and natural guardian SAM
PIROZZOLO, IZAIYAH EWERS, by his parent and natural guardian KENDRA OKE, on
behalf of themselves and others similarly situated,                     Plaintiffs,

-against-

THE STATE OF NEW YORK, THE NEW YORK STATE BOARD OF REGENTS, THE
NEW YORK STATE EDUCATION DEPARTMENT, THE CITY OF NEW YORK, THE
NEW YORK CITY DEPARTMENT OF EDUCATION, JOHN AND JANE DOES 1-100,
XYZ ENTITIES 1-100,                                                    Defendants.

## SUMMONS AND VERIFIED CLASS ACTION COMPLAINT

JONATHAN W. TRIBIANO, PLLC
1811 Victory Boulevard, Staten Island, NY 10314
(718) 530-1445

To:                                          Service of a copy of the within
                                             is hereby admitted.

                                             Dated: _____20_____

Attorney(s) for

PLEASE TAKE NOTICE:
Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in
the courts of New York State, certifies that, upon information and belief and reasonable
inquiry, the contentions herein contained in the annexed documents are not frivolous.
[ ] NOTICE OF ENTRY
That the within is a (certified) true copy of a
Duly entered in the office of the clerk of the within named court on                  20
[ ] NOTICE OF SETTLEMENT
That an order of which the within is a true copy will be presented for settlement to the
HON.                          one of the judges of the within named Court, at
        on               20      at        M.
AFFIRMATION OF SERVICE
The Undersigned attorney duly admitted to practice law in the Courts of the State of New
York, a non-party to this action over 18 years of age and residing in Staten Island, New
York, did serve the papers herein contained by:
[ ] Personal Service on _____
at _____
[ ] Overnight Mail Service by mailing a true copy of the attached papers, enclosed and
properly sealed in a postpaid envelope, which I deposited, on _____, in an official
depository under the exclusive care and custody of the Overnight Carrier and mailed to
_____
[ ] Regular Mail Service by mailing a true copy of the attached papers, enclosed and
properly sealed in a postpaid envelope, which I deposited, on _____, in an
official depository under the exclusive care and custody of the United States Postal
Services within the State of New York addressed to
_____

Dated: Staten Island, New York              Yours, etc.
        June 30, 2014

                                            JONATHAN W. TRIBIANO, ESQ.

# OFFICE OF THE RICHMOND COUNTY CLERK

### Application for Index Number

RES.

| Fee | $165.00 |
|-----|---------|
| Surcharge | $45.00 |
| TOTAL DUE | $210.00 |

☑ APPROVED

This space reserved for Clerk's use
**INDEX NUMBER**

**101105/14**

All information is to be typed or printed

**Full Caption of Action or Proceeding:** MYOMOENA DAVIDS et. al.

-V-

The State of New York et al.

**Name and Address of Attorney for Plaintiff or Petitioner:** Jonathan W. Feibiano
1811 Victory Blvd
Staten Island NY 10314

**Name and Address of Attorney for Defendant or Respondent:**

**Name, Address & Phone # of Person Paying Fee for Index Number:** Richard A. Luthmann
1811 Victory Blvd
SI NY 10314    718-772-1467

## TYPE OF ACTION OR PROCEEDING (please check one)

| | | | |
|---|---|---|---|
| ☒ General Civil Action | series 100000 | Special Proceeding | series 000000 |
| Malpractice Action | series 100000 | Guardianship | series 080000 |
| Commercial Action | series 100000 | AR (Assessment Review) | series AR0001 |
| Mortgage Foreclosure Action | series 130000 | Tax Certiorari | series 090000 |
| Matrimonial Action | series 050000 | MHLP (Mental Hygiene Legal Proceeding) | |
| Mass Tort Action | series 700000 | Unsafe Buildings | series CY3000 |
| Third Party Action (please provide the Index number of main action): | | Other (please specify): | |

DOCUMENT # 9928584
1-INDEX NUMBERS

07/03/2014        03:35:58 P.M.
RECEIPT: 32685    FEE: $210.00
RICHMOND COUNTY CLERK

# Davids v State of New York

Annotate this Case

Davids v State of New York 2018 NY Slip Op 02168 Decided on March 28, 2018 Appellate Division, Second Department Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on March 28, 2018 SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department
REINALDO E. RIVERA, J.P.
JEFFREY A. COHEN
JOSEPH J. MALTESE
ANGELA G. IANNACCI, JJ.
2015-03922
2015-12041
(Index No. 101105/14)

[*1]Mymoena Davids, etc., et al., respondents,

v

State of New York, et al., defendants-appellants, et al., defendants; Michael Mulgrew, etc., et al., intervenors-defendants-appellants.

Eric T. Schneiderman, Attorney General, New York, NY (Steven C. Wu, Andrew W. Amend, and Philip V. Tisne of counsel), for defendants-appellants State of New York, Board of Regents of the University of the State of New York, and New York State Department of Education.

Zachary W. Carter, Corporation Counsel, New York, NY (Richard Dearing, Devin Slack, and Benjamin Welikson of counsel), for defendants-appellants City of New York and New York City Department of Education.

Stroock & Stroock & Lavan LLP, New York, NY (Charles G. Moerdler, Alan M. Klinger, Beth A. Norton, David J. Kahne, and Adam S. Ross, of counsel), for intervenor-defendant-appellant Michael Mulgrew.

Richard E. Casagrande, Latham, NY (Jennifer N. Coffey, Wendy M. Star, Keith J. Gross, Jacquelyn Hadam, and Christopher Lewis of counsel), for intervenors-defendants-appellants Seth Cohen, Daniel Delehanty, Ashli Skura Dreher, Kathleen Ferguson, Israel Martinez, Richard Ognibene, Jr., Lonnette R. Tuck, and Karen E. Magee.

Arthur P. Scheuermann, General Counsel, School Administrators Association of New York State, Latham, NY (Jennifer L. Carlson of counsel), for intervenors-defendants-appellants Philip A. Cammarata and Mark Mambretti.

Jonathan W. Tribiano, PLLC, Staten Island, NY, for respondents Mymoena Davids, Eric Davids, Alexis Peralta, Stacy Peralta, Lenora Peralta, Andrew Henson, Adrian Colson, Darius Colson, Samantha Pirozzolo, Franklin Pirozzolo, and Izaiyah Ewers.

Kirkland & Ellis LLP, New York, NY (Jay P. Lefkowitz and Devora W. Allon of counsel), for respondents John Keoni Wright, Ginet Borrero, Tauana Goins, Nina Doster, Carla Williams, Mona Pradia, and Angeles Barragan.

Wendy Lecker, Albany, NY, for amicus curiae Alliance for Quality Education.

DECISION & ORDER

In a consolidated action for declaratory relief, the defendants State of New York, Board of Regents of the University of the State of New York, and New York State Department of Education, the defendants City of New York and New York City Department of Education, the intervenor-defendant Michael Mulgrew, the intervenor-defendants Seth Cohen, Daniel Delehanty, Ashli Skura Dreher, Kathleen Ferguson, Israel Martinez, Richard Ognibene, Jr., Lonnette R. Tuck, and Karen E. Magee, and the intervenor-defendants Philip A. Cammarata and Mark Mambretti separately appeal, as limited by their respective briefs, from (1) so much of an order of the Supreme Court, Richmond County (Philip G. Minardo, J.), dated March 12, 2015, as denied their respective motions pursuant to CPLR 3211(a) to dismiss the complaints insofar as asserted against each of them, and (2) so much of an order of the same court dated October 22, 2015, as, in effect, upon renewal, adhered to its prior determination.

ORDERED that the appeals from the order dated March 12, 2015, are dismissed, as that order was superseded by the order dated October 22, 2015; and it is further,

ORDERED that the order dated October 22, 2015, is affirmed insofar as appealed from; and it is further,

ORDERED that one bill of costs is awarded to the respondents appearing separately and filing separate briefs.

This consolidated action challenges the constitutionality of several sections of the Education Law relating to the tenure, discipline, evaluation, and layoff of teachers, on the ground that those sections permit ineffective teachers to remain within New York's public schools and thereby deny students the "sound basic education" guaranteed by article XI, § 1 of the NY Constitution (hereinafter the Education Article) (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 48).

The first complaint in the consolidated action was filed by Mymoena Davids, among others (hereinafter collectively the Davids plaintiffs), in Richmond County. The Davids plaintiffs are 11 children who reside in the State of New York and attend New York City public schools. The first complaint named as defendants, among others, the State of New York, the Board of Regents of the University of the State of New York, and the New York State Department of Education (hereinafter collectively the State defendants), and the City of New York and the New York City Department of Education (hereinafter together the City defendants). The second complaint in the consolidated action was filed by John Keoni Wright, among others (hereinafter collectively the Wright plaintiffs), in Albany County. The Wright plaintiffs are nine parents of students who attend public schools in Albany, New York City, and Rochester. The second complaint named as defendants, among others, the State of New York and the Board of Regents of the University of the State of New York. The actions were consolidated by order of the Supreme Court, Richmond County. Michael Mulgrew, as President of the United Federation of Teachers, Local 2, American Federation of Teachers, AFL-CIO (hereinafter the UFT), Seth Cohen, Daniel Delehanty, Ashli Skura Dreher, Kathleen Ferguson, Israel Martinez, Richard Ognibene, Jr., Lonnette R. Tuck, and Karen E. Magee, individually and as President of the New York State United Teachers (hereinafter collectively the Teacher defendants), and Philip A. Cammarata and Mark Mambretti (hereinafter together the School Administrator defendants), were granted leave to intervene as defendants in the consolidated action.

The State defendants, the City defendants, the UFT, the Teacher defendants, and the School Administrator defendants (hereinafter collectively the defendants) made separate motions pursuant to CPLR 3211(a)(2), (3), (7), and (10) to dismiss the complaints insofar as asserted against each of them on the grounds, inter alia, that they failed to state a cause of action, that they presented a nonjusticiable controversy, and that the Davids plaintiffs and the Wright plaintiffs (hereinafter together the plaintiffs) did not have standing to maintain the actions. In an order dated March 12, 2015, the Supreme Court, among other things, denied the defendants' respective motions. The defendants then made separate motions, inter alia, for leave to renew their prior motions, contending that the actions had become academic since the New York State Legislature had amended some of [*2]the statutes challenged by the plaintiffs. In an order dated October 22, 2015, the court, in effect, granted renewal and, upon renewal, adhered to its original determination. The defendants appeal.

"In considering the sufficiency of a pleading subject to a motion to dismiss for failure to state a cause of action under CPLR 3211(a)(7), our well-settled task is to determine whether, accepting as true the factual averments of the complaint, plaintiff can succeed upon any reasonable view of the facts stated" (Aristy-Farer v State of New York, 29 NY3d 501, 509 [internal quotation marks omitted]; see Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 318; People v New York City Tr. Auth., 59 NY2d 343, 348). The plaintiffs are entitled to all favorable inferences that can be drawn from their pleadings (see Aristy-Farer v State of New York, 29 NY3d at 509). Thus, if the court determines that the plaintiffs are entitled to relief on any reasonable view of the facts stated, the inquiry is complete and the court must declare the complaint legally sufficient (see id.).

"The Education Article requires the Legislature to provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated'" (Paynter v State of New York, 100 NY2d 434, 439, quoting NY Const, art XI, § 1). "[S]tudents have a constitutional right to a sound basic education'" (Paynter v State of New York, 100 NY2d at 439, quoting Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d at 28). "[A] sound basic education consists of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury'" (Paynter v State of New York, 100 NY2d at 439-440, quoting Campaign for Fiscal Equity v State of New York, 86 NY2d at 316). " Fundamentally, an Education Article claim requires two elements: the deprivation of a sound basic education, and causes attributable to the State'" (Aristy-Farer v State of New York, 29 NY3d at 517, quoting New York Civ. Liberties Union v State of New York, 4 NY3d 175, 178-179).

Here, the Davids plaintiffs allege in their complaint that teachers are a key determinant of the quality of education students receive and have a profound impact on students' lifetime achievement. The Davids plaintiffs allege that students taught by ineffective teachers—those in approximately the bottom five percent of teachers in New York—suffer lifelong problems and fail to recover from this marked disadvantage.

The Davids plaintiffs allege that the statutory scheme which controls the dismissal of teachers in New York and a seniority-based layoff system make it nearly impossible for school administrators to dismiss ineffective teachers. Specifically, the Davids plaintiffs allege that the following statutes pertaining to the dismissal of teachers deprive students of a sound basic education: Education Law §§ 1102(3), 2509, 2573, 2590-j, 3012, 3014, and 3020-a (hereinafter collectively the Dismissal Statutes). They further allege that Education Law § 3013(2), which mandates that teachers with the least seniority be laid off first (i.e., "last in first out"; hereinafter the LIFO Statute), also deprives students of a sound basic education.

The Davids plaintiffs allege that because of the Dismissal Statutes, school administrators are compelled to either leave ineffective teachers in place or transfer them from school to school. This statutory scheme, they allege, inevitably presents a fatal conflict with the right to a sound basic education guaranteed by article XI, § 1 of the

NY Constitution because it forces certain New York students to be educated by ineffective teachers who fail to provide such students with the basic tools necessary to compete in the economic marketplace and participate in a democratic society. The Davids plaintiffs further allege that the LIFO Statute creates a seniority-based layoff system, irrespective of a teacher's performance, effectiveness, or quality. They allege that the LIFO Statute, together with the other statutes at issue, ensures that a certain number of ineffective teachers who are unable to prepare students to compete in the economic marketplace or to participate in a democracy retain employment in the New York school system, and substantially reduces the overall quality of the teacher workforce in New York public schools. The Davids plaintiffs seek a declaration that the Dismissal Statutes and the LIFO Statute, separately and together, violate the right to a sound basic education protected by the Education Article of the NY Constitution.

The Wright plaintiffs challenge the constitutionality of Education Law §§ 2509, 2510, 2573, 2585, 2588, 2590, 3012, 3012-c, 3020, and 3020-a (hereinafter collectively the Challenged Statutes). They allege that the Challenged Statutes confer permanent employment, prevent the removal of ineffective teachers from the classroom, and mandate that layoffs be based on seniority alone, rather than effectiveness. The Wright plaintiffs allege that the Challenged Statutes ensure that ineffective teachers who are unable to provide students with a sound basic education are granted virtually permanent employment in the New York public school system and near-total immunity from termination of their employment. They allege that the Challenged Statutes impose dozens of procedural hurdles to dismiss or discipline ineffective teachers, including investigations, hearings, improvement plans, arbitration processes, and administrative appeals, making it prohibitively expensive, time-consuming, and effectively impossible to dismiss an ineffective teacher who has already received tenure. The Wright plaintiffs allege that, because of the difficulty, cost, and length of time associated with removal, the number of ineffective teachers who remain employed is far higher than the number of those disciplined or terminated, and that ineffective teachers return to the classroom and students are denied their right to a sound basic education.

The Wright plaintiffs further allege that Education Law § 2585 mandates that the last teachers hired are the first fired when school districts conduct layoffs that reduce the teacher workforce, irrespective of teacher effectiveness or quality. They allege that, in the absence of that statute, school administrators conducting layoffs would consider teacher performance, a higher number of effective teachers would be retained, and fewer children would suffer the loss of an effective teacher. The Wright plaintiffs allege that Education Law § 2585, both alone and in conjunction with the other Challenged Statutes, ensures that a number of ineffective teachers unable to provide students with a sound basic education retain employment in the New York school system. The Wright plaintiffs seek a declaration that the Challenged Statutes violate the NY Constitution.

We agree with the Supreme Court that the Davids plaintiffs' allegations are sufficient to state a cause of action for a judgment declaring that the Dismissal Statutes and the LIFO Statute separately and together violate the right to a sound basic education protected by the Education Article of the NY Constitution. In addition, the Wright

plaintiffs' allegations are sufficient to state a cause of action for a judgment declaring that the Challenged Statutes violate the NY Constitution. Accordingly, the defendants were not entitled to dismissal under CPLR 3211(a)(7).

Contrary to the defendants' further contentions, the plaintiffs' allegations present a justiciable controversy (see Matter of Montano v County Legislature of County of Suffolk, 70 AD3d 203, 211). "[T]o avoid resolving questions of law merely because a case touches upon a political issue or involves acts of the executive would ultimately undermine the function of the judiciary as a coequal branch of government'" (Matter of Boung Jae Jang v Brown, 161 AD2d 49, 55, quoting Matter of Anderson v Krupsak, 40 NY2d 397, 404). "Notwithstanding the doctrines of justiciability and separation of powers or, perhaps more aptly, because of them, the courts will always be available to resolve disputes concerning the scope of that authority which is granted by the Constitution to the two other branches of the government" (Matter of Montano v County Legislature of County of Suffolk, 70 AD3d at 211 [internal quotation marks omitted]; see Korn v Gulotta, 72 NY2d 363, 369; Saxton v Carey, 44 NY2d 545, 551).

We further agree with the Supreme Court that the plaintiffs' claims are not academic despite the amendments to some of the statutes they challenge. It cannot be concluded at this stage of the proceedings that a declaration as to the validity or invalidity of those statutes would "have no practical effect on the parties" (Saratoga County Chamber of Commerce, v Pataki, 100 NY2d 801, 811). Further, contrary to the defendants' contentions, the plaintiffs had standing to commence these actions, as they adequately alleged a threatened injury in fact to their protected right of a sound basic education due to the retention and promotion of alleged ineffective teachers (see generally Bernfeld v Kurilenko, 91 AD3d 893, 894).

The defendants' remaining contentions are without merit.

RIVERA, J.P., COHEN, MALTESE and IANNACCI, JJ., concur.

ENTER:

Aprilanne Agostino

Clerk of the Court



FROM: BETSY COMBIER (917) 596-1762
315 EAST 65TH STREET
APT 4C
NEW YORK NY 10065
US

TO: TOLUCIO CELLI

2743 SEYMOUR AVENUE

Bronx NY 10469

(000) 000-0000
INV COPLAND 2 AVE
PO COPLAND 2 AVE

REF COPLAND 2 AVE

DEPT COPLAND 2 AVE

SHIP DATE: 30 JUL 18
ACTWGT: 3.0 LB
CAD: 100786131/INET4040

BILL SENDER

FedEx
Home Delivery

TRK# 7728 4629 0212

9622 0804 3 (000 000 0000 0000) 0 00 7728 4629 0212

10469

(US)

552J1/3309/DCA5

J182018072201uv

TRK#

---

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** IMPORTANT: TRANSMIT YOUR SHIPPING DATA AND PRINT A MANIFEST:
At the end of each shipping day, you should perform the FedEx Ground End of Day Close procedure to transmit your shipping data to FedEx. To do so, click on the Ground End of Day Close Button. If required, print the pickup manifest that appears. A printed manifest is required to be tendered along with your packages if they are being picked up by FedEx Ground. If you are dropping your packages off at a FedEx drop off location, the manifest is not required.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide and applicable tariff, available upon request. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations, including limitations on our liability, can be found in the current FedEx Service Guide and applicable tariff apply. In no event shall FedEx Ground be liable for any special, incidental, or consequential damages, including, without limitation, loss of profit, loss to the intrinsic value of the package, loss of sale, interest income or attorney's fees. Recovery cannot exceed actual documented loss. Items of extraordinary value are subject to separate limitations of liability set forth in the Service Guide and tariff. Written claims must be filed within strict time limits, see current FedEx Service Guide.